IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

No. 03-CIV-0531 GKF-TLW


JAMES J. FITZGERALD,

|                                           |     |                          |
|-------------------------------------------|-----|--------------------------|
|                                           | )   |                          |
| Petitioner                                | )   |                          |
|                                           | )   |                          |
| vs.                                       | )   | No. 03-CIV-0531  EA (J)  |
|                                           | )   |                          |
|                                           | )   | **(DEATH PENALTY CASE)** |
|                                           | )   |                          |
| Anita Trammell, ActingWarden,             | )   |                          |
| Oklahoma State Penitentiary,              | )   |                          |
|                                           | )   |                          |
| Respondent                                | )   |                          |

_____

**Petitioners's Proposed Findings of Fact and Conclusions of Law**
_____


Jack Fisher OBA #2939
Post Office Box 1976
Edmond, Oklahoma 73083
Telephone:  405/ 235-9466
Facsimile:  405/340-7269
Email Okfishlaw@aol.com

Attorney for Petitioner
James J. Fitzgerald


February 4, 2013

# TABLE OF CONTENTS

I.  Table of Authorities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I.

II.  Introduction and Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  Findings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  The 1998 Reversal of Death Sentence by OCCA  . . . . . . . . . . . . . . . . . . . . . . 6

    B.  The 2000 Defense Trial Team . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.  Lead Trial Counsel's Lack of Capital Litigation Experience and
        Knowledge of Medical and Psychiatric Terminology Adversely
        Affected his Decision-Making . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    D.  The Court Finds Mr. Lyman Failed to Meet the 1989 ABA
        Eligibility Qualifications for Capital Trial Counsel  . . . . . . . . . . . . . . . . . . . 9

    E.  Mr. Lyman's Decision Not to Utilize Endocrinologist Christina
        Bratcher Was Objectively Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.  Impaired Neurological Functioning During the Robberies
             and Murder  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.  Impaired Development from Type 1 Diabetes . . . . . . . . . . . . . . . . . . 15

    F.  Failure to Introduce Evidence of Brain Injury and Frontal Lobe
        Impairment From Gunshot Wound Through Expert
        Dr. Herman Jones Was Objectively Unreasonable  . . . . . . . . . . . . . . . . . . . 22

    G.  Counsel's Decision Not to Introduce Evidence of Intoxication
        and It's Significance in Combination with Diabetes and
        Frontal Lobe Impairment Was Objectively Unreasonable  . . . . . . . . . . . . . 28

    F.  Testimony of Debbie Maddox - Expert Witness and
        Former Capital Trial Lawyer  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

I.

IV. Conclusions of Law

A.    Mr. Lyman Did Not Have Sufficient Experience with Assessment of
      Mitigation Evidence in Capital Litigation or the Assessment of Medical
      Evidence and Psychological and Neuropsychological Evidence to Make
      an Informed Reasoned Strategic Decision Not to Present Expert
      Testimony  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

B.    Assuming Arguendo That in Spite of Mr. Lyman's Inexperience and
      Failure to Investigate His Decision Not to Present Evidence from Dr.
      Bratcher and Dr. Jones  Can Be Considered as "Strategic" the Evidence
      Presented in this Case Establishes That His Decision Was "Objectively
      Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

C.    Respondent's Theory that the Omitted Expert testimony was a Two
      Edged Sword Fails Under Prevailing Supreme Court and Tenth Circuit
      Authority  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

      [Note: This authority is offered under the assumption
      Respondent will argue the evidence from Dr. Jones and/or Dr.
      Bratcher is a two edged sword.]

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Ake v. Oklahoma, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61, 65

Anderson v. Sirmons, 476 F.3d 1131, 1145 (10th Cir. 2007) . . . . . . . . . . . . . . . . 50, 53, 63

Antwine v. Delo, 54 F.3d 1357 (8th Cir. 1995), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Baxter v. Thomas, 45 F.3d 1501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Blystone v. Horn, 664 F.3d 397 (3rd Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Boyde v. California, 494 U.S. 370, 387, 110 S.Ct. 1190 (1990) . . . . . . . . . . . . . . . . . 68, 69

Brewer v. Aiken, 935 F.2d 850, 862 (7th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 71

Brownlee v. Haley, 306 F.3d 1043 (11th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Bryan v. Gibson, 276 F.3d 1163 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Bryan v. Mullin, 335 F.3d 1207, 1223 n.22 & 24 (10th Cir. 2003) . . . . . . . . . . . . . . . . . 41

Burdine v. Johnson, 262 F.3d 336, 371 n.16 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 40

Cannon v. Gibson, 259 F.3d 1253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Cannon v. Johnson, 134 F.3d 683, 687 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 41

Caro v. Woodford, 280 F.3d 1247,1254 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 65

Cockrum v. Johnson, 119 F.3d 297, 304 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 41

Coleman v. Mitchell, 268 F.3d 417 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 63, 64, 73

Correll v. Ryan, 539 F.3d 938, ----, 2008 WL 2039074, *20 (May 14, 2008) . . . . . . . . . 52

Cullen v. Pinholster, – U.S. –, 131 S.Ct. 1388 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Dutton v. Brown, 788 F.2d 669, 671 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Duvall v. Reynolds, 139 F.3d 768, 790 (10th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Eddings v. Oklahoma, 455 U.S. 104, 110 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Elliott v. Williams, 248 F.3d 1205, 1208 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fisher v. Gibson, 282 F.3d 1283, 1296, 1305 (10th Cir. 2002) . . . . . . . . 4, 5, 41, 53, 58, 59

Gilson v. Sirmons, 520 F.3d 1196, 1244-1250, (10th Cir. 2008) . . . . . . . . . . . . . . . . 74, 75

Glenn v. Tate, 71 F.3d 1204, 1211 (6th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Gray v. Branker, 529 F.3d 220 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 54, 73

Harrington v. Richter, – U.S. –, 131 S.Ct. 770 (2011) . . . . . . . . . . . . . . . . . . . . . . 5, 44, 45

Hooks v. Ward, 184 F.3d 1206, 1212 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Humphreys v. Gibson, 261 F.3d 1016 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Hill v. Lockhart, 28 F.3d 832 (8th Cir. 1994), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Jefferson v. Upton,130 S.Ct. 2217, 2219 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Circuit, Knighton v. Mullin, 293 F.3d 1165 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 77

Littlejohn v. Trammell, --F.3d --, 2013 WL 64372 (10th Cir. Jan. 7, 2013) . . . . . 56, 61, 76

Lockett v. Ohio, 438 U.S. 586, 604 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18-22, 24, 25

Loyd v. Whitley, 977 F.2d 149, 160 (5th Cir. 1992), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Marshall v. Cathel, 428 F.3d 452, 468 (3rd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Mayfield v. Woodford, 270 F.3d 915 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Middleton v. Dugger, 849 F.2d 491, 494 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 41

Reynoso v. Giurbino, 462 F.3d 1099, 1112 (9th Cir.2006) . . . . . . . . . . . . . . . . . . . . . . . . 52

Rompilla v. Beard, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 55, 56, 77

iv.

Sallahdin v. Gibson, 275 F.3d 1211, 1235, 1240 (10th Cir. 2002) . . . . . . . . . . . . . . . . . 4, 45

Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . 52, 53

Sears v. Upton, 130 S.Ct. 3259, 3265-66 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 77

Silva v. Woodford, 279 F.3d 825, 833 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 52, 64

Simmons v. Luebbers, 299 F.3d 929, 936 (8th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . 70

Skipper v. South Carolina, 476 U.S. 1, 4 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Smith v. Mullin, 379 F.3d 919, 942 (10th Cir.2004) . . . . . . 10, 47, 52, 53, 57, 66, 67, 73, 76

Stafford v. Saffle, 34 F.3d 1557, 1563 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 41

Strickland v. Washington, 466 U.S. 668, 694 (1984) . . . . . . . . . . . . . . . . . . . . . . 4, 8, 49, 50

Terry Williams, Coleman v. Indiana, 529 U.S. 1085 (2000) . . . . . . . . . . . . . . . . . . . . . . 63

United States v. Cronic, 466 U.S.648, 665 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Wackerly v. Workman, 580 F.3d 1171(10th . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Westley v. Johnson, 83 F.3d 714, 723 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . 10, 49, 50, 56, 77

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . 47-49, 53, 56, 60, 62, 64, 66, 69, 77

Williamson v. Ward, 110 F.3d 1508, 1514 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 49

**STATE CASES**

Ball v. State, 2007 OK CR 42, ¶ 29 n. 4, 173 P.3d 81, 90 n. 4 . . . . . . . . . . . . . . . . . 6, 7, 11

Burrows v. State, 640 P.2d 533, 544 (Okl. Cr. 1982) . . . . . . . . . . . . . . . . . . . . . . . 54, 57, 67

Coleman v. Indiana, 703 N.E.2d 1022, 1065 (Ind. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 69

Fitzgerald v. State, 972 P.2d 1157, 1161 (Okla. Crim. App. 1998) . . . . . . . . . . . . . . . 72, 73

Jackson v. State, 964 P.2d 875, 892 (Okl. Cr. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 69, 75

FEDERAL STATUTES

28 U.S.C. § 2254(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

STATE STATUTES

22 Okla. Stat. §2703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

## PETITIONER'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

### I. Introduction and Procedural History

The Petitioner, James Fitzgerald, through his appointed counsel, hereby respectfully submits the attached proposed Findings of Fact and Conclusions of Law in the form of a proposed Report and Recommendation. An Evidentiary hearing was held at the direction of the Honorable Gregory K. Frizzell on August 21, 22 and 23, 2012. Following a continuance for Respondent to offer rebuttal to Petitioner's expert witness, the hearing was concluded on November 4, 2012.  The Court directed the parties to file simultaneous Findings of Fact and Conclusions of Law.

Petitioner, James J. Fitzgerald, was tried by jury and convicted of two counts of robbery with a firearm, one count of attempted robbery with a firearm, and one count of first degree murder. The jury found three aggravating circumstances and recommended a death sentence. In accordance with the jury's recommendation, Petitioner was sentenced to death on the first degree murder count; life imprisonment on the robberies and a $10,000.00 fine on the other counts.

On direct appeal, Petitioner raised sixteen propositions of error and requested an evidentiary hearing for the failure to provide funds pursuant to *Ake v. Oklahoma*, 470 U.S. 68 (1985), to hire an expert to establish he was deprived of expert assistance at the trial level in violation of his constitutional rights. See Appl. For Evidentiary Hr'g, No. F-96-1200. The Oklahoma Court of Criminal Appeals ("OCCA") affirmed his convictions and the sentences for murder, robbery and attempted robbery with a firearm but vacated his death sentence and

remanded for resentencing due to "pervasive error in the second stage of trial. . . ." *Fitzgerald*

*v. State,* 972 P.2d 1157, 1161 (Okla. Crim. App. 1998).  Petitioner's request for evidentiary

hearing was denied and relief was granted on the affidavits and  record.  *See id*. at 1175, n.73.

The OCCA found error requiring reversal:

> [A] pro se defendant was unable to life-qualify his jury, was denied experts to
> assist in presentation of mitigating evidence, chose not to present such evidence
> without guidance or inquiry from the trial court, was denied the opportunity to
> rebut evidence of an aggravating circumstance, and was denied the chance to list
> a circumstance of the crime in mitigation.

*Fitzgerald v. State,* 972 P.2d at 1175.  The OCCA explained why expert witnesses were

required to explain mitigating  combination of Mr. Fitzgerald's illnesses and brain injury:

> However, these (lay/family) witnesses *could not effectively explain* the particular
> problems and phenomena associated with juvenile-onset diabetes, nor could they
> describe the physiological and psychological effects resulting when alcohol and
> diabetes are combined.  These witnesses certainly could neither conduct
> neuropsychological tests nor present the result of those tests to the jury. As other
> witnesses could not present this mitigating evidence, Fitzgerald has shown he was
> prejudiced by the trial court's decision.(*emphasis supplied*)   (other footnotes
> omitted); citing *Ake*, 470 U.S. at 80.

*Fitzgerald v. State,* 972  P.2d 1157, 1170 (Okl. Cr.1998).

Unfortunately, in Mr. Fitzgerald's new 2000 penalty trial his trial counsel made a

strategic decision to only present bare medical records to establish his head injury and  diabetes

without supporting these "top of the list" mitigating factors[1] with expert testimony explaining

the combined and synergistic effects of Petitioner's mental and physical illnesses, brain injury

---

[1]. "That James Fitzgerald was diagnosed with diabetes at age 11 and must take daily insulin injections; 2. That in 1985 James Fitzgerald suffered a gunshot wound to the head that resulted in physical injury to his brain; 3. That prior to the 1985 gunshot wound to his head, James Fitzgerald was not convicted of any crimes involving violence."

and intoxication on his ability to control his actions at the time he shot and killed Mr. Russell. This Court noted in granting an evidentiary hearing: "Yet, at Petitioner's new sentencing trial, Petitioner's new trial counsel did not present this expert testimony for which Petitioner 'tirelessly and constantly' fought for in previous proceedings.  Dkt. 72 at 10, *citing id.* at 1165.

For the reasons set forth herein, undersigned RECOMMENDS this Court determine Mr. Fitzgerald was denied the effective assistance of trial counsel under the Sixth Amendment to the United States Constitution due to counsel's failure to sufficiently prepare, investigate and present readily available mitigation evidence explaining Mr. Fitzgerald's mental impairments.

## FINDINGS[2]

In the Order granting an evidentiary hearing, this Court held:

> This Court, like the OCCA in Petitioner's first direct appeal, concludes that there is a reasonable probability that the presentation of the proposed testimony, as outlined in the affidavits presented by Petitioner, could have altered the outcome of the sentencing phase. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). However, at this point, the Court is unable to conclude that Petitioner was denied his right to effective assistance of counsel and, in turn, his right to a fair trial. Petitioner must demonstrate that his trial counsel's performance was constitutionally deficient, i.e., "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. As the Supreme Court noted in *Strickland*, "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal attorneys would not defend a particular client in the same way." Id. at 689. Thus, the Court must "indulge a strong presumption . . . that counsel's conduct was not the result of error or omission but derived instead from trial strategy." *Sallahdin v. Gibson*, 275 F.3d 1211, 1235, 1240 (10th Cir. 2002) (*quoting Elliott v. Williams*, 248 F.3d 1205, 1208 (10th Cir. 2001). But "the mere incantation of 'strategy' does not insulate attorney behavior from review." *Fisher v. Gibson*, 282 F.3d 1283, 1296, 1305 (10th Cir. 2002). This Court must consider whether that strategy was objectively reasonable. *See id.* at 1305.

---

[2]Any conclusion of law which is more appropriately characterized as a finding of fact is hereby incorporated herein.

Order Granting Evidentiary Hearing, August 9, 2010, Dkt. 72.

This Court also determined that review of counsel's performance under *Strickland v. Washington* is *de novo. See* Order Overruling Motion to Reconsider and Motion for Summary Judgment. Dkt. 104 at 4 and7. Furthermore, because review is *de novo*, the deference provision the AEDPA, 28 U.S.C. §2254 (d), *Cullen v. Pinholster*, – U.S. –, 131 S.Ct. 1388 (2011) and *Harrington v. Richter*, – U.S. –, 131 S.Ct. 770 (2011) do not apply to Fitzgerald's ineffective assistance of counsel claims. Accordingly, this Court owes no deference under the AEDPA to the state court judgement.[3] In the 1998 direct appeal the OCCA recited the basics facts of Mr. Fitzgerald's actions before, after and during the murder of Will Russell. As stated, these findings are not binding on this Court because review of the claim is de novo.

¶Fitzgerald spent the evening of July 15, 1994, with Regina Stockfleth and other friends.[4] In the early morning hours of July 16, Fitzgerald, armed with an SKS assault rifle, robbed the Git-N-Go store at 7494 East Admiral Street in Tulsa. After the robbery he returned to Stockfleth's house, wearing a bandanna around his neck and carrying $55 cash in a Git-N-Go bag. He was asked to leave.

¶ 3 Fitzgerald arrived at the Git-N-Go store at 6938 East Pine about 2:45 a.m. The clerk, William Russell, took the SKS rifle away from Fitzgerald. Russell pointed the rifle at Fitzgerald but apparently could not release the safety on the weapon. Fitzgerald came over the counter, and the two scuffled. Russell escorted Fitzgerald (who had the rifle) out of the store and locked the doors. As Russell retreated behind the store counter, Fitzgerald turned and fired, shattering the glass doors. His bandanna mask had fallen, and his face was visible. Fitzgerald pointed the gun in Russell's direction and fired several shots, then ran. Police recovered

---

[3]Order Dkt. 104 at 2.

[4]Except as indicated, the facts of the two robberies, one attempted robbery and the murder of Will Russell are taken from the original direct appeal, *Fitzgerald v. State*, 972 P.2d 1157 (1998). Ironically, in the 2003 Post-Conviction Order contained no discussion of the facts of the crime or the evidence that counsel failed to present. *See* Order Denying Post-Conviction Relief No. PCD-2002-626, March 13, 2003 (unpublished).

eight spent casings and six bullets from various locations in the store, and one bullet was found in Russell's body. That bullet had passed through six cigarette packages, two counter partitions, and a roll of calculator tape before entering Russell near his left armpit. The bullet pierced his lung and spine and broke two ribs. Russell had massive internal bleeding and died of a gunshot wound to the chest.

¶ 4 After leaving the Pine Street store, Fitzgerald robbed the Git-N-Go store at 903 North Yale at approximately 3:00 a.m. He wore a bandanna mask and threatened the clerk with the SKS assault rifle. After this robbery Fitzgerald briefly returned to his parents' home, then left the state. In Illinois he traded the SKS rifle for $100 and a .357 magnum handgun. He was arrested in Missouri. Fitzgerald confessed to robbing the two stores and attempting to rob the store on Pine Street, but insisted he did not intend to injure or kill Russell.

