**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **JAMES FITZGERALD,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Case No. 03-cv-531-GKF-TLW** |
| **vs.** | ) | |
| | ) | |
| **ANITA TRAMMELL, Warden,** | ) | |
| **Oklahoma State Penitentiary,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## REPORT AND RECOMMENDATION

Before the undersigned United States Magistrate Judge for a report and recommendation is a part of petitioner's Petition for Writ of Habeas Corpus. (Dkt. #24). After filing this lawsuit, petitioner filed his Amended Motion for Evidentiary Hearing. (Dkt. #62). Petitioner alleged fourteen grounds for relief in support of his motion. Id. The District Court granted petitioner's motion as to the seventh ground for relief only and referred this case to the undersigned for the purpose of conducting an evidentiary hearing and issuing a report and recommendation. Id. Petitioner's seventh ground for relief alleges that "trial and appellate counsel's failure to adequately develop and present available mitigating evidence of brain damage, diabetes, and consumption of alcohol on the night of the offense in petitioner's second penalty trial deprived petitioner effective assistance of counsel." (Dkt. ## 24, 72).

The undersigned held an evidentiary hearing on August 21-23, 2012, and November 9, 2012. (Dkt. ## 132, 133, 135, 136, 141, 142, 143, 152, 153). The undersigned also ordered the parties to submit proposed findings of fact and conclusions of law. (Dkt. #152). Those submissions were filed on February 5, 2013. (Dkt. ## 156, 157).

For the reasons that follow, the undersigned recommends that the District Court **GRANT** petitioner's Petition for Writ of Habeas Corpus on the grounds that petitioner was denied effective assistance of counsel. The undersigned finds that petitioner's counsel, during the second penalty trial, fell below the constitutional standards guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

## PROCEDURAL HISTORY AND BACKGROUND INFORMATION

### Initial Trial and Sentencing

In 1996, petitioner was convicted in state court of two counts of robbery with a firearm, one count of attempted robbery, and one count of first-degree murder in connection with a series of robberies at Git-n-Go stores in Tulsa over the course of one night. See Fitzgerald v. State, 972 P.2d 1157, 1161 (Okla. Crim. App. 1998). Petitioner received three life sentences for the robbery counts and the death penalty for the murder. See id. Prior to the trial, petitioner "tirelessly and constantly requested that the State provide funds under Ake v. Oklahoma[1] for a neuropsychologist and an expert on juvenile-onset diabetes." Id. at 1165. Petitioner argued that these experts were necessary to explain the connection between his diabetes diagnosis and his consumption of alcohol the night of the crimes, as well as the impact of a gunshot wound that caused probable brain damage affecting petitioner's behavior and judgment. See id. at 1167. The trial court denied those requests, holding that petitioner was required to show that he actually suffered from the conditions for which he sought expert testimony at the time the crimes were committed. See id. at 1164, 1166.

---

[1] Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), provides that an indigent defendant who makes a preliminary showing that experts are necessary to an adequate defense is entitled to retain experts at the State's expense. Petitioner was required to request funds through motions to the trial court because he was represented by the Tulsa County Public Defender's Office. See Fitzgerald, 972 P.2d at 1165.

**Initial Appeal**

In 1998, the Oklahoma Court of Criminal Appeals ("OCCA") affirmed the convictions but reversed the death sentence based on a number of errors that occurred during the sentencing stage. See id. at 1175. OCCA gave special consideration to petitioner's claim that the trial court erred in refusing to allow petitioner to retain experts to assist in preparing a case for mitigation during the second stage trial. See id. at 1161, 1168-70, 1175. OCCA agreed with petitioner's argument that "the mere facts of the gunshot wound and his diabetic condition are not particularly mitigating" and required expert testimony. See id. at 1166. OCCA also held that the trial court erred in requiring a heightened burden of proof from petitioner to establish his need for those experts. See id. at 1166-67. OCCA remanded the case for a new penalty phase trial, in which petitioner would be permitted to retain experts for use at trial. See id. at 1175.

**Second Trial**

Petitioner's second penalty phase trial took place in October 2000. (Dkt. # 54).[2] Three attorneys from the Oklahoma Indigent Defense System ("OIDS") were appointed to represent petitioner at the second trial: Silas Lyman, Dr. Kathy LaFortune, and Lynn Burch. (Dkt. # 141 at 115). Mr. Lyman served as first chair. (Dkt. # 141 at 15). The OIDS attorneys retained Dr. Herman Jones, a neuropsychologist, in July 1999 to evaluate petitioner. (Pet. Exh. 12).[3] They retained Dr. Christina Bratcher, an endocrinologist, to review petitioner's history of diabetes, to opine on his prognosis, and to share her results with Dr. Jones and another neuropsychologist. (Resp. Exh. 1).

_____

[2] The parties designated the trial transcript as part of the record for consideration of petitioner's Petition for Writ of Habeas Corpus. (Dkt. # 54). References to the second penalty phase trial will be cited as (Tr. T. _).

[3] All exhibits introduced during the evidentiary hearing will be cited as (Pet. Exh. __) or (Resp. Exh. __).

At the second trial, the State sought to prove three aggravating circumstances in support of the death penalty: (1) that petitioner "was previously convicted of a felony involving the use or threat of violence to the person;" (2) that petitioner committed the murder in an attempt to avoid arrest and prosecution; and (3) that petitioner posed a "continuing threat to society." (Tr. T. 750) (citing 21 Okla. Stat. §§ 701.12(1), (5), and (7)). The State presented evidence to assist the jury in reconstructing the crime scene of the murder, including video and still photographs from the surveillance video at the convenience store. (Tr. T. 762-78). The testimony of two witnesses from the first trial, Michael Hansen and Neil David Myers, was introduced and read into the record. (Tr. T. Exh. AA and DD). These witnesses gave testimony regarding the petitioner's activities on the night of the murder, which included looking for pallets to sell. (Tr. T. Exh. AA and DD). Michael Hansen testified that he observed petitioner drink one beer while they were out looking for pallets and that petitioner tried to persuade him to commit a robbery that evening. (Tr. T. Exh. AA at 775-76, 778). Michael Hansen did not think petitioner was intoxicated at that time. (Tr. T. Exh. AA at 778). Neil David Myers testified that petitioner came to his house around ten o'clock that evening to ask him to go to a bar. (Tr. T. Exh. DD at 809). Petitioner was "slightly drunk" at the time. (Tr. T. Exh. DD at 813).

The two troopers who captured petitioner in Missouri also testified in person at the second trial. (Tr. T. 787-814, 816-26). Deputy Justin Moreland testified that petitioner confessed to the shooting in a recorded statement. (Tr. T. 796). The statement was played for the jury, who was given transcripts to read along with the recording. (Tr. T. 798). In that statement, petitioner talked freely about his level of intoxication on the night of the murder. (Resp. Exh. 6). The State also introduced a second recorded statement, in which petitioner told now-former Tulsa Police

Detective Charles Folks about the robbery that led to the murder, including the fact that he was heavily intoxicated. (Tr. T. 861-70; Resp. Exh. 7).

The State presented evidence that petitioner had previously committed a violent felony by introducing testimony from the victim of an armed robbery that petitioner committed in Indiana in 1988. (Tr. T. 955-62). Petitioner's pen pal, Susan Kay Duncan, testified that petitioner wrote her letters discussing an escape plan and stating that he "knew" he would have to hurt or kill an inmate to protect himself while in prison. (Tr. T. 896-902). The State introduced those letters and a recorded telephone conversation involving petitioner and Ms. Duncan as well. (Resp. Exh. 5-8). The officers who arrested petitioner also testified that he had access to a gun at the time of his arrest and that he made statements indicating that he would have shot the officers to escape arrest. (Tr. T. 787-814, 816-29).

After the State rested its case, Dr. LaFortune made her opening statement. (Tr. T. 1056-62). Dr. LaFortune described petitioner's diabetes diagnosis, his time in foster care, his difficult family life, the gunshot wound he suffered at age twenty-six, his current medical condition, and his relationship with his son. (Tr. T. 1056-62). Mr. Lyman then introduced into evidence a copy of petitioner's waiver of extradition from Missouri, where he was arrested, to Oklahoma. (Tr. T. 1063-64; Exh. 29). Mr. Lyman also introduced into evidence medical records documenting petitioner's treatment for diabetes and the gunshot wound. (Tr. T. 1064-66; Exh. 8-15, 17). The medical records indicated that petitioner's diabetes had always been poorly controlled. (Tr. T. Exh. 8-14). Medical records from his gunshot wound indicated that petitioner had to undergo multiple surgeries and received treatment from a neurologist, who noted that petitioner's neurological examinations post-surgery were "normal." (Resp. Exh. 14, identified as Tr. T. Exh. 15).

Petitioner's mother, foster mother, and son testified on petitioner's behalf. (Tr. T. 1068-1102; 1103-32; 1147-59). Petitioner's mother testified about the impact that petitioner's Type I diabetes diagnosis had on his life and his behavior as a young teenager. (Tr. T. 1071-72). Ultimately, his behavior led to a stint in foster care. (Tr. T. 1072-73). She also testified that petitioner was the victim of a gunshot wound to the head when he was twenty-six years old. (Tr. T. 1074-76). She stated that petitioner's behavior changed after he was shot, describing him as "fearful" and quick to anger. (Tr. T. 1075). She also stated that petitioner "was never that way before he was shot." (Tr. T. 1076).

Petitioner's foster mother testified that petitioner came to live with her in 1974. (Tr. T. 1107). She stated that he was very thin and poorly dressed when she first met him but that he was a pleasant child. (Tr. T. 1107). When she accepted petitioner as a foster child, she knew only that he had been in trouble with the law, as the system provided little information for foster parents at that time. (Tr. T. 1109, 1114). She did have an opportunity to meet petitioner's parents at a later date. (Tr. T. 1109). She described petitioner's father as self-absorbed and uninterested in his children. (Tr. T. 1109-11). She described petitioner's mother as looking "worn out" and "overwhelmed." (Tr. T. 1109). After petitioner left her care and returned to his parents, she was aware that he continued to have trouble with stealing and truancy. (Tr. T. 1114). Although petitioner was not a model student in her care, the foster mother stated that petitioner did well in her home and responded positively to the structure and discipline she imposed. (Tr. T. 1114-17). He was angry about his diabetes diagnosis and had a tendency to overeat sweets, but he was never aggressive and was, in fact, "one of the more enjoyable of our foster kids." (Tr. T. 1116-17).

Petitioner's thirteen-year-old son, Kyle, was the last mitigation witness. (Tr. T. 1147-59). Kyle lived with his grandmother in 1994, when the murder occurred. (Tr. T. 1150). Petitioner also lived in the home. (Tr. T. 1150). Kyle testified that he and petitioner had a strong relationship during that time and spent a great deal of time together. (Tr. T. 1150). Kyle was "[r]eally upset" when petitioner went to jail. (Tr. T. 1150). He testified that his father writes him often from jail and that they still have a good relationship. (Tr. T. 1150-51). Kyle wanted to maintain a relationship with his father and did not want to lose him to the death penalty. (Tr. T. 1155-56).

Mr. Lyman gave the closing argument. (Tr. T. 1181-1208). He argued that the jury should consider petitioner's entire life and stated that the mitigating evidence was presented to help the jury understand petitioner's life was "not a life full of excuses." (Tr. T. 1183-84). Mr. Lyman stated that the evidence regarding the circumstances of the robberies and the murder was "not contested." (Tr. T. 1184). He acknowledged that the evidence showed "[t]here is a bad person and there is a good person" inside petitioner. (Tr. T. 1185). He argued, however, that petitioner took sole responsibility for the crimes and was remorseful. (Tr. T. 1185-88). Mr. Lyman briefly noted that petitioner talked about abusing alcohol the night of the crimes, but he quickly stated that petitioner was not using alcohol as an excuse. (Tr. T. 1188-89). Mr. Lyman characterized petitioner's letters, in which he planned an escape, as proof that petitioner also showed remorse for the murder and concern for his family. (Tr. T. 1190-91).

With respect to petitioner's diabetes, Mr. Lyman stated that the medical records were submitted as proof of petitioner's diagnosis. (Tr. T. 1191). He argued that petitioner's diagnosis "affected him" and contributed to his problems. (Tr. T. 1191). He also argued that the problems young diabetic patients experience were compounded by a dysfunctional family. (Tr. T. 1191-

92). Mr. Lyman cited petitioner's mother's lack of understanding about her family's issues and petitioner's time in foster care as proof of the family's dysfunction. (Tr. 1191-92). Mr. Lyman explained that those problems led to petitioner spending time in prison because "[h]e was trouble and he was a problem." (Tr. 1192-93). Mr. Lyman contended, however, that petitioner served his time and had started creating a family before he was shot in the head. (Tr. T. 1193).

Mr. Lyman characterized this gunshot wound as "a very important event" that changed petitioner's personality. (Tr. T. 1193-94). He argued that petitioner was not violent until after his injury. (Tr. T. 1194, 1195). However, Mr. Lyman also stated that

> Now, we really will never know what this injury to James did to him. And none of us are doctors. And there's information in these records, and the State will bring it up, and I'll tell you right now, that he's had neurological assessments after the gunshot wound that appear to be normal. But did his life take a normal twist after this, this point in time? It did not.

(Tr. T. 1194). Mr. Lyman made no further argument regarding the gunshot wound, but he noted that the medical records documenting the gunshot wound and petitioner's recovery were submitted to the jury for consideration. (Tr. T. 1193-94).

Finally, Mr. Lyman argued that petitioner was no longer a threat to society due to a broken leg that he sustained while in prison. (Tr. T. 1194-95). Mr. Lyman stated that due to complications from that injury, petitioner was no longer a threat to society because he was not mobile. (Tr. T. 1194-95).

Following closing arguments, the jury found that the State had proven two aggravating circumstances: (1) that petitioner had previously been "convicted of a felony involving the use or threat of violence to the person;" and (2) that petitioner posed a "continuing threat to society" because he was likely to commit further "criminal acts of violence." (Tr. T. 1240). The jury did

not find that petitioner committed the murder "for the purpose of avoiding or preventing a lawful arrest or prosecution." (Tr. T. 1240). The jury sentenced petitioner to death. (Tr. T. 1241).

**Appeals After the Second Trial**

Petitioner again appealed the death sentence, and OCCA affirmed. See Fitzgerald v. State, 61 P.3d 901 (Okla. Crim. App. 2002). In his state post-conviction proceeding, petitioner argued that his "trial and appellate counsel were ineffective for failing to present available mitigating evidence." (Dkt. #25, Exh. 18 at 3).[4] OCCA disagreed. OCCA applied

> The three-tiered test enunciated in Walker v. State [933 P.2d 327, 333-34 (Okla. Crim. App. 1997)]. Did appellate counsel commit the alleged predicate act? [Id. at 333.] If so, was counsel's performance deficient under Strickland v. Washington's two-pronged test? [Id.] We consider mishandled claims on their merits only if the post-conviction petitioner sustains the initial heavy burden of proving deficient performance. [Id.]

(Dkt. #25, Exh. 18 at 3). OCCA concluded that petitioner had failed to establish "that the omission amounts to deficient performance: that counsel breached any duties owed him or that counsel's judgment was unreasonable and fell beyond an acceptable range of professional assistance." (Dkt. #25, Exh. 18 at 3-4). In a footnote to that holding, OCCA stated that "[i]t appears from the application that trial and appellate counsel's decision not to present this evidence was strategic as the evidence was available at trial. This Court will not second-guess strategic decisions." (Dkt. #25, Exh. 18 at n.14). Following this denial, petitioner filed his Petition for Writ of Habeas Corpus (Dkt. #24).