*Fitzgerald v. State,* 972 P.2d 1157 (1998).

Petitioner filed his 28 U.S.C §2254 Petition in this Court and alleged Mr. Fitzgerald's 2000 penalty stage retrial counsel failed to adequately present evidence of alcohol consumption the night of the offense, neurological brain damage from a gun shot wound in 1984 and evidence of juvenile onset diabetes. *See* Petition Doc. 24 pp. 127 *et seq*. At trial the State introduced Petitioner's uncorroborated statement, that he was intoxicated in the hours before the robberies and homicide. See EH Ex. 25. Defense counsel failed to call other witnesses, such as Regina Stockfleth and Candy Ashley who would have confirmed Petitioner's intoxication. He also failed to re-introduce the evidence of intoxication from the first trial. See footnote four (4) Petition Dkt. 24. On February 23, 2010 Petitioner filed Supplemental Authority [Dkt. 63] followed by Respondent's Response [Dkt. 68] and Petitioner's Reply. Petitioner was granted an evidentiary hearing and this Court made the following findings and Order:

More specifically, the purpose of the evidentiary hearing will be to determine trial counsel's strategy and reasons, or lack thereof, for foregoing the use of the

proffered testimony regarding Petitioner's brain damage, diabetes, and consumption of alcohol on the night of the offense during the sentencing phase. If trial counsel made a strategic decision not to use the proposed testimony, the Court must evaluate "whether that was a constitutionally reasonable decision under the circumstances." Order Doc. 72 p. 16.

## A.     The 1998 Reversal of Death Sentence by OCCA

This Court finds that although not binding, the OCCA finding and conclusion upon remand is significant: "([L]ay/family) witnesses could not effectively explain the particular problems and phenomena associated with juvenile-onset diabetes, nor could they describe the physiological and psychological effects resulting when alcohol and diabetes are combined;" and "certainly could neither conduct neuropsychological tests nor present the result of those tests to the jury" Mr. Fitzgerald "has shown he was prejudiced by the trial court's decision." (other footnotes omitted); *citing Ake*, 470 U.S. at 80; *Fitzgerald v. State,* 972 P.2d 1157, 1170 (Okl. Cr.1998).

## B.     The 2000 Defense Trial Team

At the first trial in 1996 Sid Conway of the Tulsa County Public Defender's Office represented Petitioner.  After receipt of the OCCA mandate in Tulsa County on February 19, 1999, Sid Conway was permitted to withdraw on May 21, 1999 and the Oklahoma Indigent Defense System was appointed.  See Tulsa Dkt. OSCN O.R.   From the record it appears that Dr. Herman Jones,  a neuropsychologist was first contacted by OIDS trial counsel to testify as an expert on July 8, 1999.  *See* Pet. EH Ex. A and Ex. 12.Mr. Fitzgerald's new OIDS attorney Silas Lyman appeared with Mr. Fitzgerald for status conference on  July 22, 1999 which was continued to September 1999. Tulsa County Docket O.R. On July 28, 1999, Dr. Herman Jones first examined and interviewed Mr Fitzgerald in the Tulsa County Jail [See Dr. Jones Report

6

p. 4 Pet. EH Ex. 12].

In addition to Mr. Lyman, Petitioner was represented by two other lawyers, Kathy LaFortune, J.D. Ph.D. and Lynn Burch J.D. It was clearly established at the evidentiary hearing that Mr. Silas Lyman was lead counsel and determined what mitigating factors and evidence would be submitted to the jury:

> (1) That the Defendant, James Joseph Fitzgerald, is 36 years old; (2) That the defendant was diagnosed with Diabetes at the age of 12 and must take daily shots of insulin; (3) That the Defendant suffered a gunshot wound to his forehead in 1985, resulting in injury requiring surgery in the Defendant's skull; (4) That the statements of the Defendant to law enforcement voiced remorse over the death of the deceased; (5) That in statements of the Defendant, the Defendant asked about the deceased's children; (6) That upon arrest, the Defendant cooperated with law enforcement officials by confessing to the crimes; (7) That the Defendant has a family who loves him. Pet EH Ex. 18.

This Court finds that the decision to not present Dr. Bratcher and Dr. Jones as expert witnesses was also ultimately made by lead counsel Silas Lyman.  The well-settled standard for proving ineffective assistance of counsel requires a petitioner to show, by a preponderance of the evidence, that (1) counsel's performance fell below an objective standard of reasonableness, and (2) prejudice, such that there is a reasonable probability that but for counsel's errors, the outcome of the trial would have been different. Strickland, 466 U.S. at 688, 693-94, 104 S.Ct. 2052. The question that remains under *de novo* review is whether Mr. Lyman's decision to ignore the available expert opinions that the OCCA said were required for jury consideration was objectively reasonable and based on "sound strategy" under the circumstances existing at the time the decision was made.

Mr. Fitzgerald contends that trial counsel's decision not to present expert testimony to the jury to explain Petitioner's development into an impulsive dangerous person who was not

wholly responsible for his impulsive behavior on the day he committed murder was based on his inexperience and failure to investigate and research and consult with qualified counsel. He claims that if counsel's decision is considered to be a strategic decision, it is objectively unreasonable and Mr. Fitzgerald is entitled to relief from his death sentence. He claims counsel's decision as an informed or reasoned strategic decision. He claims that no competent capital trial lawyer would have refrained from using an expert to explain the medical records that were introduced as evidence to the jury.

In particular, Petitioner proffers that Mr. Lyman's inexperience presenting psychiatric and psychological evidence and his misconception of critical psychological terminology relating to the disabilities caused by Mr. Fitzgerald's brain injury in combination with diabetes, and alcohol resulted in the jury being deprived of critical mitigation evidence that would have caused at least one juror to select a penalty less than death.

C. **Lead Trial Counsel's Lack of Capital Litigation Experience and Knowledge of Medical and Psychiatric Terminology Adversely Affected his Decision-Making**

This Court agrees that "[The character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation." *United States v. Cronic*, 466 U.S. 648, 665 (1984). However, every lead counsel in a capital case has a duty to educate himself on the relevant facts and in the penalty stage must understand medical and psychiatric issues pertaining to his client in order to make rational and competent strategic decisions. The 1989 American Bar Association Guidelines for Counsel in a Capital Case Guideline 5.1 provides that lead counsel in a capital case should be an experienced criminal defense lawyer, an experienced

8

capital litigator and be familiar with psychiatry, psychology and medical conditions causing

mental impairments.  It is common sense that before counsel can make rational and competent

decisions regarding evidence that is available to mitigate the intentional killing of a human

being he must understand the evidence.

### D.     The Court Finds Mr. Lyman Failed to Meet the 1989 ABA Eligibility Qualifications for Capital Trial Counsel.[5]

The ABA 1989 - Guideline 5.1 Attorney Eligibility provides specific eligibility

requirements for capital lead counsel. Mr. Lyman testified while in school he worked for a

defense lawyer "for two or three days" and agreed that at that point in time "it was not his cup

of tea."  EH Vol. 1 p. 16.  As a legal intern he worked for the Oklahoma Attorney General

writing briefs in low-level felony cases.[6]  When he graduated from law school and passed the

Bar Examination in 1989,  his "primary desire was to become a prosecutor" and "a trial

attorney." He started at the Tulsa County District Attorney's Office prosecuting preliminary

hearings and second chaired one jury trial (not murder or complex). The Oklahoma Supreme

Court Network [hereafter OSCN] docket search indicated he was not attorney of record in any

---

[5]In *Wiggins v. Smith,* 123 S.Ct. 2527 (2003), the Court stated capital defense work as articulated by the American Bar Association (ABA)--standards "we long have referred as 'guides to determining what is reasonable,'" citing Strickland, supra, at 688, 104 S.Ct. 2052; *Williams v. Taylor, supra*, at 396, 120 S.Ct. 1495*, See also Smith (Roderick) v. Mullin*, 379 F.3d. 919, 942 (10th Cir. 2004), (Citing ABA standards: " Those standards repeatedly reference mental health evidence, describing it as "of vital importance to the jury's decision at the punishment phase." See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 1.1, 4.1, 10.4, 10.7, 10.11."

[6]We . . . .would respond to their propositions of error, typically one, two propositions, misdemeanor, low felonies, no death penalty, no murders that I recall." Vol. 1 p. 15.

felony or misdemeanor cases.  Pet. EH Exhibit 3. EH Vol. 1 at 18.  In 1990 he left for the Garfield County DA's office because he "wanted a more expanded role handling cases from beginning to end." Vol. 1 at 20. The OSCN docket for Garfield County indicates Mr. Lyman was attorney of record in 40 civil forfeiture cases related to drug and money seizures. *Id.* at 20. He was in Garfield County for 5.5 years until 1996.  During that time he prosecuted 3 jury trials one misdemeanor homicide jury trial and 2 sexual child abuse cases; one jury trial involving a firearm and 1 or 2 drug cases to a jury.  He agreed that he tried less than 6 felony jury trials and in one he was second chair. Vol. 1 p. 7.  In 1996 he went to work for Atoka County as assistant DA. He tried 1 or 2 felony jury trials in Atoka bringing his total jury trial experience to 7 or 8 cases with zero first degree murder or death penalty experience.  *Id.*  28-29.  June 30, 1997, he applied to the Oklahoma Indigent Defense System [OIDS] to represent defendants charged with the death penalty.  Petitioner's EH Ex. 5. He represented to OIDS that while at the Tulsa DA's office he "was responsible for handling felony cases from preliminary hearing through trial." (According to his EH testimony - after the preliminary he "passed the case on then to some other lawyer and second chaired one jury trial. P. 18). He made no representations concerning jury trial experience in his letter to OIDS.  He had never consulted with or introduced evidence from a psychologist, medical doctor or psychiatrist nor had he ever represented any criminal defendant in any proceeding prior to representing petitioner Fitzgerald. Vol. 1 pp. 45-52.

Mr. Lyman testified he took a $3,000.00 to $5,000.00 pay cut to end his career as a prosecutor to work at OIDS to get "more trial experience." He wanted "to be a trial lawyer." Tr. 33-36.  Mr. Lyman's resume' of "professional experience" reflected he had experience in "numerous homicide cases" which this court finds is inaccurate based on his testimony.    Mr.

10

Lyman started at OIDS in the Fall of 1997 and almost immediately was second chair in the *Sampson* capital jury trial. Ironically, this is the first time he represented any criminal defendant. A psychologist testified in the second stage but was prepared and presented by lead counsel. Vol. 1 36-37. In July of 1998, Mr. Lyman, as sole counsel tried the *Millhollin* case but the Bill of Particulars seeking death had been withdrawn. Pet. EH Ex. 6. In December 1998 Petitioner Fitzgerald's case was reversed. *Id. In* April 1999 Mr. Lyman retried the *Matthews* case, another case that had been reversed. *Id.* Mr. Lyman was lead counsel responsible only for the first stage. His private co-counsel presented the psychologist during the second stage who had been worked up by previous trial counsel *Id.* 39-41. He handled three other death penalty cases, *Tate, Whisenhunt* and *Morgan* that resulted in guilty pleas and did not involve mental health issues. *Id.* 44. Prior to representing Mr. Fitzgerald Mr. Lyman had tried two death penalty cases, one as lead counsel (*Matthews*)  and had no experience evaluating or presenting mental health experts in any case. *Id.* 45-46.

Accordingly, this Court finds that prior to Mr. Fitzgerald's trial in October of 2000,  Mr. Lyman fails to qualify as lead counsel under Section 5.1 of the ABA Guidelines.  He did not have "at least five years litigation experience in the field of criminal defense;" he did not have "prior experience as lead counsel in no fewer than nine jury trials of serious and complex cases which were tried to completion;" and most importantly for Petitioner's case, he was not "familiar with and experienced in the utilization of expert witnesses and evidence, including, but not limited to, psychiatric and forensic evidence."  See Petitioner's EH Ex. 8.   This Court finds that counsel could have overcome his lack of experience with medical and psychiatric terminology if he conducted a reasonable forensic investigation, conducted research, consulted

with his co-counsel Katherine LaFortune, who had very little trial experience[7] as an attorney but held a Ph.D. in psychology.  He also failed to consult with experienced capital litigators that had tried dozens of cases involving mental impairment.

For 3 years his co-counsel Katherine LaFortune Ph.D., had performed pre-trial forensic examinations of defendants for competency to stand trial.  Vol. 2, p. 302-307.  As lead counsel, Mr. Lyman chose not to listen to effectively seek her counsel and advice concerning the critical decision not to present Drs. Bratcher and Jones as experts to explain petitioner's physical and mental conditions  as mitigating evidence in the second stage.  That decision coupled with his misunderstanding of medical and psychological terminology was not defensible as a "reasoned strategic decision" and was "objectively unreasonable" under the *Strickland* performance standard.

Two (2) of the first three (3) mitigating factors Mr. Lyman selected for presentation to the jury were not explained by the available medical and psychological testimony.  Any mitigating effect of the gun shot injury to Mr. Fitzgerald's brain was destroyed by Mr. Lyman's decision to introduce medical records of the brain injury without explaining the basic medical and neurological terminology.

**E.     Mr. Lyman's Decision Not to Utilize Endocrinologist Christina Bratcher Was Objectively Unreasonable**

This Court finds it was objectively unreasonable for Mr. Lyman not to introduce the testimony of Christina Bratcher to explain the disparaging affect of juvenile onset diabetes on Mr. Fitzgerald's childhood development and his decision making at the time of the murder.

---

[7]Three DUI jury trial in Municipal court. Vol. 32 at 305.

Over 25 years ago the Supreme Court determined in *Skipper v. South Carolina*, 476 U.S. 1, 4

(1986), "There is no disputing that this Court's decision in *Eddings* requires that in capital cases

'the sentencer . . . . . . .not be precluded from considering, as a *mitigating factor*, any aspect of

a *defendant's character or record* and any of the *circumstances of the offense* that the defendant

proffers as a basis for a sentence less than death," *citing Eddings v. Oklahoma*, 455 U.S. 104,

110 (1982) (the unprovoked killing of a highway patrolman). *See also Lockett v. Ohio*, 438

U.S. 586, 604 (1978) (plurality opinion of Burger, C.J.). Eighth Amendment principles require

the admission of relevant mitigating evidence supporting mitigating factors that might serve "as

a basis for a sentence less than death." *Id. quoting Lockett, supra.*  Dr. Bratcher would have

testified concerning "Mr. Fitzgerald's diabetes and a variety of physical complications arising

from diabetes from the time Mr. Fitzgerald was approximately 12 years old until the year 2000,

when he was 41." Pet. EH Ex. 1. Dr. Bratcher is an endocrinologist whom diagnoses and treats

disorders of the endocrine glands.  Mr. Fitzgerald suffered from juvenile onset diabetes Type

1 and a variety of physical complications arising from diabetes from the time he was 12 years

old until the time of his trial in 2000. Diabetes type 1 is caused by a combination of factors

including both genetic predisposition and environmental influences. There is no cure for this

condition. Diabetes is a chronic, life-long disease.  Insufficient insulin production results in high

blood sugar with symptoms of blurred vision, drowsiness, fast and shallow breathing, fruity

breath odor, loss of appetite, abdominal pain and vomiting. Following his diagnosis in 1971 at

age 12, Mr. Fitzgerald had "repeated hospitalizations with conditions arising from poor

management and control of his diabetes."  When he was diagnosed in 1971, his diabetes diabetic

ketoacidosis (DKA) which is a life-threatening condition resulting in uncontrolled high blood

13

sugar levels. Before insulin was developed as a treatment for diabetes, ketoacidosis was frequently a fatal.

Mr. Fitzgerald required medical attention and/or hospitalization several more times with infections and complications that were likely the result of poor diabetic control. Admissions were explicitly related to uncontrolled diabetes occurring in 1973, 1975, 1981, 1985 (ketoacidosis). 1986 (mild diabetic neuropathy). twice in 1988 (both ketoacidosis), 1991 (hypoglycemic episode with loss of consciousness), twice 1993 (fell during hypoglycemic episode and hypoglycemic seizure).

In 1986,Mr. Fitzgerald presented with a variety of physical complaints including daily bi-temporal headaches, lightheadedness, vertigo, getting overheated, decreased consciousness and confusion. He was diagnosed with mild diabetic neuropathy.  Several of Mr. Fitzgerald's other complaints noted at that time appear to be consistent with poor diabetic control an affective disorder such as dysthymia, or sequelae from the gunshot wound. Diabetic neuropathy is a common complication of long-term diabetes. It results from damage to the nerves that connect the spinal cord and brain (the central nervous system) to the rest of the body. Damage caused by diabetic neuropathy can upset the normal flow of certain types of nerve impulses through the legs, arms, and other parts of the body.

### 1.   Impaired Neurological Functioning During the Robberies and Murder

Dr. Bratcher testified that assuming in the hours before the robberies and homicide, Mr. Fitzgerald shared a gallon container of margaritas including a liter bottle of  tequila and did not eat food it could dramatically increase blood sugar levels or may induce extremely low blood sugar levels. This "combination of large quantities of alcohol and diabetes could have affected

Mr. Fitzgerald's cognitive functioning." The consumption of alcohol is also medically significant because of his history of head injury from a gunshot wound in 1985. According to a neuropsychological report provided to Dr. Bratcher, injury to the left frontal lobe of Mr. Fitzgerald's brain has been diagnosed.[8] She notes that this might also have affected his judgment at the time of the offenses.

### 2.   Impaired Development from Type 1 Diabetes

Dr. Bratcher could have testified that Mr. Fitzgerald's diabetic condition is significant because of the impact that chronic illness played in his development as a person.