**Petition for Writ of Habeas Corpus**

In the Petition for Writ of Habeas Corpus, petitioner raises fourteen points of error. (Dkt. #24). Petitioner's seventh point of error argues that counsel was ineffective for failing to

---

[4] Petitioner submitted OCCA's opinion in his post-conviction petition as an exhibit to his petition. The unpublished opinion can be found at the following citation: Fitzgerald v. State, PCD-2002-626 (Okla. Crim. App. March 13, 2003).

"adequately develop and present available mitigating evidence of brain damage, diabetes, and consumption of alcohol on the night of the offense in petitioner's second penalty trial." (Dkt. #24 at 140; Dkt. #72). Petitioner argues that counsel either failed to recognize the "viable mitigating strategy" available or ignored it. (Dkt. #24 at 152). Petitioner also argues that the record contained no explanation for counsel's decision not to present the mitigating evidence, thereby preventing the court from determining whether the decision was strategic. (Dkt. #24 at 153). Petitioner contends, however, that even if the decision was strategic, it was unreasonable under any standard. (Dkt. #24 at 163). In support, petitioner cites counsel's decision to use the fact that petitioner suffered from diabetes and a gunshot wound without presenting expert testimony "to explain the significance of the evidence to the jury." (Dkt. #24 at 155). Petitioner also contends that it was patently unreasonable for counsel to ignore the evidence of petitioner's intoxication at the time of the murder. (Dkt. #24 at 155). Petitioner argues that this trial strategy, if it was strategy, resulted in prejudice to petitioner because counsel was limited, in closing argument, to generic arguments that petitioner was a "bad man" whose life still had "value" because he took responsibility for his crimes and maintained "strong relationships with his family." (Dkt. #24 at 166). Finally, petitioner argues that there was no conflict or risk that the mitigating evidence would act as a "double-edged sword" to support the aggravating circumstances. (Dkt. #24 at 168-172).

In response, the State argues that counsel conducted an adequate investigation and "presented sufficient mitigating evidence." (Dkt. #41 at 54). The State contends that counsel's decision was a strategic decision and a sound one. (Dkt. #41 at 54). The State cites to the jury instructions, which contained a list of eleven mitigating factors presented to the jury during the second penalty trial, as proof that petitioner's counsel presented sufficient mitigating evidence to

avoid a finding of ineffective assistance of counsel. (Dkt. #24 at 55-56). The State also argues that petitioner suffered no prejudice. (Dkt. #24 at 57-58). The State contends that the outcome of the trial would not have changed, even if the "proposed evidence" had been presented, due, in part, to the strength of the evidence supporting the aggravating circumstances. (Dkt. #24 at 58).

**District Court's Order Granting Evidentiary Hearing**

Of the fourteen points of error raised in petitioner's Petition for Writ of Habeas Corpus, the District Court found that only petitioner's claim that counsel was ineffective for failing to "adequately develop and present available mitigating evidence of brain damage, diabetes, and consumption of alcohol on the night of the offense in petitioner's second penalty trial" required additional consideration. (Dkt. #24 at 140; Dkt. #72). The District Court reviewed the evidence presented at the second penalty trial as well as the available expert information and opinions of which counsel knew but did not present. (Dkt. #72).

Citing Strickland, the District Court concluded that "there is a reasonable probability that the presentation of the proposed testimony, as outlined in the affidavits presented by Petitioner, could have altered the outcome of the sentencing phase." (Dkt. #72 at 13). The District Court further held that "the record is silent regarding trial counsel's reasons, or lack thereof, for not presenting the available testimony relating to Petitioner's brain damage, diabetes, and consumption of alcohol on the night of the offense, although the record shows that trial counsel prepared to present such testimony." (Dkt. #72 at 15). Because the affidavits from Dr. LaFortune and Mr. Burch were vague, and because lead counsel, Mr. Lyman, had not submitted an affidavit, the District Court determined that "the available record is inadequate to allow the Court to analyze whether Petitioner's trial counsel was constitutionally deficient." (Dkt. #72 at 15).

The District Court ordered an evidentiary hearing and referred the matter to the undersigned. (Dkt. #72 at 15-16, 17). The District Court stated that "the purpose of the evidentiary hearing will be to determine trial counsel's strategy and reasons, or lack thereof, for foregoing the use of the proffered testimony regarding Petitioner's brain damage, diabetes, and consumption of alcohol on the night of the offense during the sentencing phase." (Dkt. #72 at 16). The District Court further instructed that "[i]f trial counsel made a strategic decision not to use the proposed testimony, the Court must evaluate 'whether that was a constitutionally reasonable decision under the circumstances.'" (Dkt. #72 at 16, quoting Bryan v. Mullin, 335 F.3d 1207, 1214-15 (10th Cir. 2003)). Finally, the District Court stated that if the facts asserted were true, petitioner may be entitled to habeas relief. (Dkt. #72 at 16).

## FINDINGS OF FACT

Prior to the evidentiary hearing, the parties conducted discovery, including the deposition of Mr. Lyman and other witnesses. (Dkt. ##76, 80, 85, 86, 88, 102, 103, 105, 107, 108, 110, 111). During that time, the undersigned denied petitioner's request to present expert witness testimony (dkt. #112) "regarding standards for effective representation and the ABA standards" because it was unnecessary in light of the undersigned's ability "to apply the relevant legal standards" and the lack of relevance that expert testimony would have in resolving factual issues. (Dkt. #122 at 2). The District Court also denied the State's motion seeking reconsideration of the order granting an evidentiary hearing, or, in the alternative, summary judgment. (Dkt. ##89, 90, 104).

The undersigned conducted the evidentiary hearing on August 21-23, 2012, and November 9, 2012. (Dkt. ## 132, 133, 135, 136, 141, 142, 143, 152, 153). During the course of the hearing, the undersigned heard testimony from Mr. Lyman, Dr. LaFortune, Mr. Burch, Dr.

Jones, and Debbie Maddox and admitted numerous exhibits. The parties also stipulated that the first robbery occurred at 2:30 AM. (Dkt. #141 at 12-14). A summary of the evidence follows.

**Silas Lyman**

Mr. Lyman was the lead attorney on petitioner's second penalty phase trial, which occurred in October 2000. (Dkt. #141 at 14-15). Mr. Lyman obtained his law degree in 1989 and worked as a prosecutor in various offices until the fall of 1997. (Dkt. #141 at 15-29; Pet. Exh. 5). During that time, Mr. Lyman's trial experience included serving as second chair in a burglary case and a manslaughter case and serving as lead counsel in a misdemeanor vehicular homicide, one to three child abuse cases, one shooting with intent to kill case, one or two narcotics cases, a mental health trial and a case of assault and battery of a police officer. (Dkt. #141 at 19-29). Additionally, Mr. Lyman stated that he prepared many cases that settled before trial. (Dkt. #141 at 34). Mr. Lyman testified that none of the cases he tried involved the use of a psychologist or psychiatrist as an expert witness. (Dkt. #141 at 29-30).

In the fall of 1997, Mr. Lyman made the decision to move from the district attorney's office, where he worked as a prosecutor, to the Oklahoma Indigent Defense System ("OIDS"), to serve as a capital trial attorney in the Tulsa-Sapulpa Office. (Dkt. #141 at 29). Mr. Lyman stated that he made this choice for several reasons: (1) he knew several of the attorneys in the OIDS Tulsa-Sapulpa office and wanted to work with a good friend of his who had moved to OIDS approximately a year and a half earlier; (2) he wanted to "have the opportunity to be a trial lawyer in a very important and serious area of the law representing people in their worst situation"; and (3) he wanted to move from a rural area to a larger city so that his wife would have better employment opportunities. (Dkt. #141 at 30-32).

Prior to his work on the instant case, Mr. Lyman worked on other cases as a capital trial defense attorney at OIDS.[5] In his first case that went to trial, <u>Sampson</u>,[6] he served as second chair. (Dkt. #141 at 37). A neuropsychologist testified as an expert witness during that trial, but Mr. Lyman was not responsible for that witness, nor did he have a clear memory of the reason for that testimony. (Dkt. #141 at 37-38). His second case, the <u>Slone</u> case, ended in a guilty plea. (Dkt. #141 at 38; Pet. Exh. 6). Mr. Lyman's first case as lead counsel was the <u>Matthews</u> case, a retrial following reversal. (Dkt. #141 at 39-43). Mr. Lyman testified that he handled the guilt phase of the trial, in which the defendant asserted his innocence, and his co-counsel handled the penalty phase, including the presentation of a psychologist as an expert witness. (Dkt. #141 at 40). According to petitioner's list of cases, Mr. Lyman worked on two additional cases that ended in guilty pleas before he was assigned petitioner's case.[7] (Pet. Exh. 6). Mr. Lyman testified that he worked on two additional cases, performing preliminary work on one and negotiating a guilty plea as lead counsel on the other. (Dkt. #141 at 44-45). Counsel for petitioner then asked Mr. Lyman if his capital defense experience was "basically two death-penalty trials, neither one that you had put on psychology evidence; is that correct?" (Dkt. #141 at 46). Mr. Lyman agreed. (Dkt. #141 at 46).

Petitioner's counsel then reviewed the attorney eligibility requirements set forth in the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in

---

[5] Pet. Exh. 6 is a list of the cases in which Mr. Lyman served as first or second chair at OIDS before he tried the instant case. Case names, citations, and a brief description of the case are included in the list.

[6] Sampson is not included in the list (Pet. Exh. 6), but Mr. Lyman cited it in his deposition testimony. (Dkt. #141 at 37).

[7] Mr. Lyman was also assigned to the <u>Millhollin</u> case prior to his work on petitioner's case, but that case ended in a mistrial and was not re-tried until after Mr. Lyman tried petitioner's case.

Death Penalty Cases. ((Dkt. #141 at 46-53; Pet. Exh. 8). Counsel for petitioner and Mr. Lyman

agreed that, at the time of petitioner's second trial, Mr. Lyman met the first guideline for

admission to practice in Oklahoma. (Dkt. #141 at 50). Mr. Lyman did not have five years of

criminal defense litigation experience, as stated in the second guideline.  (Dkt. #141 at 50-51).

Mr. Lyman believed that he met the qualifications of the third guideline. (Dkt. #141 at at 51).

The third ABA guideline requires

> prior experience as lead counsel in no fewer than nine jury trial of serious  and
> complex cases which were tried to completion, as well as prior experience as lead
> counsel or co-counsel in at least one case in which the death penalty was sought.
> In addition, of the nine jury trials which were tried to completion, the attorney
> should have been lead counsel in at least three cases in which the charge was
> murder or aggravated murder; or alternatively, of the nine jury trials, at least one
> was a murder or aggravated murder trial and additional five were felony jury
> trials.

(Pet. Exh. 8). Mr. Lyman explained that his trial experience as a prosecutor, coupled with his

previous work at OIDS, arguably met the numerical requirements, but he also stated that "not all

the cases I did as a prosecutor were serious and complex." (Dkt. #141 at 51-52). Counsel for

petitioner stipulated that Mr. Lyman met the requirements for guidelines four and six, which

relate to procedural knowledge and continuing education. (Dkt. #141 at 52-53). Mr. Lyman

indicated that he arguably met the fifth guideline, requiring experience with expert witnesses,

although he acknowledged a difference between preparing expert witnesses for trial and actually

presenting them to a jury. (Dkt. #141 at 52-53). Finally, counsel for petitioner stated that he

would allow "the record to speak for itself" with respect to the seventh guideline – demonstration

of "the necessary proficiency and commitment which exemplify the quality of representation

appropriate to capital cases." (Dkt. #141 at 53; Pet. Exh. 8).

Counsel for petitioner then questioned Mr. Lyman about his decisions regarding

petitioner's second trial, beginning with the list of eleven mitigating factors presented to the jury

during the second trial. (Dkt. #141 at 53-54; Pet. Exh. 18). The first three mitigating factors addressed petitioner's childhood diagnosis of diabetes and the 1985 gunshot wound to plaintiff's head. (Pet. Exh. 18). Mr. Lyman testified at the evidentiary hearing that he compiled that list because "I thought that this would best detail the mitigating circumstances that we were trying to establish under our theme." (Dkt. #141 at 54).

Mr. Lyman explained that he believed petitioner's diabetes diagnosis was mitigating because it "tells [the jury] from an early age that he's been dealing with diabetes" and that it helped present a picture of petitioner's "whole life." (Dkt. #141 at 54-55). Mr. Lyman admitted that he could have presented expert testimony "to more fully define the diagnosis of diabetes and the impact, potentially the family and social impact that it has on a young person. . . ." (Dkt. #141 at 56). In fact, Mr. Lyman had hired an adult endocrinologist, Dr. Christina Bratcher, to testify as an expert witness at petitioner's second trial. (Dkt. #141 at 56-57; Pet. Exh. 15). In requesting funds for her services, Mr. Lyman stated that Dr. Bratcher would "focus[] on significant episodes of the mismanagement of his diabetes. The goal is to present to the jury in a meaningful manner the history of his illness, the current state of his medical condition and the probable prognosis for the future." (Dkt. #141 at 57).

Mr. Lyman met with Dr. Bratcher at some point before the trial in 2000. (Dkt. #141 at 61-62). He could not remember if Dr. LaFortune attended that meeting with him, but he believed that she did. (Dkt. #141 at 61-62). He also had no "specific recall on exactly what [Dr. Bratcher] said what her findings were," but he recalled discussing petitioner's history of diabetes and how it had impacted his life over the years. (Dkt. #141 at 62). Mr. Lyman reviewed an affidavit from Dr. Bratcher and stated that he had no reason to believe that her affidavit was inconsistent with the information she disclosed at their meeting. (Dkt. #141 at 59-62, 65; Pet. Exh. 1). He also

16

stated, however, that Dr. Bratcher was not as specific in her interview with him as she was in her affidavit. ((Dkt. #141 at 66).

Dr. Bratcher's affidavit[8] provided basic background information regarding the symptoms associated with juvenile onset diabetes, Type 1. (Pet. Exh. 1). Dr. Bratcher also reviewed petitioner's personal medical history with diabetes, noting that he had been hospitalized on numerous occasions for reasons "explicitly related to uncontrolled diabetes." (Pet. Exh. 1). Dr. Bratcher opined on the long-term impact of petitioner's diabetes, stating that chronic illnesses like juvenile onset diabetes were known to cause stress, impact emotional development, and create conflict. (Pet. Exh. 1). These emotional complications were exacerbated in patients who did not have adequate family support. (Pet. Exh. 1). Dr. Bratcher also opined on the interaction between Type 1 diabetes and alcohol, based on information that petitioner had consumed "large quantities of alcohol" without eating regular meals on the night of the murder. (Pet. Exh. 1). The interaction could cause dramatic changes in blood sugar that "could have affected Mr. Fitzgerald's cognitive functioning." (Pet. Exh. 1).

Mr. Lyman later made the decision not to call Dr. Bratcher as a witness because he "did not believe that she would be a good witness.[9] She did not come off as strong in presence when you're talking to her as she appears to come off in writing." (Dkt. #141 at 63). He recalled that,

---

[8] Dr. Bratcher's affidavit will be addressed as a stand-alone piece of evidence later in the Report and Recommendation. The summary provided here is intended to give context to Mr. Lyman's testimony.

[9] Mr. Lyman could not recall specifically when he made the decision not to call Dr. Bratcher as a witness, nor could he recall whether he talked to Dr. LaFortune or Mr. Burch about that decision. (Dkt. #141 at 63, 66-67, 86-87). Mr. Lyman testified that "I just know generally we talked about this case and worked on this case for some time prior to it being tried." (Dkt. #141 at 66-67). He also stated that Dr. LaFortune did not "voic[e] an objection" to the decision not to call Dr. Bratcher as a witness. (Dkt. #141 at 86-87).

after meeting with Dr. Bratcher, he felt that her findings would more appropriately be used as background information for another expert, "someone like Dr. Herman Jones [a neuropsychologist] if we chose to use him, although I think at that point in time we were inclined not to use him." (Dkt. #141 at 64). Mr. Lyman testified that Dr. Bratcher's affidavit was "a helpful affidavit by itself," but he expressed concerns that Dr. Bratcher would become "a summation witness for the state" and "would have negated what we were trying to do, and that was to show value to his life that's not an excuse." (Dkt. #141 at 60, 73-75, 78-79). He believed that a mitigation theory involving petitioner's diabetes, alcohol, and mental impairment "could have been perceived as an excuse" and would undercut the "no-excuse mitigation theme" he had chosen to present. (Dkt. #141 at 72-73).