> Dealing with a diagnosis of diabetes as a child and teenager can be very challenging to the patient and his family. A chronic illness such as diabetes can affect an adolescent in many ways: Complicating their development of independence; Interfering with their connection to peers; Introducing new emotional conflicts during an already emotionally charged time, including an overwhelming fear of disability or death from the disease; Stress on family and peer relationships due to the limits o§n social activities or increased need for support; Imposing physical change and limitations; Affecting self-esteem and self-concept.

Although not personally acquainted with the intimate details of Mr. Fitzgerald's upbringing, Dr. Bratcher had sufficient information to say Mr. Fitzgerald certainly appeared to have poor family support for his illness, as well as behaviors which indicated a rebellion against his disease that is commonly seen in young diabetic patients.

Dr. Bratcher would testify Mr. Fitzgerald and his family would be a rare exception indeed if they did not experience a variety of these difficulties over the long course of his

---

[8]Under the Oklahoma law, in forming an expert opinion, a medical expert can rely on the reports and opinions of other medical experts "if it is the type relied on by experts in the field." 12 Okla. Stat. §2703; *Ake v. State*, 778 P.2d 460 (Okl. Cr. 1989).  Mr. Lyman said that is his understanding of Oklahoma Law. Vol. 1 p. 61.

illness. These psychological complications of chronic illness are in her practice and can have long-lasting effects on an individual's personality, family relationships, and ability to control the symptoms of diabetes.

Mr. Lyman conceded that 7 months prior to the trial he requested the assistance of Dr. Bratcher from his OIDS supervisor.[9]  She was retained by OIDS.  Mr. Lyman had no reason to believe she would not have testified as stated in her affidavit.  He testified there was nothing in her testimony that "could be potentially harmful to Mr. Fitzgerald" in his "second-stage trial in 2000."  Vol. 1 p. 60. In fact, he admitted her testimony would explain the "impact of this illness, the effects of alcohol on diabetes and low sugar and his history of mismanagement." *Id.*  He said that he went to interview Dr. Bratcher and believes that co-counsel Kathy Lafortune who he describes as " a very well-educated, very bright lady" went with him.  In the interview she did not say "anything contrary to her affidavit" but he "did not believe that she would be a good witness.[10]  He had no recollection talking to Kathy LaFortune about whether or not to call Dr. Bratcher her as a witness. *Id.* 66; 138.

_____

[9]Mr. Lyman stated:  Dr. Bratcher specializes in adult endocrinology at the Diabetes Center in Tulsa, OK. The purpose of her services will be to review and prepare a "life line" of my client's medical history focusing on significant episodes of the mismanagement of his diabetes. The goal is to present to the jury in a meaningful manner the history of his illness, the current state of his medical condition and the probable prognosis for the future. In addition, her report will be shared with Dr. Herman Jones and Dr Faust Bianco (neuropsychologists) to corroborate their findings. EH Exhibit 15.

[10]She did not come off as strong in presence when you're talking to her as she appears to come off in writing." *Id.* 63. I didn't think she was going to be comfortable testifying or be a good witness. Id. 64. He had "no specific recall on exactly what points made me have that feeling. I just think just engaging with her, talking to her, asking her questions, seeing how she's, you know, answering the questions, I just didn't think she would be a very good witness." *Id.* 65.

Kathy Lafortune had a much better memory of Mr. Lyman's decision not to call Dr. Bratcher at the trial. Her undergraduate degree is from Duke University in mechanical engineering where she specialized in mechanical failure analysis. She switched to behavioral science and"the study of criminal behavior and why people fail sometimes at being normal citizens." Vol. 2 p. 300. She was at Eastern State Hospital working with severely mentally ill patients. As a Ph.D. she performed court ordered competency evaluations for 3 years. She was director of mental health services at the David L. Moss Criminal Justice Center for six months and went into private practice doing numerous types of psychological and forensic evaluations. Vol. 2, 302-304  When her husband, Bill LaFortune, was Tulsa County DA she consulted with him and critiqued capital sentencing mental health issues. *Id.* 306. She went to work at OIDS in February 2000 as a capital attorney tasked with gathering evidence for mitigation and provide information and advice to attorneys to determine what types of experts, if any, would need to be utilized. *Id*. 303. Lead counsel made the final decision on experts and she provided them information. *Id.* 304.

She became part of the Fitzgerald trial team and In the eight (8) months she worked on the Fitzgerald mitigation she was charged with uncovering childhood history; talking to his relatives about his history, including his mother, his father; talking to his two children to develop -- help them develop a comfort level with coming to court and testifying about their father. She developed the testimony of Sandy Davis, Petitioner's foster mother to find out what deficiencies she observed when he was a boy and observations of his home life. She considered one of the most important issues in his development to be the effects of the diagnosed type I diabetics and how if unmonitored by the parent caused the child to act out; risk taking that

17

another child in school would not do -  because of their fear about the diagnosis and "uncertainty where they feel confused and agitated and not understand why." *Id.* 311.  She recalled that Dr. Jelly[11] was unavailable to testify and she and Mr. Lyman went to see Dr. Bratcher regarding her potential testimony. She recalled the meeting and nothing Dr. Bratcher said at that meeting or in subsequent conversations contradicted anything Bratcher said in her 2002 affidavit. Pet. EH Exhibit 1. Mr. Lyman **did not** indicate to her that Bratcher would not be a good witness or they were not going to use her as a an expert. Vol. 2 p. 315.  She continued to work with Dr. Bratcher and prepare her testimony for trial to explain the difficulties Mr. Fitzgerald suffered as a child due to uncontrolled and mismanaged diabetes.[12] The factors that Dr. Bratcher discussed in her 2002 affidavit, was basically the same issues Dr. Bratcher  was developing for trial. "I had done my own research on juvenile diabetes and those are the factors that I thought at the time were important." *Id.* 322. Her goals with Dr. Bratcher was to ask "her to give a description of type I diabetes," and "relate it to his specific childhood environment" and "the behaviors which demonstrated in school, which were sometimes negative." *Id.* 323. If called as a witness she would have asked Dr. Bratcher to explain lack of "self-esteem,

---

[11]Paula Alfred, Petitioner's attorney in the first appeal from his conviction also obtained an affidavit from Dr. David H. Jelly.  See HA-1, exhibit 24; (Exh. 6, Appendix, Application for Post-Conviction Relief, Affidavit of Dr. David H. Jelly). Dr. Jelly, a practicing pediatric endocrinologist, confirmed the likelihood of a neurobehavioral link between Petitioner's diabetes,  the brain injury from gunshot, and his consumption of alcohol on the night of the offenses

[12] [A] child who is not guided by the parents to help them control their own illness, it complicates this picture of that child being able to do that and being an independent person who can say, I can control my medication and my insulin and here's how I do it - it prevents the child from becoming independent. *Id.* 318.

self-concept, the fear that children with type I diabetes may have and how this fear impacts their behavior." *Id.* 324.   In the mitigation concept it was important to explain the diabetes development issues because type I diabetes is not something that is a child's fault - it is given to him by his genetics. *Id.* 325. Dr. Lafortune could also have utilized Dr. Bratcher's testimony to explain that his flawed childhood development and misbehavior linked to diabetes could have resulted in his juvenile misbehavior which was a component of the Dr. Jones' Anti-Social Personality Disorder [ASPD] Axis II diagnosis. Dr. LaFortune attended a capital seminar during this period of time regarding "deconstructing ASPD" that focused on using experts such as Dr. Bratcher to deconstruct ASPD. She could have made the jury understand that ASPD "is behaviorally based, it's all about actions that people take."  Mr. Lyman made the decision not to call Dr. Bratcher during the trial. *Id.* 328.  She deferred to his decision not only because he was the lead attorney - she believed him to be a seasoned capital attorney. *Id.* 330.  Dr. Lafortune plainly states that had she known he had tried only two death penalty cases and both were residual doubt cases rather than mitigation cases, she would not have deferred  to his decisions. Rather than call Dr. Bratcher Mr. Lyman decided to give the medical records to the jury.  Dr. LaFortune "didn't think that was enough . . . .because how are jurors going to look at those records on their own and make sense of them without someone to guide them?" *Id.* 332. She did not confront Mr. Lyman because "she had been there [OIDS] for less than a year and she believed him to be "a good seasoned lawyer" but she was unaware that "he had not put on a psychologist or a psychiatrist in a trial." *Id.* 333. Dr. LaFortune was upset and shocked with his decision not to call Dr. Bratcher and called Debbie Maddox, an OIDS lawyer in the Norman office to vent her frustration although she could not remember what she told her. She believed

she called her that night at home - not from the courthouse. *Id.* 364. She testified she called her before her opening statement. *Id.* 370. She did not believe Mr. Lyman made a reasoned strategic decision. *Id.* 371. I believed it was the wrong decision. She would have presented Dr. Bratcher's testimony. *Id.* 384.

Mr. Lyman testified the reason he did not call Dr. Bratcher is that the diabetes medical history was introduced "through the medical records" and my feeling was "it's better to make the arguments based on what has been presented in the medical records . . . . . . the jurors have some idea what diabetes is, we're able to talk about that through his medical records." He thought it would be better to do it that way than to put on Dr. Bratcher who would have been attacked by the state through their cross-examination of all the bad facts and circumstances such as:

> the aggravating circumstances, the three robberies, the Indiana robbery years before; history of criminal acts from a young age to the day he was sitting there in front of the jury; his, say, uncharged crimes or attempted crimes or thought-of crimes, such as the Brink's armed robbery or his plans for an escape; the recruitment of juveniles to either participate in an armed robbery or to participate or assist in an escape; the issues around, well, lots of people have diabetes and they don't commit crimes, that angle.

Vol. 1 p. 74.

Mr. Lyman agreed the jury had heard all of these "bad" acts in opening statement, when they were introduced as evidence and would be heard again in closing argument. *Id.* 76. Mr. Lyman also believed cross-examination of Dr. Bratcher would negate what we were trying to do, and that was to show value to his life <u>that's not an excuse,</u> he's remorseful, he's taking responsibility, his life has value, and I thought Dr. Bratcher's testimony could "do more harm than good." Mr. Lyman agreed that without expert testimony the jury had no explanation how

20

the "good person" he tried to portray committed this act of violence against Will Russell. Vol. 1 at 149. Mr. Lyman also agreed that Dr. Jones' testimony would support the argument that Mr. Fitzgerald was acting impulsively when he shot Will Russell.  And he agreed it would have explained how the "good person"  described in mitigating factors 4 through 11 could do a bad thing like kill another human being. *Id.* 151.

This Court finds Mr. Lyman's decision to not call Dr. Jones and Dr. Bratcher was an "objectively unreasonable decision." If Mr. Lyman's assessment is accurate then no expert testimony on mental impairments would ever be introduced in any death penalty case.  This court finds that this further demonstrates Mr. Lyman's inexperience with mental impairment issues in the capital sentencing setting and violates the controlling authority from the Tenth Circuit and Supreme Court.

This Court finds the jury would hear of Mr. Fitzgerald's "bad acts" one more time does not outweigh the importance of developmental and mental impairment mitigation that can explain and mitigate Mr. Fitzgerald's actions at the time of the murder. Mr. Lyman did not recall discussing his decision with any other capital attorneys in the Sapulpa office or the more experienced attorneys in the Norman office.  Vol. 1 p. 85-86.

Mr. Lyman agreed that Dr. Bratcher's testimony did not conflict with any of the other mitigating factors listed in Instruction 15 - Petitioner's EH Exhibit  22.  However, his main defense of his failure to present Dr. Bratcher and Dr. Jones was that he believed the jury would "view this as an excuse." This conflicts with recent cases of the Supreme Court and Tenth Circuit as discussed below.

**F.**     **Failure to Introduce Evidence of Brain Injury and Frontal Lobe Impairment From Gunshot Wound Through Expert Dr. Herman Jones Was Objectively Unreasonable**

This Court finds that Mr. Lyman also made the "unreasoned and uniformed"decision to not call Dr. Jones as an expert. This Court also finds that decision was "objectively unreasonable" and based at least in large part on the failure to understand both medical and psychological terms and his misperception that brain impairment testimony would be considered as an "excuse" but his number one concern was that Dr. Jones would "become the state's best summation witness for their case." *Id*. p. 88.

Mr. Lyman viewed Dr. Herman Jones' report and believed that he made the decision not to use Dr. Jones prior to March 2000 because he did not appear on the witness list.  Vol. 1 p. 87. He recalled examining Dr. Jones' report, Petitioner's Exhibit 12, and recalled visiting his office to discuss the report.  He "had real concerns about how the state would be able to utilize his findings and opinions to benefit the state's case to the extent that it would diminish any benefit we would have received from him if we had used him."  *Id.* Reading Dr. Jones' report he was concerned that Dr. Jones' statement that "the brain damage displayed by Mr. Fitzgerald makes him slightly more impulsive under normal situations and reduces his ability to disengage or inhibit his impulses."  Based on his perception of Dr. Jones statement that Mr. Fitzgerald was "disinhibited" Mr. Lyman believed the state was going to turn that into "Mr. Fitzgerald just didn't give a damn."  He believed that cross-examination of Dr. Jones by the state"would have resulted in [the jury] thinking that Mr. Fitzgerald is a person that just didn't care, just would do what he wanted to do, wasn't inhibited."  *Id.* 89.  He admitted he may have misunderstand the terminology but he took it to mean that the gun shot wound caused the disinhibition. He arrived

at that definition "by my thought and my concern the way the jury would take that. Dr. Jones did not use that terminology; I did." *Id.* 90. "Right or wrong that was my impression, and that was a concern I had as the way the jury would take it." *Id*. 91. "I felt that by using someone like Dr. Herman Jones, it would diminish, negate, cause them to forget, or get off track of what I was trying to show in the other mitigation factors." *Id*. 98.

Dr. LaFortune testified that even though Dr. Bratcher could address the brain impairment to a limited degree - in her opinion they still needed to call Dr. Jones because he was a neuropsychologist and could explain the impact of a gunshot wound that was not  fault and explained why that before the gunshot wound Mr. Fitzgerald was nonviolent, and following the gunshot wound, he engaged in violent behaviors. Vol. 2 p.  336.  Dr. Jones could explain the impact neuropsychologically on his behavior in becoming disinhibited and the significance of that gunshot wound and the paranoia that resulted as a result of the gunshot wound that his mother described. *Id.* 337.

Dr. Jones testified he has a Ph.D. in psychology and in1999 and 2000 he was an assistant professor.  His practice was in treating and evaluating people with neurological brain disease and injuries.  He identified his report, Pet. EH Exhibit 12 [Vol. 2 p. 176] where he indicated from his exam in 1999 "there was indication of subtle but significant findings of persisting neurologic damage in the anterior portions of his brain (frontal lobe) with greater impairment demonstrated on the activities mediated with the left frontal lobe compared to the right. The behavioral impairments reflect structural damage related to the gunshot wound of 1985 and are considered to be relatively permanent. Dr. Jones identified Pet. EH Exhibit 14 as the hospital and doctor records for Mr. Fitzgerald's Nebraska brain injury in 1985 in Nebraska when

Petitioner was shot in the head with a .38 caliber firearm while sitting on his porch.  Dr. Hellbush was the neurosurgeon who removed the bullet and bone fragment from his brain and his August 13th, 1985 statement in his letter that "His neurological examination today was normal"did not indicate there was no permanent neurological damage because that can only be measured by a neuropsychological exam.  Dr. Hellbush's neurological evaluation had six components: reflexes, a motor sensory examination, mental status examination, gait and station and cranial nerves, and that he was generally intact upon his -- upon his examination." EH Exhibit 14. Hellbush's report did not address whether or not there was permanent neurological damage.   In order to make that determination required a neurological exam by a neuropsychologist such as Dr. Jones and there was no indication that was performed. Vol. 2 168- 171. Dr. Jones regularly received referrals neurosurgeons like Dr. Hellbush. *Id.* Dr. Jones nteracts with families and lay people regularly and he would be mildly surprised if 12 randomly selected people reading Dr. Hellbush's letter believed there was impairment from the gun shot wound. *Id.* 175.

Dr. Jones said that even though the residual impairment was "subtle" the front portions of the frontal lobe are "responsible for many behavioral constructs, the ability to empathize with other individuals, the ability to anticipate and reflect upon the consequences of one's actions." It's been postulated that "what we refer to as a conscience often resides in the frontal lobe, in that aspect of the frontal lobe, the orbital frontal cortex. *Id.* 177. The subtlety of his impairment could be intensified by any of six secondary factors: 1.  The response to fatigue  is intensified; 2. excessive anxiety and individuals with brain injuries show a greater rate of decompensation; 3. Sedating drugs or medications including alcohol; 4. concurrent physical illness, which can

24

be either transient or chronic; 5. depression can exacerbate these deficits; and 6. lack of

motivation. *Id*. 179. He explained that frontal lobes function in a "normal" person  causes

"individuals to inhibit themselves, to slow down, to anticipate the consequences of their actions

so that damage in this area and behavioral deficits from this area are often referred to as

disinhibition." *Id*. 180. He explained that if Mr. Fitzgerald ingested alcohol to the point where

he had motor impairment it intensifies the effects of the brain injury.  It further compromises

the function of those parts of the brain that are responsible for control and inhibition. He further

explained that excessive alcohol consumption operates in a "multiplicative" fashion. This Court

recognizes the existence of a dispute regarding the quantity of alcohol consumed by Mr.

Fitzgerald and the extent of his intoxication at the time he shot and killed Mr. Russell. Whether

or not Mr. Fitzgerald was intoxicated and the extent of intoxication during the robbery of the

second store where Mr. Russell was shot and killed is important in this case for three reasons

1. Metabolic 2.  Multiplicative affect. Dr. Jones reviewed Regina Stockfleth's affidavit and

indicated if true,  it establishes that Mr. Fitzgerald was intoxicated from alcohol and marijuana

between 12:00 a.m. and 1:00 a.m.  Dr. Jones indicated he had no idea if her testimony was true

or not - he was taking that as an assumption for purposes of his opinion.  *Id.* 217. He was

unaware that Tommy Hansen testified he only saw Mr. Fitzgerald consume one can of beer and

he did not believe he was intoxicated.  He agreed this contradicted Mrs. Stockfleth's testimony.