Specifically, Mr. Lyman stated that he did not use Dr. Bratcher to address the interaction between petitioner's alcohol usage and his diabetes because he had "concerns that it would be an excuse. There was other ways that the use of alcohol or his consumption of alcohol had been introduced in the trial."[10] (Dkt. #141 at 73). He was comfortable with presenting the evidence regarding petitioner's diabetes through the medical records because "my feeling at the time was that it's better to make the arguments based on what has been presented in the medical records and the no excuse for alcohol in all the arguments I made without exposing and making a

---

[10] At that time, petitioner's counsel also questioned Mr. Lyman regarding the affidavits of Candy Ashley and Regina Stockfleth, which will be covered in more detail later in the Report and Recommendation. (Dkt. #141 at 66-68; Pet. Exh. 2, 23). Both affidavits indicated that petitioner was intoxicated at the time of the murder. (Pet. Exh. 2, 23). Mr. Lyman admitted that he could have established petitioner's intoxication at the time of the murder by calling Ms. Ashley and Ms. Stockfleth as witnesses, if the jury believed their testimony. (Dkt. #141 at 67-68, 70). Mr. Lyman also acknowledged that petitioner's own statements about his intoxication had been presented to the jury through the introduction of a transcript of petitioner's statements to law enforcement. (Dkt. #141 at 68-69; Pet. Exh. 25). In fact, Mr. Lyman used those statements to support his mitigation theme of "no excuses" by pointing out that petitioner stated that he did not blame alcohol for his decision to commit the robberies and the murder. (Dkt. #141 at 69).

negative with a particular witness." (Dkt. #141 at 73-74). Mr. Lyman acknowledged that the jury would not be able to ascertain the effects of diabetes on children without Dr. Bratcher's testimony, but he believed that "they did receive some of that type of information from his mother" and foster mother. (Dkt. #141 at 76-77).

Mr. Lyman testified that he had similar concerns about presenting testimony from Dr. Herman Jones. (Dkt. #141 at 87-88). Mr. Lyman stated that his "number one concern was that he would in effect become the state's best summation witness for their case." (Dkt. #141 at 88). He believed that Dr. Jones would make a good witness and that "the state would be able to utilize his findings and opinions to benefit the state's case to the extent that it would diminish any benefit we would have received from him if we had used him." (Dkt. #141 at 88). On cross-examination, he agreed that the expert reports were favorable to petitioner when presented in a straightforward manner, but he stated that a jury does not receive information "in a vacuum." (Dkt. #141 at 131).

Mr. Lyman had specific concerns about the portions of Dr. Jones's report that described petitioner as goal-oriented but impulsive and disinhibited. (Dkt. #141 at 88-91; Pet. Exh. 12). Mr. Lyman believed that the term "disinhibited" meant that petitioner was "a person that just didn't care, just would do what he wanted to do, wasn't inhibited." (Dkt. #141 at 89). He also believed that petitioner's lack of caring was caused by the gunshot wound and "with the combination of alcohol it could get worse." (Dkt. #141 at 90). Mr. Lyman acknowledged that he may have misunderstood the term "disinhibition," but he stated that he believed the jury would have reached the same conclusion. (Dkt. #141 at 89-90, 91). Mr. Lyman also stated that he "thought that [he] would have talked" to Mr. Burch and Dr. LaFortune about whether to call Dr. Jones as a

witness, but he could not recall a specific date or time for that conversation. (Dkt. #141 at 91-92, 93).

Mr. Lyman denied that he chose not to call Dr. Bratcher and Dr. Jones due to his own inexperience in presenting expert witness testimony. (Dkt. #141 at 93). On cross-examination, Mr. Lyman testified that he remembered feeling anxious about the trial, but he was confident that his previous experiences preparing expert witnesses for trial was sufficient. (Dkt. #141 at 110-14). Mr. Lyman explained that his concern regarding Dr. Jones's testimony was two-fold. (Dkt. #141 at 94-95). First, he believed that the State would use Dr. Jones's testimony to highlight the aggravating factors surrounding the murder. (Dkt. #141 at 94). He reiterated this position on cross-examination, stating that Dr. Jones would have been "forced to answer questions of [petitioner] being goal-oriented when he was planning an escape and not under the influences of alcohol, or the number of escapes, the recruitment of juveniles, his criminal history, all the other things, and it was going to avalanche everything else." (Dkt. #141 at  131). Second, he believed that the State's cross-examination of Dr. Jones would "diminish and negate our other mitigating factors, and in effect one of the last witnesses this jury would see would be the defense witness that I believe would have been a better state's witness." (Dkt. #141 at 94). Mr. Lyman denied that those concerns existed in all death penalty cases involving psychological testimony, stating that, in this case, he worried that the jury would "get off track of what I was trying to show in the other mitigation factors." (Dkt. #141 at 95). He also wanted to focus on "presenting a no-excuse life story, remorse, responsibility" mitigation case, and he was concerned that testimony from Dr. Bratcher and Dr. Jones would serve as reiteration of the facts surrounding the murder and "come[] off as an excuse." (Dkt. #141 at 129). Mr. Lyman cited "the potential conflict there in a juror's mind of, well, I thought he was guilty but yet now you're telling me or going off this path

that he's not culpable or his degree of culpability is reduced because of his state of mind at the time." (Dkt. #141 at 130). Mr. Lyman believed that a mitigation defense that showed "the good and the bad" in petitioner was a better way to meet the goal to "humanize" petitioner and show that he had "good qualities too, that his family loved him, that his life had value." (Dkt. #141 at 127-28).

Mr. Lyman stated that he "tried" to cover all of the mitigating factors in his closing argument. (Dkt. #141 at 98-99). He agreed that petitioner's diabetes diagnosis was a good mitigating factor because petitioner was not at fault for the condition that impacted him. (Dkt. #141 at 99). He was less positive about the gunshot wound and resulting neurological deficits. (Dkt. #141 at 99). Although he agreed petitioner was the victim, he was concerned that the jury would view petitioner in a negative light because he was "part of another violent act" and because he was not certain that the jury would know about the circumstances that led to petitioner's injury. (Dkt. #141 at 99-100). Mr. Lyman acknowledged that he could have provided that information to the jury. (Dkt. #141 at 100).

Mr. Lyman also testified that although he made the decision not to call Dr. Bratcher or Dr. Jones as expert witnesses at some point prior to the trial, he did present evidence to support the mitigating factors of diabetes and the gunshot wound to the head through a stipulation admitting petitioner's medical records. (Dkt. #141 at 122). He stated that the records allowed him to reference petitioner's history "and make them part of the whole mitigation theme." (Dkt. #141 at 122). Mr. Lyman discounted the State's position at trial regarding petitioner's diabetes diagnosis. (Dkt. #141 at 123). Although the State ridiculed the notion that a juvenile diabetes diagnosis mitigated the crime of first degree murder, he insisted that the State's treatment of petitioner's diabetes would have been worse if Dr. Bratcher had testified. (Dkt. #141 at 123-24).

Mr. Lyman testified that he was familiar with the OCCA opinion, including the OCCA's determination that a lay witness is not an effective substitute for an expert witness. (Dkt. #141 at 134). Mr. Lyman stated that he did not interpret the OCCA decision as a directive or mandate to present expert testimony. (Dkt. #141 at 134). To the contrary, his decision not to present expert testimony was a "difficult" decision based on the specific facts of the case and the advice of co-counsel. (Dkt. #141 at 135). Mr. Lyman stated that "[t]he easiest thing to do would have been to call Dr. Jones or Dr. Bratcher or both." (Dkt. #141 at 135). Instead, he "took the way I thought would be best for [petitioner] at the time." (Dkt. #141 at 135).

**Dr. Herman Jones**

Dr. Herman Jones testified that he worked as a neurologist and psychologist and currently served as a professor at the University of Oklahoma Health Sciences Center in the College of Medicine. (Dkt. #142 at 165). In 1999, he was retained to examine petitioner; evaluate the evidence, medical records, and other reports; and "render opinions concerning any frontal lobe impairment as a result of his gunshot injury." (Dkt. #142 at 166). At the time he was retained in 1999, he was not yet board-certified in neuropsychology, but he did perform consultations on individuals with brain injuries and nerve behavioral deficits. (Dkt. #142 at 167-69). In 1999, he served as the director "of the brain injury program at the Rehabilitation Center" and consulted on cases at Jim Thorpe Rehabilitation Center and the Oklahoma Department of Vocational Rehabilitation. (Dkt. #142 at 168-69).

Having established Dr. Jones's credentials at the time he was retained to evaluate petitioner, counsel for petitioner asked Dr. Jones to review the medical records related to petitioner's gunshot wound in 1985. (Dkt. #142 at 169-70; Pet. Exh. 14). Dr. Jones identified medical records from the neurosurgeon who operated on petitioner after he was shot. (Dkt. #142

at 169-70). Among those records was an August 13, 1985, record that contained the statement, "His neurological examination today was normal." (Dkt. #142 at 170; Pet. Exh. 14). Dr. Jones explained that a "standard neurological evaluation" like the one referenced in the records "has six components. It has reflexes, a motor sensory examination, mental status examination, gait and station and cranial nerves." (Dkt. #142 at 170). Dr. Jones testified that the record did not describe "a detailed examination of deficits that could have determined whether there was sequelae."[11] Dr. Jones interpreted the August 13, 1985, neurological examination as the neurosurgeon's opinion that petitioner was "grossly intact and would be able to return to work within two months," insofar as the ability to return to work was defined under Social Security disability rules. (Dkt. #142 at 171).

Dr. Jones explained the distinction between a neurologist/neurosurgeon's concerns with respect to neurological functioning and a neuropsychologist's concerns. (Dkt. #142 at 171-73). Neurologists/neurosurgeons address the physical injury that impacts neurological functioning, and neuropsychologists evaluate the residual impairments and behavioral deficits that remain after an injury. (Dkt. #142 at 172-73). Dr. Jones opined that laymen, like those on a jury, would not be able to determine that petitioner had residual impairment simply by reading the August 13, 1985, report. (Dkt. #142 at 173-75).

Dr. Jones explained the nature of petitioner's injury: "the bullet dislodged a bone fragment which penetrated the covering of the brain called the dura, the dura mater, and that [] bone fragment then lodged itself in the inferior aspects of his frontal lobe." (Dkt. #142 at 176). The details of the injury were important to the examination and its results, Dr. Jones opined,

---

[11]  Merriam-Webster defines sequelae as the "afteraffect of disease, condition, or injury." http://www.merriam-webster.com/dictionary/sequela (last visited on April 17, 2013). By sequelae, Dr. Jones was referring to "residual impairment or permanent impairment to the frontal lobe," from counsel's previous question. (Dkt. #142 at 170).

"because the front or anterior portions of the frontal lobe are responsible for many behavioral constructs, the ability to empathize with other individuals, the ability to anticipate and reflect upon the consequences of one's actions." (Dkt. #142 at 177). Dr. Jones stated that many indviduals believe that the conscience is found in the orbital frontal cortex of the frontal lobe. (Dkt. #142 at 177).

Dr. Jones then reviewed his own report, saying that he relied on previous testing and then performed a number of other tests. (Dkt. #142 at 175-78). Dr. Jones found that petitioner had "subtle but significant" behavioral deficits as a result of the gunshot wound. (Dkt. #142 at 178). The damage to petitioner's brain "would not be manifested in his activities of daily living typically, but that they would be intensified were further compromising factors to be present, such as exotoxins, alcohol specifically." (Dkt. #142 at 178). In that sense, the neurosurgeon's report was correct – petitioner would be able to work and would not be considered disabled. (Dkt. #142 at 178). With the injury, petitioner's moral judgment would not ordinarily be impacted, but secondary factors "can intensify structural neurologic damage." (Dkt. #142 at 178-79). Dr. Jones listed six circumstances that would exacerbate petitioner's behavioral deficits: (1) fatigue; (2) excessive anxiety; (3) sedating drugs or medications, including alcohol; (4) concurrent physical illness, both acute and chronic; (5) depression; and (6) lack of motivation. (Dkt. #142 at 179).

Dr. Jones testified that impulsivity was one symptom of petitioner's injury. (Dkt. #142 at 180). He explained that the orbital frontal cortex "causes individuals to inhibit themselves, to slow down, to anticipate the consequences of their actions so that damage in this area and behavioral deficits from this area are often referred to as disinhibition." (Dkt. #142 at 180). Dr. Jones's report also stated that petitioner's impulsivity would be "intensified and exacerbated" by

alcohol. (Dkt. #142 at 182; Pet. Exh. 12). Dr. Jones opined in his report that, under the influence of alcohol, petitioner "typically retains the capacity to engage in goal directed behavior and sequenced activities but likely displays more impulsive disinhibited character." (Dkt. #142 at 182; Pet. Exh. 12). In his testimony at the evidentiary hearing, he expounded on that opinion, stating that alcohol "intensifies the effects of the brain injury. It further compromises the function of those parts of the brain that are responsible for control and inhibition." (Dkt. #142 at 183). Although Dr. Jones could not quantify the effect through numbers, he explained that "the effects are not linear, they don't stack up and add to each other." (Dkt. #142 at 184). Instead, if petitioner was subjected to more than one of the exacerbating factors, his symptoms would "intensify, not just in an additive fashion, but in a multiplicative fashion." (Dkt. #142 at 184). For example, at the time he issued his report, Dr. Jones had been told that petitioner was intoxicated on the night of the murder. (Dkt. #142 at 184-85). Dr. Jones explained that intoxication would have impacted petitioner's impulsivity, but he could not clearly estimate the extent of the impact without a better understanding of petitioner's level of intoxication. (Dkt. #142 at 185).

Petitioner's counsel then reviewed the evidence that could have been submitted at the second trial to establish petitioner's intoxication. (Dkt. #142 at 186-92). Dr. Jones read the affidavit of Regina Stockfleth, which gave a somewhat detailed description of petitioner's alcohol consumption on the night of the murder. (Dkt. #142 at 186-87; Pet. Exh. 2). In the affidavit, Ms. Stockfleth stated that she and petitioner drank a bottle of tequila mixed into margarita mix and some beer before driving to two different bars. (Pet. Exh. 2). While at the bars, petitioner continued to drink, although Ms. Stockfleth could not remember what petitioner

was drinking. (Pet. Exh. 2). Petitioner then drove them home. (Pet. Exh. 2). Ms. Stockfleth noted that petitioner was "drunk" and that his driving was impaired. (Pet. Exh. 2).

Dr. Jones also read the affidavit of Candy Ashley. (Dkt. #142 at 188-89). Ms. Ashley was parked approximately one hundred feet from the convenience store that was the site of the first robbery. (Dkt. #142 at 188; Pet. Exh. 23). While her companion was in the convenience store, she observed a man, later identified as petitioner, walking around the store. (Pet. Exh. 23). "[T]he way the man was walking and behaving" led Ms. Ashley to believe that he was intoxicated. (Pet. Exh. 23). Ms. Ashley's companion then returned to the car, and they left. (Pet. Exh. 23). Her companion later called the police to report what she had seen. (Pet. Exh. 23). The parties stipulated that the first robbery occurred at 2:30 A.M., and petitioner's counsel stated that, according to the record, the murder occurred at 3:07 A.M. (Dkt. #141 at 12-14; Dkt. #142 at 190).