*Id.* 218. He also was advised that the clerk at the first robbery indicated "Mr. Fitzgerald seemed

very much like he was communicating he was in control and that if he was intoxicated -- and

if he was intoxicated, it was an early stage of intoxication where he was still in substantial

control of what he was doing."  *Id.* 218.

There was a stipulation[13] that the first robbery on July 16, 1994, committed by Mr. Fitzgerald occurred at 2:30 p.m. on Admiral Street. Candy Ashley testified that she saw Mr. Fitzgerald walk into the store on East Admiral and "her opinion from the way the man was walking and behaving he appeared to be intoxicated to her." Mr. Fitzgerald also told police that he was intoxicated, not functioning properly and could not remember certain things.[14] Pet. EH ex. 25 p. 2.  Dr. Jones explained that if Mr. Fitzgerald was intoxicated as these witnesses indicated, it would be a significant factor and "it would be more likely to reflect disinhibition and would further reduce his ability to anticipate the consequences of his actions." He also agreed that based on evidence that Mr. Fitzgerald regularly consumed alcohol in "excessive quantities" and based on "habituation" he would have to consume larger quantities of alcohol to become intoxicated. *Id.* 220-21.

Dr. Jones also indicated that if Mr. Fitzgerald was drinking excessively there could be a metabolic imbalance - either high blood sugar or low blood sugar.  Either way this would could create a metabolic imbalance.  "If he had loaded himself with alcohol, the liver's going to do its best to break that into available sugars so that you would expect possible

_____

[13]During the evidentiary hearing, the parties stipulated that the first robbery at the Git-N-Go convenience store on East Admiral occurred at 2:30 a.m. when a man matching Mr. Fitzgerald's description came in th store and the clerk Ed Chambers. EH Vol. 1 at 12; Trial Tr. At 641.

[14] ". . . .my mistake was is I got too close to the counter. I mean, if I had' t been intoxicated, that wouldn't have happened. (inaudible) Q: (Sgt. Bell) How come you decided to do some robberies when A: you've been staying out of trouble? I don't know. don't know. I don't know. I was drunk, wasn't thinking." Pet. EH Ex. 25 p. 14; *See also* Ex. 25 p. 2: "As you're watching this, tell me what happened.  A: I don' t remember. I was drunk straight out. I don't remember."

hyperglycemia, not hypoglycemia." There would be a metabolic effect because "brains will react to either variations of too low or too high, just as an individual with prior structural damage will respond in a more exaggerated fashion to those same variations." *Id.* 195-199. Dr. Jones noted that mild neurological impairment would make it more difficult for Mr. Fitzgerald to manage either his diabetes, the amount he drank or his alcoholism "due to his reduced ability to  anticipate the consequences of one's action in a larger context, whether that be alcoholism or whether that be a chronic disease like diabetes." *Id.* 200. Mr. Fitzgerald's "ability to operate sort of in everyday life is not significantly impaired. But once he makes a poor decision, he begins to have – as you said, it's a multiplied effect and, in your opinion, he begins to have a more difficult time recovering from that poor decision." *Id.* 201.

Dr. Jones said that at the request of Mr. Lyman and Mrs. LaFortune he informed them of his DSM IV multi-axial assessment.   Axis I was the bullet wound resulting in cognitive disorder and alcohol dependence and is the primary presenting problem. Axis II was antisocial personality disorder [ASPD] which is the adult version of a personalty disorder based on personality traits and Axis III is a "medical condition"- in this case the penetrating missile wound to the head. However, Dr. Jones also noted that Mr. Fitzgerald's conduct disorders existed prior to the gun shot wound. *Id.* 207-211. Mr. Fitzgerald's characteristics of ASPD: failure to comply with social norms, deceitfulness as indicated by repeated lying, impulsivity or failure to plan ahead, irritability and aggressiveness, manifest reckless disregard for safety of self or others, and consistent irresponsibility as indicated by repeated failure to sustain consistent work behavior or honor financial obligations and lack of remorse are all present in Mr. Fitzgerald's conduct before he was shot in 1985.  However, it is inescapable that prior to

27

being shot in the head while sitting on the front porch in 1985 Mr. Fitzgerald had not committed a crime of violence including the armed robbery in Indiana in 1986. He said he would never cross that line.

Dr. Jones summarized his testimony that the combination of these three factors: the frontal lobe impairment, the excessive alcohol, and the possible metabolic problem from high or low blood sugars made it more difficult for Mr. Fitzgerald to control his impulses or his behavior at the time of the murder. *Id.* 213. "And so is what you're saying that it's just a matter of degrees, but, in your opinion, the frontal lobe injury did increase his impulsivity that evening and did decrease his inhibitions that evening." A. Yes. *Id.* 214.

Dr. Jones testified that "antisocial personality disorder" has a correlation with criminality and could make Fitzgerald appear to be dangerous. Dr. Jones also noted that Mr. Fitzgerald's letters planning escape attempts, and armed robberies also indicated he was dangerous and potentially violent. *Id.* 242-244. Dr. Jones further stated that the facts of the three robberies, the wearing of the mask, the modification of the AK-47 all indicated Mr. Fitzgerald was potentially dangerous. *Id.*

**G.    Counsel's Decision Not to Introduce Evidence of Intoxication and It's Significance in Combination with Diabetes and Frontal Lobe Impairment Was Objectively Unreasonable**

Mrs. LaFortune was aware Regina Stockfleth was available to testify concerning Fitzgerald's alcohol consumption and intoxication and another witness (Candy Ashley) who could testify that he appeared to be intoxicated. *Id.* 379. LaFortune also acknowledged that in a forensic interview "some things that don't fit together and some things do." There is also the option to have Dr. Jones testify to a hypothetical - "offer an opinion, if indeed it was true that

he had that much alcohol, he could perhaps testify to that." *Id*. 384. Dr. LaFortune agreed that based on all of the evidence the jury's going to make the determination whether or not he's intoxicated. *Id*. 386. She also acknowledged that if some of those jurors believe that alcoholism standing alone was not mitigating, then Dr. Jones' testimony about the effects of alcohol, in combination with the gunshot wound and the diabetes, would be potentially helpful to them in deciding a sentence of less than death. *Id*. 387. She acknowledged that in many cases such as DUI convictions are obtained without a blood or other chemical test for intoxication.  People are sent to jail based on outward appearances and behavior "the way people walk, the way they look, wether their eyes flutter, staggered gait, slurred speech, odor of alcohol - your do it through behavioral aspects.  Of the 150 capital cases she reviewed she was unaware of any capital case where there was a blood test of the defendant shortly before or after the murder. *Id*. 388.  It was Mr. Lyman's decision not to call Candy Ashley and Regina Stockfleth. *Id*. 389.

   In order to grant Petitioner relief this court is not required to determine how much alcohol Mr. Fitzgerald consumed, whether he was intoxicated, or his blood sugar reading  at the time of the offense. There is evidence he was and was not intoxicated.  Whether he was intoxicated as Regina Stockfleth and Candy Ashley testified is a question for the sentencing jury based on the direct and circumstantial evidence that was available for presentation by the Fitzgerald defense team on each of these issues. According to the jury instructions in this case, in the penalty stage in Oklahoma, there is no quantification of the defendant's burden of proof to establish a mitigating fact or factor. In the instant case the jury was instructed in instruction 15: . . . .The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case . . . . . .unanimous agreement of jurors concerning

mitigating circumstances is not required. In addition, mitigating circumstances do not have to be proved beyond a reasonable doubt in order for you to consider them. O.R. 1134. Instruction 16 instructed:  Evidence has been introduced as to the following mitigating circumstances: (list) . . . . . . .In addition you may decide that other circumstances exist, and if so, you should consider those circumstances as well.  O.R. 1135.

Mr. Fitzgerald's relatively low burden of proof to establish intoxication at the time he shot and killed Will Russell, demonstrated by the jury instructions above, and Oklahoma's definition of *prima facie* evidence for an <u>outright defense</u> discussed below, (which is a higher burden first stage burden than submission of intoxication and alcohol as a mitigating factor), convinces this Court convinces this Court that counsel breached his duty to provide competent counsel when he failed to introduce the available evidence that Petitioner was intoxicated at the time of the murder. This Court's query of Dr. Jones at the evidentiary hearing establishes the importance of intoxication as mitigation in combination with the diabetes and neurological impairment.

> THE COURT: Dr. Jones, in terms of the discussion we had about events that create a multiplying effect, given your evaluation of Mr. Fitzgerald and assuming there was no intoxication and no acute diabetic event, would the decision to pick up a gun and go rob a convenience store be one of those multiplying events, or would that just be something that would still fit within sort of his normal behavior?  DR. JONES: Were he not to be intoxicated, were there not to be any disruption from the diabetes, then I would conceptualize this as a product of his antisocial personality disorder and the brain injury would be a non-factor.

Vol. 2 p. 294.

This Court finds that Oklahoma Judges and Juries determine every day whether a defendant in a DUI case or someone involved in litigation is intoxicated or under the influence

30

without a blood or Breathalyzer test. The testimony of Candy Ashley[15] is sufficient to establish a *prima facie* case that Mr. Fitzgerald was intoxicated and weaving 37 minutes[16] before the shooting of Will Russell.  Ms. Ashley states that she saw a man outside of the store on East Admiral and "it is her opinion from the way the man was walking and behaving he appeared to be intoxicated to her." The next day she saw a televison news report with a video depicting a robbery at another convenience store. This store was about a mile from the store where she had been to the night before."  Pet EH Ex. 23.  Regina Stockfleth would testify: "Around 12 to 1 o'clock, we headed home. Jim. and I were both loaded. His driving scared me. I remember telling him to quit weaving and stay on the road. I knew Jim was drunk and I was, too." Pet. EH Ex. 2.

These ladies' testimony, as well as the post-arrest statement of Mr. Fitzgerald, was sufficient to establish a *prima facie* case that he was intoxicated from alcohol at the time he shot and killed Will Russell.  This Court also considers that Candy Ashley's credibility is enhanced because she is a disinterested citizen that is not the girlfriend of Mr. Fitzgerald (Regina Stockfleth) or the victim of one of the robberies (such as Ed Chambers, the clerk at the first store on Admiral or John Sartain, the clerk at the Yale store), nor is she Michael Hansen that

---

[15]During his testimony Mr. Lyman testified: "Q. All right. Would you agree with Ms. Ashley or Ms. Goodnight you could have established that Mr. Fitzgerald was intoxicated at the convenience store on East Admiral in Tulsa at the time of that shooting, if the jury chose to believe her testimony?  A. And if they -- and if they believed that it was Mr. Fitzgerald that she saw, yes. Vol. 1 p. 67.

[16]It was 2:30 when he committed the first robbery on Admiral. The second robbery occurred 37 minutes later at 3:07. a.m. and this was the robbery where Will Russell was killed. The district attorney argued in his opening statement -- that 37 minutes later Mr. Fitzgerald killed Will Russell at the Git-n-Go on Pine Street. Vol. 5 p. 752.

Mr. Fitzgerald implicated in wrong doing by trying to recruit him to aid in his escape.  This Court's finding and conclusion is there was sufficient evidence for one juror to find that Mr. Fitzgerald's post-arrest statement was true, when he  indicated he "crossed the line," because he was drunk or intoxicated.[17]  *Prima facie* evidence is evidence that is "good and sufficient on its face," *i.e.*, "sufficient to establish a given fact, or the group or chain of facts of facts constituting the defendant's claim or defense, and which if not rebutted or contradicted, will remain sufficient to sustain a judgment in favor of the issue which it supports." Black's Law Dictionary 1190 (6th ed. 1990); *Ball v. State*, 2007 OK CR 42, ¶ 29 n. 4, 173 P.3d 81, 90 n. 4. The court in *Ball cited* Judge Lumpkin's concurring opinion in *Jackson v. State*, 964 P.2d 875, 892 (Okl. Cr. 1998) where he defined *prima facie* evidence in Oklahoma as evidence:

> . . . . which in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the defendant's claim or defense, and which if not rebutted or contradicted, will remain sufficient to sustain a judgment in favor of the issue which it supports. *The issues of whether the evidence has been rebutted or contradicted are questions of fact for the jury to decide under proper instructions by the Court.* The Court shall review the evidence presented to determine if the defendant has established prima facie proof of the defense which would warrant an instruction on the defense *without speculating on whether the jury will find the evidence contradicted or rebutted.*

*Id.* at ¶ 14, 964 P.2d 875, 902 (Lumpkin, J., concurring in result) (*emphasis added*).

Furthermore, in addition to establishing there a was a metabolic reaction to excessive alcohol due his diabetes and that his impulsiveness resulting from the frontal lobe impairment

---

[17]. _ ". . . . .my mistake was is I got too close to the counter. I mean, if I had' t been intoxicated, that wouldn't have happened. (inaudible) Q: (Sgt. Bell) How come you decided to do some robberies when A: you've been staying out of trouble? I don't know. don't know. I don't know. I was drunk, wasn't thinking." Pet. EH Ex. 25 p. 14; See also Ex. 25 p. 2: "As you're watching this, tell me what happened.  A: I don' t remember. I was drunk straight out. I don't remember."

was enhanced - at least one juror may very well have believed Mr. Fitzgerald's assessment that "being drunk" caused him to act impulsively and "cross the line. " "I don't mean to be flippant about it, but I, yeah, I realize (inaudible) . I'm still kinda in shock that I ... 'cause that was the line I promised myself I'd never cross. It's stupid. It was stupid (inaudible). I can't change it." Fitzgerald post-arrest statement.  Pet. Ex. 25 p. 16.

The same burden of proof applies to Mr. Fitzgerald's burden to establish his blood sugar was out of balance causing a metabolic enhancement of the impulsiveness resulting from the gun shot impairment of his frontal lobe. Dr. Bratcher's testimony indicates Mr. Fitzgerald was unable to consistently manage his diabetes throughout his life resulting life threatening spikes of his blood sugar resulting in Ketoacidosis and periods of low sugars resulting in low sugars.[18] Mr. Fitzgerald was hospitalized  occurred twice in 1993 the year before the murder (fell during hypoglycemic episode and hypoglycemic seizure, see Pet. EH Ex. 1 ¶10).  This "circumstantial evidence" is evidence that one or more jurors could apply to find Mr. Fitzgerald's blood sugar was out of balance causing a metabolic disruption.

This Court finds and concludes that if all of the available mitigation evidence was presented to the jury, including  the testimony of Dr. Bratcher, indicating the impairment of his development that Mr. Fitzgerald experienced due to his Type I diabetes; the prolonged mismanagement of his diabetes disease and the metabolic effect of high or low blood sugar; Dr. Jones testimony that the combination of these three factors -- the frontal lobe impairment, the

---

[18]Q. Okay. And what would happen if you load in a metabolic imbalance, either from high or low blood sugars, at the same time you have the other two things in the cart? A [Dr. Jones]  It would further compromise in a multiplicative effect . . . . . . . There would be less control but more disinhibition." Vol. 2 at 203.

excessive alcohol, and the possible metabolic imbalance resulting from high or low blood sugars would make it more difficult for Mr. Fitzgerald to control his impulses or his behavior at the time of this murder [Vol. 2 213]; the evidence indicating Mr. Fitzgerald was intoxicated during the murder of Will Russell and this evidence, when considered along with the other mitigating evidence that the Fitzgerald team managed to present, there exists a reasonable probability that at least one juror would have selected a sentence less than death.

This Court finds that the damaging information imparted during the cross-examination of Dr. Jones, relative to his "labeling" Mr. Fitzgerald's conduct as ASPD, was not new evidence of Mr. Fitzgerald's dangerousness, misconduct, misconduct or attitudes. This Court finds these prior crimes and ASPD characteristics consisted of cumulative information, that was not missing from the Government's body of proof prior to Dr. Jones' testimony, outlining these acts as elements of his Axis II diagnosis of ASPD. What *was missing* from the body of evidence the jury considered before sentencing Mr. Fitzgerald to death for the killing of another human being, was the readily available medical and neuropsychological explanation for Mr. Fitzgerald's conduct during the murder that is required by the United States Constitution to be considered by any Oklahoma jury before a convicted murderer can be sentenced to death.

This Court finds the mitigating factor that Mr. Fitzgerald did not resort to violence causing physical injury until after he received the gun shot to the head in 1985 was significant. Both the Indiana armed robbery and the murder of Will Russell occurred after the head injury. Based on the Supreme Court decision in *Terry Williams v. Taylor*,[19] this Court must factor in

---

[19]"State Supreme Court's prejudice determination [of prejudice] was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence--both that

that mitigating factor when "considering all of the evidence" that was presented to determine if Mr. Fitzgerald was denied competent counsel.

Lynn Burch, the third member of the defense team testified that his affidavit submitted was true and correct. *See* Pet. Ex. 20; Vol. 3, p. 495.  His affidavit was admitted [Vol. 3 p. 486] and counsel for Respondent had the opportunity to examine him concerning his affidavit. Vol. 3 p. 489 *et seq.*  This Court finds that his testimony was credible. This Court finds based on Mr. Burch's testimony that Mr. Lyman made all of the decisions regarding what evidence and experts would be used at the new penalty trial and Mr. Burch did not have enough experience in criminal trial defense or jury trials to make decisions about witnesses and evidence. Mr. Burch was in the learning mode as to trial work and had the impression Silas Lyman was a seasoned capital trial lawyer. *Id.*

Mr. Burch indicates - the same as his co-counsel Kathy LaFortune, that if he was aware in 2000, that Mr. Lyman had no experience with psychiatry, psychology or mental impairment issues, he would have likely suggested Mr. Lyman seek the opinions of some of the other OIDS lawyers who have successfully used that type of evidence to obtain life and LWOP sentences." Pet. Ex. 22. Since the trial, Mr. Burch continued to worked as a death penalty trial lawyer and was involved in the trial or disposition of over 20 first degree murder cases.  In the course of his experience, he learned the importance mental impairment evidence and all forms of potential mitigation when there is no question about the client's guilt and the state has already introduced evidence that he has committed acts of previous violence.