Dr. Jones agreed that the two affidavits indicated petitioner was intoxicated and that the affidavits were consistent with his understanding of petitioner's level of intoxication as it was reflected in Dr. Jones's report. (Dkt. #142 at 184-85, 190-92). Dr. Jones opined that petitioner's intoxication would have been a "significant factor" that exacerbated petitioner's behavioral deficits on the night of the murder. (Dkt. #142 at 190-91). Dr. Jones further opined that petitioner's behavior "would be more likely to reflect disinhibition and would further reduce his ability to anticipate the consequences of his actions." (Dkt. #142 at 191).

Petitioner's counsel also questioned Dr. Jones about petitioner's diabetes, through the affidavit of Dr. Bratcher. (Dkt. #142 at 192-99). Dr. Jones testified that he would have been able to rely on Dr. Bratcher's opinion as an "additional external consultation[]."(Dkt. #142 at 192). Dr. Jones reviewed Dr. Bratcher's affidavit, which showed that petitioner had been hospitalized

multiple times for conditions related to poor diabetes management. (Dkt. #142 at 192-94; Pet. Exh. 1). Dr. Jones testified that petitioner's diabetes was a medical condition that would qualify as one of the secondary factors affecting petitioner's behavioral deficits. (Dkt. #142 at 194). He also noted that Dr. Bratcher's affidavit described both chronic and acute issues with petitioner's diabetes management. (Dkt. #142 at 194). Dr. Jones opined that the frontal lobe responds to metabolic imbalances, including high and low blood sugar. (Dkt. #142 at 195-96). He explained that "the brain requires a disproportionate amount of energy demands from sugar and oxygen" as well as "a balance of those nutrients and an absence of relative toxins." (Dkt. #142 at 196). Dr. Jones further explained that "normal brains will react to either variations of too low or too high [blood sugar], just as an individual with prior structural damage will respond in a more exaggerated fashion to those same variations." (Dkt. #142 at 196). Dr. Jones "expect[ed]" that, for petitioner, the combination of alcohol and diabetes would cause hyperglycemia, a "sugar low" that causes symptoms of "sedation and fatigue." (Dkt. #142 at 199).

Additionally, petitioner's impairment would make it "more difficult" to manage alcoholism and diabetes because "[t]he reduced ability to anticipate the consequences of one's actions [also applies] in a larger context, whether that be alcoholism or whether that be a chronic disease like diabetes." (Dkt. #142 at 199-200). Dr. Jones agreed that petitioner's history of multiple hospitalizations due to diabetes complications reflected that difficulty. (Dkt. #142 at 200). Dr. Jones testified that not only would petitioner have more difficulty with impulse control in making an initial decision, such as the choice not to eat a candy bar because he is diabetic, "once the compromise is in place, that's when it gets worse." (Dkt. #142 at 200-01). Once petitioner made an initial bad decision, "[t]he slope that he slides down is steeper." (Dkt. #142 at 201). With all three conditions – brain impairment, alcohol, and diabetes – present, "[t]here

would be less control but more disinhibition. There would be less inhibition but more disinhibition." (Dkt. #142 at 203-04).

After examining petitioner, Dr. Jones met with Mr. Lyman and Dr. LaFortune.[12] (Dkt. #142 at 181-83, 205-06). Dr. Jones recalled discussing the concept of "disinhibition" with Mr. Lyman, but did not remember whether Mr. Lyman had questions about its definition. (Dkt. #142 at 181-83). At the attorneys' request, Dr. Jones reviewed his multi-axial assessment[13] of petitioner during his meeting(s) with Mr. Lyman. (Dkt. #142 at 205-06). Dr. Jones explained which diagnoses applied to each Axis: (1) Axis I applies to all psychological and psychiatric problems; (2) Axis II addresses "baseline personality functioning;" and (3) Axis III "describes medical conditions that relate back to the first two issues." (Dkt. #142 at 207-08). Dr. Jones had assessed petitioner with alcohol dependence and cognitive disorder, NOS on Axis I, antisocial personality disorder on Axis II, and "penetrating missile wound to the brain" on Axis III. (Dkt. #142 at 206). Dr. Jones did not address psychosocial stressors on Axis IV or provide a global assessment functioning score on Axis V. (Dkt. #142 at 206).

With respect to petitioner's personality disorder, Dr. Jones testified that anti-social personality disorder could be a result of petitioner's Axis I problems – alcohol dependence and cognitive disorder. (Dkt. #142 at 209). Petitioner's counsel read an excerpt from a book titled Behavioral Neurology, written by neurologist, Dr. Jonathan Pincus. (Dkt. #142 at 209-10). In that excerpt, Dr. Pincus makes the case that a diagnosis of anti-social personality disorder may

---

[12] Dr. Jones met with Mr. Lyman on two separate occasions. (Dkt. #142 at 181-83). Dr. LaFortune attended the first meeting, but Dr. Jones could not recall if anyone other than Mr. Lyman attended the second meeting. (Dkt. #142 at 181-83).

[13] A multi-axial assessment is a diagnostic tool used in conjunction with the DSM-IV to create a complete assessment of a patient by addressing "the interrelated complexities of the various biological, psychological, and social aspects of a person's condition." http://medical-dictionary.thefreedictionary.com/multiaxial+system (last visited on April 19, 2013).

be a reflection of disease in the frontal lobe. (Dkt. #142 at 209-10). Dr. Jones agreed that the symptoms of anti-social personality disorder could be caused by neurologic damage. (Dkt. #142 at 210). In petitioner's case, Dr. Jones could not identify petitioner's anti-social personality disorder as an effect of the frontal lobe damage, and he opined that petitioner's anti-social personality disorder "existed before he had brain damage and you could have both simultaneously." (Dkt. #142 at 211). He cited petitioner's juvenile history as evidence that petitioner's frontal lobe damage did not cause him to exhibit signs of anti-social personality disorder. (Dkt. #142 at 211-12). Notwithstanding that opinion, Dr. Jones still believed that the combination of brain damage and excessive alcohol would have made it more difficult for petitioner to control his impulses and behavior at the time of the murder. (Dkt. #142 at 213). Plaintiff's diabetes could also have been a factor, but because Dr. Jones did not have sufficient information to form an opinion on its impact (i.e. no access to Dr. Bratcher's opinion), he did not discuss it with Mr. Lyman. (Dkt. #142 at 213-14).

On cross-examination, counsel for the State presented Dr. Jones with conflicting testimony regarding petitioner's level of intoxication. (Dkt. #142 at 215-22). Dr. Jones agreed that his opinion would require an assumption that Regina Stockfleth was telling the truth in her affidavit. (Dkt. #142 at 217). Counsel for the State asked Dr. Jones about the testimony of Mr. Hansen, who testified at trial that petitioner drank only one can of beer that night and left Ms. Stockfleth's house at eleven o'clock that evening, not at one o'clock in the morning .[14] (Dkt. #142 at 217; Tr. T. State's Exh. AA). Counsel for the State also asked Dr. Jones about the testimony of the store clerk from the first robbery, who testified that petitioner seemed "in

---

[14] Mr. Hansen testified in person at the first trial. At the second trial, the State read his testimony into the record.

control" and, at most, in "an early stage of intoxication," and from the clerk at the third robbery, who noticed no signs that petitioner was intoxicated.[15] (Dkt. #142 at 218-19; Tr. T. State's Exh. CC, FF). Dr. Jones acknowledged that those statements contradicted the affidavits of Ms. Stockfleth and Ms. Ashley. (Dkt. #142 at 219). Dr. Jones also acknowledged that his opinion would change if petitioner was not intoxicated on the night of the murder. (Dkt. #142 at 219). Additionally, Dr. Jones stated that the amount of alcohol necessary to achieve intoxication varies among individuals, particularly those who habitually consume alcohol. (Dkt. #142 at 220-21).

Counsel for the State asked similar questions about petitioner's blood sugar levels, stress levels, fatigue, lack of motivation, depression, and illness on the night of the murder. (Dkt. #142 at 219, 221-22). Dr. Jones stated that he had no personal knowledge about any of those circumstances on the night of the murder. (Dkt. #142 at 219, 221-22). He testified, however, that if none of those circumstances were present on the night of the murder, petitioner's level of functioning would be "pretty close to typical for him." (Dkt. #142 at 223).

Dr. Jones also stated that he had specifically omitted the issue of petitioner's diabetes from his opinion. (Dkt. #142 at 222). Although Dr. Jones testified that he did not have enough information about the status of petitioner's diabetes on the night of the murder to feel comfortable rendering an opinion regarding its impact on petitioner's behavior, he did not question Dr. Bratcher's ability to do so. (Dkt. #142 at 222-23). He stated that petitioner's reactions would vary depending on whether his blood sugar was high or low. (Dkt. #142 at 223-24). He also re-affirmed his opinion in his report, which noted that "moods and emotions associated with blood sugar fluctuations are highly variable and idiosyncratic even within the

---

[15] The clerk from the first robbery, Edward Thomas Chambers, and the clerk from the third robbery, John William Sartain, also testified in person at the first trial. Their testimony was read into the record at the second trial.

same individual." (Dkt. #142 at 224; Pet. Exh. 12). Dr. Jones later testified that the medical records indicated that petitioner's diabetes could be managed, as he had been "fairly stable" for the last few years leading up to the murder. (Dkt. #142 at 247-49).

Turning to the issue of petitioner's diagnosis of anti-social personality disorder, Dr. Jones acknowledged that he also had no knowledge of petitioner's circumstances when he committed past crimes, acquired the gun used in the murders, or planned an escape from jail while awaiting trial on the murder and robbery charges. (Dkt. #142 at 225-26). He testified that it was possible for petitioner to commit crimes without being compromised and that such behavior would be "consistent with my diagnosis of an antisocial personality disorder." (Dkt. #142 at 226). He confirmed that petitioner exhibited all of the signs of antisocial personality disorder and that petitioner exhibited those signs prior to receiving the damage to his frontal lobe. (Dkt. #142 at 228-30). He also confirmed that his opinion on this issue was consistent with two other expert reports, written by Dr. Ann Taylor and Dr. Mickey Ozolins, who both examined petitioner before Dr. Jones was retained.[16] (Dkt. #142 at 230-32; Resp. Exh. 15). Dr. Jones essentially agreed with Dr. Taylor's findings, in which she concluded that petitioner was oppositional and defiant, had trouble with the law from an early age, experienced behavioral problems from an early age, suffered from a substance abuse problem in his teens, and had a long history of diabetes mismanagement. (Dkt. #142 at 231-34).

Counsel for the State reviewed three letters that petitioner wrote to his friend, Susan Duncan, attempting to persuade her to help him escape, as well as the transcript of a telephone call that petitioner made to his family. (Dkt. #142 at 237; Resp. Exh. 5, 8). Dr. Jones agreed that

---

[16] Dr. Taylor's report is included in the record, but Dr. Ozolin's report is not. However, Dr. Jones's report indicates that he reviewed both reports in rendering his own opinion. (Pet. Exh. 12).

this evidence tended to show that petitioner was attempting to manipulate Ms. Duncan. (Dkt. #142 at 241). Dr. Jones testified that manipulative behavior was consistent with anti-social personality disorder, as was a lack of "consistent empathy," "inflated self-appraisal," and "superficial charm." (Dkt. #142 at 241-42). All of those qualities, which reflected the diagnosis of anti-social personality disorder, contributed to Dr. Jones's opinion that petitioner posed a danger to society at large and could pose a danger to the prison population and staff. (Dkt. #142 at 241-43). Counsel for the State also reviewed additional evidence with Dr. Jones that would establish petitioner's goal-oriented behavior and "potential for danger." (Dkt. #142 at 243-47).

On re-direct examination, Dr. Jones again stated that he does not perform any investigation in his role as an expert. (Dkt. #142 at 276). Instead, he relies on the information that is made available to him. (Dkt. #142 at 276). Dr. Jones stated that the evidence of the timeline of the robberies, together with the affidavits of Ms. Stockfleth and Ms. Ashley "certainly would have buttressed my opinion that a level of – a significant level of intoxication was present." (Dkt. #142 at 276-77). Additionally, Dr. Bratcher's report would have been significant to Dr. Jones because Dr. Bratcher's affidavit "talks more about the developmental aspects and how it distorts personality acquisition and development." (Dkt. #142 at 277-78). Dr. Jones emphasized the importance of "understand[ing] how that person got there so as to get them away from there to make that diagnostic label no longer applicable," particularly in the context of educating a jury. (Dkt. #142 at 278-79).

**Dr. Kathy LaFortune**

Dr. LaFortune has worked as both a lawyer and as a psychologist. (Dkt. #142 at at 300-304). She joined OIDS in February 2000, working under the title of "capital counsel." (Dkt. #142 at 302-03). She testified that "[m]y main job at that time was to gather evidence for mitigation,"

assist attorneys in determining "what type of experts, if any, would need to be utilized," and reviewing issues relevant to defendants' competency, both at the time of the crime and for purposes of standing trial. (Dkt. #142 at 303). Her position was a new one, and Dr. LaFortune testified that the trial lawyer always had the final say in deciding how mental health evidence would or would not be utilized. (Dkt. #142 at 304). Prior to joining OIDS, Dr. LaFortune had no direct experience as a death-penalty attorney, but she did advise her husband, a district attorney, on how to handle mental health expert testimony in several death penalty cases. (Dkt. #142 at 305-06).

Dr. LaFortune testified that in the several months that she worked at OIDS prior to petitioner's second trial, she felt that she had established a rapport with Mr. Lyman, "[b]ut eight months is not a long time to develop a solid collegiality. I was new." (Dkt. #142 at 309-10). She described her role in petitioner's second trial as "uncovering childhood history; talking to his relatives about his history, including his mother, his father; [and] talking to his two children" to prepare them to testify in court about their father. (Dkt. #142 at 310). She spoke extensively with petitioner's foster mother to gain insight to petitioner's childhood. (Dkt. #142 at 310-11).

Dr. LaFortune also investigated the impact of a Type I diabetes diagnosis on a child, which she considered "probably the most important aspect of this case." (Dkt. #142 at 311). She explained that a child diagnosed with Type I diabetes would "tend to act out, tend to take risks that another child in school would not because of their fear about the diagnosis" unless the child had support and proper monitoring at home. (Dkt. #142 at 311). After Mr. Lyman requested the services of Dr. Bratcher in March 2000, Mr. Lyman and Dr. LaFortune met with Dr. Bratcher in her office to discuss whether she would be willing and able to testify. (Dkt. #142 at 313). Dr. LaFortune could not recall whether she identified Dr. Bratcher as a potential witness or whether

Mr. Lyman retained her on his own. (Dkt. #142 at 313). Dr. LaFortune could only recall that "Dr. Jelly was not able or unwilling to testify for whatever reason, and Mr. Lyman and I went to see Dr. Bratcher to ask her about testifying in this case." (Dkt. #142 at 313-14). She also could not recall whether she had any contact with Dr. Bratcher before that meeting. (Dkt. #142 at 314). After that meeting, Mr. Lyman did not tell Dr. LaFortune that he did not want to utilize Dr. Bratcher as an expert witness, so Dr. LaFortune continued to work with Dr. Bratcher to develop her testimony. (Dkt. #142 at 315).