---

adduced at trial, and the evidence adduced in the habeas proceeding in re-weighing it against the evidence in aggravation." *Williams, supra* at 398.

It is Mr. Burch's opinion, from conversations with Mr. Lyman, that he believed the jury might view the expert opinions expressed by Dr. Bratcher and Jones "as potential excuses," and was also concerned the expert opinion and diagnosis of Dr. Herman Jones might convince the jury that "Mr. Fitzgerald was dangerous and a continuing threat to society." This Court notes that Mr. Lyman testified several times that he believed the jury might consider the testimony of Dr. Bratcher and Dr. Jones as excuses. *See* Vol. 1 p.  72;76; 78; 79; 80; 87; 127 and 129.

Mr. Burch testified that based on the knowledge and experience he gained since Fitzgerald's trial, the following factors weighed in favor of admitting the Jones and Bratcher expert testimony:

1.  that neither the diabetes or the brain impairment was Fitzgerald's fault;

2.  the expert opinions would have given the jury a medical and psychological explanation as to why these factors acting in combination with alcohol made it more difficult for Mr. Fitzgerald to control his actions at the time of the robbery/murder;

3.  the jury was already aware he was dangerous and committed acts of violence from the aggravating evidence -- that he robbed two other convenience stores and robbed a woman at gun point several years earlier.

4.  the omitted expert testimony would have provided context and a possible explanation as to why Fitzgerald acted in that way.

This Court agrees on all four points and makes these findings.

**F.    Testimony of Debbie Maddox - Expert Witness and Former Capital Trial Lawyer**

Ms. Maddox testified that she was a capital defense litigator with OIDS from 1993 until March of 2004.  She was then in private practice and at the time of her testimony she was Assistant General Counsel for the Oklahoma Bar Association for the past 3 years. Vol. 3 p. 401.

Ms. Maddox was asked: Between October of 1993 and October 2000 she testified that when you went over to capital trials and October of 2000, how many cases, capital cases, did you try where you were first- or second-chair? A. I think it's about 27 or 28." Vol. 3 p. 296. Later she testified that during the total time she was at OIDS she "ended at about 34 trials." Following this hearing the Respondent requested a list of Ms. Maddox's trials and in drafting the list she discovered that she overstated her trial experience. The final day of the evidentiary hearing was November 9, 2012, and at that time Ms. Maddox reappeared and the revised list of her jury trial experience. *See* Petitioner's Exhibit 26 which is the email from Ms. Maddox. Her amended testimony was that she had 19 total murder jury trials while at OIDS. 15 of those trials occurred before 2000 and 4 of them occurred afterwards. See Pet EH Exhibit 26 and Vol. 4 p. 553.

Ms. Maddox testified that the fact she did not estimate her capital trial experience completely accurately, did not change the opinions that she rendered on August 23, 2012. Nor did it alter any of her opinions concerning performance standards for capital counsel. Vol. 4 at 557.

At the August 23, 2012 hearing, this Court permitted Ms. Maddox to testify as an expert. "I'm going to allow Ms. Maddox to share her opinion regarding what Mr. Lyman did, both currently and back at the time of trial, in terms of whether or not it met professional standards and in terms of whether or not it was, if you will, an appropriate decision he made with respect to the putting on of these expert witnesses." Vol. 3 p. 403. Following the hearing, Respondent filed a Motion to Strike Ms. Maddox testimony as "not relevant or reliable." Dkt. 144. The crux of the motion is that Ms. Maddox was unprepared to testify; did not have sufficient information to render an opinion; and she harbored potential bias against Mr. Lyman because he fired her

37

at OIDS in 2004 for insubordination for filing a "Notice of Conflict" in *State of Oklahoma v. Malone* and she later filed a lawsuit for wrongful firing against OIDS. Vol. 3. 522-589.

This Court finds that Respondent Motion to Strike Dkt. 144 is overruled. While it is true that Ms. Maddox was unprepared to testify as an expert because she had no notice that she would be asked to do so, her testimony was credible and will be considered by this Court along with the other evidence. Her testimony will only be considered as expressly stated herein. This Court finds that based on the testimony of Ms. Maddox and Mr. Lyman, there is no reason to believe that her testimony in this case was biased or that she harbors any ill will toward Mr. Lyman. She testified, "there's no question that any -- any anger that I felt was -- that was directed at Jim Bednar. He is the one that decimated that division. He's the one that fired people without cause as far as I was concerned." Vol. 4 at 579.

The Tenth Circuit and other circuits have considered the testimony of a qualified attorney expert on the performance standards of counsel, and this Court will consider Ms. Maddox's opinions as stated herein. *See Marshall v. Cathel*, 428 F.3d 452, 468 (3rd Cir. 2005) (expert testimony concerning the "actual courtroom practice of capital defenders" was permitted in capital case); *Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008), cert. denied 129 S.Ct. 1579 (2009) ("expert on the practice of criminal law" testified in capital case); *Burdine v. Johnson*, 262 F.3d 336, 371 n.16 (5th Cir. 2001) ("an expert witness on criminal law" testified in capital case); *Cannon v. Johnson*, 134 F.3d 683, 687 (5th Cir. 1998) ("legal experts . . . explained that Texas criminal defense clinics have been teaching the art of humanization of capital defendants since the late 1970s . . ."); *Cockrum v. Johnson*, 119 F.3d 297, 304 (5th Cir. 1997) ("an experienced criminal defense lawyer" testified in capital case); *Westley v. Johnson*, 83 F.3d 714, 723 (5th

Cir. 1996) ( "legal expert" testified in capital case); *Bryan v. Mullin*, 335 F.3d 1207, 1223 n.22

& 24 (10th Cir. 2003) ("legal expert" testified in capital case); *Fisher v. Gibson*, 282 F.3d 1283,

1309 (10th Cir. 2002) (an attorney "expert on professional standards for death penalty counsel"

testified); *Hooks v. Ward*, 184 F.3d 1206, 1212 (10th Cir. 1999) ("an expert in death penalty

defense" testified in capital case); *Stafford v. Saffle*, 34 F.3d 1557, 1563 (10th Cir. 1994) ("an

expert on death penalty trials" testified in capital case); *Dutton v. Brown*, 788 F.2d 669, 671

(10th Cir. 1986) ("an expert on criminal defense testified" in capital case); *Middleton v. Dugger*,

849 F.2d 491, 494 (11th Cir. 1988) (expert testimony by "an attorney who has handled

numerous murder and capital cases" permitted).

Ms. Maddox testified regarding the general importance of mental health evidence but

also rendered one expert opinion this Court will consider as it relates to Mr. Lyman's prior

experience being limited to the prosecution rather than the defense and being unfamiliar with

the evaluation and selection of mental impairment evidence as mitigation. Ms. Maddox was

asked this hypothetical question [By Mr. Fisher]:

> Assume that a lawyer had been a district attorney his entire career. He interned
> for the Attorney General's Office and then he was a district attorney for four years
> in Tulsa, six years in Garfield County, two years in Atoka County. During that
> time, he had experience with one case that was a civil commitment case where
> there was maybe psychiatric information involved, a psychiatric witness, he
> couldn't recall. During the years that he was a district attorney, he tried eight or
> nine cases that were felonies. None of those cases, except perhaps one, was
> complex. That he had no experience ever putting on psychology or psychiatry
> evidence in court.  Prior to the time he went to work for OIDS, he had never
> represented a criminal defendant, and the only two death-penalty cases that he
> had actually tried were residual-doubt cases.  Based upon your experience, your
> trial of the 27 to 28 cases (Amended to 19 cases, Vol. 4 at 533)  your observing
> other cases, all of your information and knowledge that you gained as a capital
> litigator, do you have an opinion whether or not that lawyer would be competent
> to make a decision with the evidence in this case whether or not to call the expert

witnesses?

Ms. Maddox:

> A. It would be unlikely because the prosecutorial function is so different. There was a time, maybe up until May of this year, I would have said, well, I don't know, maybe they're similar, and then I prosecuted my first case at the Oklahoma Bar Association during the month of June. I had no idea of the differences of -- I consider prosecuting more difficult than I do criminal defense work. I'm willing to bet Mr. Lyman may have found the opposite, that he found defense work much more difficult than prosecution work. But the defenses really are quite staggering from a strategic perspective. Just prosecuting a lawyer-misconduct case, I can't tell you the differences and how out of my own depth that I felt during that trial because the duties are -- I just had no idea how different they were. And so now that I've done that and I've seen that, I think -- I think Silas would have been fairly challenged by that scenario of having to figure out defense work with prosecutorial experience.

Ms Maddox was also asked: If Mr. Lyman if consulted with in the Sapulpa office rather than the Norman office; do you have an opinion how that would have affected his decision-making in the circumstances we've described here.  Ms. Maddox responded:

> A. Well, in that office, you dealt with mostly – they were all former prosecutors in that office so I'm not sure that he would have gotten a per -- and fairly inexperienced criminal defense lawyers as well. In other words, even the prosecutors that were in that Sapulpa office, they had not been doing criminal defense work long themselves either. So he wouldn't have had -- I don't know who he would have gone to that would have had a breadth of experience in criminal defense work.  And, you know, often times you'll have a second-chair who may bring something to the table, but he didn't have an outside second-chair, he had another person that did -- Mr. Burch, who also didn't have much trial experience either. So oftentimes you can put heads together and come up with a better pool of experience but he didn't even have that here. So – Q. Were there people in the Norman office that could have assisted him and explained to him the decision-decision-making process and been willing to aid him in making the decisions in this case?  A. Well, his good friend, Debbie Maddox, from law school would have explained it to him.

Vol. 3 p. 476-477.

This Court notes that although consultation with other attorneys at OIDS was available,

40

Mr. Lyman could recall no other attorneys that he consulted with about his decision.  This Court finds that for whatever reason, it appears that Mr. Lyman did not have any meaningful consultation with Kathy LaFortune, because he was unaware of the critical meaning of "neurological assessment" or "disinhibited" in the context of neuropsychology. As Ph.D. it is likely that Dr. Lafortune could have assisted him in this regard. This Court finds that his lack of knowledge on these issues was very prejudicial to Mr. Fitzgerald. This Court finds, that based on Mr. Lyman's closing argument indicating Mr. Lyman's Neurological Exam was "normal," any reasonable juror, considering that Mr. Lyman was an advocate for Mr. Fitzgerald, would have determined the 1985 gun shot wound caused no impairment whatsoever.

This Court also finds that based on Mr. Burch's testimony and Kathy LaFortune's surprise when Mr. Lyman decided not to call Dr. Bratcher, this Court finds that Mr. Lyman spent more time conferring with Mr. Burch than Mrs. LaFortune.  This was unfortunate because Mr. Burch had less criminal defense and trial experience than did Mrs. LaFortune, and he was not a clinical psychologist.

Ms. Maddox also rendered an opinion that Mr. Lyman failed to meet professional standards when he failed to call an expert to explain the "technical" terms in the medical records concerning diabetes and Dr. Hellbush's "normal neurological exam."  Referring to Pet. EH Ex. 14 - the records of Mr. Fitzgerald's head injury from a .38 caliber bullet to the frontal lobe of his brain and specifically  Dr. Hellbush's letter dated August 13, 1985  Ms. Maddox was asked by Mr. Fisher:

> Q. -- assuming they [the jury] read them, they would -- based upon your experience and training, is it possible they would have believed the same thing you did, that he was almost neurologically normal?   Ms. Maddox .

"Unquestionably." Q.  And would they assume that since 1985 that his diabetes was relatively controlled?

A. [Maddox] Oh, sure. There's just -- there's just no question that -- I've never understood the idea of I'm going to give a jury records but I'm not going to bring an expert to explain technical records. I've never done it, I've never considered it, and actually it is beyond the kin of my imagination that this is considered to be appropriate in any circumstance. And I include noncapital offenses in that analysis. What in the world are you thinking as a lawyer?

Vol. 2 at 451-452.

## IV. Conclusions of Law

**A.    Mr. Lyman Did Not Have Sufficient Experience with Assessment of Mitigation Evidence in Capital Litigation or the Assessment of Medical Evidence and Psychological and Neuropsychological Evidence to Make  an Informed Reasoned Strategic Decision Not to Present Expert Testimony**

In all three of Lyman's previous capital cases the decision to use psychology or psychiatry as mitigation evidence and the presentation of the selected mitigation evidence to the jury was made by another lawyer. In determining if trial counsel's "strategic decision"was reasonable, this Court must first determine if Mr.  Lyman was "competent" to make the decision to exclude expert testimony that the OCCA determined constitutionally required.  In other words, did he have sufficient capital jury trial experience to assess the strengths and weaknesses of their testimony, assess how a jury would treat the evidence and conclude Drs. Bratcher and Jones should not be called as expert witnesses? *See Harrington v.  Richter,*  131 S.Ct. 770 (2011) ("it would be reasonable to conclude that a competent attorney might elect not to use it."Id.  at 778-779) One critical question is: was Mr. Lyman competent to make this decision under the overall circumstances?  *See also Sallahdin*, 275 F.3d at 1240 (citing Strickland, 466 U.S. at 689) ("A fair assessment of attorney performance requires that every effort be made to

eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.") Accordingly, one of these "circumstances"is Mr. Lyman's experience regarding development, evaluation and presentation of mental impairment evidence as a whole and more importantly in the context of mitigation in the penalty stage of Petitioner's trial.  Furthermore, as another component of his decision, Mr. Lyman determined he was not presenting the evidence based on his opinion how a capital sentencing jury would treat the evidence: "it might be considered an excuse." Mr. Lyman testified several times he believed the jury might consider the testimony of Drs. Bratcher and Jones as excuses. *See* Vol. 1 p. 72;76; 78; 79; 80; 87; 127 and 129.

As noted, Mr. Lyman fails to qualify under the ABA Guidelines as lead counsel. Two (2) of the first three (3) mitigating factors he submitted were not explained by medical and psychological testimony that was available through Dr. Bratcher and Dr. Jones. See Pet. EH Ex. 21.  This Court concludes, that any mitigating effect of the gun shot injury to Mr. Fitzgerald's brain was ruined by his decision to introduce only medical records of the brain injury without explaining the basic medical terminology in the hospital records. Mr. Lyman's inexperience with medical terms and failure to conduct his own research or consult with his co-counsel Kathy LaFortune caused Mr. Lyman to believe that a "normal neurological" exam by Dr. Hellbush in 1985 meant that Mr. Fitzgerald had no neurological impairment. See Pet. EH Ex. 14.  In fact, this counsel told the jury in his closing argument his client's brain was "apparently normal:

> Now, *we really will never know what this injury to James did to him*. And *none of us are doctors*. And *there's information in these records*, and the State will bring it up and I'll tell you right now, that *he's had neurological assessments after the gunshot wound that appear to be normal*. But did his life take a normal twist after this, this point in time? It did not. *(Emphasis supplied)*.

2000 Trial Vol. 8. P. 1194.

Dr. Jones clarified that Dr. Hellbush's *neurological exam* had no bearing on Mr. Fitzgerald's *neuropsychological impairment*. Dr. Jones confirmed that based on his experience with families and laypersons "he would be mildly surprised if 12 random people drew an inference that there was impairment from the gun shot wound (by reading Dr. Hellbush's letter). *Id.* 175. It is almost certain, that the jurors that signed the death verdict "will never know" there was a viable and credible explanation for his behavior.  Counsel's lack of knowledge and failure to consult with knowledgeable counsel, medical professionals or conduct research not only skewed his decision-making but also mislead the jury to believe Mr. Fitzgerald had no neurological impairment. In effect, he fulfilled the district attorney's role by making an argument that would have been otherwise impossible had he introduced the testimony of Dr. Jones and Dr. Bratcher. This court finds that based on counsel's closing argument it would be next to impossible for the jury to draw that conclusion following Mr. Lyman's closing argument informing them Mr. Fitzgerald was "apparently normal."   There are other cases like Mr. Fitzgerald's case where severe mental defects of the defendant were totally hidden from the jury. *See, e.g., Jefferson v. Upton*,130 S.Ct. 2217, 2219 (2010) ("[A]s far as the jury knew, Jefferson did not suffer from brain damage or neurological impairment; he had no organic disorders; and his emotional stability, impulse control, and judgment were perfectly normal." (quotation marks omitted)); *Anderson,* 476 F.3d at 1144 ("[R]ather than offering the jury a potential explanation for Anderson's actions relating to the murders he participated in, trial counsel's case in mitigation was limited to a simple plea for mercy."); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir.2004) ("[E]vidence of Mr. Smith's mental retardation, brain damage, and

troubled background constituted mitigating evidence.... It was patently unreasonable for Mr. Watson to omit this evidence from his case for mitigation."); *see also Porter v. McCollum,* 130 S.Ct. at 453 ("Counsel ... failed to uncover and present any evidence of Porter's mental health or mental impairment....").

In *Blystone v. Horn*, 664 F.3d 397 (3rd Cir. 2011), the court held habeas corpus relief was warranted for trial counsel's failure to investigate inter alia evidence of organic brain damage. In *Blystone*, the AEDPA's restrictions on relief, found in 28 U.S.C. § 2254(d), were applicable. 664 F.3d at 417. That is not the case here because the OCCA did not adjudicate this claim on the merits. Further, in *Blystone*, the petitioner had indicated he did not want to present at least some types of mitigating evidence. *Id.* at 403-04. That complication is not present in this case either. Blystone bragged in "vivid and grisly detail" about the planned killing and the jury heard this, via tape, in Blystone's own voice. *Id*. at 402. Thus, at least three hurdles present in *Blystone* are not present here, yet relief was granted despite those additional hurdles.