Dr. LaFortune testified that Dr. Bratcher's affidavit, written in 2002, was consistent with the information she provided to Dr. LaFortune and Mr. Lyman in 2000, prior to petitioner's second trial. (Dkt. #142 at 314-15). Dr. LaFortune believed that Dr. Bratcher would be able to explain the ways that petitioner's lack of family support impacted his response to the Type I diabetes diagnosis, including petitioner's inability or unwillingness to control the disease. (Dkt. #142 at 315-19, 342-43). She explained that her goal in utilizing Dr. Bratcher "would have been to have her give a description of type I diabetes, first of all, and then relate it to his specific childhood environment and how those two things would have interacted . . . ." (Dkt. #142 at 323). She further explained that she would have asked Dr. Bratcher "to give a description of the emotional and psychological – I guess for her it would be psychiatric issues surrounding his self-esteem, self-concept, the fear that children with type I diabetes may have and how this fear impacts their behavior." (Dkt. #142 at 324). Dr. LaFortune would also have focused Dr. Bratcher's testimony on petitioner's physical changes and limitations, in light of the fact that his diabetes was not well-controlled later in life, and the impact that the stress of having diabetes caused in petitioner's relationships and social activities. (Dkt. #142 at 324). She understood that

uncontrolled blood sugar could cause a patient to be "agitated and irritable and angry and not making good decisions, not making rational decisions." (Dkt. #142 at 340-41).

She testified that Mr. Lyman made the decision not to call Dr. Bratcher at some point during the trial. (Dkt. #142 at 328-29). She was "shocked" by his decision but did not confront him. (Dkt. #142 at 329). Dr. LaFortune also disagreed with Mr. Lyman's decision to submit petitioner's medical records to the jury without the context of expert testimony. (Dkt. #142 at 332). She believed that the jurors could not "look at those records on their own and make sense of them without someone to guide them. . . ." (Dkt. #142 at 332).

Dr. LaFortune explained that a death penalty trial was "like being in a war zone" and required her to "follow what the lead attorney, the commander, tells you." (Dkt. #142 at 329). At that time, she trusted Mr. Lyman's opinion because she believed he was a seasoned attorney who had performed well in court. (Dkt. #142 at 330). Had she known that he had no experience with mitigation death penalty cases, she would have spoken with him about his decision not to call Dr. Bratcher as a witness and suggested that they discuss the decision with their supervisor or other attorneys in the office. (Dkt. #142 at 331-32, 348). Instead, Dr. LaFortune testified that she called Debbie Maddox, an OIDS attorney in the Norman, Oklahoma, office, to "vent [her] frustrations." (Dkt. #142 at 333-34).

Dr. LaFortune testified that she also supported calling Dr. Jones, the neuropsychologist, as a witness because Dr. Bratcher's testimony could not address all of the factors that mitigated petitioner's behavior on the night of the murder. (Dkt. #142 at 335-38). She believed that Dr. Jones would have been able to explain the impact of petitioner's gunshot wound on his behavior, which became more physically aggressive after he was shot. (Dkt. #142 at 335-36). She also believed that "Dr. Jones would have explained the impact neuropsychologically on his behavior

in becoming disinhibited and explaining to the jury the significance of that gunshot wound and the paranoia that resulted. . . ." (Dkt. #142 at 337). She did not recall whether Mr. Lyman misunderstood the term "disinhibited." (Dkt. #142 at 337-38). However, she did remember that Mr. Lyman made the decision not to use Dr. Jones as a witness well before the trial because Dr. Jones was never included on the witness list. (Dkt. #142 at 338). Because she had only been with OIDS for six or seven weeks at the time that decision was made, she "would never" have questioned Mr. Lyman's decision. (Dkt. #142 at 345).

Mr. Lyman did share his concerns that calling Dr. Bratcher or Dr. Jones as a witness would permit the state to review, in front of the jury, all of petitioner's violent acts, including his previous crimes and his threats of escape and injury to others. (Dkt. #142 at 338-39). Dr. LaFortune stated, however, that she believed that the experts should have been called because they could "look at the antisocial behaviors that he had and put them in another context." (Dkt. #142 at 339).

On cross-examination, Dr. LaFortune confirmed that she examined the defense witnesses during petitioner's second trial. (Dkt. #142 at 358). She also reviewed her opening statement and confirmed that she did not mention Dr. Bratcher; therefore, Mr. Lyman must have made his decision before the State rested its case. (Dkt. #142 at 366, 370). Dr. LaFortune did not believe those decisions were reasonable, but she re-iterated her reasons for not raising the issue with Mr. Lyman, stating that she believed that he was a seasoned capital attorney who understood the importance of the expert testimony. (Dkt. #142 at 370-74, 386).

**Lynn Burch**

Mr. Burch, the third member of petitioner's trial team, testified on behalf of the State. (Dkt. #143 at 489-90). He participated in the trial as an appellate attorney, pursuant to a new

policy that placed appellate attorneys into the capital trial division to assist with trials by preserving errors and pursuing a more aggressive pre-trial motion practice. (Dkt. #143 at 489-90, 493). Mr. Burch testified that petitioner's trial was "my first time in a trial court setting," so he was "in an observing and learning mode." (Dkt. #143 at 493). He was not involved in making decisions regarding which witnesses to call at trial. (Dkt. #143 at 492-93).

With respect to the trial itself, Mr. Burch recalled that he and Mr. Lyman had some concerns about Dr. LaFortune's opening statement, but he did not remember whether those concerns related to the decision not to use expert witnesses. (Dkt. #143 at 490-92). He also did not recall whether he was present for the decision not to call Dr. Bratcher as a witness during the trial or whether someone told him about it. (Dkt. #143 at 494-95). He believed that Mr. Lyman made the decision on his own. (Dkt. #143 at 495, 496).

**Debbie Maddox**

Debbie Maddox worked as a capital defense attorney in the Norman, Oklahoma, office at the time of petitioner's second trial. (Dkt. #143 at 396, 400). During petitioner's second trial, Ms. Maddox received a call from Dr. LaFortune. (Dkt. #143 at 416). She remembered that petitioner's trial was a resentencing trial, and she remembered that Dr. LaFortune called "on the first evening after the first day of trial." (Dkt. #143 at 416).

When Ms. Maddox spoke to Dr. LaFortune from home that night, Dr. LaFortune was "very upset." (Dkt. #143 at 417). The two of them had spoken previously about petitioner's trial and the experts Dr. LaFortune had prepared, and Dr. LaFortune told Ms. Maddox that Mr. Lyman no longer wanted to "use the experts." (Dkt. #143 at 417). Dr. LaFortune reported that when Mr. Lyman and Mr. Burch asked her about her opening statement, she told them her mitigation theory only to have them dismiss it and "deride" her. (Dkt. #143 at 417-18). Ms.

Maddox testified that their condemnation of Dr. LaFortune's strategy, as Dr. LaFortune relayed it during their telephone conversation, was so harsh that Ms. Maddox questioned whether Dr. LaFortune was still part of the trial team. (Dkt. #143 at 418). Ms. Maddox then asked Dr. LaFortune what mitigation evidence would be presented. (Dkt. #143 at 418). Ms. Maddox testified that Dr. LaFortune's description of the evidence Mr. Lyman wanted to present "all sounded like they were going to be aggravating witnesses, but that they were just going to cross-examine, that that was going to be kind of what they utilized." (Dkt. #143 at 418).

Ms. Maddox advised Dr. LaFortune to speak with the trial judge about her concerns. (Dkt. #143 at 419-20). Ms. Maddox even offered to get involved with the case, even though "[i]t would not have been pretty" for her to do so. (Dkt. #143 at 419-20). Dr. LaFortune did not want to pursue that course of action, so Ms. Maddox focused on calming Dr. LaFortune. (Dkt. #143 at 419-20).

Ms. Maddox also testified that she spoke with Dr. LaFortune two more times before the trial ended. (Dkt. #143 at 420). Ms. Maddox said that Dr. LaFortune was still concerned about the outcome of the trial and unhappy about the strategy employed, but she was less upset than she had been the first night. (Dkt. #143 at 420). Ms. Maddox gave only one other piece of advice: to make a record for appellate counsel by memorializing the events in writing. (Dkt. #143 at 420).

During Ms. Maddox's testimony, she also recounted her experience with death penalty cases. (Dkt. #143 at 395-96). When counsel for petitioner asked questions about Ms. Maddox's experience working with expert witnesses, counsel for the State objected, arguing that "Ms. Maddox's career and her experience with mitigation witnesses is not relevant at all to this hearing." (Dkt. #143 at 396-97). Counsel for petitioner argued that he did not intend to ask Ms.

Maddox her opinion, but he believed that her experience put the conversations with Dr. LaFortune into context. (Dkt. #143 at 397).  At that time, the undersigned announced that he was going to allow Ms. Maddox to give her opinion. (Dkt. #143 at 398). Ms. Maddox opined on a number of issues related to the evidence available for use in mitigation and the use of expert witnesses in death penalty cases. (Dkt. #143 at 395-484).

The State subsequently filed a motion to strike Ms. Maddox's opinion testimony. (Dkt. #144). Counsel for both parties presented arguments and testimony on November 9, 2012. (Dkt. ## 152, 153). Because the undersigned has determined that Ms. Maddox's opinion testimony is not necessary to the analysis and legal conclusions set forth in this report and recommendation, the undersigned does not include those opinions here.[17] See Dkt. #158, Order on Motion to Strike.

**The Exhibits**

Both parties submitted a number of exhibits for use at the evidentiary hearing. Each party stipulated to the admissibility of the other party's exhibits prior to the hearing. The undersigned has reviewed all of the exhibits but will only address those relevant to the ineffective assistance of counsel analysis.

### Affidavit of Dr. Christina Bratcher

Dr. Bratcher is an endocrinologist. (Pet. Exh. 1). She reviewed petitioner's medical records with the expectation that she would serve as an expert witness at petitioner's second trial. (Pet. Exh. 1). Dr. Bratcher's affidavit was drafted and signed in December 2002, more than two years after petitioner's second trial. (Pet. Exh. 1).

---

[17] Were Ms. Maddox's opinions to be considered, they would undoubtedly weigh in favor of Petitioner.

After reviewing petitioner's records, Dr. Bratcher concluded that petitioner suffered from Type I diabetes, "a chronic, life-long disease" "affecting the production of the chemical compound insulin by cells located in the human pancreas. Petitioner was diagnosed at age twelve. (Pet. Exh. 1).

Dr. Bratcher opined that petitioner had significant difficulty controlling his diabetes. (Pet. Exh. 1). She cited ten hospitalizations that occurred between his diagnosis in September 1971 and the time of the murder "that were explicitly related to uncontrolled diabetes." (Pet. Exh. 1). In 1986, after petitioner sustained the injury to his frontal lobe from the gunshot wound, he experienced symptoms that included "decreased consciousness and confusion." (Pet. Exh. 1). Petitioner was subsequently diagnosed with mild diabetic neuropathy, which "can upset the normal flow of certain types of nerve impulses through the legs, arms, and other parts of the body." (Pet. Exh. 1).

Dr. Bratcher also opined that external factors could have impacted petitioner's behavior on the night of the murder. (Pet. Exh. 1). She noted the neuropsychological expert report, presumably from Dr. Jones, which cited the diagnosis of injury to petitioner's left frontal lobe. (Pet. Exh. 1). She also stated that, based on witness reports, petitioner's judgment could have been impacted by alcohol consumption and lack of food. (Pet. Exh. 1). Dr. Bratcher explained that "[i]ngestion of alcohol can dramatically increase blood sugar levels in a diabetic, or may induce extremely low blood sugar levels if the person has not eaten." (Pet. Exh. 1).

Finally, Dr. Bratcher stated that petitioner's diabetes diagnosis "is significant because of the impact that chronic illness played in his development as a person." (Pet. Exh. 1). The stress of a chronic illness can affect an adolescent's self-esteem, sense of independence, and relationships. (Pet. Exh. 1). Even with her limited knowledge of petitioner's family history, Dr.

40

Bratcher found clear evidence that petitioner had "poor family support for his illness, as well as behaviors which indicated a rebellion against his disease that is commonly seen in young diabetic patients." (Pet. Exh. 1). These stressors "can have long-lasting effects on an individual's personality, family relationships, and ability to control the symptoms of diabetes." (Pet. Exh. 1).

### Report by Dr. Herman Jones

Dr. Herman Jones, a neuropsychologist, examined petitioner in July 1998, four years after the murder and a little more than two years before his second trial. (Pet. Exh. 12). In addition to performing a number of tests, Dr. Jones also reviewed reports from a previous psychological evaluation and a recent neuropsychological evaluation. (Pet. Exh. 12). Dr. Jones also reviewed petitioner's history and found it "significant" for a gunshot wound to the head – specifically the "left inferior medial frontal lobe" – in July 1985. (Pet. Exh. 12). During that same time period, petitioner had "several events of loss of consciousness" that were "attributed to diabetes." (Pet. Exh. 12). Petitioner also began suffering "generalized tonic clonic seizures secondary to fluctuations in his blood sugar" after the gunshot wound. (Pet. Exh. 12).

Testing revealed "subtle but significant findings of persisting neurologic damage in the anterior portions of his brain (frontal lobe) with greater impairment demonstrated on the activities mediated with the left frontal lobe compared to the right." (Pet. Exh. 12). The damage manifested in "decreased spontaneous fluency and decreased verbal problem solving." (Pet. Exh. 12). Behaviorally, petitioner's brain damage "makes him slightly more impulsive under normal situations and reduces his ability to disengage or inhibit his impulses." (Pet. Exh. 12). Under "normal circumstances," petitioner's "behavior would be within 'normal' parameters given his psychosocial circumstances." (Pet. Exh. 12).

However, if petitioner "experiences a toxic encephalopathy such as that induced with alcohol consumption, the neurologic component of impulsivity is intensified and exacerbated." (Pet. Exh. 12). Dr. Jones opined that petitioner "typically retains the capacity to engage in goal directed behavior and sequenced activities during these intervals, but he likely displays a more impulsive disinhibited character." (Pet. Exh. 12). Petitioner reported that he frequently drank excessive amounts of alcohol, so Dr. Jones concluded that petitioner's use of alcohol that night would be "a significant factor in conceptualizing his behavior and its etiology." (Pet. Exh. 12).

Dr. Jones also found petitioner's diabetes diagnosis significant. (Pet. Exh. 12). He noted that "blood glucose fluctuations" associated with Type I diabetes typically cause "mood swings and emotional behaviors." (Pet. Exh. 12). He also noted that petitioner "has a decreased appreciation of his mood swings and lack of concurrent awareness and correlation between his blood glucose levels and his mood." (Pet. Exh. 12). Dr. Jones did not opine about the impact of petitioner's diabetes on his behavior the night of the murder because he had no information about petitioner's blood sugar levels that night to help him form an opinion. (Pet. Exh. 12).

**Evidence of Intoxication**

Petitioner submitted two affidavits from potential witnesses Regina Stockfleth and Candy Ashley. (Pet. Exh. 2, 23). The State stipulated[18] that the affidavits would accurately reflect the witnesses' testimony, if called to testify. (Pet. Exh. 2, 23). Petitioner argues that these witnesses were available at the time of the second trial and that Mr. Lyman knew the substance of their

---

[18] The State lodged an objection to Regina Stockfleth's affidavit, arguing that it was not relevant to the issues to be determined at the evidentiary hearing. (Pet. Exh. 2). The State stipulated to the admission of the affidavit subject to this objection. (Pet. Exh. 2). Candy Ashley's affidavit contains no objection. (Pet. Exh. 23). The undersigned finds that Regina Stockfleth's affidavit, which provides evidence regarding petitioner's intoxication on the night of the murder, is relevant to the issues, as it reflects testimony that Mr. Lyman could have presented to the jury.

proffered testimony. (Dkt. #157 at 28-29). Petitioner contends that their testimony could have proven that he was intoxicated at the time of the murder. (Dkt. #157 at 29-30).

### Regina Stockfleth

Regina Stockfleth's affidavit states that she and petitioner have been friends for twenty years. (Pet. Exh. 2). They began drinking margaritas, made with "a fairly large size bottle of tequila and some Margarita mix," at five or six o'clock on the evening of the murder. (Pet. Exh. 2). Petitioner then left Ms. Stockfleth's house to look for marijuana. (Pet. Exh. 2). When he returned, they drove to two different bars and continued to drink. (Pet. Exh. 2). Petitioner drove them home around twelve or one o'clock in the morning, and he was intoxicated at that time, as demonstrated by his erratic driving. (Pet. Exh. 2). Ms. Stockfleth further stated that she did not see petitioner eat anything that evening. (Pet. Exh. 2).