Following the decision in *Williams v. Taylor*, 529 U.S. 362 (2000), this Court concludes it is a difficult task for any court to reach a determination that failure to present evidence of mental illness is based on a "reasoned strategic choice" when the omitted evidence explains that a defendant's violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation. *Williams,* at 397-399.)

Mr. Lyman was also disqualified as "competent" to make a strategic decision by his lack of investigation, research or consultation concerning the use of the term "disinhibited" which he believed after his interview with Dr. Jones meant "Mr. Fitzgerald did not give a damn." Vol. 1 p. 89. This was contrary to Dr. Jones' definition. He explained that frontal lobes function in

a "normal" person causes "individuals to inhibit themselves, to slow down, to anticipate the consequences of their actions so that damage in this area and behavioral deficits from this area are often referred to as disinhibition." *Id*. 180. Once again, Mr. Lyman's lack of experience and failure to investigate the accurate meaning of this critical neurological term prevented him from being competent to make a "reasoned strategic decision. Rather than characterize Mr. Fitzgerald's "disinhibition" as a consequence of his gun shot wound that was beyond his control, he missed the opportunity to provide the jury with an explanation for his impulsiveness the night and morning of the murder.

A relevant "circumstance" for Mr. Lyman as the "decision maker" was his experience in preparing and presenting evidence to juries in general and more specifically to capital sentencing juries. His opinion that ultimately led to his decision could not be "reasonable" if he did not have sufficient experience with jury trials, mental impairment evidence and jury decision making. His lack of investigation and consultation with Dr. LaFortune or some more experienced capital litigator before basing his decision not to call Dr. Jones and Bratcher on his incorrect medical and neuropsychological knowledge does not insulate his uninformed decision as a "strategic decision."

A decision cannot be fairly characterized as "strategic"unless it is a conscious choice between two legitimate and rational alternatives. It must be borne of deliberation and not happenstance, inattention, or neglect. *See Wiggins v. Smith*, 539 U. S., at 526 (concluding that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment"); *Strickland*, 466 U. S., at 690–691. Moreover, "a cursory investigation" does not "automatically justif[y] a tactical decision with respect to sentencing strategy." *Wiggins*, 539

U. S. at 527. In keeping with the tenor of the Supreme Court decisions applying the Sixth Amendment case law, the Tenth Circuit has long noted counsel's duties must be "strictly observed" in capital cases. *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997). The Supreme Court has sent a clear signal that in cases such as *Terry Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005) that the penalty phase of capital cases is critical and must be reasonably and thoroughly investigated and only "informed" decisions can qualify for the shroud of protection of a "strategic decision."   An investigation reasonable under the circumstances is essential to strategic decision making and ultimately to effective attorney performance.

In *Anderson v. Sirmons*, the Court made this finding:

> The Supreme Court has squarely rejected the notion that, when counsel has "some information with respect to petitioner's background," counsel has necessarily fulfilled his constitutional duty to investigate and present a case in mitigation. *Wiggins,* 539 U.S. at 527, 123 S.Ct. 2527. Moreover, although Oklahoma is quite correct in asserting that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Strickland*, 466 U.S. at 690, 104 S. Ct. 2052, the question in this particular case is not whether trial counsel made a tactical or strategic decision not to include the omitted mitigation evidence at trial, but rather whether "the investigation supporting counsel's decision . . . was itself reasonable." *Wiggins*, 539 U.S. at 523, 123 S.Ct. 2527.

*Anderson v. Sirmons*, 476 F.3d 1131, 1145 (10th Cir. 2007) (emphasis in original).

The Supreme Court confirmed this holding in *Sears v. Upton*, 130 S.Ct. 3259, 3265-66 (2010) (noting the Court has rejected any suggestion counsel's decision was "justified by a tactical decision" when counsel did not "fulfill their obligation to conduct a thorough investigation"). Counsel was determined deficient and suffered prejudice even where "counsel presented what could be described as a superficially reasonable mitigation theory during the

penalty phase." *Id.* at 3266. As indicated in the Supreme Court's cases, most recently in *Sears*, the importance of the evidence is significant in assessing both deficient performance and prejudice. 130 S.Ct. at 3266. Potential importance is significant to the deficiency inquiry, whereas actual importance is significant to prejudice. The mental health information here was both potentially and actually of critical import.  Mr. Fitzgerald's third counsel, Lynn Burch explains Mr. Lyman's misgivings with the available mental impairment evidence:

> As I recall, Mr.  Lyman thought the jury might view the expert opinions expressed in the reports as potential excuses, and was also concerned the expert opinion and diagnosis of Dr.  Herman Jones as evidence that the jury might rely on to decide Fitzgerald was dangerous and a continuing threat to society.

Pet EH Ex. 20.  Mr. Lyman confirmed this view several times in his testimony -  that he believed the jury might consider the testimony of Dr. Bratcher and Dr. Jones as excuses. *See* Vol. 1 p. 72;76; 78; 79; 80; 87; 127 ("I thought it was best just to proceed in that manner, no excuse, alcohol isn't going to be an excuse . . ." *Id.* 129.

> My understanding is you wanted to portray Mr. Fitzgerald as a good person who was loved, who had remorse, who accepted responsibility, who had a good side as well as the bad side? Would you -- that was your theory? A. Yes. Q. Okay. A. And no excuses. Q. How was the jury supposed to determine why he committed this act of violence in killing Will Russell? Did you give them any explanation why a good person would commit a bad, violent act? A. No.

Vol. 2 p. 149.

This decision making is patently uninformed and demonstrates a complete misunderstanding of mitigation which is a by-product of counsel's failure to qualify as lead counsel under the ABA Guideline 5.1.  The mitigation that counsel excluded is the same specie of mitigation Justice O'Connor determined was required to explain the actions of a capital defendant in *Terry Williams v. Taylor, ante*.  Evidence of mental impairment derived from a

48

genetic disease (Type I diabetes) and  frontal lobe injury caused by a bullet wound to his head while he was sitting on his porch as evidence of future dangerousness is not an excuse and Mr. Lyman's uninformed assessment of this evidence is simply incorrect.

Two mitigating factors were introduced by Mr. Lyman that indicated he would not be a future danger: No. 7. That in 1996 while in the custody of the Tulsa County Detention Center, James Fitzgerald suffered a fracture of his left femur which has hampered his mobility and causes him daily discomfort [Pet. Ex. 14] and Mr. Fitzgerald was serving a life sentence for the 1996 convictions in this case and would never leave prison.

Mr. Lyman's concern that Dr. Jones' testimony would establish Mr. Fitzgerald was "dangerous" and therefore should be excluded demonstrates that his inexperience and refusal to consult with knowledgeable attorneys at OIDS with years of experience, conduct legal, medical and psychological research establishes his decision was not a "reasonable strategic decision." Mr. Fitzgerald's counsel suffered from the same misconception as the lawyer in *Roderick Smith v. Mullin*[20] - he believed mental impairment as mitigation was inconsistent with the first stage guilt verdict for intentional malice murder and should not introduced for that reason.[21] "An uninformed strategy is not a reasonable strategy." *Correll v. Ryan*, 539 F.3d 938,

---

[20]*Smith v.  Mullin*, 379 F.3d 919 (10th Cir.  2004).

[21]Cross Exam by Mrs. Dickson: Q. And just so I understand -- just to make sure I understand what your thought process is on that, or what your answer is on that, the fact that the jury has already been instructed then that he is guilty of premeditated-malice murder, that is in a sense conflicting, would you say, to then present evidence that something would have affected the way he acted?  Or is that what you're saying? A. There could be the potential conflict there in a juror's mind of, well, I thought he was guilty but yet now you're telling me or going off this path that he's not culpable or his degree of culpability is reduced because of his state of mind at the time.  Q. Okay.  A. I'm

----, 2008 WL 2039074, *20 (May 14, 2008); *see also, Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir.2006) (a strategic decision predicated on inadequate investigation is not a reasonable strategy); *Silva v. Woodford*, 279 F.3d 825, 833 (9th Cir. 2002) , involving the brutal rape and dismemberment of two college students. Prejudice was found from failing to introduce evidence of organic brain damage, family history, mental health and substance abuse problems. (counsel's performance "is not immunized from Sixth Amendment challenges simply by attaching to it the label of 'trial strategy,' . . . . . certain defense strategies may be so ill chosen that they may render counsel's overall representation constitutionally defective"*Silva*, 279 F.3d at 846); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir.1994) (defense counsel's tactical decisions are only appropriate where counsel has conducted "a reasonable investigation enabling him to make informed decisions about how best to represent his client").

In *Roderick Smith*, Smith was found guilty of intentional malice murder and counsel did not re-introduce the mental impairment evidence and instead "In the penalty phase, he negated whatever value this mental health evidence had, essentially telling the jury not to consider it. . . . . .*Smith at* 944. "I tried to point out with the testimony of the psychiatrist and the psychologist a real defense to this case," Mr. Watson told the jury.  "Well, you took that credibility away." Tr., Vol.  X., at 93. *Id. Smith v.  Mullin* at 941. In the instant case Mr. Lyman did not present the only witnesses that could explain the significance of his mental impairments.

In *Anderson v. Sirmons*,  476 F.3d 1131 (10th Cir.  2007), counsel breached his duty

_____

sure that there was some of that thinking on my part. Q. Right. Okay. Vol. 1, page 130.

under *Strickland* when he failed to introduce evidence[22] "offering the jury a potential explanation for Anderson's actions relating to the murders he participated in" *citing Smith (Roderick) v. Mullin*, 379 F.3d at 943 (noting importance of mitigation evidence that explains to the jury why a defendant acted as he did) and *citing Williams v. Taylor*, 529 U.S. 362, 415(2000). The issue of defective performance and the corresponding effect on prejudice under *Strickland* are entwined. *See Fisher v. Gibson*, 282 F.3d 1283, 1304 (footnote 11) (10th Cir.2002) ( "[T]hese items therefore relate to both the various deficiencies of counsel we identify and to prejudice. Assessing prejudice *Anderson* the panel noted that Anderson's "brain deficits affect his reasoning, problem solving, and judgment which can be perceived by lay persons as "meanness" or antisocial behavior, but with expert evaluation and explanation are properly explained as deriving from disruption and impairments to the nervous system." The adult use of "methamphetamine would serve to exacerbate Anderson's existing deficits and impairments."

In a 4th circuit case, *Gray v. Branker*,[23] the court reviewed the death sentence imposed on John Gray, a dentist, who shot and killed his wife who filed for divorce. Gray became "increasingly distraught, emotional, and disturbed, according to his friends and associates," made 'very agitated' telephone calls and visits to the office of Mrs. Gray's gynecologist, Dr.

---

[22]The evidence consisted of "brain damage . . . from multiple etiologies, use of inhalants as a child, abuse of alcohol and marijuana from the time he was 9 years old; abuse of marijuana and other drugs from the time he was 9 years old and chronic addiction to and abuse of methamphetamine and repeated head injuries resulting in unconsciousness.

[23]*Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008), cert. den. 129 S.Ct. 1579 (2009).

Marshall Jay Barker, who also had training in psychology.  In Dr. Barker's "medical opinion" Gray suffered from a "behavioral aberration and psychological problem" that included obsessive compulsion." *Id.* at 223-224. "Gray's counsel were confronted repeatedly with indications of Gray's mental impairment. Nevertheless, without making reasoned strategic decisions, counsel ignored these red flags and failed to investigate for mental health evidence or consider introducing evidence on that issue." *Id.*  Mr. Gray's counsel made a strategic decision not to use mental impairment evidence whereas Mr. Fitzgerald's trial lawyer made the decision to use Mr. Fitzgerald's juvenile diabetes and frontal lobe gun shot injury as his lead mitigating factors and them made the unreasoned and uninformed decision to not present Dr. Bratcher and Dr, Jones to explain the significance of these "potential" mental impairments and his medical records.  In Gray's case, the expert evidence, which was missing entirely, would have provided the jury with a medical explanation for Gray's "compulsive behavior" and his "inability to control his reactions." *Id.*  The jury would have known that he suffered from a severe mental illness.  In short, this evidence would have provided direct support for the two mental health mitigating factors - just like in Mr. Fitzgerald's case. Given the significance of the mental health evidence, there is a reasonable probability that a competent lawyer would have introduced it at sentencing. Specifically, like in Mr. Fitzgerald's case, evidence of Gray's mental impairment would not have conflicted with the mitigation strategy pursued by the defense, which was essentially that Gray was a good father, son and community member. *Id.* The mental health evidence would surely have significantly boosted Gray's mitigation case. *Id.*  Finally the court determined "Gray's lawyers simply missed or ignored--and failed to act on--the many signs that Gray was mentally and emotionally unstable." *Id. at* 232. Nevertheless, "without making

reasoned strategic decisions, counsel ignored these red flags and failed to investigate for mental health evidence or consider introducing evidence on that issue." *Gray* at 229, *citing Rompilla v. Beard*, 545 U.S. 374, 392, 125 S.Ct. 2456 (2005).  In finding prejudice, the 4th circuit found that "In comparison to the other mitigating factors submitted for the jury's consideration in this case (such as that Gray "was a good and loving son,"), the two mental health mitigating factors--largely ignored by defense counsel–"were Gray's best hope of convincing the jury he did not deserve the death penalty. The missing expert evidence on Gray's impaired mental condition would have provided the essential support for these factors." *Id. at* 236.

Likewise in Mr. Fitzgerald's case as the jury tried to select a proper penalty they didn't have critical evidence explaining how the combination of brain damage, intoxication and diabetes affected Mr.  Fitzgerald's ability to control his actions at the time of the murder. The mitigating evidence that was not admitted, including Mr. Fitzgerald's intoxication at the time of the murder did not conflict with the other mitigation that was admitted - counsel should have introduced all of this evidence to give Mr. Fitzgerald a fair chance at a verdict less than death.

Recently in *Littlejohn v. Trammell*, --- F.3d ----, 2013 WL 64372 (10th Cir. Jan. 7, 2013) (Respondent's Motion for Rehearing pending), the panel in remanding for an evidentiary hearing, determined that counsel must conduct a "thorough investigation—in particular, of mental health evidence—in preparation for the sentencing phase of a capital trial." *Wilson v. Workman,*  536 F.3d at 1083:

> "We recently had occasion to expound on this principle, drawing on a trilogy of Supreme Court cases— *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495 (2000), *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527 (2003), and *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456 (2005)—involving ineffective assistance at capital-sentencing proceedings." *Victor Hooks*, 689 F.3d at 1201 (referring to the

discussion in *Wilson v. Workman*, 536 F.3d at 1084–85).

*Littlejohn* at *35.  Judge Holmes also notes that "We set forth 'three important principles' that are derived from these cases." These principles are particularly relevant to Mr. Fitzgerald's case:

> First, the question is not whether counsel did something; counsel must conduct a full investigation and pursue reasonable leads when they become evident. Second, to determine what is reasonable investigation, courts must look first to the ABA guidelines, which serve as reference points for what is acceptable preparation for the mitigation phase of a capital case. Finally, because of the crucial mitigating role that evidence of a poor upbringing or mental health problems can have in the sentencing phase, defense counsel must pursue this avenue of investigation with due diligence. *Wilson,* 536 F.3d at 1084–85

The majority in *Littlejohn* opined "in *Victor Hooks*, we underscored the importance of a specific type of mental-health evidence—that is, evidence relating to *organic or physical brain injury*" . . . . .have found to have a powerful mitigating effect. . . . . And for good reason—the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal *relationship between impulse and action.  See Victor Hooks*, 689 F.3d at 1205 (*citations omitted*). Because of its central significance, where the defendant's circumstances put it in play, ordinarily it would be "patently unreasonable for [counsel] to omit this evidence from his case for mitigation." citing *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir.2004); *see id.* (noting "evidence of [petitioner's] mental retardation, brain damage, and troubled background constituted mitigating evidence" and, indeed, is "exactly the sort of evidence that garners the most sympathy from jurors"). *Littlejohn* at *34-35, Emphasis supplied.*

This Court concludes that Mr. Lyman did not have the necessary capital and jury trial

experience to make this life or death decision and his decision does not qualify as a "reasoned "strategic decision."

**B.**    **Assuming Arguendo That in Spite of Mr. Lyman's Inexperience and Failure to Investigate His Decision Not to Present Evidence from Dr. Bratcher and Dr. Jones  Can Be Considered as "Strategic" the Evidence Presented in this Case Establishes That His Decision Was "Objectively Unreasonable."**

The evidence cited above indicating that counsel was not competent under *Strickland* to be shielded by "strategic decision" also establishes that counsel's decision to not offer the testimony of Drs. Jones and Bratcher was patently and objectively unreasonable.   It is this Court's conclusion that the failure to call Dr. Bratcher as an expert witness to explain the adverse affect of diabetes on childhood development and developing patterns of misbehavior rendered Mr. Lyman's performance at sentencing deficient.[24] "The mere incantation of 'strategy' does not insulate attorney behavior from review." *Fisher v. Gibson*, 282 F.3d 1283, 1296, 1305 (10th Cir. 2002). This Court finds the strategy employed in Mr. Fitzgerald's case was objectively reasonable. *Fisher id.* at 1305. The issue of defective performance and the corresponding effect on prejudice under *Strickland* are entwined. *Fisher,* 282 F.3d at 1304 (footnote 11).  "[T]hese items therefore relate to both the various deficiencies of counsel we identify and to prejudice." Therefore, the prejudice caused by counsel's decision to not to call experts in this case  is directly relevant to the reasonableness of his decision not to do so.  This is only common sense.  If the omitted evidence weak,  irrelevant or cumulative its omission is not prejudicial and therefore counsel's decision to not present it is not breach of performance.

---

[24]The failure to call Dr. Bratcher to support Dr. Herman Jones' testimony on neurological impairment will be addressed below.