### Candy Ashley

Candy Ashley does not know petitioner personally. (Pet. Exh. 23). On the night of the murder, she was sitting in a van parked approximately one hundred feet from the first convenience store that petitioner robbed, waiting for her partner, who was inside the store. (Pet. Exh. 23). She observed a white male walking around the store. (Pet. Exh. 23). The man walked to the back of the store's exterior and then returned "carrying what she believed to be a rifle." (Pet. Exh. 23). The man looked to the front of the store and again walked to the back of the store's exterior. (Pet. Exh. 23). Based on the way he walked, Ms. Ashley thought the man was intoxicated. (Pet. Exh. 23). Ms. Ashley's partner, Sean, then returned to the van, and they left the store. Ms. Ashley told Sean what she had seen, and when they arrived home, Sean called the police to report what Ms. Ashley had seen. (Pet. Exh. 23).

The next day, Ms. Ashley saw a news story with video about a robbery at another convenience store one mile from the store she had been to the previous evening. (Pet. Exh. 23). Ms. Ashley believes that the man she saw carrying the rifle is the same man depicted in the video from the other robbery. (Pet. Exh. 23).

Petitioner's Statement to Police

In addition to the affidavits of Regina Stockfleth and Candy Ashley, petitioner also submitted a transcript of a statement that he made to police on July 20, 1994. (Pet. Exh. 25).[19] A Tulsa homicide detective reviewed the video of the murder with petitioner and asked petitioner to describe the events. (Pet. Exh. 25). On several occasions during the interview, petitioner stated that he was "drunk" and could not clearly remember what happened. (Pet. Exh. 25 at 2, 5, 8, 13, 14).

The State submitted a second transcript of an interview that petitioner gave to police on July 19, 1994. (Resp. Exh. 6). In that statement, petitioner described, in some detail, drinking margaritas with "a female friend" (Regina Stockfleth). (Resp. Exh. 6). He also stated that he left to buy marijuana with a "minor individual from the neighborhood" (Michael Hansen) but never bought any. (Resp. Exh. 6). Instead, he purchased and drank a single can of beer. (Resp. Exh. 6). After buying and consuming the beer, petitioner and the "female friend" went to two bars, where they continued to drink. (Resp. Exh. 6). Petitioner then described the two robberies and the attempted robbery, in which he shot and killed the store clerk. (Resp. Exh. 6). Petitioner repeatedly stated that he could not remember or "kinda" remembered the events because he was intoxicated. (Resp. Exh. 6). Petitioner did tell the officer conducting the interview that he was "not blaming the alcohol" but that he believed it "impaired my thinking." (Resp. Exh. 6).

---

[19] The State also submitted a transcript of this statement as Respondent's Exhibit 7.

**Petitioner's Medical Records**

Petitioner's medical records were submitted to the jury in petitioner's second trial under a stipulation, without additional testimony. (Dkt. #141 at 153-54). The records address petitioner's treatment for a gunshot wound to the left frontal lobe of his brain on July 4, 1985. (Pet. Exh. 14). Petitioner underwent three surgeries within a one-week period to repair the damage and retrieve the bullet. (Pet. Exh. 14). Petitioner's recovery in the hospital was somewhat slowed due to his diabetes. (Pet. Exh. 14). Following his discharge from the hospital, petitioner had two follow-up appointments with Dr. Leslie C. Hellbusch, a neurosurgeon. (Pet. Exh. 14).

At the first appointment on August 13, 1985, Dr. Hellbusch wrote that petitioner's "neurological examination today was normal." (Pet. Exh. 14). Petitioner was ordered to return for a follow-up appointment in two months and to refrain from returning to work until that time. (Pet. Exh. 14). At the second follow-up appointment on October 15, 1985, Dr. Hellbusch found that petitioners "neurological examination today looked normal. He has had no evidence of cerebrospinal fluid rhinorrhea." (Pet. Exh. 14). Because petitioner was still exhibiting physical effects from the injury, such as headaches, dizziness, and fainting, Dr. Hellbusch ordered petitioner not to return to work, do any heavy lifting, or drive a vehicle. (Pet. Exh. 14).

**Mitigating Circumstances Jury Instruction**

Petitioner submitted the jury instruction from his second trial that listed the mitigating circumstances the jury was to consider in reaching its decision. (Pet. Exh. 18). Petitioner's counsel reviewed most of the mitigating circumstances during his examination of Mr. Lyman. (Dkt. #141 at79-85). The jury instruction lists eleven mitigating circumstances. (Pet. Exh. 18). The first three mitigating circumstances listed were

1.  That James Fitzgerald was diagnosed with diabetes at age 11 and must take daily insulin injections;

45

2. That in 1985 James Fitzgerald suffered a gunshot wound to the head that resulted in physical injury to his brain;

3. That prior to the 1985 gunshot wound to his head, James Fitzgerald was not convicted of any crimes involving violence;

(Pet. Exh. 18). The remaining mitigating circumstances addressed petitioner's cooperation and accountability for his crimes following the arrest; family relationships; difficult childhood; and recent injury, which decreased his mobility and caused him daily pain. (Pet. Exh. 18).

### Petitioner's Letters and Phone Calls

The State submitted several letters that petitioner wrote to Susan Duncan from jail and transcripts of phone calls that petitioner made to his family from jail in the spring of 1999. (Resp. Exh. 5, 8). The letters describe petitioner's desire to avoid growing old in prison, which he stated was dangerous, and his feelings about the death penalty. (Resp. Exh. 5). Statements in the last two letters and in the telephone call transcripts indicate that petitioner had formulated a plan to escape. (Resp. Exh. 5).

Petitioner attempted to recruit two people, one of whom was a minor, to assist him. (Resp. Exh. 5, 8).  Petitioner's plan was to have someone with a gun intercept him while he was in transport to or seeking treatment at an emergency room. (Resp. Exh. 5, 8). Petitioner explained to Ms. Duncan that a prisoner being transported for medical care only had one officer accompanying him, making it easy for an accomplice with a gun to hold up the officer while petitioner grabbed the officer to keep him from drawing his weapon. (Resp. Exh. 5). Petitioner would then make his escape in one car, drive a short distance, and then "dump" the first car for a second car. (Resp. Exh. 5). Petitioner believed that he had convinced Ms. Duncan to store the two getaway cars at her home. (Resp. Exh. 5).

In his phone calls to his family, petitioner spoke to Randy Whitaker about the escape plan. (Resp. Exh. 8). Those conversations are thinly veiled, and it is clear that petitioner wanted

Randy Whitaker to drive the car during the escape. (Resp. Exh. 8). Petitioner also believed that he had convinced Ms. Duncan to store the two getaway cars at her home. (Resp. Exh. 5).

At some point, authorities discovered petitioner's escape plan. During a telephone call to Ms. Duncan on April 22, 1999, she told petitioner that she did not want any further contact with him. (Resp. Exh. 8). She stated that she had "been questioned all day" and was "not going to be put in jail for nothing." (Resp. Exh. 8). Petitioner then called his mother to ask if anyone had been to her house asking questions. (Resp. Exh. 8). He told his mother that he had been joking "with old fat Sue about running off and evidently somebody come and talk to her about that." (Resp. Exh. 8). He also stated that Ms. Duncan was upset, but he "could care less, she don't mean nothing to me." In that same telephone call, however, petitioner spoke to Randy Whitaker again about helping him escape. (Resp. Exh. 8).

## CONCLUSIONS OF LAW

In his proposed findings of fact and conclusions of law, petitioner argues that Mr. Lyman's lack of experience and failure to investigate prevented him from making an informed strategic decision not to present expert testimony at petitioner's second trial. (Dkt. # 157 at 42-54). Alternatively, petitioner argues that even if Mr. Lyman's decision can be construed as a strategic decision, it was an objectively unreasonable decision based on the evidence presented at the hearing. (Dkt. #157 at 55-63). Petitioner also contends that Mr. Lyman's concerns about the expert testimony working as a "two edged sword" that would strengthen the State's evidence of the aggravating circumstances were objectively unreasonable, as they represent a misunderstanding of the applicable case law. (Dkt. #157 at 64-74). Petitioner argues that a proper reading of the case law holds that the concern that mitigating evidence can be used as a "two edged sword" to bolster the State's claims that a defendant is a continuing danger applies only

47

when that defendant has claimed innocence. (Dkt. #157 at 64-74). Because Mr. Lyman's strategy and decision-making process was based on an erroneous understanding of the law, petitioner argues that the decision not to use expert testimony was objectively unreasonable. (Dkt. #157 at 64-74).

In its proposed findings of fact and conclusions of law, the State argues that Mr. Lyman's experience, or lack of experience, does not impact the analysis regarding the reasonableness of his decision. (Dkt. #156 at 16-18). The State also argues that Mr. Lyman's investigation was thorough and reasonable under the circumstances, in light of the fact that Mr. Lyman knew of all the evidence that Petitioner presented at the hearing. (Dkt. #156 at 18-19). Further, the State contends that Mr. Lyman's theme at the second trial, "a 'large' one intended to humanize Petitioner and convince the jury that he had a good side and there was value to his life" was appropriate and reasonable under the circumstances. (Dkt. #156 at 19).

The State further contends that Mr. Lyman was right to be concerned about the use of experts, for the following reasons: (1) Mr. Lyman believed that the presentation of expert testimony regarding petitioner's "mental state," including the impact of alcohol, diabetes, and the brain injury on petitioner's thought processes, would appear to the jury as an attempt to improperly re-litigate intent at a resentencing trial and would harm Mr. Lyman's credibility with the jury; (2) Mr. Lyman believed that evidence of intoxication would appear to the jury as an excuse, which conflicted with part of Mr. Lyman's theme that petitioner's life had value because he took responsibility for his actions; and (3) the expert witnesses, particularly on cross-examination, would highlight the aggravating evidence, thereby harming petitioner's case. (Dkt. #156 at 18-22). With respect to Mr. Lyman's concerns about the expert testimony being used to highlight the aggravating factors, which he called a "double-edged sword," the State cites Mr.

Lyman's concerns that Dr. Bratcher would make a weak witness and that Dr. Jones would be forced to testify about petitioner's disinhibition, goal-oriented behavior, and anti-social personality disorder. (Dkt. #156 at 21-22). In light of all these concerns, the State argues that Mr. Lyman's strategy and his decision not to call expert witnesses was reasonable. (Dkt. #156 at 24).

**Standard of Review**

The Sixth Amendment "right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (citations omitted). In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court defined the parameters for analyzing ineffective assistance of counsel claims. To prevail on a claim for ineffective assistance of counsel, a convicted defendant bears the burden of proving two elements to establish that "counsel's representation fell below an objective standard of reasonableness." Id. at 688. "First, the defendant must show that counsel's performance was deficient" by "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id.

In analyzing whether counsel's performance was deficient, a reviewing court must strive "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. Courts are required to give great deference to counsel's performance through "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" based on "prevailing professional norms." Id. at 689, 690. The prevailing professional norms are determined by applying the law as it existed at the time counsel acted or failed to act. See Bland v. Sirmons, 459 F.3d 999, 1030-31 (10th Cir. 2006) (applying the

standard to a claim based on failure to obtain a jury instruction on involuntary intoxication); Bullock v. Carver, 297 F.3d 1036, 1052 (10th Cir. 2002) (citations omitted) (stating that counsel is not required to "predict future law" or to anticipate arguments that do not exist at the time of trial).

Additionally, counsel is presumed to have acted in an "objectively reasonable manner" and in a manner that "might have been part of a sound trial strategy." Bullock, 297 F.3d at 1046. Counsel is given "wide latitude" to make "tactical decisions" because "[t]here are countless ways to provide effective assistance in any case." Strickland, 466 U.S. at 689. Accordingly, where the facts establish that decisions made by counsel were, in fact, "strategic choices made after thorough investigation of law and facts relevant to plausible options," those decisions are virtually unchallengeable." Id. at 690. Conversely, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91. Counsel must conduct a reasonable investigation or "make a reasonable decision that makes particular investigations unnecessary." Id. at 691. If a decision qualifies as a strategic decision made after a constitutionally adequate investigation, a convicted defendant may only establish deficient performance if "the choice was so patently unreasonable that no competent attorney would have made it." Bullock, 297 F.3d at 1046 (citations and internal quotation marks omitted).

"Second, the defendant must show that the deficient performance prejudiced the defense." Id. Prejudice is established by a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Thus, a defendant must prove by "a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." Id. at 694. The Supreme Court defines "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Id.

**Deficient Performance**

In his proposed findings of fact and conclusions of law, petitioner argues that Mr. Lyman's performance was deficient in a number of ways. First, petitioner asserts that Mr. Lyman's lack of experience with the presentation of expert testimony to establish mitigating factors in a capital cases made it impossible for him to make a strategic decision. (Dkt. #157 at 42-55). Petitioner also contends that Mr. Lyman failed to conduct an adequate investigation by failing to comprehend the expert testimony that could have been presented and by failing to understand the impact of submitting fact-based evidence without expert testimony to educate the jury. (Dkt. #157 at 50-55). Finally, petitioner argues that, even if Mr. Lyman made a strategic decision not to present expert testimony, that decision was objectively unreasonable and would have impacted at least one juror's decision. (Dkt. #157 at 55-74).

**Adequate Investigation**

Petitioner's claim that Mr. Lyman conducted an inadequate investigation is based, in large part, on what petitioner perceives as Mr. Lyman's failure to comprehend the importance of the information uncovered in the investigation. (Dkt. #157 at 42-55). The State contends that Mr. Lyman's investigation was thorough because he was aware of all of the evidence presented during the evidentiary hearing. (Dkt. #156 at 18-19). In support, the State cites to Mr. Lyman's retention of two experts, Dr. Bratcher and Dr. Jones; his meetings with those witnesses; and the witness and exhibit lists. (Dkt. #156 at 18-19).

Although "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," Strickland, 466 U.S. at 690, the duty to

investigate is separate from the question of whether counsel made a reasonable, strategic decision. When considering a claim that counsel was ineffective because he failed to investigate, the question "is not whether trial counsel made a tactical or strategic decision not to include the omitted mitigation evidence at trial, but rather whether 'the investigation supporting counsel's decision . . . *was itself reasonable*." Anderson v. Sirmons, 476 F.3d 1131, 1145 (10th Cir. 2007) (quoting Wiggins v. Smith, 539 U.S. 510, 523, 123 S.Ct. 2427, 156 L.Ed.2d. 471 (2003) (emphasis in original)).

In the Tenth Circuit, counsel's failure to properly prepare a mitigation case can be considered ineffective assistance of counsel, but "only if the investigation fails to . . . uncover significant mitigating evidence." DeRosa v. Workman, 679 F.3d 1196, 1208-09 (10th Cir. 2012) (quoting Wilson v. Sirmons, 536 F.3d 1064, 1143 (10th Cir. 2008)). In DeRosa, the district court granted defendant an evidentiary hearing on his ineffective assistance of counsel claim. See id. at 1200, 1206-07. At that hearing, defendant presented a number of factual witnesses and one expert witness that he argued should have been presented as part of the mitigating evidence at his trial. See id. at 1214-18. The Tenth Circuit, reviewing the decision of the district court, concluded that defendant's attorney "was well aware of most, if not all, of the significant mitigating events that occurred during DeRosa's life" and had presented evidence recounting most of those events to the jury; therefore, the failure to introduce at trial the additional evidence presented during the evidentiary hearing was not a constitutional error. Id. at 1218-19.