Such is not the case here.

Because counsel did not present expert testimony linking his mental impairments and impulsiveness to Petitioner's behavior before and after the murder, counsel was left with the argument that James Fitzgerald was a "bad man," but there is "value to his life" because he still has "strong relationships with his family," and the mitigators were "not excuses." Tr. Vol. 8, 1206. Clearly, trial counsel did strategically decide to use mental impairment in the form of diabetes and head injury as a mitigating factor but then made the unreasoned decision not to use an expert to explain how the evidence was mitigating and how Mr. Fitzgerald's choices and actions were impaired by the combination of disease, physical disability and intoxication. Counsel's deficits opened the door to the prosecution dismissing diabetes and his "difficult" childhood:

> You will be able to evaluate mitigating circumstances. Instruction No. 15 says, "The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of the case." It's for you to resolve under the facts and the circumstances of the case. And what have you been told? You've been told that he's a diabetic, you've been told that he's had a difficult childhood, you've been told that he has children. Common sense tells you, and life experience, that does not make him much different than a lot of people in those areas. And you can use common sense and you can use your life experience when you go back there.

Tr. 2000 2nd stage re-trial Vol 8 p. 1177.

The fact is, counsel could have explained how the combination of the brain injury, diabetes and intoxication did make him "different" than a lot of people. Counsel's failure to introduce evidence of deprived Mr. Fitzgerald any answer to the State's argument that "despite the fact that he has children and he has family" he "made this choice - he struck again . . . . . .

if you couple that information with the ***cold and cruel circumstances*** of this murder, he not only qualifies for the death penalty, he has earned it." (*Emphasis supplied*) 2000 trial Tr. 1169. "Only a small portion of crimes committed are eligible for death penalty. ***Only the ones that are so cold and cruel and so despicable that the law provides for the most severe punishment. This is one of those crimes***." 2000 Tr. at 1180. "He knows that we know that he's killed Will Russell in ***cold blood***. *Id.* 1226. . . . . "this is important. ***Somebody who is evil and a killer*** and an armed robber . . . . . .what drives him? *Id.* 1232.  Counsel had a shield to fend off this argument but failed to use it.

Like in *Terry Williams* and *Roderick Smith* counsel had no answer for the charge that Mr. Fitzgerald was a *evil and a cruel and cold blooded murderer*.  All that counsel could really say was that Mr. Fitzgerald had no excuses, his son Kyle loved him - -  even though he did not deserve it and asked the jury to find he had value to his life:

> These are mitigating circumstances. These are not excuses. These facts and this information is about his life. There is value to his life, ladies and gentlemen. You can sit and deliberate and consider all the bad of James Fitzgerald, it's very easy to do. It will be easy for the State to draw your attention to that, because they will argue again, they have the burden. But there is value to his life. . . . . . . .don't destroy Kyle. He may love a man that shouldn't be loved, but he loves him.

Vol. 8, p. 1206-1208.

In *Terry Williams v. Taylor,* 529 U.S. at 396-398, the Court held that a capital defendant has "a constitutionally protected right--to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer, "and to be Constitutionally protected from omission, does not have to cause the mitigating evidence to outweigh the aggravating circumstances, but it's omission is prejudicial if there is a reasonable probability it could have

influenced the jury's assessment of moral culpability in selection of penalty." *Id.* at 397. In Oklahoma,"even if the jury finds aggravating circumstances, and those circumstances are not outweighed by mitigating circumstances, they can decline to impose the death penalty," *Burrows v. State*, 640 P.2d 533, 544 (Okl. Cr. 1982); *Duvall v. Reynolds*, 139 F.3d 768, 790 (10th Cir.1998). "Even if you find that the aggravating circumstances outweighs the mitigating circumstance or circumstances, you may impose a sentence of imprisonment for life with possibility of parole or life without the possibility of parole." Fitzgerald Instr. No. 17, O.R. 1137.

As mandated by *Terry Williams*, Petitioner Fitzgerald was entitled to the benefit of evidence that could influence the juries selection of penalty even if it did not undermine or rebut (or outweigh) the prosecution's death-eligibility case. ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case.") *Id.* 398.

This Court finds that Dr. Bratcher's expert testimony could have explained to Petitioner's sentencing jury how juvenile diabetes adversely affected Petitioner's development and provided an explanation for his childhood misbehavior. This Court finds that the testimony of Dr. Bratcher was a significant mitigating factor and there exists a reasonable probability at least one juror would have struck a different balance, ... prejudice is shown." *Littlejohn v. Trammell*, *supra* (citations omitted) (*quoting Wiggins v. Smith*, 539 U.S. at 537) (*internal quotation marks omitted).*

"To assess prejudice arising out of counsel's errors at a capital-sentencing proceeding, we must 'reweigh the evidence in aggravation against the totality of available mitigating

evidence." *Victor Hooks*, 689 F.3d at 1202 *(quoting Julius Young*, 551 F.3d at 960). "If there is a reasonable probability that at least one juror would have struck a different balance, ... prejudice is shown." *Littlejohn* at *35. *Terry Williams v. Taylor* is a case on point because like Mr. Fitzgerald the evidence in Terry Williams indicated Mr. Williams' ability to control his impulses was impaired - which could be interpreted that he was a future danger.

The Supreme Court found the following to be Constitutionally mandated mitigating evidence: " [at]11 years old dramatically described mistreatment, abuse, and neglect during his early childhood, . . . . borderline mentally retarded, . . . suffered repeated head injuries, and might have mental impairments organic in origin." The Court noted that Williams' omitted juvenile records contained unfavorable evidence, "thrice committed . . .for aiding and abetting larceny, . . .for pulling a false fire alarm, . . . . . . .and for breaking and entering. . ." *Id.* at 396. The Court found the omitted mental impairment evidence might well have influenced the jury's appraisal of his moral culpability." Id. at 398. (counsel has the duty to not only investigate and present all available evidence, he must also explain it's significance to the jury, or the jury will be left to conclude, as suggested by the prosecution that Petitioner's violent behavior *was the product of cold-blooded premeditation, rather than a compulsive reaction, Williams*, at 397-399.). The Supreme Court and the Tenth Circuit have found prejudice and breach of duty from mitigation failures in cases that are exponentially more aggravated than that the facts in this case. Like in Petitioner's case, the jury in *Terry Williams* had already been presented with evidence that he was "dangerous." In *Williams*, the Supreme Court granted sentencing stage relief despite the fact the mitigation would apparently not "undermine or rebut the prosecution's death-eligibility case." 529 U.S. at 398. In addition to Mr. Williams's alarming proclivity for

preying on and viciously assaulting the elderly, including placing one elderly woman "in a 'vegetative state'" from which she was "not expected to recover," he had also set fire to a home, stolen two cars, set a fire in the jail while awaiting trial, stabbed a man during a robbery, and confessed to having strong urges to choke other inmates and break a fellow prisoner's jaw. *Id.* at 368, 418. Not surprisingly, two experts testified there was a high probability Williams would pose a continuing threat to society. *Id.* at 368-69. In *Roderick Smith v. Mullin*, 379 F.3d 919, 924 (10th Cir. 2004), the Tenth Circuit found the petitioner was prejudiced despite the fact his case was a quintuple homicide. Four of the five people Smith killed were children, two of whom were coming to the aid of their mother. Smith's jury found four aggravating circumstances as to Mrs. Smith's death and five as to the deaths of each child (four children were murdered and their mother). *Id.* 944. Smith had also stabbed a girlfriend 30 times with a ball point pen five (5) years before he killed 5 innocent people. *Id.*

In *Anderson*, the Court found prejudice in a quadruple shooting and triple homicide. 476 F.3d at 1134. The murders were "callous and brutal," possibly involving wounded victims being burned alive in a fire set to cover the perpetrators' tracks. *Id. at* 1134, 1146. Further, Mr. Anderson subsequently corresponded about "taking care" of witnesses and had a knife in the jail. *Id. at* 1146. Notably, the available mitigation in Mr. Anderson's case also included brain damage. *Id. at* 1144. Many other circuits have found counsel ineffective and failure to introduce evidence of brain damage prejudicial even in cases where such a finding would indicate the defendant was a continuing threat or poses a future danger.

In light of *Terry Williams*, *Coleman v. Indiana*, 529 U.S. 1085 (2000), (GVR),was remanded to the Supreme Court of Indiana, signaling that the *Williams* standard should be to

the omitted evidence in Coleman's case, (earlier convicted of murders in Ohio; he enticed two young girls into the woods, bound them, stomped and strangled one of them to death, repeatedly molested the other) *Coleman v. Indiana*, 703 N.E.2d 1022, 1065 (Ind. 1998). The Sixth and Ninth Circuits have properly applied the standard of prejudice mandated by *Terry Williams*, where psychiatric evidence has been omitted. See *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001), defendant abducted and murdered a 15 year old girl. His violent criminal history was staggering.[25] The omitted mitigation,[26] would certainly support the thought that Coleman had no impulse control. However, the Sixth Circuit found prejudice citing the *Terry Williams* standard, *Id*. 452, citing *Williams*, at 398.

> We find, given Petitioner's personal background, psychological history, and potential organic brain dysfunction, that it is reasonably probable that the presentation of even a substantial subset of the mitigating evidence detailed above "would have humanized [Petitioner] before the jury such that at least one juror could have found he did not deserve the death penalty." Id.

In *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001), the petitioner murdered a woman to exact revenge, and killed the only eye witness to the crime. *Id.* 918. The State also presented in aggravation that episodes of prior violence, *Id*. 928. Omitted mitigation included childhood behavioral disorder and depression, drug use and low-normal IQ. In spite of these problems he

---

[25]the abduction and murder by ligature strangulation of a 9 year old girl in Wisconsin; abducted two ten-year old girls in Indiana, one murdered by strangulation; murdered a 25 year old woman in Indiana by strangulation; car theft and battery in Michigan; murder in Ohio (woman and nine-year-old daughter by strangulation), and an additional murder and car theft in Ohio. *Id.440.*.

[26]mixed personality disorder with antisocial, narcissistic and obsessive features, borderline personality, organic brain dysfunction, as well as probable manic- depressive psychosis, a childhood and infancy and early adulthood replete with abuse, dysfunction, disruptive environment. *Id*. 450-52.

was described as caring, helpful, generous and that he helped the disabled and elderly. Id. 930-33.[27]  *See also Silva v. Woodford*, 279 F.3d 825, 833 (9th Cir. 2002) , involving the brutal rape and dismemberment of two college students. Prejudice was found from failing to introduce evidence of organic brain damage, family history, mental health and substance abuse problems. See also *Caro v. Woodford*, 280 F.3d 1247,1254 (9th Cir. 2002), (stalked victim before killing him, lured other victims to come near so he could shoot them at close range, had kidnaped and sexually assaulted other victims, and made two escape attempts). "[B]ecause . . . Caro suffers from brain damage, the delicate balance between his moral culpability and the value of his life would certainly teeter toward life." The Court found the omitted physiological evidence explained why Caro would have "impulse discontrol"and "irrational aggressiveness."   Other circuits have also found evidence to be mitigating that indicated the defendant suffered from psychiatric disabilities indicating *lack of impulse control* , and multiple aggravators including "future danger" or "continuing threat."[28]

_____

[27]Even in the face of this strong aggravating evidence, however, we must reverse Mayfield's death sentence if we cannot conclude with confidence that the jury would unanimously have sentenced him to death if Ames had presented and explained all of the available mitigating evidence.  *See Williams,* 529 U.S. at 368-69, 399, (reversing death sentence for ineffective assistance at the penalty phase despite strong aggravating evidence).  We cannot so conclude on this record.

[28]*Baxter v. Thomas*, 45 F.3d 1501 (11th Cir.), omitted psychiatric problems and commitment to psychiatric institution. Psychiatric mitigating evidence "has the potential to totally change the evidentiary picture." *Id*. 1515 (aggravators: (1) that the murder "was outrageously or wantonly vile,  horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim" and (2) that the murder was committed "for the purpose of receiving money or any other thing of monetary value"); *Hill v. Lockhart*, 28 F.3d 832 (8th Cir. 1994), omitted history of mental problems and anti-psychotic medication, (aggravators: prior violent felony, the defendant knowingly created a great risk of death to someone other than the murder victim, and that the murder was committed in order to avoid arrest.); *Loyd v. Whitley*, 977 F.2d 149, 160 (5th Cir. 1992), omitted abuse as a child, brain damage, schizoid personality, extremely high overall emotional disturbance, (aggravators: abducted and raped a three year old child, drowned her in a ditch, threw body in swamp, (1) death during aggravated rape, (2) heinous, atrocious, cruel (3) killing a witness to rape); *Brewer*

There is no empirical data to support the thought that the omitted mitigating evidence "could" be treated in the mind of some jurors as aggravating. This speculation presumes that all jurors on Petitioner's jury would not have considered Petitioner less morally culpable. Because in Oklahoma a death verdict must be unanimous, the district court's finding all jurors in Petitioner's case would find the omitted evidence more aggravating than mitigating is unwarranted and devoid of empirical support.  Empirical data from the Capital Jury Project demonstrates a history of mental illness influences far more of those jurors surveyed away from the death penalty, (fifty-three percent), than toward it, (three percent).*See* Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What Do Jurors Think? 98 Columbia. L. Rev. 1538, 1559 (1998), note 161.

Counsel's failure to present a psychologist or psychiatrist that could identify and explain his mental impairments had the same effect as in *Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2003). although for a slightly different reason.   In *Smith*, like in *Terry Williams v. Taylor* the aggravating circumstances were "strong." Undoubtedly the aggravating circumstances in *Smith* and *Terry Williams*  were much stronger than in Mr. Fitzgerald's case.  In *Smith* the Tenth circuit noted: "The State's case in favor of the death penalty was strong.  But as the Tenth circuit noted in Smith, the aggravating evidence in *Williams*, was also strong.  Justice Rehnquist's *Williams* dissent over the Court's finding of prejudice: "The murder of Mr. Stone was just one

_____

*v. Aiken*, 935 F.2d 850 (7th Cir. 1991), omitted history of mental problems, disruptive family background, susceptibility to being easily led, brain damage, mentally defective.(aggravators killed victim during a robbery and committed three other armed robberies the same day); *Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995), omitted bi-polar disorder and manic episode at time of murder, (aggravators: (1) torture and physical abuse and (2) offense committed in place of confinement [likely to place correction officers at risk in the future].

act in a crime spree that lasted most of Williams's life.  Indeed, the jury heard evidence that, in the months following the murder of Mr. Stone, Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to a city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw." *Williams*, 529 U.S. at 418, 120 S.Ct. 1495 *(quotations omitted)*. The omitted evidence in *Smith* clearly established "future dangerousness" and the omitted evidence in Smith included evidence of "brain injury to the particular area of the brain that regulates emotions  .  .  . when a person is stressed or put in a stressful situation, their control over their emotions may break down even further." *Smith*, 379 F.3d at 941. Like Mr. Fitzgerald, Smith was found guilty of malice murder. However, Roderick Smith's attorney, like Mr. Fitzgerald's counsel, failed to understand that in due to the finding of premeditated malice murder in the guilt stage, he "was unaware Mr. Smith's mental s*tate or mental illness could be introduced as mitigation in the second stage of (the) trial," [*Id. 939] and counsel was left with the argument "I also submit to you it's not normal behavior to stab people, kill five people and then wanting to go to sleep.  That's not normal behavior  .  .  [N]o logical person, no person acting in their right mind  .  .  .  would commit this type of act without some driving force," which the Tenth Circuit noted "What that 'driving force' might have been, however, Mr. Smith's counsel never sought to define."

### C.    Respondent's Theory that the Omitted Expert testimony was a Two Edged Sword Fails Under Prevailing Supreme Court and Tenth Circuit Authority

[**Note: This authority is offered under the assumption Respondent will argue the evidence from Dr. Jones and/or Dr. Bratcher is a two edged sword.]**

Respondent cites several Tenth circuit cases that apply the "two edged sword" to deny prejudice where mental health evidence has been omitted by counsel because it could have

strengthened the state's evidence of future dangerousness. In *Terry Williams*, the Supreme Court

clarified, if not underscored, the constitutional requirement mental health evidence must be

introduced if it "might well have influenced the jury's appraisal of his moral culpability." *Terry*

*Williams* at 397, *citing Boyde v. California*, 494 U.S. 370, 387, 110 S.Ct. 1190 (1990).  The

court emphasized that in making the prejudice determination all of the evidence - that admitted

at trial and evidence omitted by trial counsel must be considered in the prejudice determination.

*Id.*

The facts in *Terry Williams* provide a baseline for prejudice evaluations where mental

health evidence has been omitted from a jury's assessment of moral culpability in the  selection

of penalty. [29]  The 4th circuit reversed - basically agreeing with the Virginia Supreme Court that

_____

[29]Based on his confession *Terry Williams* was convicted of robbery and capital
murder for bludgeoning Dee Stone to death in order to steal three dollars. Williams at
368. The jury found a probability of "future dangerousness" and unanimously fixed his
punishment at death. *Id.* In the sentencing hearing the state offered overwhelming
evidence that Williams was a future danger: (1) He had three previous felony convictions:
armed robbery, burglary and grand larceny. (2) In addition Williams confessed to two
auto thefts and two separate violent assaults on elderly victims perpetrated after the Stone
murder; (3) Williams had started a fire outside one victim's residence before attacking and
robbing him. (4) Williams had brutally assaulted an elderly woman who was in a
"vegetative state" and not expected to recover. Williams had also been convicted of arson
for setting a fire in  jail while awaiting trial for the murder.   Two expert witnesses
employed by the State testified there was a "high probability" that Williams would pose a
serious continuing threat to society.  Id. at 368. Three family members and neighbors that
testified Williams was "a nice boy" and "not a violent person" and that he had turned
himself in and admitted to the robbery/murder [but also confessed to other robberies and
beating the elderly woman until she was in a coma.] In federal habeas proceedings, the
district court granted relief and found that the Virginia Supreme Court had
mischaracterized the omitted mitigation evidence because they "ignored or overlooked
the evidence of Williams' difficult childhood and abuse and his limited mental capacity"
and misrepresented the additional evidence as coming from 'mostly relatives because "a
respected professional in the community, and several correctional officers offered to
testify on Williams behalf." *Williams* at 374.

prejudice under Strickland was not established from omission of the mitigating evidence.  The

Supreme Court reversed the 4th circuit and granted relief finding:

> [T]the state court failed even to mention the sole argument in mitigation that trial counsel did advance--Williams turned himself in, alerting police to a crime they otherwise would never have discovered, expressing remorse for his actions, and cooperating with the police after that.   While this, coupled with the prison records and guard testimony, may not have overcome a finding of future dangerousness, the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was "borderline mentally retarded," might well have influenced the jury's appraisal of his moral culpability.  *See Boyde v. California,* 494 U.S. 370, 387, 110 S.Ct. 1190 (1990). The circumstances recited in his several confessions are consistent with the view that in each case his violent behavior *was a compulsive reaction rather than the product of cold-blooded premeditation.   Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case. The Virginia Supreme Court did not entertain that possibility*. It thus failed to accord appropriate weight to the body of mitigation evidence available to trial counsel. (Emphasis supplied).