Conversely, the Supreme Court has found ineffective assistance of counsel and prejudice where counsel's failure to investigate a previous conviction resulted in the failure to discover mitigating evidence in the case file regarding the defendant's mental health. See Rompilla v. Beard, 545 U.S. 374, 390, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). Instead of reviewing the

court file, counsel for defendant interviewed five family members in his investigation on defendant's childhood and mental development. See id. at 381-82. The Court, in Rompilla, concluded that counsel's investigation fell below prevailing professional norms because counsel for the defendant was aware that the prosecution intended to use the transcript of the previous conviction and the accompanying court file to prove aggravation that supported the death penalty. See id. at 383-87 (holding that "[t]he notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense." It was also a standard set forth by the American Bar Association.). The Tenth Circuit has made similar findings in cases where counsel "did not investigate and therefore did not know such evidence was available." Anderson, 476 F.3d at 1145-46 (collecting cases involving failure to investigate). In Anderson and the cases cited therein, the courts found that a proper investigation would have yielded evidence that, to a reasonable probability, would have impacted at least one juror's decision. See id. at 1145-48.

The State's argument that, at the time of petitioner's second trial, Mr. Lyman was aware of the evidence petitioner presented during the evidentiary hearing, is well supported by the case law. Petitioner has failed to demonstrate that Mr. Lyman was unaware of the witnesses and information available for use in developing a mitigation defense. Petitioner has submitted no *new* information or witnesses that did not exist at the time of petitioner's second trial.[20] Accordingly, the undersigned recommends a finding that Mr. Lyman's investigation into the mitigating evidence satisfied the constitutional duty to investigate.

---

[20] The impact of Mr. Lyman's failure to understand the information gained during the investigation is addressed *infra*.

**Strategic Decision**

Petitioner contends that Mr. Lyman's lack of experience with capital trials, generally, and with the use of mitigation expert testimony, specifically, prevented Mr. Lyman from making a strategic decision not to call Dr. Bratcher and Dr. Jones as expert witnesses during petitioner's second trial. (Dkt. #157 at 8-9). Both parties agree that Mr. Lyman did not meet all of the ABA's advisory guidelines for qualification of capital counsel, but the State argues that this fact does not mandate a finding that Mr. Lyman's decisions were not strategic or reasonable. (Dkt. #156 at 16-17).

<u>Lack of Experience</u>

Although there was some debate about Mr. Lyman's criminal trial experience during the evidentiary hearing, the evidence ultimately established that Mr. Lyman did not meet all of the 1989 ABA Guidelines for the appointment of counsel in death penalty cases. The applicable guideline, ABA Guideline 5.1 recommends that appointed counsel have "at least five years litigation experience in the field of criminal defense" and "have prior experience as lead counsel in no fewer than nine jury trials of serious and complex cases which were tried to completion." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989); (Pet. Exh. 8). Mr. Lyman acknowledged that he did not meet these requirements because he had only worked at OIDS for three years when he conducted petitioner's second trial and an insufficient number of his previous trials rose to the level of "serious and complex cases." (Dkt. #141 at 47-53). Counsel for petitioner and Mr. Lyman also discussed Mr. Lyman's experience with "the utilization of expert witnesses and evidence, including, but not limited to, psychiatric and forensic evidence." ABA Guidelines; (Dkt. #141 at 48-53). Mr. Lyman testified that he had

experience working with expert witnesses, including limited experience with psychiatric expert witnesses, but he had never presented expert testimony to a jury. (Dkt. #141 at 48-53).

While Mr. Lyman's lack of experience is relevant to a discussion of the strategic nature of the decisions he made and of their objective reasonableness, his failure to meet the qualifications set forth in the ABA Guidelines is insufficient, standing alone, to warrant a finding that the decision not to utilize expert testimony was not a strategic decision. As the Supreme Court has noted on numerous occasions, the "[p]revailing norms of practice as reflected in the American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides." Strickland, 466 U.S. at 688. See also Padilla v. Kentucky, 559 U.S. 356, ___, 130 S.Ct. 1473, 1482, 176 L.Ed.2d 284 (2010) (collecting citations). The generalized standard of "reasonableness under prevailing professional norms" articulated in Strickland is the standard, not a "particular set of detailed rules." Strickland, 466 U.S. at 688-89 (citation omitted). Accordingly, while the standards set forth in the ABA Guidelines "may be valuable measures," they are not dictates and are not determinative here. Padilla, 130 S.Ct. at 1482. Misunderstanding of the Expert Reports

Petitioner also contends that Mr. Lyman's lack of experience contributed to his misunderstanding of Dr. Jones's report. Although Mr. Lyman met with Dr. Jones and spoke to him about the expert report, Mr. Lyman did not demonstrate a clear understanding of the meaning of that report. Specifically, Mr. Lyman testified that he interpreted Dr. Jones's conclusion that petitioner was "disinhibited" to mean that petitioner was uncaring and did not care about the consequences of his actions. (Dkt. #141 at 89-93). Dr. Jones testified to the contrary, stating that "disinhibited" was a reference to a lack of impulse control. (Dkt. #142 at 180-83). Petitioner's disinhibition was directly caused by damage to the frontal lobe of his brain

from the gunshot wound petitioner received in 1985. (Dkt. # 142 at 175-79). Petitioner argues that this testimony constitutes strong mitigating evidence that the jury should have heard. (Dkt. #157 at 28-35).

A decision based on an error of law cannot be categorized as a strategic decision if, under the circumstances, that decision was "contrary to professional prevailing norms." Kimmelman v. Morrison, 477 U.S. 365, 385, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). In Kimmelman, the defendant's attorney failed to conduct any pretrial discovery because he was under the "mistaken beliefs that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense." Id. at 385.  Because the defendant's attorney was not aware of the evidence against his client, he failed to file a motion to suppress certain evidence. See id. The Supreme Court concluded that the attorney's decision was not a strategic one because it stemmed from the attorney's misunderstanding of the law regarding discovery procedures, which resulted in a failure to investigate.[21] See id. at 386-87. The Supreme Court applied this analysis to a similar case in Williams v. Taylor, 529 U.S. 362, 395-96, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In Williams, counsel's investigation into the defendant's childhood for the purpose of preparing a mitigation case was inadequate, in part,[22] because counsel failed to obtain state records that revealed defendant was the victim of criminal neglect and an abusive foster home.

---

[21] Consistent with Strickland, the Court also held that the defendant was required to establish prejudice by demonstrating (1) that a timely motion to suppress would have been granted and (2) that, to a reasonable probability, the jury would have reached a different result without the introduction of the suppressed evidence. See Kimmelman, 477 U.S. at 375.

[22] The record also revealed that counsel did not begin its mitigation investigation until a week before trial and that counsel failed to uncover additional records of the defendant's "borderline" mental retardation, commendations the defendant received in prison, and the testimony of prison officials and a prison ministry volunteer who would have testified that the defendant was not prone to violence and thrived under the structure of the prison schedule. Williams, 529 U.S. at 395-96.

See id. Counsel for the defendant failed to obtain those records "not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." Id. at 395.

The evidence, as it was presented during the hearing, indicates that Mr. Lyman may not have been as familiar with the mitigation case being built for petitioner's second trial as he could, or should, have been. This error, however, was a misunderstanding of fact, not a misunderstanding of the law; therefore, Mr. Lyman's decision not to call Dr. Jones as an expert witness may still be considered a strategic decision, even though Mr. Lyman's interpretation of Dr. Jones's report was incorrect.[23]

### "Double-Edged Sword"

Mr. Lyman testified that his main reason for not calling either Dr. Jones or Dr. Bratcher as an expert witness was his concern that the State would use that testimony on cross-examination to support the aggravating factors. (Dkt. #141 at 88). Mr. Lyman's concern with Dr. Bratcher's testimony was that the focus on the interaction between petitioner's diabetes and alcohol consumption would "come across, one, as an excuse; two, that it would be in effect kind of a summation for the state." (Dkt. #141 at 82). Mr. Lyman had similar concerns with Dr. Jones's testimony. (Dkt. #141 at 88). He stated that his "number one concern was that [Dr.

---

[23] The undersigned notes that Mr. Lyman may have misunderstood the term "disinhibited" based on his conversations with Dr. Jones, which included a discussion of Dr. Jones's conclusion – not included in his report – that petitioner had anti-social personality disorder. (Dkt. #142 at 206-08). In his testimony at the evidentiary hearing, Dr. Jones testified that the signs and symptoms of anti-social personality disorder include "a pervasive pattern of disregard for and violation of the rights of others," "a failure to conform to social norms with respect to lawful behaviors," "deceitfulness," "impulsivity," "irritability and aggressiveness," "consistent irresponsibility," and "lack of remorse" or "rationalization" of misdeeds. (Dkt. #142 at 226-30). Petitioner exhibited all seven signs and symptoms. (Dkt. #142 at 226-30). Several of those factors describe behavior that could define the petitioner as uncaring, which could explain Mr. Lyman's incorrect interpretation of Dr. Jones's findings.

Jones] would in effect become the state's best summation witness for their case" because he would be cross-examined on the evidence that supported the aggravating factors and "the state would be able to utilize his findings and opinions to benefit the state's case to the extent that it would diminish any benefit we would have received from him if we had used him." (Dkt. #141 at 88). Mr. Lyman testified that Dr. Jones's findings regarding petitioner's impulsivity, particularly his findings on the interaction between petitioner's frontal lobe damage and alcohol consumption would be wrongly interpreted by the jury. (Dkt. #141 at 90-91).

The State argues that Mr. Lyman's decision on this issue was both strategic and reasonable because the expert opinions constituted a "double-edged sword," evidence that could be used to support both aggravation and mitigation. (Dkt. #156 at 3-4). Petitioner argues that the "double-edged sword" argument should be applied to an analysis of prejudice under the second prong of Strickland. (Dkt. #157 at 64-74). Under the prevailing case law concerning evidence that may be considered a "double-edged sword," petitioner is correct in stating that the evidence should be considered in analyzing whether petitioner was prejudiced by the failure to present expert testimony. The undersigned addresses the issue here solely for the purpose of determining whether Mr. Lyman erred, as a matter of law, in viewing the expert testimony through the lens of the "double-edged sword analysis." If Mr. Lyman did err as a matter of law, then his decision would not be strategic because it would have been "contrary to professional prevailing norms." Kimmelman, 477 U.S. at 385.

In his analysis of the "double-edged sword" cases, petitioner correctly notes that the Tenth Circuit now draws a distinction among certain types of cases. (Dkt. #157 at 64-74). For example, in Smith v. Mullin, 379 F.3d 919, 943 n. 11 (10th Cir. 2004), the Tenth Circuit acknowledged that evidence of mental impairments can be seen as a "double-edged sword." The

Tenth Circuit ultimately found, however, that counsel was ineffective in failing to introduce mental health evidence and that the defendant suffered prejudice as a result because, to the extent that such evidence was aggravating, that evidence was already before the jury. See id. The Court distinguished its previous cases involving evidence of a "'double-edged' nature" on the grounds that in all of those cases, "such evidence had not previously been placed before the jury." Id. The Tenth Circuit found prejudice in Smith because "[t]he jury already had evidence of Mr. Smith's impulsiveness and lack of emotional control. What the jury wholly lacked was an *explanation* of how Mr. Smith's organic brain damage caused these outbursts of violence and caused this 'kind hearted' person to commit such a shocking crime." Id. at 943 (emphasis in original).

At the time of petitioner's second trial in October 2000, however, Smith had not yet been decided, and the cases available to Mr. Lyman indicated that the Tenth Circuit viewed mental health evidence as a double-edged sword that required counsel to proceed with caution in presenting such evidence.[24] See, e.g., Duvall v. Reynolds, 139 F.3d 768, 782 (10th Cir. 1998) (holding counsel's decision not to introduce evidence of the defendant's substance abuse reasonable because it "would have resulted in the introduction of details of [] prior convictions and violent conduct, which invariable resulted from his substance abuse. The jury could have perceived such evidence as aggravating rather than mitigating."); Davis v. Executive Dir. Of Dept. of Corrections, 100 F.3d 750, 760-61 (10th Cir. 1996). In Davis, the Tenth Circuit held

---

[24] At the time, the Supreme Court's precedent also cautioned counsel that a criminal defendant's mental health and childhood history could be a "two-edged sword" that "may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." Penry v. Lynaugh, 492 U.S. 302, 324, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (abrogated by Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)). In Penry, the issue was whether the jury instructions clearly instructed the jury to consider the mitigating value of such evidence and not whether counsel was ineffective. However, the possibility that mitigating evidence could ultimately be harmful to a criminal defendant's case during the penalty phase of a capital trial is clearly stated in the case law that existed at the time of petitioner's second trial.

that counsel's decision not to introduce evidence of the defendant's alcoholism as a factor in establishing the defendant's mental state at the time of the crime was reasonable, even though the facts established that the defendant was an alcoholic who had been drinking on the day of the murder. <u>Davis</u>, 100 F.3d at 763-64. The Court based its holding on the following reasons: (1) no direct evidence supported a finding that the defendant was intoxicated at the time of the crime; (2) the defendant's multiple unsuccessful attempts to achieve sobriety could be viewed as an aggravating factor; and (3) the expert report also contained evidence that the defendant lied about the facts of the crime, either to the expert or to the jury. <u>See id.</u>

Nothing in the Court's analysis in <u>Davis</u> and similar cases would have put Mr. Lyman on notice that the evidence of petitioner's diabetes, alcohol intake, or frontal lobe damage should carry more weight as mitigating evidence simply because petitioner's guilt was not at issue or because the State had re-introduced that evidence during its case-in-chief. Accordingly, the undersigned cannot conclude that Mr. Lyman's decision not to introduce expert witnesses who could opine on those issues was an error of law that would disqualify Mr. Lyman's decision from being categorized as a strategic one.

### Objective Reasonableness of the Strategic Decision

Because Mr. Lyman's decision not to call expert witnesses or present evidence of petitioner's alcohol use qualifies as a strategic decision made after adequate investigation, petitioner's claim that Mr. Lyman's performance was constitutionally deficient succeeds only if Mr. Lyman's decisions were objectively unreasonable. <u>See</u> <u>Strickland</u>, 466 U.S. at 690-91 (holding that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). This highly deferential standard requires a finding that Mr. Lyman's decisions were "completely unreasonable, not merely wrong." <u>Fox v.</u>

Ward, 200 F.3d 1286, 1296 (10th Cir. 2000) (citations omitted). Although the undersigned has recommended findings that Mr. Lyman's investigation and "no excuses" strategy were constitutionally adequate, the implementation of the defense case in petitioner's second trial contains numerous errors. "[C]umulatively, each failure underscores a fundamental lack of formulation and direction in presenting a coherent defense," so that the defense case appears haphazard and disorganized. Stouffer v. Reynolds, 168 F.3d 1155, 1164 (10th Cir. 1999). See also Fisher v. Gibson, 282 F.3d 1283, 1299 (10th Cir. 2002). After careful review of the entire record, for the reasons that follow, the undersigned is convinced that, under the circumstances of this case, counsel's decisions were objectively unreasonable.