*Id.* 399.

In other words, it does not matter that the omitted mitigation evidence does not

overcome, undermine or rebut the prosecution's death eligibility case because it may alter the

jury's selection of penalty by influencing the jury's appraisal of his moral culpability. As this

applies to Mr. Fitzgerald's case, the omitted mental health evidence did not establish Mr.

Williams was less likely to be a danger in the future but it did establish there was an explanation

for his violent conduct that it was a *compulsive reaction rather than the product of cold-blooded*

*premeditation* and therefor reduced his moral culpability and may have altered at least one

jurors selection of penalty.  In *citing Terry Williams* the Tenth circuit in Roderick *Smith v.*

*Mullin* held:

---

In granting relief from a death sentence under circumstances quite similar to those before us, the Supreme Court noted that evidence of borderline mental retardation and childhood privation and abuse is "consistent with the view that [the petitioner's] behavior was a compulsive reaction rather than the product of cold-blooded premeditation." Williams, 529 U.S. at 398, 120 S.Ct. 1495; see also *Simmons v. Luebbers*, 299 F.3d 929, 936 (8th Cir.2002) (granting relief from a death sentence and noting: "The jury was already aware of Simmons's anger towards women. [A psychiatrist's] report would have introduced the possibility that Simmons's inability to control his violent behavior was caused by childhood trauma and abuse. This information could have been used in his favor at the penalty stage. Instead, the jury was allowed to conclude that Simmons's violent behavior was simply the result of his wicked and aggressive nature.")

*Smith (Roderick) v. Mullin*, 379 F.3d. 919, 943 (10th Cir. 2004).

Following *Terry Williams* the Supreme Court provided more guidance *Wiggins v. Smith*, 123 S.Ct. 2527 (2003), and the *Roderick Smith* panel also applied *Wiggins* to the *Strickland* prejudice determination:

We conclude, much as the Supreme Court did in *Wiggins,* that "had the jury been able to place" Mr. Smith's background, brain damage, and mental retardation-- *this compelling explanation for his behavior--"on the mitigating side of the scale,* there is a reasonable probability that at least one juror would have struck a different balance." [FN13] *Wiggins,* 123 S.Ct. at 2543.

In *Roderick Smith v. Mullin*, the 10th circuit fell in step with the Supreme Court and reversed the district court finding that the omitted evidence was a "two edged sword" and found prejudice from omitted evidence of brain damage and mental retardation is mitigating and has practically no aggravating effect:

We first note that the mitigating evidence omitted in Mr. Smith's trial is exactly the sort of evidence that garners the most sympathy from jurors. Death penalty litigation expert Dr. Craig Haney testified at the evidentiary hearing that "[j]uries respond to and find mitigating [this type of evidence,] and [they] are more likely to vote for life rather than death sentences in cases where there is ... clear and clearly presented evidence that the defendant has suffered from some form of mental illness...." E.H., vol. X, at 479-80. The available empirical evidence as to juror attitudes supports Dr. Haney's conclusions. See Stephen P. Garvey,

> *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 COLUM. L.REV. 1538, 1559 (1998) (finding evidence of mental retardation and mental illness to be the most persuasive mitigation evidence and to have practically no aggravating effect); *Samuel P. Gross, Update: American Public Opinion on the Death Penalty--It's Getting Personal*, 83 CORNELL L.REV. 1448, 1468-69 (1998) (finding mental retardation to be "much more" mitigating than other potential factors). See also *Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir.1996) (citing empirical evidence of juror sympathy to claims of "organic brain problems")*; Brewer v. Aiken*, 935 F.2d 850, 862 (7th Cir.1991) (Easterbrook, J., concurring) (same).

*Smith, supra* at 942.

The panel also found that the district court's application of the two edged sword revealed a fundamental misunderstanding of the purpose the mental health mitigation evidence is presented noting that the district court denied prejudice because [The omitted evidence] "tends to portray [Mr. Smith] as an unstable individual with very little control over either his impulses or his 'alter' personalities" and would have "negated much of the mitigation evidence actually presented to the jury of [Mr. Smith's] good work history and friend's and relatives perception of [Mr. Smith] as a kind hearted person." The Tenth circuit reversed the district court's order, granted the Writ and in the process dulled the negative edge of the two edged sword:

> These statements reveal a fundamental misunderstanding of the purpose for which such mitigation evidence would have been presented. The jury already had evidence of Mr. Smith's impulsiveness and lack of emotional control. What the jury wholly lacked was an explanation of how Mr. Smith's organic brain damage caused these outbursts of violence and caused this "kind hearted" person to commit such a shocking crime." (Footnote omitted).

*Smith (Roderick)*, 379 F.3d. at 943.

In this case, as in *Terry Williams* and *Roderick Smith* the state alleged, and Respondent still claims, that an overwhelming amount of evidence was introduced that Mr. Fitzgerald would pose a continuing threat to society. The jury already had evidence of Mr. Fitzgerald's

impulsiveness and lack of emotional control which resulted in the acts of violence they claimed rendered him a "continuing threat." Mr. Fitzgerald's bad conduct and attitude that he testified were symptoms of ASPD were already before the jury.

The fact that Mr. Fitzgerald became angry when Will Russell "snatched his rifle" was already before the jury, as was the additional evidence of "continuing threat" offered by the state that Mr. Fitzgerald robbed and held a knife to the neck of female clerk in Indiana in 1985. As in Roderick Smith, this conduct could only be explained by a mental health expert, not by passing references by counsel in closing argument "Now, *we really will never know what this injury to James did to him. And none of us are doctors - neurological assessments after the gunshot wound that appear to be normal.(Emphasis supplied)*. 2000 Trial Vol. 8. P. 1194.

Trial counsel and respondent claim it was sound strategy to introduce head injury records from 1985 concerning his gun shot wound and argue based on the testimony of this mother that "he acted differently after he was shot in the head." What Mr. Fitzgerald's jury did not know is how the combination of uncontrolled Type 1 diabetes, an unprovoked gun shot wound to the head resulting in impulsiveness that was ignited by alcohol consumption the day of the murder, combined and created a "multiplicative effect" arguably causing Mr. Fitzgerald "to cross the line" and as a result this man who "had significant long term relationships with his family," who considered his "life to have value" and he was loved by his son Kyle but could shoot an unarmed man in a fit of anger.

Mr. Fitzgerald' prior acts of violence and the state's evidence supporting future danger or continuing threat is relatively minor in comparison to the aggravating circumstances in *Roderick Smith.* This court will follow *Terry Williams* and *Roderick Smith* and find that what

Mr. Fitzgerald' jury lacked an explanation for his behavior that could have resulted in one juror "selecting" a sentence less than death.  See also *Brownlee v. Haley*, 306 F.3d 1043 (11th Cir.2002), omission of "the powerful mitigating evidence of Brownlee's borderline mental retardation, psychiatric disorders" undermines our confidence in Brownlee's death sentence." Id. 1070. This finding was made in spite of the two overwhelming aggravating circumstances. See Id. at 1051. The *Brownlee* panel rejected the "two edged sword" argument, *Id*. at 1072.

The Sixth circuit has also properly applied the standard of prejudice mandated by *Terry Williams*, where mental impairment evidence has been omitted in *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001), discussed *supra*.  The Fourth Circuit has also cast aside the  "double edge sword" in granting habeas relief and finding Strickland prejudice based on Terry Williams, Wiggins and with complete reliance on the Tenth circuit's well-reasoned decision in *Roderick Smith*.  *See Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008) discussed *supra*.

Assuming arguendo, that *post-Terry Williams* omitted mental impairment evidence can be a "two-edged sword," each case must be evaluated based on the aggravating evidence supporting"continuing threat" and whether the omitted mental impairment evidence might explains the defendant's acts of violence in a way that "might well have influenced the jury's appraisal of his moral culpability."  Respondent's two edged sword argument, if accepted, negates not only the holding in *Roderick Smith*, but also ignores the Supreme Court holding in *Terry Williams*  and instead follows Justice Rehnquist's dissent.

The point of departure that seems to define the state of the "two edged sword" in the Tenth Circuit depends, in large part, whether the defendant claimed factual innocence of the murder and relied on a specie of residual doubt or admitted his factual guilt and attempted to

mitigate his sentence away from death. Respondent cites *Bryan v. Gibson*, 276 F.3d 1163, 1178 (10th Cir. 2001) for the statement that "psychiatric evidence does present a double-edged sword." In a nutshell, the omission of mental impairment in *Bryan* was not prejudicial because it conflicted with his defense claiming he was totally innocent of the murder, "in light of the testimony two attorney experts and trial counsel "regarding the need for consistency between guilt and penalty phase presentations." *Id.*

In support of the "two edged sword" Respondent also *cites Gilson v. Sirmons*, 520 F.3d 1196, 1244-1250, (10th Cir. 2008) (finding that evidence that the defendant suffered from brain damage that caused him to have extreme difficulties dealing with frustration and conforming his behavior to societal norms likely would have weighed against him). Like in *Bryan*, the evenly split panel in *Gilson* determined the diminished capacity evidence conflicted with the claims of actual innocence:

> We find trial counsel was aware of the automobile accident and any personality changes in [Gilson] since the accident. However, the record reflects that with that knowledge, counsel chose a defense of actual innocence, not one of diminished capacity. That strategic choice is not indicative of deficient performance as a defense of actual innocence was reasonable based upon information provided to counsel by [Gilson]'s family and friends. . . . . Such evidence would have been contradictory to mitigating evidence of [Gilson]'s lack of culpability and lack of violent conduct. Counsel's strategic decision to pursue a second stage defense that [Gilson] was less culpable than Coffman, and highlight the positive traits of his character instead of focusing on any mental problems he might have was well within the range of professional reasonable judgment. *Id.* 1247-1248.

In the instant case, as in *Terry Williams* and *Roderick Smith* - there is no factual innocence plea, applying the *Bryan* and *Gilson* holdings, that conflicts with the presentation of mental impairment to explain violent conduct. Here, there was no innocence claim. Counsel at the 2000 re-trial made the uninformed decision to pursue as mitigation "head injury affecting

behavior" and "diabetes" but did not introduce available expert testimony to explain it.

Respondent also cites *Cannon v. Gibson*, 259 F.3d 1253, 1278 (10th Cir. 2001) for the proposition that "evidence that the defendant had very little impulse control could have strengthened the state's evidence of future dangerousness." Response p. 92. *Cannon* is also distinguishable on it's facts.[30]

*Wackerly v. Workman*, 580 F.3d 1171(10th Cir. 2009) was rendered in the wake of the *en banc decision that Wilson* and *Wackerly* were entitled to de novo review. *Wackerly* cites a number of cases that pre-date *Terry Williams* and were clearly distinguished in *Roderick Smith v. Mullin*. The *Wackerly* panel distinguishes *Roderick Smith v. Mullin*, "By way of example, [Wackerly] does not argue that this is a case in which the aggravating aspect of his drug use was already placed before the jury, such that no further harm, and only good, could have come from introducing further details of his substance abuse habit," citing *Roderick Smith*, 379 F.3d 919, 943 n .11 (10th Cir.2004).  Consequently, Judge  Tymkovich, the lone dissenter in *Littlejohn, supra*, was on the *Wackerly* panel and distinguished *Littlejoh*n, *Roderick Smith* and *Anderson,*

---

[30]Other than the gruesome facts of the murder - the death of an elderly lady who was kidnaped, beaten, burned alive after being doused with gasoline, sexually assaulted all of which Cannon claimed he was innocent blaming Loyd LaFevers his co-defendant. *Cannon, Id.* at 1258.  The state offered no evidence of previous arrests or criminal acts and certainly no previous violent behavior that begged an explanation as in *Terry Williams* and *Roderick Smith*.  The mitigation in Cannon consisted of: exemplary work history; lengthy history of acts of kindness to the elderly, disabled, and destitute;  strong, continuing attachment to his young daughter;  lack of a criminal record before the murder;  relatively less culpable role in the murder;  and exemplary behavior as a prisoner. Trial counsel's mitigation evidence painted Cannon as a kind, compliant, and responsible individual whose involvement in murder was an aberration." *Cannon* at 1277.

*supra.*[31]

The *Wackerly* panel applies prejudice from the omitted mitigating evidence to the guilt stage and the penalty eligibility decision rather than to selection of penalty ("such evidence surely would have strengthened the State's case of guilt, supplying a persuasive motive for the murder, as well as its case that Mr. Wackerly posed a continuing threat to society, emphasizing that Mr. Wackerly's expensive and unaddressed habit gave him a continuing reason to rob and kill, even for modest sums."). Neither of these applications have any bearing on "moral culpability" in the selection of penalty process described in *Boyde*, *Terry Williams* and *Roderick Smith*. The panel in *Wackerly* describes the omitted mitigation evidence to consist mainly of drug use with little or no actual evidence of mental impairment:

> Mr. Wackerly's drug abuse, its longevity, that he had previously engaged in "car theft activity to trade for drugs," and that he needed approximately $300 a day to feed his drug habit. And such evidence surely <u>would have strengthened the State's case of guilt</u>, supplying a persuasive motive for the murder, as well as its case that Mr. Wackerly posed a continuing threat to society, emphasizing that Mr. Wackerly's expensive and unaddressed habit gave him a continuing reason to rob and kill, even for modest sums.

*Wackerly* at 1179.

The main distinguishing factor in *Wackerly* is that like *Gilson* and *Bryan*, he never

---

[31]*Anderson,* 476 F.3d at 1144 ("[R]ather than offering the jury a potential explanation for Anderson's actions relating to the murders he participated in, trial counsel's case in mitigation was limited to a simple plea for mercy."); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir.2004) ("[E]vidence of Mr. Smith's mental retardation, brain damage, and troubled background constituted mitigating evidence.... It was patently unreasonable for Mr. Watson to omit this evidence from his case for mitigation.")

conceded his guilt, he claimed that he was innocent and his wife committed the murder.[32]

Two older "two edged sword" cases from the Tenth Circuit, *Knighton v. Mullin*, 293 F.3d 1165 (10th Cir. 2002), and *Humphreys v. Gibson*, 261 F.3d 1016 (10th Cir. 2001), were decided before much of the enlightenment was provided.[33]  Moreover, *Humphreys* involved a planned stabbing of Mr. Humphrey's regularly battered wife. *Id*. at 1019. The murder for which Knighton was convicted was a deliberate double homicide at a rural home. *Knighton*, 293 F.3d at 1169-70. This was part of a four day crime spree during which Knighton killed two other people and attempted or planned other killings. *Id.* at 1170-71.

In conclusion, for the reasons stated herein, this Court finds and recommends Mr. Fitzgerald be granted habeas relief due to his trial counsel's failure to present available mitigating evidence.   There exists a reasonable probability that if this evidence had been presented at least one juror would have selected a sentence less that death.

---

[32]Shortly after receiving a COA on his habeas petition, Mr. Wackerly filed a pleading with this court seeking permission to file a second or successive habeas application with the district court. In this pleading, Mr. Wackerly sought permission to present a new claim that his trial counsel was constitutionally ineffective for failing to investigate Mr. Wackerly's claim that Mrs. Wackerly committed the murder. *Wackerly,* 580 F.3d at 118.

[33]*Williams v. Taylor,* 529 U.S. 362, 398 (2000), decided before *Knighton* and undoubtedly not briefed to the Court in that case. The Supreme Court's other seminal mitigation cases came later, *including Wiggins v. Smith*, 539 U.S. 510 (2003), *Rompilla v. Beard*, 545 U.S. 374 (2005), and *Sears v.Upton,*130 S.Ct. 3259, 3265-66 (2010) "We have never limited the prejudice inquiry under *Strickland* to cases in which there was only little or no mitigation evidence presented." *Sears*, 130 S.Ct. at 3266 (*quotations omitted*).

Respectfully submitted,


s/ Jack Fisher
Jack Fisher OBA #2939
Post Office Box 1976
Edmond, Oklahoma 73083
Telephone:  405/ 235-9466
Facsimile:  405/340-7269
E-mail Okfishlaw@aol.com

Attorney for Petitioner
James J. Fitzgerald


## Certificate of Service

I, Jack Fisher, state that on the 4th day of February, 2013, I electronically transmitted the foregoing to the Clerk of the Court and also electronically transmitted of a Notice of Electronic Filing to the following individuals who are  registered participants of the ECF NDOK System:


Jennifer J Dickson and
Jennifer Strickland
Office of the Attorney General
313 NE 21st Street
Oklahoma City , Ok 73105
Email: fhc.docket@oag.state.ok.us


s/ Jack Fisher
Jack Fisher