Mr. Lyman, Dr. LaFortune, and Mr. Burch were appointed to represent petitioner after OCCA reversed the death sentence in his first trial on the grounds that the trial court erred in denying funds for expert witnesses. See Fitzgerald, 972 P.2d at 1165. Petitioner argued to OCCA that an adequate defense required the use of two experts – a neuropsychologist and "an expert on juvenile-onset diabetes" – because "the combination of his juvenile-onset diabetes, probable brain damage from his head injury and drinking habits (including drinking before committing the crimes) affected his mental processes and deprived him of the ability to form the intent to kill necessary for malice murder." Id. at 1165-66. OCCA agreed that petitioner had submitted sufficient evidence to demonstrate that "his physical and psychological condition at the time of the crime will be *a significant factor* in his defense." Id. at 1166. The evidence and theories petitioner presented on direct appeal were nearly identical to the evidence and theories presented during the evidentiary hearing. See id. OCCA held that the denial of expert testimony deprived petitioner of the opportunity to present mitigating evidence of his diabetes and brain injury. See id. at 1168-69. OCCA specifically

> reject[ed] the suggestion that lay witnesses provide an effective substitute for expert testimony in these circumstances. Fitzgerald's friends and family could have testified regarding symptoms and behavior they observed, and his pediatrician and surgeon could have testified regarding their diagnoses and treatment. However, these witnesses could not effectively explain the particular problems and phenomena associated with juvenile-onset diabetes, nor could they describe the physiological and psychological effects resulting when alcohol and diabetes are combined. These witnesses certainly could neither conduct neuropsychological tests nor present the result of those tests to the jury. *As other witnesses could not present this mitigating evidence*, Fitzgerald has shown he was prejudiced by the trial court's decision.

Id. (emphasis added). OCCA reversed with instructions for petitioner to receive a second trial for purposes of determining his sentence. See id. at 1174-75. With this mandate from OCCA, Mr. Lyman undertook representation of petitioner.

According to Dr. Jones's report, Mr. Lyman retained Dr. Jones in July 1999 to conduct neuropsychological testing. (Pet. Exh. 12). Dr. Jones was made aware of petitioner's diabetes diagnosis, but he was only marginally aware of petitioner's alcohol use on the night of the murder. (Pet. Exh. 12; Dkt. #142 at 184). Dr. Jones testified that "[i]t was conveyed to me that a large amount of a mixed drink was consumed, but I don't know the amount, nor do I know the alcohol content, nor do I know his blood alcohol level at an approximate time."[25] (Dkt. #142 at 184).  He had also advised either Mr. Lyman or Dr. LaFortune that an endocrinologist, such as Dr. Bratcher, would be better able to opine on the impact of alcohol and diabetes on petitioner's metabolism, and that he could rely on her report to supplement his conclusions. (Dkt. #142 at 192, 250).

Although the record does not clearly establish when Dr. Jones made those statements to counsel, Mr. Lyman did not request funds for Dr. Bratcher, an endocrinologist, until March 21, 2000. (Pet. Exh. 15). Ten days later, Mr. Lyman submitted his witness list, which included Dr.

---

[25] The evidence of petitioner's intoxication and the decision not to use any evidence of alcohol use is discussed *infra*.

Bratcher but did not include Dr. Jones. (Pet. Exh. 19). Mr. Lyman testified that he included Dr. Bratcher on the witness list, even though she had not yet submitted a report, "with the thought that we may be using her." (Dkt. #141 at 86).  Because Dr. Jones was not on the witness list, Mr. Lyman stated that he must have decided not to call Dr. Jones as a witness "sometime before then." (Dkt. #141 at 86).

Mr. Lyman's testimony regarding the decisions he made not to utilize either Dr. Jones or Dr. Bratcher reinforces the appearance of disorganization in the defense of petitioner's case. Mr. Lyman initially stated that he chose not to call Dr. Bratcher after he interviewed her because he did not think that she would make a good witness. (Dkt. #141 at 60-67). He testified, however, that Dr. Jones could have used the information Dr. Bratcher provided to support his testimony. (Dkt. #141 at 60, 64). He further testified that he "viewed it more as providing or attempting to consider using whatever her findings would be with someone like Dr. Herman Jones if we chose to use him, although I think at that point in time we were inclined not to use him." (Dkt. #141 at 64). Yet, Mr. Lyman submitted a witness list without Dr. Jones on it (the witness he was apparently considering calling) and with Dr. Bratcher on it (the witness he did not intend to call but needed to support Dr. Jones' testimony), even before he received Dr. Bratcher's report. This contradiction in testimony indicates that Mr. Lyman did not have a clear plan for building petitioner's mitigation defense.

Dr. LaFortune's testimony also supports that conclusion. Although Mr. Lyman testified that he decided not to call Dr. Bratcher after meeting with her (dkt. #141 at 60-67), Dr. LaFortune testified that Mr. Lyman did not communicate his decision to her until after the trial began. (Dkt. #142 at 315, 328-29, 364). Dr. LaFortune also testified that she had continued to work with Dr. Bratcher until the time of trial. (Dkt. #142 at 315). She did testify that she was

aware that Dr. Jones was not on the witness list submitted in March 2000, and she did not consult with him after that time. (Dkt. #142 at 360-61). She stated that she believed Mr. Lyman could have filed a supplemental witness list, but she did not discuss any further conversations about utilizing Dr. Jones. (Dkt. #142 at 360-61). She also stated that she could have asked Dr. Bratcher to rely upon Dr. Jones's report in her testimony, but she did not state whether that was part of her trial strategy and doing so would have contradicted Mr. Lyman's stated strategy.[26] (Dkt. #142 at 351).

Not only does the testimony of Mr. Lyman and Dr. LaFortune establish a pattern of disorganization and a lack of communication among the members of petitioner's defense team, the last-minute decision not to utilize expert testimony from Dr. Bratcher (and the earlier decision not to use Dr. Jones) also jeopardized the defense theory. Prior to trial, Mr. Lyman had prepared a list of mitigating factors to be used in an instruction for the jury. (Pet. Exh. 18). The first two mitigating factors related to petitioner's diabetes and his brain injury. (Pet. Exh. 18). If Dr. Bratcher was to be called as an expert witness to establish the impact of petitioner's diabetes on his development, as Mr. Lyman and Dr. LaFortune testified, and if she was to discuss how her findings dove-tailed with Dr. Jones's findings, as Mr. Lyman and Dr. LaFortune implied, the decision to remove Dr. Bratcher from the witness list after the mitigating factors were finalized robbed petitioner of the very evidence that OCCA had said was necessary to create an effective mitigation defense. See Fitzgerald, 972 P.2d at 1168-69. In fact, submitting these mitigating factors without a neuropsychology expert like Dr. Jones, of itself, shows disorganization, particularly in light of the medical records regarding Mr. Fitzgerald's brain injury (discussed infra.).

---

[26] Dr. LaFortune was responsible for preparing the mitigation witnesses and presenting them to the jury.

Without the expert testimony, the jury received only partial information regarding those mitigating factors. Jurors presumably reviewed petitioner's medical records establishing that petitioner was diagnosed with Type I diabetes at age twelve and had difficulty managing his diabetes for years. (Tr. T. 1065-66; Tr. T. Def. Exh. 8-14, 17). Petitioner's mother testified briefly about his diabetes diagnosis and his tendency, as a teenager, "to keep wandering away from home," but she could not recall any information about the progress of his illness. (Tr. T. 1071-72). Petitioner's foster mother testified that petitioner had difficulty managing his diabetes because he liked to eat sugary foods. (Tr. T. 1116-17). She was able to recall and describe petitioner's emotional response to his diabetes diagnosis. (Tr. T. 1116-17). She stated that petitioner "didn't like being a diabetic," that he was "really angry" and "felt it was really unfair." (Tr. T. 1117). Even at fifteen years of age, three years after his diagnosis, petitioner's foster mother felt that "he still was hanging onto a lot of anger concerning his diabetes." (Tr. T. 1117). While this testimony helped provide the jury with background information regarding petitioner's diabetes, it fell fall short of providing the jury with an explanation of "the particular problems and phenomena associated with juvenile-onset diabetes," as OCCA mandated. Fitzgerald, 972 P.2d at 1168-69.

Likewise, jurors received an incomplete picture of the impact of petitioner's gunshot wound. Counsel introduced the medical records without any comment or testimony to explain them. (Tr. T. 1066; Pet. Exh. 14). As Dr. Jones testified, the medical records indicate that petitioner recovered fully from his gunshot wound. (Dkt. #142 at 169-75). The medical records did not establish that petitioner had frontal lobe damage and residual impairment. (Dkt. #142 at 169-75). In fact, the medical records, without explanation from an expert witness like Dr. Jones, actually damaged petitioner's case. The medical records contained a letter from petitioner's

neurosurgeon, who reported that petitioner's neurological examination was "normal." (Pet. Exh. 14). Dr. Jones testified that a jury, which has no specialized knowledge of neurology, would not understand that the neurological examination described in the letter referenced only physical components such as reflexes, orientation, gait, and cranial nerves and was intended to serve as a notice that petitioner could return to work under Social Security Disability standards. (Dkt. #142 at 169-75). The jury never even heard evidence of petitioner's frontal lobe damage. To their knowledge, petitioner "suffered a gunshot wound to the head that resulted in physical injury to his brain," and he fully recovered from that injury. (Pet. Exh. 18).

The failure to introduce any evidence of petitioner's frontal lobe damage and its implications for petitioner's behavior is a particularly egregious omission. In Smith, 379 F.3d at 940-43, the Tenth Circuit found that counsel was ineffective in failing to introduce evidence of the defendant's mental retardation, caused by a brain injury resulting from a near-drowning when the defendant was a child. The Tenth Circuit noted that evidence of mental illness, mental retardation, or organic brain injuries is the most compelling mitigating evidence available. See id. at 942. Failure to introduce this mitigating evidence was both objectively unreasonable and prejudicial because the jury had seen evidence of the defendant's "impulsiveness and lack of emotional control. What the jury wholly lacked was an *explanation* of how Mr. Smith's organic brain damage caused these outbursts of violence . . . ." Id. at 943 (emphasis in original). The Court concluded that the mitigating evidence of the defendant's brain injury and resulting mental retardation would have provided that explanation. See id.

In this case, the jury heard evidence that petitioner sustained a gunshot wound, but they heard no testimony regarding the damage caused by the gunshot wound petitioner sustained. Dr. Jones's testimony at the hearing was clear and persuasive. The damage to petitioner's frontal

lobe was "subtle" but "significant." (Dkt. #142 at 178). While the behavioral deficits caused by the frontal lobe damage "would not be manifested in his activities of daily living," the effects of the damage "would be intensified were further compromising factors to be present," such as physical illness or alcohol. (Dkt. #142 at 178-79).

Mr. Lyman had evidence of two compromising factors at his disposal: physical illness, in the form of petitioner's diabetes, and alcohol consumption. Admittedly, the evidence presented at the evidentiary hearing regarding petitioner's blood sugar levels was not significant. Although petitioner submitted medical records showing that petitioner had a history of poor diabetes management, petitioner submitted no concrete evidence regarding his blood sugar level around the time of the murder. Dr. Jones testified that the brain requires a large amount of sugar to function properly and that too much or too little blood sugar would impact brain function. (Dkt. #142 at 196). He stated that, if petitioner had been drinking at the time of the murder, he could have been experiencing hyperglycemia, caused by the liver breaking down alcohol into sugars. (Dkt. #142 at 198-200). He also stated, however, that hyperglycemia presents with symptoms of sedation, which contradicted reports that petitioner was hyperactive on the night of the murder. (Dkt. #142 at 198-200; Tr. T. State's Exh. AA).

Although the evidence of the impact of petitioner's diabetes on his brain function was weak, the evidence that he was intoxicated was strong. Regina Stockfleth's affidavit stated that she and petitioner consumed large amounts of alcohol that night and that petitioner was heavily intoxicated shortly before he committed the robberies and the murder. (Pet. Exh. 2). Candy Ashley, a neutral bystander, submitted an affidavit describing petitioner's behavior as consistent with intoxication. (Pet. Exh. 23). Additionally, petitioner made statements admitting that he was intoxicated at the time of the murder during two separate interviews. (Resp. Exh. 6,7). While

there was some conflicting evidence that indicated petitioner was not heavily intoxicated – both Michael Hansen and the clerk at the first convenience store testified that petitioner did not appear intoxicated that night – Mr. Lyman testified that he believed the evidence was sufficient to establish petitioner's intoxication. (Dkt. #141 at 69-73). He simply chose not to present evidence of intoxication because he thought it was inconsistent with the "no excuses" mitigation defense he wanted to present.

In light of the impact that petitioner's intoxication had on his brain function, as presented through Dr. Jones's testimony, the undersigned finds that Mr. Lyman's decision not to present evidence of petitioner's intoxication was objectively unreasonable. Dr. Jones's testimony would likely have served to demonstrate that petitioner's brain was not functioning properly at the time of the murder as a result of the interaction between petitioner's brain damage and the alcohol he had consumed. Mr. Lyman's concerns about the testimony regarding petitioner's diagnosis of anti-social personality disorder simply cannot outweigh the benefits of utilizing Dr. Jones's testimony. This fact is particularly true because Dr. Jones specifically stated that if petitioner was intoxicated or otherwise compromised at the time of the murder, he would have opined that petitioner was impaired by the gunshot wound. Dr. Jones would have attributed petitioner's actions to his personality disorder only if no other factors were at issue. Taken together, Mr. Lyman's lack of experience, his haphazard organization of the mitigation defense, his misunderstanding of the expert testimony and how it should be used, and his last-minute decisions to remove Dr. Bratcher from the witness line-up and to not present evidence of petitioner's intoxication[27] support a finding that Mr. Lyman's decisions were objectively

---

[27] In addition, it is likely that some evidence of the impact of Mr. Fitzgerald's diabetes on his brain function that evening could be presented were Dr. Jones and Dr. Bratcher able to consult with one another and review all of the evidence.

unreasonable. The undersigned notes that the opinion from OCCA, in which that court gave very specific reasons for finding that expert testimony was necessary in this case, also moved the scales in favor of petitioner, although it was not determinative. Mr. Lyman had explicit instructions from OCCA, and in the absence of compelling reasons not to present that expert testimony, the undersigned believes that Mr. Lyman was obligated to do so. Mr. Lyman could articulate no compelling reasons to support his decision, based on his thoughts at the time of the trial; therefore, the decisions he made were objectively unreasonable.

## Prejudice

Although Mr. Lyman's decisions were objectively unreasonable, petitioner is not entitled to relief unless he can demonstrate prejudice. Petitioner must prove by "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 668 U.S. at 694. The Supreme Court defines "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Id. Because a death sentence requires a unanimous vote from the jury, if "there is a reasonable probability that one juror" would have chosen a life sentence, petitioner has established prejudice. See Wiggins, 539 U.S. at 537. See also Matthews v. Workman, 577 F.3d 1175, 1190 (10th Cir. 2009).

The undersigned adopts the Tenth Circuit's reasoning in Smith, in which the Court found prejudice under similar, albeit more severe, circumstances. Smith, 379 F.3d at 942-44. As in Smith, the jury in petitioner's second trial had no understanding of the interplay of petitioner's diabetes diagnosis, his lack of family support from a young age, his frontal lobe damage, and the impact his intoxication had on his brain function. The Tenth Circuit has held that such evidence, particularly the evidence of petitioner's brain injury, is strong mitigating evidence that tends to generate sympathy among jurors. See id. at 942. Mr. Lyman's defense of petitioner wholly failed

to provide any explanation for his behavior, even though the evidence available to him would have provided a "compelling explanation for his behavior." Id. at 944 (emphasis removed). As such, there is a reasonable probability that at least one juror would have voted for life imprisonment rather than the death penalty, and petitioner has established prejudice.

## RECOMMENDATION

For the reasons set forth in this report and recommendation, the undersigned RECOMMENDS that the Court find that petitioner has proven that he received ineffective assistance of counsel and that he was prejudiced thereby as a result of his counsel's failure to present expert testimony regarding his diabetes and brain injury, and evidence of his alcohol consumption as it relates to these two issues, during the second trial of the penalty phase of his case.

## OBJECTIONS

In accordance with 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by August 5, 2013.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to:

> determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

See also 28 U.S.C. § 636(b)(1).

The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." <u>United States v. One Parcel of Real Property</u>, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting <u>Moore v. United States</u>, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 22nd day of July 2013.

T. Lane Wilson
United States Magistrate Judge