**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **JAMES J. FITZGERALD,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | **No. 03-CV-531-GKF-TLW** |
| | ) | |
| **ANITA TRAMMELL, Warden,** | ) | |
| **Oklahoma State Penitentiary,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## OPINION AND ORDER

This matter comes before the court on a Petition for Writ of Habeas Corpus (Dkt. # 24) filed by Oklahoma death row inmate James Fitzgerald ("Petitioner"), pursuant to 28 U.S.C. § 2254, and the Report and Recommendation (Report) (Dkt. # 159), filed July 22, 2013, by Magistrate Judge T. Lane Wilson, recommending that the Court conditionally grant a writ of habeas corpus based on Petitioner's Ground 7 claim of ineffective assistance of counsel. As more fully discussed below, this court conditionally grants the petition on Ground 7 because Petitioner received ineffective assistance of counsel at his resentencing trial and denies the petition on the remaining grounds.

Petitioner, who appears through counsel, challenges his conviction and sentencing in Tulsa County District Court, Case No. CF-94-3451. In support of his petition and request for an evidentiary hearing, Petitioner submitted a Habeas Appendix One to Petition for Writ of Habeas Corpus (Dkt. # 25). Respondent filed a response to the Petition (Dkt. # 41). Petitioner filed a Reply (Dkt. # 52). Petitioner also filed a Supplemental Authority Regarding Ground One of his Petition for Habeas Corpus Relief (Dkt. # 55) and an additional Supplemental Authority in support of his Petition (Dkt. # 63). By Order filed August 9, 2010 (Dkt. # 72), the court granted Petitioner's

request for an evidentiary hearing as to Ground 7 as raised in the Petition for Writ of Habeas Corpus. By Opinion and Order filed August 25, 2011 (Dkt. # 104), the court denied Respondent's request to reconsider the Order granting an evidentiary hearing and denied Respondent's motion for summary judgment. In the Opinion and Order, the court determined that because the Oklahoma Court of Criminal Appeals (OCCA) applied the wrong constitutional standard to deny Petitioner's claim of ineffective assistance of counsel, the claim would be reviewed de novo.  (Id.).

The Magistrate Judge held the evidentiary hearing on August 21 through 23, 2012, and on November 9, 2012.  After hearing the parties' evidence and reviewing the parties' proposed findings of fact and conclusions of law, the Magistrate Judge entered his Report on July 22, 2013 (Dkt. # 159), recommending that the court find Petitioner's lead attorney performed deficiently by deciding to forego presentation of expert testimony regarding Petitioner's diabetes and brain injury and evidence of his alcohol consumption at the resentencing trial.  Further, the Magistrate Judge found that Petitioner was prejudiced by counsel's deficient performance. On August 19, 2013, Respondent filed an objection (Dkt. # 163) and Petitioner filed a partial objection (Dkt. # 164) to the Report.  In addition to the evidence presented at the evidentiary hearing, the state court record[1] has been produced and reviewed by the court. The court considered all of these materials in reaching its decision.  For the reasons discussed below, the court concludes the Report shall be accepted and the

---

[1]     References to documents and pleadings from these proceedings shall be referred to by docket number, where feasible (Dkt. # __); references to the trial transcript from the original trial shall be referred to as "Tr. I Vol. ___ at __"; references to the trial transcripts from the resentencing trial shall be referred to as "Tr. II Vol. __ at __"; references to transcripts from other hearings shall be referred to as "Tr. [hearing date] at __." The original state court record shall be identified as "O.R. Vol. ___ at ___." Exhibits presented at the original trial shall be referred to as "State/Def. Tr. Ex. __." Exhibits presented at the evidentiary hearing held in this case shall be identified as "Evid. Hr'g Resp./Pet. Ex. __." Transcripts from the evidentiary hearing before Magistrate Judge Wilson will be referred to as "Dkt. # __ at __.

Petition shall be conditionally granted as to Ground 7.  Within 180 days of the entry of this Opinion and Order, the writ shall issue unless the State of Oklahoma commences resentencing proceedings for Petitioner.  In addition, the Court concludes Petitioner is not entitled to habeas corpus relief on his remaining claims (Grounds 1-6, 8-14).

## BACKGROUND

## I.    Factual Background

Pursuant to 28 U.S.C. § 2254(e)(1), the historical facts found by the state court are presumed correct.  In considering the issues presented in the Petition, the court relied upon the following synopsis from the OCCA in that court's first direct appeal opinion. Following review of the record, trial transcripts, trial exhibits, and other materials submitted by the parties, the court finds this summary by the OCCA is adequate and accurate.  Therefore, the court adopts the following summary as its own:[2]

> Fitzgerald spent the evening of July 15, 1994, with Regina Stockfleth and other friends.  In the early morning hours of July 16, Fitzgerald, armed with an SKS assault rifle, robbed the Git-N-Go store at 7494 East Admiral Street in Tulsa.  After the robbery he returned to Stockfleth's house, wearing a bandanna around his neck and carrying $55 cash in a Git-N-Go bag.  He was asked to leave.
>
> Fitzgerald arrived at the Git-N-Go store at 6938 East Pine about 2:45 a.m.  The clerk, William Russell, took the SKS rifle away from Fitzgerald.  Russell pointed the rifle at Fitzgerald but apparently could not release the safety on the weapon. Fitzgerald came over the counter, and the two scuffled.  Russell escorted Fitzgerald (who had the rifle) out of the store and locked the doors.  As Russell retreated behind the store counter, Fitzgerald turned and fired, shattering the glass doors.  His bandanna mask had fallen, and his face was visible.  Fitzgerald pointed the gun in Russell's direction and fired several shots, then ran.  Police recovered

---

[2]    Additional facts, apparent from the record, may be presented throughout this opinion as they become pertinent to the court's analysis.  In particular, facts summarized by the OCCA in its opinion addressing Petitioner's resentencing trial are also presumed correct unless rebutted by Petitioner by clear and convincing evidence, pursuant to 28 U.S.C. § 2254(e)(1).

eight spent casings and six bullets from various locations in the store, and one bullet was found in Russell's body.  That bullet had passed through six cigarette packages, two counter partitions, and a roll of calculator tape before entering Russell near his left armpit. The bullet pierced his lung and spine and broke two ribs. Russell had massive internal bleeding and died of a gunshot wound to the chest.

After leaving the Pine Street store, Fitzgerald robbed the Git-N-Go store at 903 North Yale at approximately 3:00 a.m.  He wore a bandanna mask and threatened the clerk with the SKS assault rifle.  After this robbery Fitzgerald briefly returned to his parents' home, then left the state.  In Illinois he traded the SKS rifle for $100 and a .357 magnum handgun.  He was arrested in Missouri.  Fitzgerald confessed to robbing the two stores and attempting to rob the store on Pine Street, but insisted he did not intend to injure or kill Russell.

Fitzgerald v. State,  972 P.2d 1157, 1161 (Okla. Crim. App. 1998).

## II.    Procedural History

In Tulsa County District Court, Case No. CF-94-3451, Petitioner was tried by jury and convicted of two counts of robbery with a firearm, one count of attempted robbery with a firearm, and one count of first degree murder.  The jury found three aggravating circumstances and recommended a death sentence on the first degree murder count.  In accordance with the jury's recommendation, the Honorable E. R. (Ned) Turnbull sentenced Petitioner to death on the first degree murder count and life imprisonment and a $10,000.00 fine on the other counts.

On direct appeal, Petitioner raised sixteen propositions of error, with numerous sub-propositions.  The OCCA affirmed his convictions and the sentences for the counts of robbery with a firearm and attempted robbery with a firearm.  Fitzgerald v. State, 972 P.2d 1157, 1161 (Okla. Crim. App. 1998) ("Fitzgerald I").  The OCCA affirmed Petitioner's conviction for the first degree murder count, but vacated his death sentence because of "pervasive error in the second stage of trial."  (Id.).  The OCCA identified five errors in the sentencing stage which, in combination, "denied Fitzgerald a fair and reliable sentencing proceeding," as follows:

4

> [A] pro se defendant was unable to life-qualify his jury, was denied experts to assist in presentation of mitigating evidence, chose not to present such evidence without guidance or inquiry from the trial court, was denied the opportunity to rebut evidence of an aggravating circumstance, and was denied the chance to list a circumstance of the crime in mitigation.

Id. at 1175.  The OCCA denied Petitioner's request for an evidentiary hearing.  Id. at 1175 n.73.

During the pendency of the direct appeal, Petitioner sought post-conviction relief from the OCCA, in Case No. PCD-98-643.  The OCCA denied relief as moot upon reversing and remanding the death sentence on direct appeal.

Upon remand from the OCCA, a new jury was impaneled and a new sentencing trial was conducted before the Honorable J. Michael Gassett on October 17-26, 2000.  The jury found two of the three alleged aggravating factors:  (1) that Petitioner had been previously convicted of a felony involving the threat or use of violence to the person, and (2) the existence of a probability that he would commit criminal acts of violence that would constitute a continuing threat to society.  The jury did not find that Petitioner committed the murder to avoid lawful arrest or prosecution.  The jury recommended a sentence of death and the trial court so ordered.  Petitioner appealed that sentence and the OCCA affirmed  in a published opinion, Fitzgerald v. State, 61 P.3d 901 (Okla. Crim. App. 2002) ("Fitzgerald II").

Thereafter, Petitioner sought post-conviction relief from the OCCA, in Case No. PCD-2002-626. Petitioner's application for post-conviction relief alleged that (1) his trial and appellate counsel were ineffective for failing to adequately develop and present available mitigating evidence of Petitioner's brain damage, diabetes, and consumption of alcohol on the night of the offense, and (2) his constitutional right to a jury trial was violated by the trial court's failure to instruct the jury that it must find the aggravating circumstances outweighed the mitigating circumstances beyond a

5

reasonable doubt and counsel was ineffective for failing to previously raise this issue. Petitioner requested an evidentiary hearing on the ineffective assistance of counsel issues. The OCCA denied all requested relief, including the request for an evidentiary hearing, in an unpublished opinion on March 13, 2003. (Dkt. # 25, Ex. 18 (Order Denying Application for Post-Conviction Relief and Motion for Evidentiary Hearing, OCCA No. PCD-2002-626)). On March 31, 2003, the United States Supreme Court rejected Fitzgerald's petition for writ of certiorari. Fitzgerald v. Oklahoma, 538 U.S. 951 (2003).

Petitioner initiated these proceedings on August 8, 2003, by filing a Motion to Proceed In Forma Pauperis (Dkt. # 1) and a Motion for Appointment of Counsel (Dkt. # 2). The Petition for Writ of Habeas Corpus (Dkt. # 24), identifies the following fourteen (14) grounds for relief:

| | |
|---|---|
| Ground I: | Petitioner was denied due process of law because his right to a fair and impartial tribunal were [sic] violated when the judge who presided over his first trial was biased and openly predisposed against Petitioner and issues critical to his defense. |
| Ground II: | Petitioner was denied the basic tools to present a defense to malice aforethought murder by the denial of expert assistance guaranteed by Ake v. Oklahoma and his conviction violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. |
| Ground III: | The first stage instruction on involuntary [sic] intoxication relieved the state of the burden of proof on "malice aforethought murder" and improperly instructed the jury in violation of the Fifth and Fourteenth Amendments to the United States Constitution. |
| Ground IV: | Petitioner was denied assistance of counsel where the purported waiver of counsel was not knowingly and intelligently made and where there was no determination of competency rendering Petitioner's conviction unconstitutional under the Sixth, Eighth, and Fourteenth Amendments. |
| Ground V: | Petitioner was denied due process of law in the guilt stage of his trial because the trial court failed to fulfill his obligation to life qualify the jury which resulted in a jury that was not fair and impartial and was |

prone to find guilt in violation of Sixth, Eighth, and Fourteenth Amendments.

Ground VI:    The accumulation of constitutional error in the first stage of Petitioner's trial denied Petitioner a fundamentally fair trial under the Fourteenth Amendment.

Ground VII:   Trial and appellate counsel's failure to adequately develop and present available mitigating evidence of brain damage, diabetes, and consumption of alcohol on the night of the offense in Petitioner's second penalty trial deprived Petitioner effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments.

Ground VIII:  Petitioner was denied a fundamentally fair resentencing penalty when the court admitted an overwhelming amount of prejudicial and inflammatory evidence which was irrelevant to the alleged aggravating circumstances in violation of the Eighth and Fourteenth Amendments.

Ground IX:    Petitioner was denied the right to present relevant and admissible mitigation evidence and evidence that would have rebutted the aggravating circumstance "continuing threat" in violation of the Eighth and Fourteenth Amendments.

Ground X:     The introduction of victim impact evidence rendered Petitioner's death sentence unconstitutional in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Ground XI:    The Oklahoma "continuing threat" aggravator is unconstitutional both on its face and as applied rendering Petitioner's death sentence invalid in contravention of the Eighth and Fourteenth Amendments to the United States Constitution.

Ground XII:   The aggravating circumstances "prior violent felony" and "continuing threat" are duplicitous and skewed the weighing process resulting in an arbitrary sentence of death in violation of the Eighth and Fourteenth Amendments.

Ground XIII:  Petitioner's rights to jury trial were violated by the failure to instruct the jury that it must find the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt in violation of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

7

<div style="margin-left:2em">

Ground XIV:        The cumulative prejudice from errors in both the first and second stages denied Petitioner a fundamentally fair trial, due process of law and a reliable sentencing proceeding in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

</div>

(Dkt. # 24).

This case was transferred to the undersigned on February 7, 2007.  (Dkt. # 60).  After granting Petitioner's motion for an evidentiary hearing, the court referred the motion to Magistrate Judge T. Lane Wilson on August 9, 2010 for the evidentiary hearing and proposed findings as to Ground 7.

The Court's rulings on each of Fitzgerald's claims are discussed below.

<div style="text-align:center"><strong><u>GENERAL CONSIDERATIONS</u></strong></div>

## I.    Exhaustion

Generally, federal habeas corpus relief is not available to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition.  28 U.S.C. § 2254(b)(1)(A); Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994); see also Wainwright v. Sykes, 433 U.S. 72, 80-81 (1977) (reviewing history of exhaustion requirement).  In every habeas case, the court must first consider exhaustion.  Harris, 15 F.3d at 1554.  "States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights."  Coleman v. Thompson, 501 U.S. 722, 731 (1991) (explaining that the exhaustion requirement is "grounded in principles of comity").  In most cases, a habeas petition containing both exhausted and unexhausted claims is deemed a mixed petition requiring dismissal.  Where it is clear, however, that a procedural bar would be applied by the state courts if the claim were now presented, the reviewing habeas court can conduct a procedural bar analysis instead of requiring exhaustion.  Coleman, 501 U.S. at 735 n.1

<div style="text-align:center">8</div>

(citations omitted).   Petitioner has fairly presented each of his habeas claims to the OCCA.

Therefore, the exhaustion requirement is satisfied in this case.

## II.     Procedural Bar

The Supreme Court has considered the effect of state procedural default on federal habeas

review, giving strong deference to the important interests served by state procedural rules.  See, e.g.,

Francis v. Henderson, 425 U.S. 536 (1976).  Habeas relief may be denied if a state disposed of an

issue on an adequate and independent state procedural ground.  Coleman, 501 U.S. at 750; Medlock

v. Ward, 200 F.3d 1314, 1323 (10th Cir. 2000).  A state court's finding of procedural default is

deemed "independent" if it is separate and distinct from federal law.  Ake  v. Oklahoma, 470 U.S.

68, 75 (1985); Duvall v. Reynolds, 139 F.3d 768, 796-97 (10th Cir. 1998).  If the state court finding

is "strictly or regularly followed" and applied "evenhandedly to all similar claims," it will be

considered "adequate."  Maes v. Thomas, 46 F.3d 979, 986 (10th Cir. 1995) (citing Hathorn v.

Lovorn, 457 U.S. 255, 263 (1982)).  To overcome a procedural default, a habeas petitioner must

demonstrate either: (1) good cause for failure to follow the rule of procedure and actual resulting

prejudice; or (2) that a fundamental miscarriage of justice would occur if the merits of the claims

were not addressed in the federal habeas proceeding.  Coleman, 501 U.S. at 749-50; Wainwright,

433 U.S. at 91.  When a claim can be more easily and succinctly analyzed on the merits, the court

need not address the applicability of a procedural bar.  Romero v. Furlong, 215 F.3d 1107, 1111

(10th Cir. 2000).

## III.    Standard of Review - AEDPA

This court's review is governed by the Antiterrorism and Effective Death Penalty Act of

1996 (AEDPA).  Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007).  Under the AEDPA, the

standard of review applicable to each claim depends upon how that claim was resolved by the state courts. Alverson v. Workman, 595 F.3d 1142, 1146 (10th Cir. 2010) (citing Snow, 474 F.3d at 696). When a state court has adjudicated the merits of a claim, a petitioner may obtain federal habeas relief only if the state decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"[3] or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d)(1)-(2); Neill v. Gibson, 278 F.3d 1044, 1050-51 (10th Cir. 2001); Williams v. Taylor, 529 U.S. 362, 402 (2000) (O'Connor, J., concurring).

The first step in applying § 2254(d)(1) is to assess whether there was clearly established federal law at the time the conviction became final, as set forth in the holdings of the Supreme Court. House v. Hatch, 527 F.3d 1010, 1016-17 (10th Cir. 2008). If clearly established federal law exists, the court must then consider whether the state court decision was contrary to or involved an unreasonable application of Supreme Court law. Id. at 1018. When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner. See Bell v. Cone, 535 U.S. 685, 699 (2002); Hooper v. Mullin, 314 F.3d 1162, 1169 (10th Cir. 2002). It is not necessary, however, that the state court cite to controlling Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradicts Supreme Court law. Early v. Packer, 537 U.S. 3, 8 (2002). Further, the Supreme Court has recently held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131

---

[3]     A legal principle is "clearly established" within the meaning of this provision only when it is embodied in a holding of the Supreme Court. Carey v. Musladin, 549 U.S. 70, 74 (2006).

S. Ct. 1388, 1398 (2011).  Thus, "evidence introduced in federal court has no bearing on § 2254(d)(1) review.  If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." Id. at 1400 (footnote omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Application of § 2254(d)(2) requires the court to review any factual findings of the state court to ascertain whether they were unreasonable in light of the evidence presented at trial.  "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010) (citing Williams, 529 U.S. at 411 (O'Connor, J., concurring)).  The "determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## GROUNDS FOR RELIEF

### I.   Denial of right to fair and impartial tribunal (Ground 1)

In Ground 1, Petitioner alleges that he is entitled to habeas relief because he was denied a fair and impartial tribunal.  Petitioner alleges the following factors to support his claim that the trial judge in his first trial, the Honorable E. R. "Ned" Turnbull, was not fair and impartial:  (1) prior to becoming a district judge and while Petitioner's case was pending, Judge Turnbull served as an assistant district attorney in the Tulsa County District Attorney's office, though he was not assigned to Petitioner's case; (2) Judge Turnbull had a business relationship with Doug Horn, one of the

prosecutors assigned to Petitioner's case; (3) Judge Turnbull allegedly informed Petitioner's trial counsel during an off the record conversation that "he was having trouble getting the D.A. out of himself;" (4) Judge Turnbull erroneously denied Petitioner funds to hire experts to assist with his defense; (5) Judge Turnbull failed to give instructions on voluntary intoxication as a defense and instead instructed that no act can be deemed less criminal by reason of voluntary intoxication; (6) Judge Turnbull allegedly failed to properly determine that Petitioner knowingly and intelligently waived his right to counsel; (7) Judge Turnbull refused to instruct in mitigation that Petitioner was under the influence of alcohol at the time of the crimes, yet Judge Turnbull's post-trial report acknowledged that Petitioner was under the influence of alcohol at the time of the offenses; and (8) Judge Turnbull was defended by the district attorney's office in a federal civil rights case at the time of trial.  (Dkt. # 24 at 53-4); Mikus v. Turnbull, Case No. 95-CV-293 (N.D. Okla. Jan. 9, 1996). Respondent contends that the OCCA's determination that there was no judicial bias is not contrary to or an unreasonable application of federal law.  Petitioner attaches to his Habeas Appendix One to Petition for Writ of Habeas Corpus, as new evidence, the Affidavits of Sid Conway and Gordon Bulla as well as Oklahoma Secretary of State records – all pertaining to Judge Turnbull's business relationship with Doug Horn.  (Dkt. # 25, Ex. 6, 7, 16).  Petitioner requested and was denied an evidentiary hearing on this ground.  (Dkt. # 72).

Petitioner raised this issue in his first direct appeal.  The OCCA denied Petitioner's bias claim finding that none of the alleged circumstances showed bias against Petitioner or infringed on his right to fair trial.  Fitzgerald I, 972 P.2d at 1164 (footnotes omitted).

The Fourteenth Amendment's Due Process Clause requires a fair trial in a fair tribunal. Withrow v. Larkin, 421 U.S. 35, 46 (1975).  Further, a trial must proceed before a judge with no

actual bias against the defendant or interest in the outcome of his particular case.  Bracy v. Gramley, 520 U.S. 899, 905, 908-09 (1997) (allowing discovery in habeas case where petitioner's trial judge had later been convicted of taking bribes in criminal cases); In re Murchison, 349 U.S. 133, 138-39 (1955) (finding denial of due process where trial judge had previously served as a one-man "judge-grand jury" in the contempt case); Tumey v. Ohio, 273 U.S. 510, 523 (1927) (it is a violation of due process for a criminal defendant to be tried by a judge who "has a direct, personal, substantial pecuniary interest in reaching a conclusion against [the defendant] in his case.").  "In general, the standard for evaluating whether a habeas petition alleges judicial bias amounting to a denial of due process is whether the judge was 'actually biased or prejudiced against the petitioner.'"  Nichols v. Sullivan, 867 F.2d 1250, 1254 (10th Cir. 1989) (citation omitted).  To show actual bias, Petitioner must present "compelling" evidence.  See Fero v. Kerby, 39 F.3d 1462, 1478 (10th Cir. 1994) (in upholding dismissal of a habeas claim involving judicial bias, the court stated that "[d]isqualification of a judge for actual bias or prejudice is a serious matter and should only be required when the evidence is compelling" (citation omitted)).

Petitioner, citing Johnson v. Gibson, 254 F.3d 1155, 1165-66 (10th Cir. 2001), contends that the state appellate court applied the incorrect federal law when it determined that, in order for Petitioner to prevail, he had to "show the trial court's prejudice against him materially affected his rights at trial, and the defendant must be prejudiced by the trial court's actions."  See Fitzgerald I, 972 P.2d at 1163 (citing Bryan v. State, 935 P.2d 338, 354 (Okla. Crim. App. 1997); Stouffer v. State, 738 P.2d 1349, 1353 (Okla. Crim. App. 1987); Carter v. State, 560 P.2d 994, 996-97 (Okla. Crim. App. 1977)).  Petitioner argues that he was only required to show "bias" or "impartiality" and was not required to show that his rights were materially affected or that he was prejudiced by the

13

trial court's bias.  Indeed, as cited above, established federal law does not require that Petitioner

show he was prejudiced or that his rights were materially affected to succeed on his judicial bias

claim.  As the state court did  not apply controlling federal law, this Court must review Petitioner's

claim de novo.  See Malicoat v. Mullin, 426 F.3d 1241, 1248 (10th Cir. 2005); Cargle v. Mullin,

317 F.3d 1196, 1202 (10th Cir. 2003) (deferential standard of review does not apply if state court

employed the wrong legal standard in deciding the merits of the federal issue).

Even reviewing Petitioner's claim de novo, he has failed to demonstrate that his due process

rights were violated as the result of an impartial or biased tribunal.  Judge Turnbull served as an

assistant district attorney in the Tulsa County District Attorney's office prior to becoming a district

judge and while Petitioner's case was pending, but he was not involved in the prosecution of

Petitioner's case in any way.  See Tr. Feb. 2, 1995 at 5.  Nothing in the record indicates that Judge

Turnbull was actually biased as a result of his previous employment.

Petitioner also argues that the fact that Judge Turnbull had a business relationship with Doug

Horn, one of the prosecutors assigned to Petitioner's case,[4] and the fact that Judge Turnbull was

---

[4]     The record undisputedly shows that a business relationship existed between Judge Turnbull
and Mr. Horn.  See Tr. Feb. 8, 1995 at 8.  Petitioner attempts to bolster this fact with
additional documentary evidence that he did not submit in state court. "While § 2254(e)(2)
refers only to evidentiary hearings, it governs as well '[w]hen expansion of the record is used
to achieve the same end as an evidentiary hearing.'"  Cargle v. Mullin, 317 F.3d 1196, 1209
(10th Cir. 2003) (quoting Boyko v. Parke, 259 F.3d 781, 790 (7th Cir. 2001)).  This court
recognized in its Order denying Petitioner's request for an evidentiary hearing on Ground
1 (Dkt. # 72 at 4-8) that Petitioner failed "to develop the factual basis" of this claim in state
court, a threshold determination that must be made pursuant to § 2254(e)(2).  As a result, this
court does not consider the additional evidence submitted to support this ground.  See
Cargle, 317 F.3d at 1209; see also Cullen v. Pinholster, 131 S. Ct. 1388, (2011) (holding
that "review under § 2254(d)(1) is limited to the record that was before the state court that
adjudicated the claim on the merits").  Petitioner argues that the state suppressed this
evidence and mischaracterized the business relationship, and thus, Petitioner could not have
developed  the  factual  basis  of  this  claim  in  state  court.  The  court  disagrees.  As

14

represented by the district attorney's office in other litigation at the time of trial shows that the trial court was somehow biased.  Courts have found no actual bias even where the trial court has a close personal relationship with the prosecutor or a key witness.  See, e.g., Welch v. Sirmons, 451 F.3d 675, 698-701 (10th Cir. 2006) ("[T]he mere fact that the lead investigator, and consequently a key witness, in the case was the trial judge's son did not mean that the trial judge had a personal interest in the outcome of the case."); Dyas v. Lockhart, 771 F.2d 1144, 1146 (8th Cir. 1985) (cited with approval by Welch, 451 F.3d at 700) (concluding that the judge who presided over criminal trial in which the prosecuting attorney was the judge's nephew, the two deputy prosecuting attorneys were the judge's brother and son, and the court reporter was the judge's wife, did not have a personal interest in the outcome of the trial).  Nothing in the record indicates that the trial court was actually biased as a result of his business or legal relationships with individuals in the district attorney's office.

Petitioner also argues that an off the record statement made by Judge Turnbull to Fitzgerald's trial counsel that "he was having trouble getting the D.A. out of himself" shows that the trial court was not impartial.  Petitioner's trial counsel at his first trial provided an affidavit stating that on July 12, 1995, when she presented an ex parte application for funds for expert witnesses to Judge

---

acknowledged by Petitioner's counsel at a hearing on Petitioner's motion to recuse, Judge Turnbull admitted, "yes, we are still business partners and we've turned our t-shirts over to a police officer hoping that he will be able to distribute them better than we have."  Tr. Feb. 8, 1995 at 8. At the same hearing, Petitioner's counsel stated she had knowledge that the relationship was still ongoing.  See id.  Nothing in the record or in Petitioner's newly developed evidence indicates that Judge Turnbull's statement was anything less than true and entirely forthcoming.  See Gordon W. Bulla Aff., Dkt # 25, Ex. 16, ¶¶ 3, 5 (Rick Phillips and his employee state that they did receive t-shirts from Turnbull which they took to the snack bar at the Tulsa County Courthouse for distribution).

Turnbull, he stated that he was not ready to rule yet, but if he had to rule on that date he would deny

the request for funds for a neuropsychologist and a juvenile-onset diabetes expert.  According to

Petitioner's trial counsel, Judge Turnbull stated that he didn't think there was any excuse for what

Petitioner had done.  Judge Turnbull purportedly stated that he was "having trouble getting the D.A.

out of himself" and that he's "hoping someday to become fair and impartial but he's not there yet."

(Dkt. # 25, Exs. 8-10).  On August 31, 1995, when confronted with this statement at a hearing on

Petitioner's second ex parte motion for funds to hire a juvenile-onset diabetes expert, Judge Turnbull

stated, "[m]aybe you misunderstood me by saying that I said that I didn't believe in this type of

defense. I don't believe that I ever said any such thing, nor that that is my feeling.  I may have said

that I'm fresh out of the prosecutors office which is true, because I am, and that I am trying my very

best to be fair and impartial, which I am also trying to do." See Tr. Aug. 31, 1995 at 6-7.  "It is true

that a trial judge should never evince the attitude of an advocate." Brinlee v. Crisp, 608 F.2d 839,

852 (10th Cir. 1979) (citing Gardner v. United States, 283 F.2d 580, 581 (10th Cir. 1960)).

"However to sustain an allegation of bias by the trial judge as a ground for habeas relief a petitioner

must factually demonstrate that during the trial the judge assumed an attitude which went further

than an expression of his personal opinion and impressed the jury as more than an impartial

observer." Id. at 852-53 (citing Glucksman v. Birns, 398 F. Supp. 1343, 1350 (S.D.N.Y. 1975)).

While the trial court may have shared his personal opinion on this issue with counsel in an off the

record conversation, he never went so far as to assume the role of an advocate in this situation or to

16

in any way impress the jury as more than an impartial observer. This exchange does not demonstrate any bias on the part of the trial court which would warrant habeas relief.[5]

Petitioner also complains of a comment Judge Turnbull made, outside the hearing of the jury, during a discussion of evidence to be offered in the second stage of trial. The State had filed notice it would introduce an Indiana armed robbery conviction to support the aggravating circumstance that Petitioner had committed a prior violent felony. Tr. I Vol. 6 at 1058. However, the State failed to give notice that it also intended the Indiana armed robbery conviction to support the aggravating circumstance of continuing threat. Id. at 1059. Based on the resulting lack of notice, Petitioner argued that the State was precluded from offering the Indiana armed robbery conviction to support the aggravating circumstance of continuing threat. Id. at 1060. Judge Turnbull found in favor of Petitioner. Id. at 1061. While discussing the issue and his ruling, Judge Turnbull remarked that he believed the jury should have this information since it was the same crime Petitioner had committed in this case "with the same excuses" that he had used before. Id. Petitioner has not factually demonstrated that Judge Turnbull "assumed an attitude which went further than an expression of his personal opinion and impressed the jury as more than an impartial observer." Brinlee, 608 F.2d at 852-53.

Petitioner also claims that several of Judge Turnbull's rulings demonstrated actual bias. Specifically, he points to the trial judge's alleged erroneous denial of Petitioner's request for funds

---

[5]     Moreover, the OCCA found that "[t]he record suggests this exchange was in fact based on a misunderstanding. Nothing in subsequent proceedings indicates Judge Turnbull did not believe in Fitzgerald's defense . . . ." Fitzgerald I, 972 P.2d at 1164. These findings of fact are entitled to a presumption of correctness. See 28 U.S.C. § 2254(e)(1). Petitioner has failed to rebut the findings of the state court by clear and convincing evidence. Sumner v. Mata, 449 U.S. 539, 550 (1981).

to hire experts to assist with his defense,[6] failure to instruct on voluntary intoxication as a defense or as mitigation and instead instructed that no act can be deemed less criminal by reason of voluntary intoxication, and alleged failure to properly determine that Petitioner knowingly and intelligently waived his right to counsel.  "Unfavorable judicial rulings do not in themselves call into question the impartiality of a judge."  United States v. Mendoza, 468 F.3d 1256, 1262 (10th Cir. 2006); see also Sac & Fox Nation of Oklahoma v. Cuomo, 193 F.3d 1162, 1168 (10th Cir. 1999) (stating in a civil action that "merely adverse rulings can almost never constitute grounds for disqualification") (citation omitted).  Even where the trial court makes incorrect legal rulings, that, standing alone, is not enough to establish actual bias.  See Welch, 451 F.3d at 698-701, abrogated on other grounds by Wackerly v. Workman, 580 F.3d 1171 (10th Cir. 2009) (citing Liteky v. United States, 510 U.S. 540, 555 (1994) (holding that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.")).  Generally, unfavorable or incorrect legal rulings constitute the basis for appeal, not for a bias challenge.  Liteky, 510 U.S. at 555.  Even though Petitioner disagreed with a number of the judge's rulings and the OCCA agreed that some rulings were incorrect, those rulings did not display actual bias warranting habeas relief.

---

[6]     Petitioner also argues that Judge Turnbull's concern with the burden on the State to rebut expert testimony presented by a petitioner connotes bias. In his denial of Petitioner's request for expert funds, Judge Turnbull stated, "[i]f I am mistaken then I'm perplexed, because the required presentation of these types of witnesses that might be helpful or useful to the defense in turn puts the State of Oklahoma in a position of having to rebut such testimony, this would be the beginning of a never ending road in my opinion."  See Tr. Aug. 8, 1995 at 6-7.  As will be discussed in depth in the court's discussion of Ground 2, it is appropriate for the trial court to consider the burden on the State when considering whether to grant funds to hire an expert under Ake.  See Rogers v. Gibson, 173 F.3d 1278, 1286 (10th Cir. 1999) (citing United States v. Kennedy, 64 F.3d 1465, 1473 (10th Cir. 1995)).

Petitioner contends that the cumulation of the above outlined circumstances shows that Judge Turnbull, based on his experience and knowledge as a prosecutor, demonstrated a preconceived opinion that the judge did not believe in the valid defense and mitigation of voluntary intoxication combined with brain damage and poorly controlled diabetes. (Dkt. # 24 at 51-52). Even when considering Judge Turnbull's past experience as a prosecutor, his relationships with individuals in the district attorney's office, his comments to counsel, and his adverse legal rulings, Petitioner simply has not demonstrated that the trial court was in any way biased against him or his legal defenses.

Petitioner here claims that even if he has not demonstrated actual bias, he was denied due process because the trial judge should have recused based upon the mere appearance of bias or impropriety. Petitioner argues that Judge Turnbull's prior employment with the district attorney's office, his purported misrepresentations regarding his business venture with Mr. Horn, his representation by an assistant district attorney in another lawsuit at the time of Petitioner's trial,[7] and his consideration of the burden on the State if Petitioner was granted funds for an expert, all support a finding of an appearance of impropriety. (Dkt. # 24 at 49-50). The court has found that Judge Turnbull did not misrepresent his business relationship with Mr. Horn and that the trial court's consideration of the burden on the State does not support a finding of bias.

The Tenth Circuit in <u>Welch</u> discussed the Supreme Court's position on the appearance of bias on the part of the trial judge in a criminal case:

> Unlike its firm stance on the constitutional impermissibility of a biased judge presiding over a criminal trial, the Supreme Court has not directly addressed a

---

[7]  Petitioner's trial began May 20, 1996. The federal civil rights suit was dismissed January 9, 1996. <u>See</u> <u>Mikus v. Turnbull</u>, Case No. 95-CV-293 (N.D. Okla. Jan. 9, 1996).

criminal case involving the appearance of bias on the part of the trial judge.  To be sure, the Supreme Court has, on occasion and in dicta, suggested that something less than actual bias can result in a violation of due process.  E.g., Taylor v. Hayes, 418 U.S. 488, 501, 94 S. Ct. 2697, 41 L.Ed.2d 897 (1974) ("the inquiry must be not only whether there was actual bias on [the judge's] part, but also whether there was such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused") (internal quotation marks and citation omitted); In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L.Ed. 942 (1955) (noting that "our system of law has always endeavored to prevent even the probability of unfairness" and that this "stringent rule may sometimes bar trial by judges who have no actual bias").  Those references, however, appear to pertain to situations in which the circumstances are sufficient to give rise to a presumption or reasonable probability of bias.  Thus, as the Third Circuit recently concluded, these cases cannot reasonably be read as "stand[ing] for the conclusion . . . that a judge with an appearance of bias, without more, is required to recuse himself sua sponte under the Due Process Clause." Johnson v. Carroll, 369 F.3d 253, 260 (3d Cir. 2004) (rejecting, in context of federal habeas proceedings, state prisoner's claim of bias on the part of trial judge); see also Del Vecchio v. Illinois Dept. of Corrections, 31 F.3d 1363, 1371 (7th Cir. 1994) (en banc) (rejecting the notion that an appearance of bias on the part of a trial judge amounted to a due process violation); see generally Bracy, 520 U.S. at 904, 117 S. Ct. 1793 (noting that "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard.").  "Because the Supreme Court's case law has not held, not even in dicta, let alone 'clearly established,' that the mere appearance of bias on the part of a state trial judge, without more, violates the Due Process Clause," Johnson, 369 F.3d at 263, Welch cannot establish his entitlement to federal habeas relief under the standards outlined in § 2244(d)(1).

Welch, 451 F.3d at 700-01.  In this case, "any biasing influence from the circumstances here was too remote and insubstantial to create a presumption [or even a reasonable likelihood] of bias."  See Id. at 700 (quoting Fero v. Kerby, 39 F.3d 1462, 1480 (10th Cir. 1994)).  Even if there was the appearance of bias in this case, there is no clearly established Supreme Court case holding that the mere appearance of bias by the trial court violates the Due Process Clause.

Petitioner has not established that he was deprived of an impartial tribunal in violation of his constitutional rights.  Petitioner's request for habeas corpus relief on Ground 1 is denied.

## II.    Denial of expert assistance guaranteed by <u>Ake v. Oklahoma</u> (Ground 2)

In Ground 2, Petitioner claims he was denied the basic tools to present a defense to malice

aforethought murder by the denial of expert assistance guaranteed by <u>Ake v. Oklahoma</u>, 470 U.S.

68, 75 (1985), in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Dkt. # 24 at

52).  Petitioner raised this claim in his first direct appeal.  The OCCA determined that the trial court

erred in denying Petitioner's request for expert funds, that the error was harmless as to the guilt or

innocence stage of trial, but that the error was not harmless as to the sentencing stage.  <u>See</u>

<u>Fitzgerald I</u>, 972 P.2d at 1164-68.  In its lengthy analysis, the OCCA ruled as follows:

> Fitzgerald claims in Proposition II that the trial court erred by denying
> Fitzgerald expert funds after a proper <u>Ake</u> showing, thus depriving him of the right
> to present a first-stage defense and the right to present a defense to the death penalty
> by way of mitigation.  He claims in two subpropositions that the trial court's denial
> of funds to hire an expert on juvenile-onset diabetes and a neuropsychiatrist deprived
> him of the ability to defend against the capital charges.  We determine the trial court
> abused its discretion in denying Fitzgerald funds for experts.  While denial of the
> funds was error in both stages, the first stage error was harmless.  The error was not
> harmless in second stage.
>
> Fitzgerald tirelessly and constantly requested that the State provide funds
> under <u>Ake v. Oklahoma</u> for a neuropsychologist and an expert on juvenile-onset
> diabetes.  Fitzgerald had to apply to the trial court because he was defended by the
> Tulsa County Public Defender's Office rather than the Oklahoma Indigent Defense
> System, which handles such funding requests internally.  <u>Ake</u> held that when an
> indigent defendant makes a preliminary showing that his sanity at the time of the
> offense is likely to be a significant factor at trial, he is entitled to experts, at the
> State's expense, who will assist in evaluation, preparation and presentation of the
> defense.  This Court has extended the principles of Ake to any expert necessary for
> an adequate defense.  In doing so, we have emphasized the necessity of providing
> each defendant with the "basic tools" for his defense.  This comports with the
> Legislature's intent that indigent defendants be provided experts, and non-expert
> assistance, at State expense.  In creating the Indigent Defense System, the
> Legislature has consistently provided that the Executive Director of that System shall
> approve expert witnesses, and non-expert assistance, when those services are
> necessary in a particular case. The Legislature has also provided that in counties
> where the population is over 200,000 expert witness compensation for indigent
> defendants shall be paid by the court fund.  We are concerned here, not with the

21

technicalities of who pays and what procedures for payment are followed, but with the clear intention that all defendants are entitled to necessary expert assistance when that constitutes a basic defense tool.  By extending Ake, we have ensured that the Legislature's intent is preserved, and indigent defendants in all counties of Oklahoma have access to the basic tools necessary for an adequate defense.

Applying the three-part test set forth in Ake, we balance: (1) Fitzgerald's private interest in the accuracy of the proceedings; (2) the State's interest affected by providing the assistance; and (3) the probable value of the procedural safeguards sought and the risk of inaccuracy in the proceedings without the requested assistance. We conclude that Fitzgerald's interest and the interest of accuracy in the proceedings outweigh the State's interest in not expending funds.  The trial court apparently also came to this conclusion, as its repeated denials of Fitzgerald's request turn instead on whether Fitzgerald had made the required preliminary showing.

Fitzgerald claimed that the combination of his juvenile-onset diabetes, probable brain damage from his head injury, and drinking habits (including drinking before committing the crimes) affected his mental processes and deprived him of the ability to form the intent to kill necessary for malice murder.  To qualify for expert assistance, a defendant must make "an ex parte threshold showing to the trial court that his sanity is likely to be a significant factor in his defense . . . ."  We have held the threshold showing is met where a defendant shows need and that he will be prejudiced by the lack of expert assistance.  Fitzgerald presented evidence to support his claims at four ex parte pretrial motions hearings; ex parte hearings were also held after the first stage and before second stage instructions were given.  Each time, the trial court determined Fitzgerald had failed to make the preliminary showing necessary under Ake.

Over the course of these hearings, Fitzgerald presented: (1) evidence admitted in the preliminary hearing that he had been drinking and was under the influence of alcohol at the time of the crime; (2) medical evidence that he suffered from juvenile-onset diabetes and had received a gunshot wound to the head requiring surgery in 1985; (3) medical articles on the physical, psychological, and psychosocial effects of juvenile-onset diabetes; (4) information that the combination of alcohol and juvenile-onset diabetes could result in poor judgment, poor impulse control, and exaggerated emotional responses; (5) an affidavit detailing Fitzgerald's physical and psychological symptoms corresponding with symptoms discussed in the medical literature; (6) an affidavit including a neuropsychologist's general explanation of the symptoms which, occurring after a head wound, may signal brain injury, and a description of the neuropsychological tests necessary to determine the existence and extent of such an injury; (7) an affidavit from the then Deputy Chief of the Capital Trial Division, Oklahoma Indigent Defense System (OIDS), who believed that Fitzgerald would qualify for expert funds were he being defended by OIDS; (8) information about Fitzgerald's childhood and family life resulting from

22

his diabetes; and (9) Dr. Taylor's current psychological evaluation noting Fitzgerald's head injury and diabetes, diagnosing him as depressed, alcoholic, with poorly regulated diabetes and probable neurological impairment, and strongly recommending neurological testing plus consultation with a juvenile-onset diabetes expert.  This is far more than, as the State argues, an "underdeveloped claim;" Dr. Taylor's report, combined with the other evidence, certainly contained enough information to meet the threshold requirement for a preliminary showing.

Fitzgerald argued to the trial court and claims on appeal that this information is sufficient to meet the Ake threshold. We agree. In applying for funds to hire experts, Fitzgerald is merely required to show his physical and psychological condition at the time of the crime will be a significant factor in his defense. Ake stated a defendant has a right to expert assistance "to help determine whether the insanity defense is viable," as well as to conduct an appropriate examination and assist a defendant in evaluating, preparing, and presenting his defense.  The trial court consistently held that, to make a proper showing, Fitzgerald would have to demonstrate that he actually suffered from these conditions and problems at the time of the offense.  To require such specificity in a preliminary showing renders the Ake categories of assistance pointless.  If a defendant must be able to show initially that he actually suffered from a condition at the time of the offense, there is no need for expert assistance in determining whether the defense based on that condition is viable, nor will an expert be needed to evaluate the defendant and the defense.

Fitzgerald made a showing of need when he presented detailed evidence, including a psychologist's report, that he (1) suffered from a chronic, long-term physical condition with psychological components that, combined with alcohol, may have affected his judgment and behavior the night of the crimes, and assistance of a juvenile-onset diabetes expert was necessary to confirm and explain that connection and (2) had suffered a wound with probable organic brain damage which could have affected his judgment and behavior the night of the crimes, and which could only be determined through specific neuropsychological testing available in the community. We discuss his showing of prejudice with regard to each stage of the trial below.

We first address Fitzgerald's claim that he was deprived of the right to present a first-stage defense. Since his arrest, Fitzgerald has stated he did not intend to kill Russell.  Fitzgerald claimed he needed the experts during the first stage of trial to effectively present his defense that voluntary intoxication, under his special circumstances, rendered him incapable of forming the intent necessary for malice murder.  Voluntary intoxication is not a complete defense to malice murder but may be considered in determining whether a defendant had the intent to kill during the commission of the crime.  Sufficient evidence must be introduced to show a defendant was so intoxicated his mental powers were overcome and he was unable to form criminal intent. Fitzgerald showed he was prejudiced by the trial court's

ruling since the experts would have tied the evidence that he was intoxicated at the time of the crimes to evidence that he suffered from diabetes (and, possibly, organic brain damage). The experts would have explained to the jury how the combination of those two factors created a physical/mental condition in which Fitzgerald was unable to form the intent necessary for malice murder. This testimony would have strengthened Fitzgerald's claim that he did not intend to kill Russell and enabled him to rebut the State's very effective argument for malice murder, which was based in large part on the State's version of Fitzgerald's state of mind at the time. Fitzgerald showed both need and prejudice, and the trial court's denial of his request for expert funds was error.

Having found error in the first stage proceedings, we must determine whether harmless error analysis applies. Fitzgerald relies on Frederick v. State for his claim that harmless error analysis cannot apply. In Frederick the defendant's only defense was insanity; the erroneous denial of an Ake expert completely denied him any ability to defend against the charges. This Court determined the error permeated the entire trial, since we could not look at any evidence presented on Frederick's behalf but would be forced to speculate on what it might have been. Under those narrow circumstances, we held the denial of an Ake expert was not subject to harmless error analysis. However, we agree with the Tenth and Eighth Circuits that, generally, "a right to which a defendant is not entitled absent some threshold showing [cannot] fairly be defined as basic to the structure of a constitutional trial." We hold that, absent the narrow circumstances presented by Frederick, harmless error analysis applies to Ake error.

Fitzgerald I, 972 P.2d at 1164-68 (footnotes omitted) (citations omitted).

In Ake v. Oklahoma, 470 U.S. 68, 83 (1985), the Supreme Court held that when a defendant demonstrates to the trial judge that his mental capacity "is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Nonetheless, a criminal defendant must offer "more than undeveloped assertions that the requested assistance would be beneficial . . . ." Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985). "General allegations supporting a request for court appointment of a psychiatric expert, without substantive supporting facts, and undeveloped assertions that psychiatric assistance would be

beneficial to the defendant will not suffice to require the appointment of a psychiatrist to aid in the preparation of a criminal defense." Liles v. Saffle, 945 F.2d 333, 336 (10th Cir. 1991).

The Supreme Court concluded that due process entitled Ake to the assistance of a psychiatrist because Ake's insanity defense was based upon fact rather than unsupported allegations, and the State's case relied heavily upon expert testimony concerning Ake's continuing criminal threat to society. Ake, 470 U.S. at 83. The Court noted that, "[W]hen a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense." Id. at 76. The Court further explained that indigent defendants must have "access to the raw materials integral to the building of an effective defense." Id. at 77. The question becomes whether, under the particular circumstances of the case, the expert's testimony "could legitimately be characterized as 'integral to the building of an effective defense,' i.e., one of the 'basic tools of an adequate defense.'" Toles v. Gibson, 269 F.3d 1167, 1176 (10th Cir. 2001) (quoting Ake, 470 U.S. at 77).

If this court determines that the missing expert's testimony was one of the "basic tools of an adequate defense," then Petitioner's due process rights were violated. The analysis does not end there, however. In Toles, the Tenth Circuit held that:

> The denial of expert assistance in violation of Ake is trial error subject to harmless error analysis under the standard set forth in Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (asking whether the error "had substantial and injurious effect or influence in determining the jury's verdict"). See Brewer v. Reynolds, 51 F.3d 1519, 1529 (10th Cir. 1995). Under this standard, we can grant relief only if we believe the error substantially influenced the jury's decision, or if we are in grave doubt as to the harmlessness of the error. See O'Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

Toles, 269 F.3d at 1176-77 (footnote omitted).  Accordingly, this court will first determine whether Petitioner's due process rights were violated by the trial court's denial of funding for experts to assist in providing an adequate defense.  If so, the harmless error question must then be decided.

In this case, Petitioner's trial counsel made multiple requests for funds to employ a neuropsychologist and/or a juvenile-onset diabetes expert.  The trial court held at least two ex parte hearings on Petitioner's motion.  Counsel for Petitioner argued that after talking with Dr. Bratcher, an endocrinologist, she realized that,

> [T]he combination of diabetes and alcohol is one that is almost, and can be deadly, but certainly will result in very poor judgment, very erratic behavior, inability for the brain to function properly.  And after talking with her, and being educated somewhat on what diabetes and alcohol does, I realized that we will be presenting evidence, as will the State be presenting evidence in this case, that my client was extremely intoxicated during the commission of this homicide.

Tr. Aug. 31, 1995 at 2-3.  The trial court repeatedly denied counsel's requests, on the basis that Petitioner had failed to demonstrate that Petitioner's identified conditions, diabetes, brain damage, and intoxication, affected Petitioner at the time of the offense.

The court finds that the evidence was sufficient to trigger the application of Ake.  Petitioner provided substantive supportive facts, in the form of an affidavit from James T. Rowan, medical records, and a May 2, 1996 psychological evaluation prepared by G. J. Ann Taylor, Ph.D, to make his threshold showing of need.  See Liles, 945 F.2d at 336.  Petitioner presented sufficient evidence to suggest that his mental condition was likely to be a significant factor during both stages of trial. See Castro v. Oklahoma, 71 F.3d 1502, 1513-14 (10th Cir. 1995).  The court concludes that the State should have provided Fitzgerald with funds for expert witnesses, and the trial court's denial of funds for such witnesses constituted a violation of his due process rights.  Ake, 470 U.S. at 87.

26

Having found constitutional error, the court must now determine whether the error was harmless as to the guilt or innocence stage of trial.  On direct review of Petitioner's convictions, the OCCA found that, as to the first stage proceeding, the <u>Ake</u> error was harmless.  The state appellate court wrote that:

> Having concluded harmless error analysis applies, we must determine whether this error is harmless beyond a reasonable doubt.  Although expert testimony would have helped Fitzgerald explain his state of mind and ability to form intent, it was not necessary to raise the issue of voluntary intoxication.  A defendant may claim voluntary intoxication as a defense to malice murder where evidence of overwhelming intoxication is presented.  No experts are needed to raise the defense. Although the evidence of intoxication was conflicting, Fitzgerald could have made his voluntary intoxication claim based on that evidence without relying on expert testimony.  Thus, Fitzgerald was not denied his ability to defend against the malice murder charge.  The trial court's erroneous denial of <u>Ake</u> experts in the first stage of trial was harmless beyond a reasonable doubt.

<u>Fitzgerald I</u>, 972 P.2d at 1168 (footnotes omitted).

 In a direct review of a state court criminal judgment, a constitutional error is harmless only if a court finds that it was "harmless beyond a reasonable doubt."  <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967).  But in a collateral review of a state court's criminal judgment, this Court applies the "more forgiving standard" first articulated in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993); <u>Fry v. Pliler</u>, 551 U.S. 112, 116 (2007).  Under the <u>Brecht</u> standard, an error is deemed "harmless unless it 'had [a] substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Fry</u>, 551 U.S. at 116 (quoting <u>Brecht</u>, 507 U.S. at 631).  A substantial and injurious effect exists if a "court finds itself in 'grave doubt' about the effect of the error on the jury's [sentencing decision]."  <u>Bland v. Sirmons</u>, 459 F.3d 999, 1009 (10th Cir. 2006) (internal citations omitted).  In <u>Brecht</u>, the Supreme Court explained that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment."  <u>Brecht</u>, 507 U.S. at 634 (quotations omitted).  "However,

when a court is 'in virtual equipoise as to the harmlessness of the error' . . . the court should treat the error . . . as if it affected the verdict . . . ." <u>Lockett v. Trammel</u>, 711 F.3d 1218, 1232 (10th Cir. 2013) (quoting <u>Selsor v. Workman</u>, 644 F.3d 984, 1027 (10th Cir. 2011) (quotations omitted)).

In this case, the court finds that the failure to provide funding for experts during the first stage proceeding did not have a substantial and injurious effect or influence in determining the jury's verdict. Petitioner argues that experts were needed during the first stage guilt or innocence proceeding to present his defense that his voluntary intoxication rendered him incapable of forming the intent necessary for malice murder. In deciding the harmless error question, the court first looks to Oklahoma law on the defense of voluntary intoxication. <u>See</u> <u>Toles</u>, 269 F.3d at 1177. Under Oklahoma law, "voluntary intoxication has long been recognized as a defense to the crime of First Degree Malice Murder." <u>Taylor v. State</u>, 998 P.2d 1225, 1230 (Okla. Crim. App. 2000), <u>abrogated on other grounds by</u> <u>Malone v. State</u>, 168 P.3d 185, 197 (Okla. Crim. App. 2007). "Voluntary intoxication instructions should be given when evidence has been introduced at trial that is adequate to raise that defense, i.e., to establish a prima facie case of voluntary intoxication," as defined under Oklahoma law. <u>Malone</u>, 168 P.3d at 196. Under Oklahoma law, "[a] defense of voluntary intoxication requires that a defendant, first, be intoxicated and, second, be so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent or special mental element of the crime." <u>Jackson v. State</u>, 964 P.2d 875, 892 (Okla. Crim. App. 1998). Notably, the OCCA has held that a defendant's "detailed account of the circumstances surrounding [a] murder defeats [a] claim to a voluntary intoxication defense." <u>Bland v. State</u>, 4 P.3d 702, 718 (Okla. Crim. App. 2000); <u>Taylor</u>, 998 P.2d at 1230; <u>Turrentine v. State</u>, 965 P.2d 955, 969 (Okla. Crim. App. 1998).

28

The record in this case demonstrates that, although Petitioner presented evidence that he had consumed alcohol prior to committing the crimes for which he was convicted, Petitioner presented no evidence of overwhelming intoxication.  Edward Chambers, the store clerk at the Git-N-Go located at 7494 East Admiral, testified that he did not smell alcohol of Petitioner's person, see Tr. I Vol. 4 at 655, and that Petitioner "was in substantial control of what he was doing."  Id. at 657. John Sartain, the store clerk at the Git-N-Go located at 903 North Yale, testified that nothing about the robber made him think the man had been drinking.  Id. at 754.  He did not notice any unusual odor or slurred speech.  Id. at 753-54.  In addition, the surveillance videos from the three convenience stores show that Petitioner did not exhibit signs of overwhelming intoxication.  See State Tr. Exs. 1, 52, 76.  He walked with a steady gait and otherwise moved without displaying signs of impairment.  His behavior, including the fact that he wore a bandana to conceal his face and did not waste time while committing the robberies, reflected that his thought processes were not impaired.  The evidence recited above demonstrates that Petitioner's mental powers were not so overcome by intoxication that he was unable to form the specific intent to kill Mr. Russell.  Jackson, 964 P.2d at 892.

Furthermore, on July 19, 1994, or only three days after the shooting and shortly after being taken into custody in Bates County, Missouri, Petitioner gave a detailed confession to law enforcement officers.  The interview was tape recorded.  The transcription of the recording was presented by the State at trial.  See State Tr. Ex. 92.  The transcript reads, in pertinent part, as follows:

> . . . if I remember right, when I walked in, I had the weapon up. He wasn't close to the register, he was back towards the back, like the coolers, and I raised the weapon up over my head so he could see it, and I told him that I wanted just the bills, paper money only, something like that. I don't remember exactly what I said, but . . .

evidently I was standing too close to the counter, 'cause he reached across. He was by the register. He reached across and got a hold of the barrel of the gun and actually snagged it all the way out of my hand. And this hit . . . this had a fold-up stock, plastic fiberglass type stock with a pistol grip on it. So he got a hold of it pretty good when he snagged it. Um, he backed up, I don't know, six, eight feet, pointed the weapon at me and pulled the trigger several times, but I had the safety on, and he didn't . . . obviously didn't understand the weapon, 'cause he was trying to . . . when I come over the counter, he was looking at it, trying to figure out how to shut the safety off. And I crowded him real, real quick, got on him real fast and got the gun back away from him. And there was like a pushing match. He stayed in close. He didn't get . . . he didn't give me no distance. And it's like the next thing I know, I'm out the door. Whether I was going out on my own or whether he pushed me, I really don't know.

Um, I had it in my mind that I wasn't gonna leave without the money. So I, I turned the safety off, and this all happened like mega-seconds. I don't think it . . . I don't think there was four seconds involved in this whole scene, five at the most. I, I fired a round through the door kinda towards the ceiling, and . . . to, to break the glass. And I remember reaching back in, and he kinda rushed at, at me, I'm thinking. I don't remember to be honest. And I thought fuck the money, it's . . . give him a good scare. And I, I figured out later that altogether, I, I fired thirteen rounds, because there was a thirty-round clip in it, and it had like one in the chamber and twenty-nine in the clip, and I had seventeen rounds left. So that means there was thirteen fired.

Um, I kinda remember hitting something on the counter, and I seen him dive behind the counter. I mighta hit him at that point, I don't know, but he went down. And it was about the point that he went down that I cut out. I don't even know how . . . I didn't even know that I hit him to be honest with you. I was, I was only trying to just scare him.

See State Tr. Ex. 92 at 1-2. The transcript reflects that Petitioner was able to recall details of the shooting, thereby demonstrating that he was not so intoxicated he could not later recount the events surrounding the murder.

In sum, the evidence presented during the first stage of trial did not support a defense of voluntary intoxication. In fact, as discussed in more detail below, Petitioner withdrew his request for a voluntary intoxication instruction and stated during his closing argument that alcohol was not the cause of the murder. See Tr. I Vol. 6 at 998, 1032. Therefore, upon review of the record, the

court is convinced that the lack of expert witnesses during the guilt or innocence stage did not have a substantial and injurious impact on the jury's decision to find Petitioner guilty of First Degree Murder.  As a result, the trial court's error in failing to provide funding for experts was harmless. Petitioner's request for habeas corpus relief on Ground 2 shall be denied.

### III.    Trial court's failure to properly  instruct  jury on voluntary intoxication (Ground 3)

In Ground 3, Petitioner argues that the trial court by instruction relieved the State of the burden of proof on the element of intent in violation of his constitutional rights.  Petitioner contends that in the first stage of his trial, the trial court should have instructed the jury on voluntary intoxication, and that the trial court erred by instructing the jury that voluntary intoxication did not render a person's actions less criminal.  Petitioner argues that the evidence presented at trial raised a reasonable doubt about his ability to form the specific intent to commit first degree murder as a result of  his drinking that night, combined with his diabetes and possible residual brain damage from the gunshot wound to his head.  At trial, Petitioner withdrew his request for the voluntary intoxication instruction due to fact that he had been deprived of expert assistance to assist with linking his alcohol consumption combined with his diabetes and brain damage with his ability to form the requisite intent.  The State requested an instruction that intoxication was not a defense to the crime (Instruction No. 13),[8] and the trial court agreed, stating it felt this instruction was proper given the evidence of intoxication presented.  See Tr. I Vol. 6 at 999-1008.

---

[8]      Instruction No. 13 stated:

You are instructed that the laws of the State of Oklahoma provide in pertinent part: "No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such a condition."

(O.R. Vol. III at 472)

As to these allegations, the OCCA held, "[i]n light of the conflicting evidence presented regarding Fitzgerald's level of intoxication and the amount of detail he recalled in each statement to police, this decision was not clearly an abuse of discretion." Fitzgerald I, 972 P.2d at 1173. In so deciding, the OCCA described the following evidence:

> At trial, the two surviving robbery victims testified Fitzgerald did not appear to be drunk; one said Fitzgerald might have been intoxicated but appeared to know what he was doing. Family and friends with Fitzgerald that night, testifying for the State, variously said he had one beer and was not intoxicated, was slightly drunk, obviously drunk, and pretty drunk. In Fitzgerald's statements to police, admitted at trial, he said he had been drinking tequila and beer all night, was very intoxicated, did not remember a lot of details about the crimes, and had not intended to hurt Russell.

Fitzgerald I, 972 P.2d at 1173-74.

"There is no Supreme Court precedent establishing a constitutional right to instructions regarding the defendant's intoxication at the time of the crime." Spears v. Mullin, 343 F.3d 1215, 1244-45 (10th Cir. 2003) (citing Montana v. Egelhoff, 518 U.S. 37, 39-40, 43, 51, 56, 116 (1996) (holding that a Montana statute precluding consideration of voluntary intoxication in determining existence of a mental state that is an element of the criminal offense does not violate the Due Process Clause)). Under Oklahoma law, however, juries may consider voluntary intoxication to determine if a defendant had the intent to commit first degree murder. See, e.g., Bland v. State, 4 P.3d 702, 715 (Okla. Crim. App. 2000); Lamb v. State, 767 P.2d 887, 889-90 (Okla. Crim. App. 1988). "[A] defense of voluntary intoxication requires that a defendant, first, be intoxicated and, second, be so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent or special mental element of the crime." Toles, 269 F.3d at 1177 (quoting Jackson v. State, 964 P.2d 875, 892 (Okla. Crim. App. 1998)). Further, under Oklahoma law, once the trial court makes the legal determination that the evidence is insufficient to support

an instruction on the defense of intoxication, it is "within the discretion of the trial court to merely reject an instruction on the alleged defense or to reject the instruction and advise the jury that pertinent state law provides that intoxication is not a defense to guilt." Crawford v. State, 840 P.2d 627, 638-39 (Okla. Crim. App. 1992), abrogated on other grounds by Malone v. State, 168 P.3d 185 (Okla. Crim. App. 2007).

On federal habeas review, the court reviews the alleged error in failing to instruct on voluntary intoxication in the context of the entire trial, only for the denial of fundamental fairness and due process.   Spears, 343 F.3d at 1244 (citing Henderson v. Kibbe, 431 U.S. 145, 156-57 (1977); Foster v. Ward, 182 F.3d 1177, 1193-94 (10th Cir. 1999)).

Upon review of the record, neither the trial court's failure to give a voluntary intoxication instruction nor the trial court's instruction that intoxication did not constitute a defense to guilt rendered Petitioner's trial fundamentally unfair.  As the OCCA noted, the evidence of Petitioner's intoxication was conflicting.   Petitioner's statements to the police recounting the details of the murder further belie his claim of voluntary intoxication. See Spears, 343 F.3d at 1244 (citing Toles, 269 F.3d at 1177).   No evidence established that his judgment was so impaired at the time of the murder that it was impossible for him to form malice aforethought.   Accordingly, the OCCA's determination was not unreasonable. See 28 U.S.C. § 2254(d)(1).

Petitioner also argues that the giving of Instruction No. 13, that intoxication did not constitute a defense to guilt, relieved the State of the burden of proof beyond a reasonable doubt on the critical question of Petitioner's state of mind.  Petitioner argues that Instruction No. 13 shifted the burden of proof as to his mental state onto him and created a conclusive presumption of intent in violation of Sandstrom v. Montana, 442 U.S. 510 (1979) (invalidating the instruction, "the law

presumes that a person intends the ordinary consequences of his voluntary acts," because jury instruction unconstitutionally shifted the burden of proving intent from the prosecution to defendants), and In re Winship, 397 U.S. 358, 364 (1970) (state must prove beyond a reasonable doubt "every fact necessary to constitute the crime with which [the accused] is charged."). Under Sandstrom, the test for unconstitutionality is whether any "reasonable juror could have given the presumption conclusive or persuasion-shifting effect." Sandstrom, 442 U.S. at 519. Petitioner does not explain how Instruction No. 13 could be understood by reasonable jurors to require them to find Petitioner intended to kill, because they were prevented from considering his intoxication at the time of the offense. There is no mention of any "presumption" of intent in Instruction No. 13; in fact, there is no mention of intent. See United States v. Vreeken, 803 F.2d 1085, 1092 (10th Cir. 1986) (declining to invalidate instruction under Sandstrom where instruction suggested that the jury "may infer" or "may consider" certain evidence rather than speaking of "presumptions"). To the contrary, at no point during Petitioner's trial did he argue that he could not form the intent to commit murder due to his intoxication. In fact, in one of Petitioner's taped statements to the police, which was played and transcribed for the jury, he said, "I'm not blaming the alcohol . . . ." See State Tr. Ex. 93 at 8. Petitioner also claimed in his statements to the police that he only intended to scare the victim and did not intend to hurt the victim. See State Tr. Exs. 92 and 93. Likewise, Petitioner argued in closing arguments, "Guilt of first degree murder in the commission of a felony, definitely I am. With malice aforethought? No." See Tr. I Vol. 6 at 1033. Instruction No. 13 in no way created a presumption of intent nor did it prohibit the jury from considering Petitioner's evidence (other than evidence of intoxication) and arguments that he did not intend to kill. The trial court's instructions did not violate Sandstrom or Winship. Petitioner has not established that the OCCA's

decision regarding the intoxication instructions was contrary to, or an unreasonable application of, established federal law.  Habeas relief on Ground 3 is denied.

## IV.    Trial court's failure to ensure knowing and intelligent waiver of right to counsel (Ground 4)

In Ground 4, Petitioner claims that he was denied assistance of counsel because the trial court erred by accepting his waiver of the constitutional right to counsel when there was no determination of competency and the waiver was not knowingly and intelligently made.  Respondent argues that the OCCA's determination that Petitioner's waiver of his right to counsel was knowing and intelligent is not contrary to, or an unreasonable application of, established Supreme Court law.

Petitioner was represented by appointed counsel throughout the preliminary proceedings. Petitioner filed a motion to proceed pro se, O.R. Vol. II at 224-26, and the trial court conducted a hearing on Petitioner's motion on April 18, 1996.  Petitioner's trial began May 20, 1996.

Petitioner raised this issue in his first direct appeal.  The OCCA rejected Petitioner's claim on the merits finding that the circumstances and evidence did not raise a doubt about Petitioner's competency sufficient to require a separate competency proceeding and that Petitioner's waiver of his right to counsel was knowingly and intelligently made.  Fitzgerald I, 972 P.2d at 1162-63.

A defendant has a Sixth Amendment right to self-representation.  See Faretta v. California, 422 U.S. 806, 819, 821 (1975).  Because the right to counsel is also guaranteed by the Sixth Amendment, however, a defendant may waive the right to counsel and proceed at trial pro se "only if the waiver is knowing, intelligent, and voluntary."  Maynard v. Boone, 468 F.3d 665, 676 (10th Cir. 2006) (citing Edwards v. Arizona, 451 U.S. 477, 482 (1981); Faretta, 422 U.S. at 835).  The validity of such a waiver thus contains two distinct inquiries.  Id. (citing Godinez v. Moran, 509 U.S.

389, 402 n.13 (1993)).  The court must first ensure that the defendant is competent to waive counsel.  Id.  It must then determine that the waiver is knowing and voluntary.  Id.

At the April 18, 1996, hearing on Petitioner's motion to proceed pro se, the trial court explained Petitioner's Sixth Amendment rights to counsel and to represent himself.  Tr. Apr. 18, 1996 at 3.  The trial court explained the duties of an attorney at trial.  Id. at 3-4.  The trial court inquired whether Petitioner had been forced or coerced into making this decision and Petitioner replied that he made this decision "[o]ut of my own free will, yes, sir."  Id. at 4.  The trial court questioned Petitioner extensively to determine whether he was dissatisfied with his attorney's representation and whether he understood the consequences of his decision.  Id. at 4, 9.  Petitioner said he and his attorney did not agree on his defense, but stated he was satisfied with her qualifications and experience.  Id. at 6, 9.  He said self-representation was his right as an American citizen and indicated he preferred to take control of his case since he would have to live with the outcome.  Id. at 4-5.  The trial court advised Petitioner of the nature of the charges, the offenses charged, and the range of punishment possible for each offense.  Id. at 7-8.  Trial counsel confirmed she had explained Petitioner's Sixth Amendment rights to him and advised him against proceeding pro se.  Id. at 9-10.  The trial court found Petitioner was "in control of your faculties, that you understand what's going on, that you understand the conversations, the meaning and the consequences of conversations that we're having."  Id. at 10.  At no point in the proceedings did Petitioner's counsel raise any concerns about Petitioner's competency to waive his right to counsel.  See id. at 9-10, 25.  The trial court repeatedly advised Petitioner against self-representation, pointing out Petitioner did not know what he was doing, that this was a bad decision, and that Petitioner could get the death penalty because he decided to proceed pro se.  Id. at 10, 14, 16.  In subsequent motion

36

proceedings, the trial court explained court procedures and gave Petitioner a comprehensive written outline of the trial structure, which included the court's voir dire questions on the death penalty and indicated when Petitioner would have the opportunity to argue, present evidence, and make motions and objections to the court.  Tr. May 13, 1996 at 2 (motion hearing).  Throughout the April 18 hearing and later proceedings, the trial court stated that, if Petitioner changed his mind, standby counsel would be re-appointed to represent him, even if trial had begun, and urged Petitioner to reconsider.  Tr. Apr. 18, 1996 at 19; Tr. May 10, 1996 at 12-13; Tr. May 13, 1996 at 8-9 (motion hearing); Tr. I Vol. 1 at 2.  Despite the trial judge's admonishments, Petitioner insisted he wanted to represent himself.  Tr. May 10, 1996 at 12-13; Tr. May 13, 1996 at 8-9 (motion hearing); Tr. I Vol. 1 at 2.

Petitioner argues that his waiver of counsel was invalid because (1) the trial court failed to conduct a hearing to determine his competency to waive counsel, and (2) his waiver was not knowing and intelligent.  The court shall address each of these arguments.

## A.  Competency

Petitioner raises a procedural competency claim.  He claims the trial court should have conducted a separate hearing to determine competency because he had presented information raising a doubt about his competency to waive counsel.

The Supreme Court has stated "that a court is [not] required to make a competency determination in every case in which a defendant seeks to plead guilty or to waive his right to counsel. As in any criminal case, a competency determination is necessary only when a court has reason to doubt the defendant's competence." Godinez, 509 U.S. at 401 n.13 (citing Drope v. Missouri, 420 U.S. 162, 180-81 (1975); Pate v. Robinson, 383 U.S. 375, 385 (1966)).  To obtain

habeas relief on his procedural competency claim, Petitioner must show that the trial court failed to give proper weight to the information suggesting incompetence which came to light during the proceedings. McGregor v. Gibson, 248 F.3d 946, 954-55 (10th Cir. 2001) (citing Drope, 420 U.S. at 179).

The standard of competency to waive the right to counsel is the same as the standard of competency to stand trial. Godinez, 509 U.S. at 399; see also United States v. DeShazer, 554 F.3d 1281, 1287-88 (10th Cir. 2009). This standard considers whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." Godinez, 509 U.S. at 396 (quoting Dusky v. United States, 362 U.S. 402 (1960) (per curiam)).

The Supreme Court in Drope discussed the factors that should be considered in determining whether there was sufficient doubt so that the trial court was required to make a competency determination:

> [E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

Drope, 420 U.S. at 180; see also McGregor v. Gibson, 248 F.3d 946, 954-55 (10th Cir. 2001) (discussing factors). Likewise, the Court noted, "Although we do not, of course, suggest that courts must accept without question a lawyer's representations concerning the competence of his client, an expressed doubt in that regard by one with the closest contact with the defendant, is unquestionably a factor which should be considered." Drope, 420 U.S. at 178 (citations and

quotation omitted); see also Maynard v. Boone, 468 F.3d 665, 676 (10th Cir. 2006) (considering the fact that counsel at waiver hearing "did not raise the question of competency to the trial court, or object to the hearing because of Maynard's mental state"); Barnett v. Hargett, 174 F.3d 1128, 1135-36 (10th Cir. 1999) (finding petitioner established bona fide doubt based in part on expressed belief of counsel at sentencing that petitioner was not competent).

In Walker v. Attorney General for State of Oklahoma, 167 F.3d 1339 (10th Cir. 1999), the Tenth Circuit rejected the petitioner's request for habeas corpus relief on his procedural competency claim because it determined that there was no bona fide doubt that the petitioner was competent to stand trial. In that case, although a competency hearing was held, the petitioner's competency was determined under a constitutionally impermissible standard of proof – the court considered this analogous to a situation where no hearing was held. Id. at 1345. The appellate court considered the evidence produced at Walker's competency hearing which included the testimony and the report of a psychiatrist, the testimony of Walker's attorney, as well as testimony from an attorney who represented Walker in another murder prosecution during approximately the same time period, and the prosecutor. Id. at 1346. The court found as follows:

> Mr. Walker's trial counsel also testified at the competency hearing. He stated that he had represented thousands of criminal defendants and had in other cases objected to going forward with a trial based on his belief that the defendant might not be competent. Although he further testified that Mr. Walker's moods varied and that at times he felt Mr. Walker did not understand clearly what was going on, he admitted he had not raised Mr. Walker's competency at trial. Indeed, he put Mr. Walker on the stand. The attorney who represented Mr. Walker in the other, contemporaneous criminal proceeding testified that he too experienced times during his representation of Mr. Walker when Mr. Walker did not appear to comprehend what was going on. Nonetheless, that attorney did not ask for a jury trial on Mr. Walker's competence or file an objection to going to trial based on that basis. The attorney also testified that it would have been his obligation to bring to the attention of the court any information indicating Mr. Walker was not competent to stand trial, and that he believed the issue in his trial to be insanity rather than competence.

Finally, the judge observed that he had tried the case and that he had noticed nothing at the time to raise a concern about Mr. Walker's competency.

We have carefully reviewed the evidence pertaining to Mr. Walker's competency at the time of his trial, including the transcript of his trial testimony. This record sets out a lamentable and grievous life history. It is undisputed that Mr. Walker was brutalized physically, emotionally, and sexually by his parents. His medical records reveal a history of serious mental disease that was apparently difficult to diagnose and to treat effectively. Nonetheless, the experts who examined the evidence determined that Mr. Walker was competent to stand trial and we have found nothing in the record to the contrary. The evidence, deplorable as it is, simply does not raise a bona fide doubt as to Mr. Walker's competency at the time of his trial. Accordingly, he cannot prevail on his procedural competency claim.

Id. at 1346-47.

Likewise, the Tenth Circuit, in Valdez v. Ward, 219 F.3d 1222 (10th Cir. 2000), rejected the petitioner's request for habeas corpus relief on his procedural competency claim because it determined that there was no bona fide doubt that the petitioner was competent to stand trial. Id. at 1241. In that case, the petitioner argued that the trial court erred in failing to suspend trial proceedings and re-evaluate his competency in violation of his procedural due process rights. Id. at 1239. In rejecting the procedural competency claim, the court noted that despite evidence that the petitioner suffered from paranoid delusions, none of the experts at trial testified that the petitioner was incompetent to stand trial. Id. at 1241. In addition, the Tenth Circuit considered the fact that there was no evidence in the record that the petitioner acted irrationally or was disruptive during any of the proceedings against him. Id. The court found that "our review of Mr. Valdez's own testimony convinces us he was competent at the time of trial. His 'behavior on the stand was neither irrational nor unusual. His testimony was responsive to the questions asked, logical, and coherent.'" Id. (quoting Foster v. Ward, 182 F.3d 1177, 1191 (10th Cir. 1999)).

Petitioner claims the trial court should have conducted a separate hearing to determine competency because he had presented information to the trial court raising a doubt about his competency to waive counsel.  Petitioner refers to the information submitted in support of his requests for expert funds which included: evidence that he suffered from juvenile-onset diabetes, O.R. Vol. III at 379-81; a medical article discussing some physical symptoms associated with juvenile-onset diabetes and the effects the disease may have on physical and psychosocial development, as well as evidence describing the effect of alcohol on a person with this disease, O.R. Vol. III at 385-391; evidence that Petitioner suffered from some of the physical effects and psychosocial problems commonly associated with juvenile-onset diabetes, O.R. Vol. III at 382-84; evidence he had received a gunshot wound to the head requiring surgery, O.R. Vol. III at 392-393; and evidence that he had been drinking the night of the murder, O.R. Vol. III at 384. This information was not presented to support a suggestion that Petitioner was incompetent to stand trial or waive his right to counsel, rather it was presented to show that Petitioner required expert assistance to present a first-stage defense to malice murder and to present mitigating evidence.

As stated above, the trial court found Petitioner to be in control of his faculties and to understand the nature and consequences of the proceeding. Tr. Apr. 18, 1996 at 10.  As in Walker, Petitioner's counsel never raised any concerns about Petitioner's competency to waive his right to counsel, despite indicating that she had discussed his waiver with him and being given the opportunity to voice any concerns. See Tr. Apr. 18, 1996 at 9-10, 25; see also Walker, 167 F.3d at 1346-47 (despite obligation to bring to the attention of the court any information that petitioner was not competent, counsel did not do so believing issue at trial was insanity not incompetence). Nothing in the record suggests Petitioner appeared incompetent or acted in an irrational, disruptive,

41

or unusual manner during the hearing on his motion to proceed pro se.  His "behavior on the stand was neither irrational nor unusual.  His testimony was responsive to the questions asked, logical, and coherent."  <u>Valdez</u>, 219 F.3d at 1241 (citation omitted).  While there was evidence that Petitioner suffered from some physical and psychosocial problems, no medical opinions or any other evidence were introduced at any time in the proceedings that called into question Petitioner's competency.  <u>Cf.</u> <u>Walker</u>, 167 F.3d at 1346-47 (while there was evidence of severe mental illness and insanity defense, court found that evidence did not raise bona fide doubt as to competency);  <u>Valdez</u>, 219 F.3d at 1241 (despite evidence that the petitioner suffered from paranoid delusions, no expert testified that petitioner was incompetent).

The OCCA held, "[t]his Court cannot find that the information about Fitzgerald's diabetes and head injury alone raised a doubt about his competency sufficient to require a separate competency proceeding."  <u>Fitzgerald I</u>, 972 P.2d at 1163.  This court agrees.  The information before the trial court at the time of Petitioner's waiver of his right to counsel did not give the trial court sufficient reason to doubt Petitioner's competence.  <u>See</u> <u>Godinez</u>, 509 U.S. at 401 n.13.  Petitioner has not shown that the trial court failed to give proper weight to any information suggesting incompetence which may have come to light during the proceedings.  <u>See</u> <u>McGregor</u>, 248 F.3d at 955.  The OCCA's determination was not an unreasonable application of established federal law.  <u>See</u> 28 U.S.C. § 2254(d)(1).  Petitioner cannot succeed on his procedural competency claim.

### B.  Knowing, intelligent, and voluntary waiver

The second prong of this analysis – whether the waiver is knowing and voluntary – hinges on the Petitioner's understanding of the significance and consequences of his decision, as well as whether the decision was coerced.  <u>Maynard</u>, 468 F.3d at 677.  Thus, the Tenth Circuit has said that

42

"[i]t is 'ideal' when the trial judge conducts a 'thorough and comprehensive formal inquiry' including topics such as the nature of the charges, the range of punishment, possible defenses, and a disclosure of risks involved in representing oneself pro se." United States v. Turner, 287 F.3d 980, 983 (10th Cir. 2002) (quoting United States v. Willie, 941 F.2d 1384, 1388 (10th Cir. 1991)). However, "[n]o precise litany is prescribed." United States v. Padilla, 819 F.2d 952, 959 (10th Cir. 1987).  Additionally, a defendant's technical legal knowledge is not relevant to an assessment of his knowing exercise of the right to waive counsel.  Faretta, 422 U.S. at 836.  Nevertheless, failure to conduct this inquiry does not necessarily indicate a constitutional violation if the surrounding facts and circumstances indicate that the defendant "understood his right to counsel and the difficulties of pro se representation."  Willie, 941 F.2d at 1389.  Even if a defendant "conduct[s] his own defense ultimately to his own detriment, his choice must be honored . . . ." Faretta, 422 U.S. at 834.

"In this context, knowing and intelligent means only that he was reasonably informed by the court of the hazards of self-representation and had sufficient understanding of those hazards. The trial court's obligation is to impart enough information to the defendant so that the defendant can make a fully informed choice." Turner, 287 F.3d at 984 (determining that the district court provided defendant enough information for knowing and intelligent waiver where "[t]he court informed Mr. Turner that he had a right to competent counsel to represent him, advised Mr. Turner of the charges against him, and explained to Mr. Turner that he would be required to follow court rules without any assistance from the judge.").  In determining whether a defendant knowingly and intelligently waived his right to counsel, "we must consider the total circumstances of the individual case including background, experience and the conduct of the accused person." Padilla, 819 F.2d at 958 (internal quotation omitted).

43

Here, the trial court explained Petitioner's Sixth Amendment rights to counsel and to represent himself. Tr. Apr. 18, 1996 at 3. The trial court also explained the duties of an attorney at trial. Id. at 3-4. The trial court inquired whether Petitioner had been forced or coerced into making this decision, and Petitioner replied that he made the decision to waive counsel out of his own free will. Id. at 4. The trial court advised Petitioner of the nature of the charges, the offenses charged, and the range of punishment possible for each offense. Id. at 7-8. The trial court repeatedly advised Petitioner against self-representation, pointing out that Petitioner did not know what he was doing, that this was a bad decision, and the potential consequences of proceeding pro se. Id. at 10, 14, 16. The trial court gave Petitioner the opportunity to reconsider his decision on repeated occasions. Id. at 19; Tr. May 10, 1996 at 12-13; Tr. May 13, 1996 at 8-9 (motion hearing); Tr. I Vol. 1 at 2.[9]

The OCCA found as follows:

> Fitzgerald also gave a knowing, intelligent, and voluntary waiver. He denied his decision was coerced during the April 18, 1996, hearing and does not suggest coercion on appeal. Fitzgerald had several prior convictions and was familiar with the criminal justice system. He was informed of the nature of the charges, offenses, and range of punishment and repeatedly advised that this was a bad decision. Over the course of several hearings, the trial court explained courtroom procedure and the role of each party, including Fitzgerald and standby counsel. Offered several opportunities to reconsider his decision, Fitzgerald clearly and unequivocally stated

---

[9]   The facts of this case are easily distinguished from those relied upon by Petitioner. In Taylor and Padilla, the trial court never advised the defendant of "the dangers and disadvantages of self-representation." United States v. Taylor, 113 F.3d 1136, 1141 (10th Cir. 1997) (comparing Taylor's case with Padilla). In Taylor, the trial court never asked the defendant his reasons for proceeding pro se or whether he actually understood the consequences of his decision. Id. In Taylor and Padilla, the trial court did not inform the defendant of the nature of the charges against him, the statutory offenses included, or the possible range of punishment or what would be expected of him in the courtroom. Id.; Padilla, 819 F.2d at 958.

his intention to proceed pro se. The record shows Fitzgerald's waiver of his right to counsel was knowing and voluntary.

Fitzgerald I, 972 P.2d at 1163.

This court finds that the OCCA's determination that Petitioner's waiver was knowing and intelligent was not an unreasonable application of established federal law. 28 U.S.C. § 2254(d)(1). While the trial court did not specifically discuss any defenses Petitioner might have or mitigation, the record indicates that Petitioner was reasonably informed by the trial court of the hazards of self-representation and had sufficient understanding of those hazards. The trial court imparted enough information to Petitioner so that he could make a fully informed choice. See Turner, 287 F.3d at 983-84. Accordingly, Petitioner is denied habeas corpus relief on Ground 4.

**V.      Trial court's failure to "life qualify" the jury (Ground 5)**

In Ground 5, Petitioner contends that, pursuant to the Supreme Court's holding in Morgan v. Illinois, 504 U.S. 719 (1992), he was unconstitutionally denied a right to "life qualify" his guilt-stage jury. Petitioner raised this issue in his first direct appeal. The OCCA determined that there was error under Morgan, and under a cumulative error review, in combination with the Ake error and instructional error vacated Petitioner's death sentence and remanded for a new sentencing trial. Fitzgerald I, 972 P.2d at 1170-71. Petitioner argues that the OCCA's decision was an unreasonable application of Morgan because the error infected his jury in the guilt-stage as well as the sentencing stage, and that he should have been granted an entirely new trial, not merely a new sentencing proceeding.

In Witherspoon v. Illinois, 391 U.S. 510 (1968), the Supreme Court determined that it was proper to ask prospective jurors about their views concerning the death penalty during voir dire in capital cases. Such "death qualifying" questions would ensure the impartiality of jurors by allowing

45

the state to properly exercise challenges for cause against potential jurors unwilling to return a capital sentence.  See id. at 520-23.  In Morgan, defense counsel was given the parallel ability to identify those jurors who would always impose the death penalty.  Morgan held that "on voir dire the court must, on defendant's request, inquire into the prospective jurors' views on capital punishment," because a prospective juror who would always impose the death penalty must not be empaneled. Morgan, 504 U.S. at 726.  "A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror."  Id. at 729.  Voir dire must adequately identify such unqualified jurors, and to this end, certain inquiries must be made in capital cases.  Id. at 729-31. "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence."  Id. at 729.

"The trial court retains great latitude in deciding what questions should be asked on voir dire."  Mu'Min v. Virginia, 500 U.S. 415, 424 (1991).  Of course, when reviewing a state court's conduct of voir dire, a federal habeas court's "authority is limited to enforcing the commands of the United States Constitution."  Id. at 422.  A state court's refusal to pose "constitutionally compelled" questions merits habeas relief.  Id. at 424-26.  To be constitutionally compelled, however, it is not enough that such questions might be helpful.  Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair.  See Murphy v. Florida, 421 U.S. 794, 799 (1975).  The trial court's duty to "life qualify" a jury is "constitutionally compelled."  See Morgan, 504 U.S. at 733-34, 739 ("Because the 'inadequacy of voir dire' leads us to doubt that petitioner was

sentenced to death by a jury empaneled in compliance with the Fourteenth Amendment, his sentence cannot stand.").

The issue here is whether the OCCA's determination that failure to "life qualify" the jury contributed to an accumulation of error which necessitated reversal of the second stage of the proceedings, but not the first stage of the proceedings, was an unreasonable application of established federal law. This Court determines it was not. The Supreme Court in the Morgan decision explained that "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do" and mandated that a death sentence imposed in a case where such a juror was impaneled cannot stand. Morgan, 504 U.S. at 729. As such, the failure to "life qualify" the jury, after a capital defendant's request to do so, renders the sentencing stage fundamentally unfair, because of the risk that a juror was impaneled who would automatically impose the death penalty, and thus fail to properly consider the evidence of aggravating and mitigating circumstances. See id. at 735. Morgan does not in any way indicate that the failure to "life qualify" the jury renders the guilt stage fundamentally unfair. Id. at 739 n.11. Thus, the OCCA's determination was not an unreasonable application of Morgan. See 28 U.S.C. § 2254(d)(1). Petitioner is denied habeas relief on this ground.

## VI.     Accumulation of error in the first stage (Ground 6)

In Ground 6, Petitioner claims that "the accumulation of constitutional error in the first stage of Petitioner's trial denied Petitioner a fundamentally fair trial under the Fourteenth Amendment." (Dkt. # 24 at 118).

The Tenth Circuit has repeatedly held that cumulative error analysis is applicable only where there are two or more actual errors.  Workman v. Mullin, 342 F.3d 1100, 1116 (10th Cir. 2003). Cumulative impact of non-errors is not part of the analysis.  Le v. Mullin, 311 F.3d 1002, 1023 (10th Cir. 2002) (citing United States v. Rivera, 900 F.2d 1462, 1471 (10th Cir. 1990) (en banc)).  "[T]he task 'merely' consists of 'aggregat[ing] all the errors that have been found to be harmless' and 'analyz[ing] whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'"  Grant v. Trammell, --- F.3d ---, 2013 WL 4105939, at *15 (10th Cir. 2013) (quoting Rivera, 900 F.2d at 1470).  "Only if the errors 'so fatally infected the trial that they violated the trial's fundamental fairness' is reversal appropriate."  Id. (quoting Matthews v. Workman, 577 F.3d 1175, 1195 n.10 (10th Cir. 2009)).  "[A]ll a defendant needs to show is a strong likelihood that the several errors in his case, when considered additively, prejudiced him."  Id. at *16.

In this case, the court did not find two or more actual errors as to the guilt or innocence stage of Petitioner's trial.  As a result, there is no basis for a cumulative error analysis.  For that reason, Petitioner is denied habeas corpus relief on Ground 6.

## VII.   Ineffective assistance of trial and appellate counsel for failure to develop and present mitigating evidence (Ground 7)

In Ground 7, Fitzgerald claims that trial counsel provided ineffective assistance in failing to develop and present mitigating evidence at his resentencing trial.  He also claims that appellate counsel provided ineffective assistance in presenting this argument on appeal from the resentencing trial.  After conducting an evidentiary hearing on the issue of ineffective assistance of trial counsel, the Magistrate Judge determined that Petitioner's claim is meritorious and recommended that habeas corpus relief be granted as to this ground of error.  (Dkt. # 159).  Respondent filed an objection (Dkt.

48

# 163) and Petitioner filed a partial objection (Dkt. # 164) to the Report.  In accordance with Rule 8(b) of the Rules Governing Section 2254 Cases and 28 U.S.C. § 636(b)(1)(C), the court reviewed de novo those portions of the Report to which the parties have objected, and concludes that, for the reasons discussed below, the Report shall be accepted.  The Petition for Writ of Habeas Corpus shall be conditionally granted as to the Ground 7 claim of ineffective assistance of appellate counsel for failing to raise on direct appeal from Petitioner's resentencing trial a meritorious claim of ineffective assistance of trial counsel.

By way of background, and as noted in the Report (Dkt. # 159), Petitioner's resentencing trial took place in October 2000.  He was represented by three attorneys from the Oklahoma Indigent Defense System (OIDS):  Silas Lyman, Dr. Kathy LaFortune, and Lynn Burch.[10]  Mr. Lyman, previously a state prosecutor, served as first chair.  In July 1999, or well in advance of the resentencing trial, Petitioner's attorneys retained Dr. Herman Jones, a neuropsychologist, to evaluate Petitioner.  They also retained Dr. Christina Bratcher, an endocrinologist, to review Petitioner's history of diabetes, to opine on his prognosis, and to share her results with Dr. Jones.  At the resentencing trial, the State presented evidence in support of three aggravating circumstances:  (1) that Petitioner "was previously convicted of a felony involving the use or threat of violence to the person," (2) that Petitioner committed the murder in an attempt to avoid arrest and prosecution, and (3) that Petitioner posed a "continuing threat to society."  See Tr. II Vol. V at 750.  Mr. Lyman cross-examined the witnesses presented by the State in support of the aggravating circumstances. Dr. LaFortune presented the opening statement on behalf of Petitioner, see Tr. II Vol. VII at 1056, and presented three witnesses in support of mitigation.  Those witnesses were Petitioner's mother,

---

[10]      Mr. Burch also represented Petitioner on direct appeal from the resentencing trial.

Virginia Fitzgerald, id. at 1068; Petitioner's foster mother, Sandra Davis, id. at 1103; and Petitioner's son, Kyle Fitzgerald, Tr. II Vol. VIII at 1147.   Mr. Lyman presented closing argument on behalf of Petitioner, id. at 1181.   Other mitigation evidence presented by Petitioner's defense team included a copy of Petitioner's waiver of extradition from Missouri, where he was arrested, to Oklahoma; and medical records documenting Petitioner's treatment for diabetes and a gunshot wound to the head.   Despite having retained two expert witnesses, the defense team unreasonably chose not to present either expert witness.   During his closing argument, Mr. Lyman argued, inter alia, that Petitioner's life was "not a life full of excuses," see Tr. II Vol. VIII at 1183-84; that Petitioner had abused alcohol the night of the crimes, but was not using alcohol as an "excuse," id. at 1188-89; that his diabetes "affected him," but conceded to the jury that many "people suffer from diabetes [that] don't go out and commit crimes," id. at 1191; that Petitioner "was shot . . . in the frontal lobe of the head," but conceded to the jury that "we will never know what this injury to [Petitioner] did to him. . . . none of us are doctors," id. at 1193-94; and that, because of a broken leg suffered while in prison, Petitioner was no longer a threat to society since he was no longer mobile, id. at 1194-95.   At the conclusion of the resentencing trial, the jury found two aggravating circumstances:  (1) that Petitioner had previously been convicted of a violent felony, and (2) that Petitioner posed a continuing threat to society.  Id. at 1240.  The jury recommended that Petitioner be sentenced to death.  Id. at 1241.  In reaching this sentence, the jury necessarily found, per jury instruction Nos. 16 and 17, that these aggravating factors necessarily outweighed all of the combined mitigating factors found, if any.  See O.R. Vol. VI at 1135-1137.

In an application for post-conviction relief, filed in OCCA Case No. PCD-2002-626, Petitioner argued that trial and appellate counsel were ineffective for failing to present available

mitigating evidence.  Applying the three-tiered test enunciated in Walker v. State, 933 P.2d 327, 333-334 (Okla. Crim. App. 1997),[11] the OCCA rejected the ineffective assistance of counsel claims and affirmed Petitioner's death sentence. (Dkt. # 25, Ex. 18 at 3).

In his Petition for Writ of Habeas Corpus, Petitioner asserts that his trial attorneys provided ineffective assistance at the resentencing trial when they failed to develop and present experts to explain the interaction of his brain damage, diabetes and intoxication.  By Order filed August 9, 2010 (Dkt. # 72), this court granted Petitioner's request for an evidentiary hearing as to Ground 7. By Opinion and Order filed August 25, 2011 (Dkt. # 104), this court denied Respondent's request to reconsider the Order granting an evidentiary hearing and denied Respondent's motion for summary judgment.  In the Opinion and Order, this court also determined that because the OCCA applied the wrong constitutional standard to deny Petitioner's claim of ineffective assistance of appellate counsel, the claim would be reviewed de novo.  (Id.).

The evidentiary hearing was held on August 21 through 23, 2012, and on November 9, 2012. After hearing the parties' evidence and reviewing the parties' proposed findings of fact and conclusions of law (Dkt. ## 156, 157), the Magistrate Judge entered the Report on July 22, 2013 (Dkt. # 159).  The Magistrate Judge recommends that the court find Petitioner's attorneys' performance at the resentencing trial deficient and prejudicial to Petitioner because the attorneys chose not to present expert testimony regarding his diabetes, brain injury, and evidence of his alcohol consumption.  On August 19, 2013, Respondent filed an objection (Dkt. # 163) and Petitioner filed a partial objection (Dkt. # 164) to the Report.

---

[11]    In 2004, Walker was superseded by statute, see Davis v. State, 123 P.3d 243 (Okla. Crim. App. 2005).

Upon de novo review of the objections, the court finds the Report shall be accepted over the parties' objections.  Under the familiar constitutional standard set forth in Strickland v. Washington, 466 U.S. 668 (1984), Petitioner must demonstrate that his counsel's performance was deficient and that the deficient performance was prejudicial.  Id. at 687; Osborn v. Shillinger, 997 F.2d 1324, 1328 (10th Cir. 1993).  Petitioner must establish the first prong by showing that his counsel performed below the level expected from a reasonably competent attorney in criminal cases.  Strickland, 466 U.S. at 687-88.  There is a "strong presumption that counsel's conduct falls within the range of reasonable professional assistance."  Id. at 689.  In making this determination, a court must "judge . . . [a] counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  Id. at 690.  Moreover, review of counsel's performance must be highly deferential.  "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  Id. at 689. While there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, closer scrutiny applies to reviewing attorney performance during the penalty phase of a capital case.  Littlejohn v. Trammell, 704 F.3d 817, 859 (10th Cir. 2013).  Assessing attorney performance requires every effort to avoid hindsight bias and evaluate conduct from counsel's perspective at the time.  Strickland, 466 U.S. at 689.  "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."  Harrington v. Richter, 131 S. Ct. 770, 791 (2011) (quoting Strickland, 466 U.S. at 686).  "The Strickland standard must be applied with 'scrupulous care.'" Cullen v. Pinholster, 131 S. Ct. 1388, 1408 (2011) (quoting Richter, 131 S. Ct. at 788).  As noted

in Richter, "[e]ven under *de novo* review, the standard for judging counsel's representation is a most deferential one." Richter, 131 S. Ct. at 788.

To establish the second prong, Petitioner must show that this deficient performance prejudiced the defense to the extent that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; see also Houchin v. Zavaras, 107 F.3d 1465, 1472 (10th Cir. 1997) (quoting Strickland, 466 U.S. at 694). Failure to establish either prong of the Strickland standard will result in denial of relief.

When a habeas petitioner alleges that his appellate counsel rendered ineffective assistance by failing to raise an issue on direct appeal, the court first examines the merits of the omitted issue. Hawkins v. Hannigan, 185 F.3d 1146, 1152 (10th Cir. 1999). The Tenth Circuit has explained that,

> If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance.

Cargle v. Mullin, 317 F.3d 1196, 1202 (10th Cir. 2003) (footnote omitted) (citation omitted); see also Parker v. Champion, 148 F.3d 1219, 1221 (10th Cir. 1998).

In his Report, the Magistrate Judge determined that, under the deficient performance prong of Strickland, Mr. Lyman's decision not to call expert witnesses or to present evidence of Petitioner's alcohol use qualifies as a "strategic decision." See Dkt. # 159 at 60. That determination was based on the Magistrate Judge's conclusions that Mr. Lyman's investigation prior

53

to the resentencing trial was adequate, and that although Mr. Lyman harbored a misunderstanding of critical facts surrounding Petitioner's health conditions, this was an error of fact as opposed to a legal error.  In addition, the Magistrate Judge determined that, based on the status of the law at the time of the trial, Mr. Lyman had reason to be concerned that the expert testimony could serve as a "double-edged sword," i.e., that the expert testimony could be used by the State against Petitioner as evidence in support of the aggravating circumstances.  The Magistrate Judge also determined that Mr. Lyman lacked sufficient experience under American Bar Association (ABA) Guideline 5.1 for providing representation in a capital case, but that Mr. Lyman's failure to meet the ABA's guidelines, standing alone, is insufficient to disqualify the decision as strategic.  The Magistrate Judge concluded that Mr. Lyman's "strategic decision" not to present any explanation for Petitioner's behavior, although compelling evidence readily existed, was unreasonable.  (Id. at 69-70).  This decision was so unreasonable it led the Magistrate Judge to find that "there is a reasonable probability that at least one juror would have voted for life imprisonment rather than the death penalty" had this important mitigation evidence been presented.  (Id. at 70).

## A.  Petitioner's partial objection to the Report

The court first considers Petitioner's partial objection to the Report (Dkt. # 164).  Petitioner objects to the Magistrate Judge's finding that Mr. Lyman's decision not to introduce the expert testimony of Dr. Bratcher and Dr. Jones qualifies as a "strategic decision" under Strickland. Petitioner identifies three primary arguments in support of his partial objection:  (1) that the "double-edged sword" analysis is incorrect, (2) that Mr. Lyman misunderstood his duty to protect Petitioner's "substantive constitutional right under the Eighth Amendment" to have the jury consider mitigating evidence that might well have influenced the jury's appraisal of his moral culpability, and (3) that

counsel's investigation and decision to limit the investigation were unreasonable.   Each of Petitioner's arguments is discussed below.

### 1. The "double-edged sword" analysis

Mr. Lyman testified at the evidentiary hearing that his main reason for not calling either Dr. Jones or Dr. Bratcher was that the mental health evidence could be a "double-edged sword" because the State could use the evidence to support the aggravating circumstances. (Dkt. # 141 at 88).  In his partial objection to the Report, Petitioner complains that the Magistrate Judge erred in finding that Mr. Lyman's concern qualifies as a "strategic decision."   (Dkt. # 164 at 6-15). Specifically, Petitioner complains that the Magistrate Judge erred in limiting his analysis to case law available to Mr. Lyman at the time of Petitioner's resentencing trial, and argues that other cases decided after Petitioner's trial are also controlling.   Petitioner is correct that case law available before and after Petitioner's resentencing trial emphasized that expert testimony or evidence must be introduced if it explains the defendant's actions and could influence the jury's assessment of his moral culpability.  See, e.g., Williams v. Taylor, 529 U.S. 362, 397-98 (2000); Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004).  In addition, Mr. Lyman could have expanded his analysis to distinguish the Tenth Circuit cases available at the time of Petitioner's resentencing trial, see, e.g., Duvall v. Reynolds, 139 F.3d 768 (10th Cir. 1998); Davis v. Executive Dir. Dep't Corr., 100 F.3d 750 (10th Cir. 1996).  Those cases establish that, at the time, the clear trend was to proceed with caution when presenting mental health evidence as mitigation evidence because it could easily be used to support aggravating circumstances such as continuing threat.  Assessing attorney performance requires every effort to avoid hindsight bias and to evaluate conduct from counsel's perspective at the time. Strickland, 466 U.S. at 689.  Therefore, the Court agrees with the Magistrate Judge's conclusion that

Mr. Lyman's decision not to call experts based on his concerns regarding the double-edged nature of the evidence does not disqualify the decision from being "strategic."

### 2. Consideration of potential conflict with first stage finding of guilt

Petitioner complains the Magistrate Judge failed to consider Mr. Lyman's misplaced concern that presentation of the experts during the second stage would be inconsistent or conflicting with the jury's first stage guilty verdict for First Degree Murder.   Furthermore, Petitioner contends Mr. Lyman was required, under Eighth Amendment principles established in Williams v. Taylor, 529 U.S. 362, 398 (2000) (citing Boyd v. California, 494 U.S. 370, 387); Skipper v. South Carolina, 476 U.S. 1, 4 (1986); Eddings v. Oklahoma, 455 U.S. 104, 110 (1982); and Lockett v. Ohio, 438 U.S. 586, 604 (1978), to present relevant mitigating evidence that may serve as a basis for a sentence less than death.  Petitioner contends that Mr. Lyman's decision was an error of law disqualifying the decision from being categorized as strategic.  This court has reviewed the transcripts from the evidentiary hearing and is convinced that Mr. Lyman's decision not to call the expert witnesses was based on a misunderstanding of the expert testimony and not on an erroneous understanding of legal principles that would prevent presentation of the testimony.  See Williams, 529 U.S. at 395-96 (finding that preparation of mitigation case was inadequate because counsel incorrectly thought that state law barred access to foster home records); Kimmelman v. Morrison, 477 U.S. 365, 386-87 (1986) (concluding that counsel's failure to engage in the discovery process resulted from counsel's misunderstanding of law regarding discovery procedures).   Therefore, Mr. Lyman's decision resulted from a factual error and qualified as a strategic decision.  For that reason, Petitioner's objection lacks merit.

### 3.  Mr. Lyman's investigation

Lastly, Petitioner argues that the Magistrate Judge erred in finding that Mr. Lyman's investigation was constitutionally adequate.  Petitioner lists Mr. Lyman's failure to learn the correct definition of "disinhibition," to provide critical evidence of intoxication to Dr. Jones and to call Dr. Jones as a witness, to obtain a report from Dr. Bratcher and provide it to Dr. Jones, to call Dr. Bratcher as a witness, to organize and present a coherent plan to avoid the death penalty, and to present a complete and accurate picture of Petitioner's gunshot wound and resulting frontal lobe impairment.  (Dkt. # 164 at 18-36).  Although Petitioner argues that the cited factors support a finding that Mr. Lyman failed to investigate, none of the cited factors is based on information that Mr. Lyman failed to uncover.  See DeRosa v. Workman, 679 F.3d 1196, 1208-1209 (10th Cir. 2012) (stating that counsel's failure to investigate a mitigation case can be considered ineffective assistance, but "only if the investigation fails to . . . uncover significant mitigating evidence").  Thus, the Magistrate Judge did not err in finding that Mr. Lyman's investigation was adequate. Furthermore, all of the factors cited by Petitioner contribute to the objective unreasonableness of the strategy followed by Mr. Lyman.  This argument lacks merit.

For the reasons discussed above and after de novo review, the court concludes Petitioner's partial objection to the Report lacks merit.

### B.  Respondent's objections to the Report

Respondent objects to the Magistrate Judge's findings on five grounds:  (1) the reasons for finding counsel ineffective are refuted by the record, (2) the Report is contrary to Tenth Circuit precedent, (3) the Report fails to afford the required deference to trial counsel's strategic decisions,

(4) the Magistrate Judge's findings of fact are erroneous, and (5) Petitioner was not prejudiced by Mr. Lyman's deficient performance. (Dkt. # 163). Each category of objection is discussed below.

### 1. Reasons for finding counsel ineffective

First, Respondent claims the Magistrate Judge incorrectly characterizes the OCCA direct appeal opinion as a "mandate" to present expert testimony at the resentencing trial. This is not the case. The Magistrate Judge noted that the case procedurally came to Mr. Lyman after the OCCA issued a mandate to provide funding for expert witnesses. (Dkt. # 159 at 62, 65, 69). The Magistrate Judge specifically noted in his Report that the OCCA order "was not determinative" on the issue of whether Mr. Lyman should have presented the expert witnesses. (Id. at 69). Moreover, the Magistrate Judge did not at any time conclude that Mr. Lyman had *per se* erred by not presenting expert witnesses at trial. Indeed, contrary to Respondent's argument, the Magistrate Judge correctly found after engaging in extensive inquiry and analysis that "in the absence of compelling reasons not to present the expert testimony," Mr. Lyman was obligated to do so. (Dkt. # 159 at 69). The Magistrate Judge found Mr. Lyman could articulate no compelling reasons to support his decision not to present this important mitigating evidence. This is the core of the Magistrate Judge's decision this court now accepts and affirms. (Dkt. # 159 at 69). Upon careful review of the Report and the OCCA's opinion, the court finds this objection to be without merit.

Next, Respondent argues that Mr. Lyman "had sufficient experience to make the strategic decisions he made," (Dkt. # 163 at 7), and that the Magistrate Judge "improperly downplayed Mr. Lyman's experience with mental health mitigating evidence," (id. at 8). Respondent also states that Mr. Lyman's "inability to recall ever personally presenting the testimony of a mental health expert has no bearing on the reasonableness of his decisions in Petitioner's case." (Id. at 9).

However, in the Report the Magistrate Judge determined that although Mr. Lyman failed to satisfy the American Bar Association's guidelines for capital trial representation, that failure, standing alone, is insufficient "to warrant a finding that the decision not to utilize expert testimony was not a strategic decision." (Dkt. # 159 at 55). Nothing presented by Respondent convinces the court that the Magistrate Judge improperly weighed Mr. Lyman's level of experience in finding that Mr. Lyman's "strategic decision" was objectively unreasonable. The court finds Respondent's objection to the Magistrate Judge's analysis of Mr. Lyman's experience with mental health evidence to be without merit.

Respondent also takes issue with the Report's characterization of the defense as being "organized in a haphazard manner." (Dkt. # 163 at 9). However, the record demonstrates that unquestionably was the case. According to Dr. LaFortune's testimony, which was significantly more consistent and linear than that of Mr. Lyman, Mr. Lyman made the decision not to call Dr. Jones in approximately March 2000 (Dkt. # 142 at 345) and not to call Dr. Bratcher after the trial had begun in October 2000 (Id. at 328). Though "shocked" by the decision not to call any expert witnesses regarding Petitioner's mental and physical condition, Dr. LaFortune chose not to confront Mr. Lyman, who was the lead attorney in a death penalty case – which Dr. LaFortune equated to being a "commander" in a "war zone." (Id. at 329). Even had Dr. LaFortune chosen to confront Mr. Lyman about his questionable decision regarding Dr. Bratcher, she would have had little opportunity to have a meaningful conversation on the topic when the trial had already commenced. In making these unilateral decisions, Mr. Lyman failed to disclose to his trial partner, Dr. LaFortune, who had more experience with expert testimony, that Mr. Lyman had no experience with presenting mitigation evidence in capital cases. (Dkt. # 142 at 328, 331-332, 338, 347, 351; Dkt. # 143 at 494-

95).  Dr. LaFortune testified that, had she known Mr. Lyman had no experience with mitigation in capital cases, she would have questioned Mr. Lyman's decision and even asked Mr. Lyman to discuss that decision with their supervisor.  (Id. at 331-32, 347).  Dr. LaFortune felt that Mr. Lyman's approach of just giving the jury the medical records was not enough, because jurors could not make sense of the medical records without "someone to guide them."  (Id. at 332).

Mr. Lyman's own testimony regarding his decisions not to use the expert witnesses further demonstrates the trial team's disorganization.  The Magistrate Judge highlighted that Mr. Lyman's testimony demonstrated significant confusion about why each witness had been eliminated from the trial.  Initially, Mr. Lyman testified that he was interviewing Dr. Bratcher, who Mr. Lyman felt "did not come off as strong in [her] presence when you're talking to her" (Dkt. # 141 at 63), for the purpose of potentially providing Dr. Bratcher's report to Dr. Jones.  (Dkt. # 141 at 64).  Mr. Lyman then stated he was thinking that Dr. Jones could rely upon Dr. Bratcher's testimony at trial, if Mr. Lyman presented Dr. Jones at trial.  (Id.).  However, Mr. Lyman simultaneously testified that he was already inclined not to use Dr. Jones either.  (Dkt. # 141 at 64).  This time line makes little sense when reviewing Mr. Lyman's March 2000 witness list, which included Dr. Bratcher (though Mr. Lyman states he had decided not to call her as a witness) and excluded Dr. Jones (though Mr. Lyman states he was still considering calling Dr. Jones as a witness).  (Dkt. # 159 at 63).  Upon a de novo review of the record, the court finds that the evidence presented at the evidentiary hearing supports the Magistrate Judge's depiction of a disorganized defense team that was unable to cohere and formulate a plan for mitigation.  Respondent's objection is without merit.

Respondent also objects to the Magistrate Judge's finding that Mr. Lyman misunderstood the expert reports.  (Dkt. # 163 at 15).  Respondent argues "Mr. Lyman considered all of the

evidence and formed a reasonable concern about how a jury might react" to the expert testimony. (Id. at 17). The Report specifically discusses Mr. Lyman's testimony concerning his understanding of the term "disinhibition" as used by Dr. Jones in his report.  According to Dr. Jones, the term "disinhibition" refers to a lack of impulse control.  (Dkt. # 142 at 180-83).  Mr. Lyman explained his concern that the State could have used Dr. Jones' testimony regarding "disinhibition" to portray Petitioner as a "person who just doesn't care, just would do what he wanted to do, wasn't inhibited." (Dkt. # 141 at 89).  In fact, Mr. Lyman admitted it was his belief, which has borne out to be a misunderstanding on Mr. Lyman's part, that when he made the decision not to call Dr. Jones that the term "disinhibited" meant Mr. Fitzgerald "didn't give a damn."  (Id. at 91:11-19).  Mr. Lyman acknowledged that he may have misunderstood the word "disinhibition," but believed the jury would think Fitzgerald "didn't care."  (Id. at 89:22-90:3).  Mr. Lyman's testimony supports the Magistrate Judge's finding that Mr. Lyman did not understand the technical term "disinhibition" as used by Dr. Jones.  Respondent's objection is without merit.

### 2.  Alleged failure to afford deference to Mr. Lyman's strategic decisions

Next Respondent argues that the Report fails to afford deference to Mr. Lyman's strategic decisions, citing Bullock v. Carver, 297 F.3d 1036, 1044 (10th Cir. 2002).  Respondent states that when counsel's strategic decisions are being evaluated for reasonableness, reviewing courts must give "considerable deference" to counsel's decisions.

In the Report, the Magistrate Judge acknowledged that the Strickland standard is "highly deferential" and that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690.  Applying that

standard, the Magistrate Judge accurately determined that, in consideration of all the facts, Mr. Lyman's strategic decisions were objectively unreasonable.

To the extent Respondent is arguing that once the Magistrate Judge found Mr. Lyman's decisions were "strategic," those decisions could not be challenged, the court disagrees. The " mere incantation of 'strategy' does not insulate attorney behavior from review." Fisher v. Gibson, 282 F.3d 1283, 1296 (10th Cir. 2002). The court must consider whether that strategy was objectively reasonable. See id. at 1305; Roe v. Flores-Ortega, 528 U.S. 470, 481 (2000); Hooper v. Mullin, 314 F.3d 1162, 1169-70 (10th Cir. 2002).

Respondent's challenge to the Magistrate Judge's finding is without merit. The Magistrate Judge considered Mr. Lyman's stated reasons for excluding the expert witnesses and not introducing evidence of Petitioner's intoxication. After engaging in substantial analysis, the Magistrate Judge concluded that Mr. Lyman's strategic  decision to exclude the expert witnesses' testimony was objectively unreasonable.

First, Mr. Lyman's strategic decision not to call Dr. Jones was objectively unreasonable. Dr. Jones was prepared to testify that Petitioner's medical records demonstrated he had suffered a gunshot wound to the head that pierced the covering of the Petitioner's brain and caused bone fragments to lodge in his frontal lobe. (Dkt. #142 at 176). Dr. Jones explained that the frontal lobe is the portion of the brain responsible for one's ability to empathize, anticipate one's actions, reflect upon one's actions, and perform other behaviors that a lay person might commonly refer to as a conscience. (Id. at 177). Dr. Jones further explained that Petitioner's neurological damage, taken alone, would not have a significant impact, but that when Petitioner's neurological damage was

coupled with fatigue, excessive anxiety, sedating drugs or medications (of which alcohol[12] was an exemplar), concurrent physical illness, depression, or lack of motivation, all which were at issue in the trial, it could result in more impulsive behavior or keep Petitioner from slowing down and anticipating the consequences of his actions.   (Id. at 179-182, 191, 214).   Dr. Jones adeptly described that these factors would have a multiplicative effect on Petitioner's ability to control his actions.  (Id. at 203).  The doctor used the image of a cart rolling down a hill as a teaching metaphor. He explained that Petitioner, given "static factors in his personality," would already be at an increased slope, and each time another factor was added, including the neurological frontal lobe injury, the alcohol usage, and the potential metabolic imbalance from not eating that day and from uncontrolled diabetes, the slope of the incline would become steeper, thereby resulting in the cart, Petitioner's decision making processes, being harder and more difficult to control.  (Id. at 201-204). Dr. Jones testified that the net result of this multiplicative effect would be that Petitioner had "less control" and "less inhibition."  (Id. at 203).  Finally, Dr. Jones testified that, without the assistance of expert testimony, the medical records Mr. Lyman presented to the jury could not explain to lay jurors this multiplicative effect on Petitioner's decision-making processes.  (Id. at 204-205).   The mitigating impact of the omitted expert testimony is undeniable.

---

[12]    The record in this case includes the affidavit of Regina Stockfleth.  See Evid. Hr'g Pet. Ex. 2; Dkt. # 25, Ex. 21.  Ms. Stockfleth avers that on the night of the robberies and murder, she and Petitioner "drank heavily."  (Id. at ¶ 3).  During the early evening hours, they consumed a "fairly large size bottle of tequila and some Margarita mix . . . . We were also drinking beer . . . . After we drank the bottle of tequila . . . [w]e went to two different bars in Tulsa . . . . Around 12 to 1 o'clock, we headed home . . . Jim and I were both loaded. His driving scared me."  (Id. at ¶¶ 3, 4, 5).  The record also contains a stipulation regarding the testimony of Candy Ashley, aka Candy Goodnight. See Evid. Hr'g Pet. Ex. 23.  Ms. Ashley observed a man fitting Petitioner's description outside the convenience store on East Admiral.  Id.  He was carrying what appeared to be a rifle.  Id.  It was her opinion that, based on the way the man was walking and behaving, the man was intoxicated.  Id.

Second, a review of Dr. Bratcher's affidavit likewise reveals strong mitigation evidence.  Dr. Bratcher described the long history of Petitioner's uncontrolled diabetes, noting that he was hospitalized several times in his youth as a result of his diabetes, including one loss of consciousness and two diabetic seizures.  (Dkt. # 25 at 99).  Dr. Bratcher also stated that, due to petitioner's diabetes, the potential large amounts of alcohol consumed by Petitioner on the night of the murder, and Petitioner's frontal lobe injury, Petitioner's cognitive functioning could have been affected, which might have impacted Petitioner's judgment that night.  (Dkt. # 25 at 99).[13]

In contrast, when reviewing the transcript of Mr. Lyman's testimony, Mr. Lyman provides no persuasive reason for not presenting these expert witnesses.  With respect to Petitioner's childhood diabetes, Mr. Lyman initially explained that he listed Petitioner's diabetes as a mitigating factor so as to tell the full story about Petitioner's life, (Dkt. # 141 at 54), demonstrating that "he's been dealing with diabetes" from an early age.  Mr. Lyman then conceded that one option for highlighting the mitigating effect of Petitioner's childhood diabetes was to hire an expert to present such testimony.  (Id. at 56).  Upon reviewing Dr. Bratcher's affidavit regarding Petitioner's diabetes, Mr. Lyman conceded such testimony would have been helpful to the Petitioner at trial.  (Id. at 60).  However, Mr. Lyman confusingly explained that he chose not to present any expert witnesses to discuss the impact of Petitioner's diabetes because he wanted to present a "no excuse" mitigation theme, whereby Petitioner took responsibility for his actions.  (Dkt. # 141 at 71-72).  By mentioning Petitioner's childhood diabetes, but providing no evidentiary support as to how Petitioner's diabetes contributed to or was relevant to Petitioner's poor decision making, Mr. Lyman caused a contrary

---

[13]     While Mr. Lyman believed Dr. Bratcher would not be a good witness because she lacked a strong presence, (Dkt. # 141 at 63-64), he could have resolved this problem by allowing Dr. Jones to present Dr. Bratcher's findings at trial.

result, whereby a reasonable juror would have perceived Petitioner's diabetes as merely an excuse and not an explanation. Mr. Lyman's closing arguments all but confirm this misguided approach:

> And you learn – and this isn't an excuse, its just part of his life – that he was diagnosed with diabetes at a young age. And these are what these medical records are for, to document that, to support that he suffers from diabetes. Many people do. ***And there's no question that people suffer from diabetes don't go out and commit crimes. There's no correlation with that, that I'm aware of.*** But it's part of his life. O.R. Vol. VIII at 1191 (emphasis added).

Even before Mr. Lyman made these regrettable remarks at closing, the district attorney had already closed in on the unreasonableness of Mr. Lyman's choice not to present expert testimony as to the import of this medical evidence:

> It's for you to resolve under the facts and the circumstances of the case. And what have you been told? ***You've been told that he's a diabetic, you've been told that he has children. Common sense tell you, and life experience tells you, that does not make him much different than a lot of people in those arenas.*** And you can use common sense and you can use your life experiences when you go back there. O.R. Vol. VIII at 1177 (emphasis added).

The reasons provided by Mr. Lyman for not presenting an expert witness with respect to the Petitioner's diabetes were unreasonable. The decision had the opposite of Mr. Lyman's intended effect, an outcome that a practitioner exercising reasonable judgment should have identified prior to trial. At the evidentiary hearing, Mr. Lyman attempted to explain his decision, noting that some of the lay witnesses presented testimony regarding the effects of Petitioner's diabetes. (Dkt. # 141 at 76-77). However, Mr. Lyman subsequently admitted the OCCA had previously held, in this case, that laymen were not adequate witnesses to testify on these medical issues. (Id.) It was unreasonable for Mr. Lyman not to heed OCCA's guidance against that approach.

Mr. Lyman's approach with respect to presenting expert witness testimony on the impact of Petitioner's alcohol intake repeats much of his faulty reasoning discussed above. Mr. Lyman was

concerned that the jury would view Petitioner's use of alcohol the night of the murder as an excuse, and he wanted to present a "no excuse" defense. (Dkt. #141 at 73). Instead, as with the evidence of Petitioner's diabetes, Mr. Lyman allowed evidence of Petitioner's alcohol usage on the night of the murder into the record and then provided no explanation as to why that evidence was important. (Id. at 73-75). This strategy, as discussed above, was unreasonable as it merely provided the jurors with facts without telling them why such facts were medically significant.

With respect to both Petitioner's alcohol usage on the night in question and Petitioner's frontal lobe injury, Mr. Lyman testified that he did not want to put on the expert witnesses because he worried such testimony would introduce "bad facts and circumstances surrounding" the Petitioner. (Dkt. # 141 at 74, 88). However, he conceded that the bad facts the experts might mention were not facts he was capable of otherwise excluding and in fact had already been admitted into evidence by the prosecution. (Dkt. # 141 at 74). Indeed, Mr. Lyman testified he did not want to "highlight" factors already raised by the state. (Id. at 98). Making a bad decision worse, Mr. Lyman actually admitted evidence that compounded the negative effect of the excluded expert witness testimony by introducing medical records documenting that Petitioner had recovered fully from his frontal lobe injury by stating that Petitioner's neurological examination was "normal." (Dkt. # 142 at 170). Dr. Jones explained that without expert testimony, such records did not present an accurate picture, as the term "normal" merely encompassed Petitioner's physical functioning[14] and bore no relation to possible long-term psychological effects, such as those investigated by Dr. Jones. (Id. at 169-175). For all these reasons, Mr. Lyman unreasonably calculated the risk of the jury

---

[14]     Dr. Jones interpreted the examination as an indication that Petitioner was "grossly intact and would be able to return to work within two months" under Social Security disability definitions. (Dkt. #142 at 171).

potentially hearing bad evidence for a second time versus the benefit of the jury receiving expert testimony explaining Petitioner's significantly diminished decision-making capacity the night of the murder.  See, e.g., Wiggins v. Smith, 539 U.S. 510, 535-36 (2003) ("Counsel told the sentencing jury '[y]ou're going to hear that Kevin Wiggins has had a difficult life,' but never followed up on this suggestion.") (citation omitted); McNair v. Campbell, 307 F. Supp. 2d 1277, 1315 (M.D. Ala. 2004), aff'd in part, rev'd in part, 416 F.3d 1291 (11th Cir. 2005) ("While it may have been reasonable for counsel to decide not to introduce evidence of drug abuse at sentencing, this court cannot find it reasonable for counsel to introduce 'bad' facts of McNair's drug use, without the explanation upon which mitigation would be premised.").

Compounding Mr. Lyman's unreasonable risk-versus-benefit analysis was a fundamental misunderstanding of Dr. Jones's testimony that precluded Mr. Lyman from making a reasonable choice.  As highlighted above, Dr. Jones's testimony would have been very helpful in establishing that Petitioner had a diminished capacity for making decisions the night of the murder.  However, Mr. Lyman fundamentally misunderstood Dr. Jones's opinion; tragically Mr. Lyman misinterpreted Dr. Jones's explanation of the word "disinhibition."  (Id. at 89).  Dr. Jones used the word "disinhibition" to describe Petitioner's decision-making abilities on the night in question.  Mr. Lyman mistakenly believed the word "disinhibition" as used by Dr. Jones meant that Petitioner "just didn't give a damn."  (Id.).  In reality, Dr. Jones intended to convey that Petitioner lacked inhibition, or the ability to slow down and consider the consequences of his actions prior to acting.  (Dkt. # 142 at 176, 177, 201-205).  This was a fundamental and damaging misunderstanding of critically relevant evidence.  Also inexplicable is counsel's fear that, by presenting evidence showing Petitioner had been shot in the head while passively sitting on his front porch, the jury

might conclude that the Petitioner was a violent person, as opposed to a victim.  (Dkt. # 141 at 99).  This concern was unreasonable, as  Mr. Lyman admitted he could have presented evidence that Petitioner had been a victim in the incident.  (Id.).  Simply put, Mr. Lyman's unreasonable strategic decision gained Petitioner nothing and cost the Petitioner gravely.  As a result the jury heard no expert testimony shedding light on Petitioner's diminished capacity.  And in the absence of that mitigation evidence, the State successfully cast Petitioner as someone not "much different than a lot of people in those arenas."  O.R. Vol. VIII at 1177.

Lastly, Respondent argues that the Magistrate Judge did not give sufficient deference to Mr. Lyman's decision to exclude the expert witnesses due to concerns about introducing evidence regarding Petitioner's Anti-Social Personality Disorder ("ASPD").  (Dkt. # 163 at 17-27).  However, Respondent's brief contains no reference to the record establishing that Mr. Lyman's decision was specifically based on concerns about introducing evidence of Petitioner's ASPD.  (Id.).  Moreover, in its review of Mr. Lyman's examination, this court found no testimony that Mr. Lyman chose to exclude the expert witnesses because of concerns about potential ASPD evidence.  (Dkt. # 141 at 1-158).  Thus, Respondent appears to be imputing to Mr. Lyman a concern about potential ASPD evidence in light of counsel's stated decision to present a "no excuse" defense.  Nonetheless, the Magistrate Judge considered any potential impact of the ASPD testimony in assessing the reasonableness of Mr. Lyman's decision and concluded that it was unreasonable for Mr. Lyman to have excluded the expert testimony.  Respondent contends the ASPD evidence would have precluded a reasonable attorney from presenting the expert testimony because such evidence would have provided support for Respondent's arguments that (1) Petitioner was a dangerous criminal, (2) that Petitioner would pose a continuing threat to society, and (3) that Petitioner possessed poor

68

decision making skills, including a lack of empathy for others and a diminished conscience.  (Dkt. # 163 at 17-27).  As discussed below, Respondent's arguments reflect a misunderstanding of the burdens of persuasion at issue here.

At the resentencing trial, three aggravating factors were at issue:  (1) that Petitioner had previously been convicted of a violent felony, (2) that the murder was committed to avoid further prosecution, and (3) that defendant would continue to be a threat to society.  O.R. Vol. VI at 1128. Once one of these aggravating factors had been found, the death penalty could not be imposed unless the jury also unanimously found that the aggravating factors outweighed the mitigating circumstances.  O.R. Vol. VI at 1137.  As Petitioner had previously been convicted of an armed robbery where he threatened the victim with death, counsel could have had no reasonable doubt that the jury would find the first aggravating factor.  Once that aggravating factor was established, Petitioner became eligible for the death penalty.  Thus, the heart of the Petitioner's defense was his mitigation case.  A reasonable practitioner should have recognized that robust mitigation evidence was Petitioner's only meaningful defense.

Respondent's argues expert testimony would have resulted in the jury perceiving Petitioner as having a lack of empathy for others and a diminished conscience.  But, as the Magistrate Judge noted, any concern about exposing the jury to testimony regarding Petitioner's ASPD "simply cannot outweigh the benefits of utilizing" the expert testimony.  (Dkt. # 159 at 68).  Dr. Jones could have put Petitioner's ASPD in context by explaining that the combination of Petitioner's alcohol consumption, uncontrolled diabetes, and frontal lobe injury exacerbated Petitioner's already diminished capacity and that each added factor had a negative  multiplicative impact on Petitioner's ability to control his behavior and anticipate consequences.  (Dkt. # 142 at 179-182, 191, 203, 214).

69

Indeed, co-counsel Dr. LaFortune, who had significantly more experience than Mr. Lyman in presenting mental health expert testimony, opined that the potentially damaging effects of Petitioner's ASPD could be dealt with by having an expert deconstruct the diagnosis for the jury. (Dkt. # 142 at 327).  Dr. LaFortune observed that Mr. Lyman, like many lawyers, did not appreciate "the importance of mental health testimony."  (Id. at 346).  This undoubtably was the case. Mr. Lyman failed to appreciate that putting Petitioner's behavior into context was imperative to an adequate defense to the death penalty.  Mr. Lyman's judgment to the contrary was unreasonable.

Based on all of the factors discussed above, the court concurs with the Magistrate Judge's conclusion that Mr. Lyman's decisions to omit all expert testimony and further evidence of Petitioner's alcohol consumption were objectively unreasonable and were not "sound trial strategy." See Mayfield v. Woodford, 270 F.3d 915, 927 (9th Cir. 2001) (citing Strickland, 466 U.S. at 689). Despite the deference properly afforded to strategic decisions, this is the rare case in which the record shows trial counsel's strategic decisions to have been objectively unreasonable. Respondent's objection is without merit.

### 3.  Tenth Circuit precedent

In the next category of objections, Respondent argues that the Report fails to follow Tenth Circuit precedent.  Respondent attempts to distinguish a case cited by the Magistrate Judge, Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) (finding ineffective assistance of counsel in failing to present mitigating evidence), and argues that the facts of this case are more aligned with DeLozier v. State, 531 F.3d 1306 (10th Cir. 2008) (finding no deficient performance by counsel when evidence of ASPD and risk of future violence was omitted).  Respondent also cites Duvall v. Reynolds, 139 F.3d 768, 782 (10th Cir. 1998) (finding counsel's decision regarding mitigating

evidence reasonable because "[t]he jury could have perceived such evidence as aggravating rather than mitigating"); <u>Davis v. Executive Dir. Dep't Corr.</u>, 100 F.3d 750, 763 (10th Cir. 1996) (rejecting ineffective assistance of counsel claim because "the jury might have reacted negatively" to evidence of the petitioner's alcoholism); <u>Sallahdin v. Mullin</u>, 380 F.3d 1242, 1250-51 (10th Cir. 2004) (recognizing that jury could have viewed petitioner's steroid use as aggravating, rather than mitigating); <u>Wackerly v. Workman</u>, 580 F.3d 1171, 1178-79 (10th Cir. 2009) (rejecting ineffective assistance claim based on possibility that mitigating evidence could be considered "double-edged").

The Report reflects careful consideration of trial counsel's concern that the potential testimony of Dr. Jones and Dr. Bratcher could be used by the State to support the aggravating circumstance of continuing threat. In fact, as discussed above, the Magistrate Judge concluded that those concerns did not disqualify Mr. Lyman's decision from being categorized as strategic. Certainly, the Tenth Circuit case law cited by Respondent reflects that an attorney should consider whether expert testimony could be used to support aggravating circumstances and that a decision to omit potentially damaging evidence may be considered effective assistance. However, in <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), a decision issued approximately six months before Petitioner's resentencing trial, the Supreme Court emphasized that expert testimony or evidence serving to explain the defendant's actions should be introduced if it "might well have influenced the jury's appraisal of his moral culpability." <u>Id.</u> at 398. The evidence at issue in <u>Williams</u> demonstrated that the petitioner's violent behavior "was a compulsive reaction rather than the product of cold-blooded premeditation." <u>Id.</u> In this case, without the expert testimony, Petitioner's jury was left with an incomplete explanation for Petitioner's actions. The expert testimony and evidence of alcohol consumption may not have overcome, undermined, or rebutted the State's

71

evidence supporting the aggravating circumstances. However, because the omitted evidence would have explained the interplay between Petitioner's alcohol consumption and his physical and mental conditions attributable to his diabetes and frontal lobe injury, it might well have influenced the jury's appraisal of Petitioner's moral culpability. In other words, the testimony might well have demonstrated to the jury that Petitioner's firing of the gun was a compulsive reaction attributable to a lack of impulse control rather than the product of cold-blooded premeditation. The expert testimony and other evidence serving to explain Petitioner's actions should have been introduced.

Although this Court is mindful that mental health evidence can serve as a "double-edged sword" during the sentencing stage of a capital case, the particular facts of this case warrant a disposition consistent with <u>Williams</u>, 529 U.S. at 395-97 (holding that trial counsel provided ineffective assistance in failing to introduce evidence that might have influenced jury's appraisal of defendant's moral culpability). Respondent's objection to the Report as contrary to Tenth Circuit precedent is overruled.

### 4. The Magistrate Judge's findings of fact

Next, Respondent alleges that the Magistrate Judge made erroneous factual findings. The court identifies nine challenges within this objection, as follows: (1) the Report incorrectly states that Mr. Lyman was unfamiliar with the mitigation case, (2) the Report incorrectly characterizes Mr. Lyman's testimony regarding the strength of the intoxication evidence, (3) the Report "appears to suggest" that Mr. Lyman did not provide sufficient information to Dr. Jones regarding Petitioner's level of intoxication, (4) the Report mischaracterizes Dr. Jones' testimony regarding Petitioner's lack of impulse control, (5) the Report incorrectly concludes that Petitioner's ASPD could be a result of his alcohol dependence and brain damage, (6) the Report incorrectly states that Dr. Jones "did not

question Dr. Bratcher's ability" to render an opinion regarding the potential effects of Petitioner's diabetes on his behavior on the night of the murder, (7) the statement that "it is likely that some evidence of the impact of Mr. Fitzgerald's diabetes on his brain function that evening could be presented were Dr. Jones and Dr. Bratcher able to consult with one another and review all of the evidence," has absolutely no support in the record, (8) the Report improperly credits or relies on Dr. LaFortune's testimony, and (9) the Report incorrectly summarizes Dr. Jones' testimony regarding ASPD. (Dkt. # 163 at 30-36). Respondent argues that the Magistrate Judge's conclusions concerning the adequacy of Mr. Lyman's decisions were influenced by these "unreasonable factual findings." (Id. at 30). To evaluate Respondent's claim, the court conducted a de novo review of the record, including reading the transcript of the evidentiary hearing. See Gee v. Estes, 829 F.2d 1005, 1008-1009 (10th Cir. 1987). For the reasons discussed below, the court finds that Respondent's objections to the findings of fact contained in the Report are without merit. In addition, Respondent's objections fail to raise any new issues of law or fact that alter the validity of the Report's conclusions.

In challenges one, two, and three, Respondent focuses on several of the Magistrate Judge's characterizations of Mr. Lyman's testimony and Mr. Lyman's consultation with Dr. Jones. In challenge one, Respondent claims that the Report inconsistently states that "Petitioner has failed to demonstrate that Mr. Lyman was unaware of the witnesses and information available for use in developing a mitigation defense," (Dkt. # 159 at 53), and then later states that "Mr. Lyman may not have been as familiar with the mitigation case being built for petitioner's second trial as he could, or should, have been," id. at 57. The first statement contributed to the Magistrate's Judge's finding that Mr. Lyman's investigation was adequate. The second statement referred directly to

Mr. Lyman's demonstrated misunderstanding of the medical facts and opinions contained in Dr. Jones' report. The fact that Mr. Lyman was aware of the witnesses and available information is not inconsistent with the fact that Mr. Lyman did not fully understand the medical facts and opinions contained in Dr. Jones' report. Upon careful reading of the Report, the court finds no inconsistency in the two statements.

As to challenge two, Respondent alleges that the Magistrate Judge incorrectly characterized Mr. Lyman's testimony regarding the strength of the intoxication evidence. (Dkt. # 163 at 31). In support of this claim, Respondent cites to the Report as stating that "Mr. Lyman testified that he believed the evidence was sufficient to establish that petitioner was intoxicated." (Id.). At the evidentiary hearing, Mr. Lyman testified that the evidence was sufficient "if [the jury] believed that it was Mr. Fitzgerald that [Ms. Ashley]" saw at the convenience store on East Admiral at the time of the shooting. (Dkt. # 141 at 67:16-23). The Magistrate Judge's characterization of the testimony was accurate.

Respondent alleges in challenge three that the Magistrate Judge improperly suggested that Mr. Lyman did not provide "sufficient information" to Dr. Jones regarding Petitioner's potential intoxication. (Dkt. # 163 at 32). In the Report, the Magistrate Judge states that Dr. Jones "was only marginally aware of petitioner's alcohol use on the night of the murder." (Dkt. # 159 at 62). The Magistrate Judge's statement simply reflects acknowledgment of the alcohol consumption evidence available to all parties. Neither the exact number of drinks nor their alcohol content was known. As a result, Dr. Jones testified that "if I could have had a more clear estimate of how intoxicated he was, that would certainly allow me to be more clear and precise in my conclusion." (Dkt. # 142 at 185:20-22). Thus, Dr. Jones based his opinion on all of the evidence available to him and no new

evidence regarding Petitioner's alcohol consumption was presented at the evidentiary hearing that was not available at the time of Petitioner's resentencing trial. Nothing in the record supports Respondent's statement that the Magistrate Judge intended to suggest that Mr. Lyman did not provide Dr. Jones with sufficient information. This court concludes that the purported "erroneous" factual findings regarding Mr. Lyman raised in the first three challenges are taken out of context or simply not inconsistent or erroneous.

In challenges four, five, and nine, Respondent focuses on several of the Magistrate Judge's characterizations of Dr. Jones' testimony. In challenge four, Respondent alleges that the Magistrate Judge mischaracterizes Dr. Jones' testimony regarding Petitioner's lack of impulse control. (Dkt. # 163 at 32). Respondent cites to the section of the Report summarizing Dr. Jones' testimony where the Magistrate Judge wrote that "Dr. Jones testified that . . . Petitioner [would] have more difficulty with impulse control in making an initial decision . . . ." (Dkt. # 159 at 27). In support of this challenge, Respondent accurately quotes Dr. Jones' testimony at the evidentiary hearing. (Dkt. # 163 at 32). In response to questions from the Magistrate Judge, Dr. Jones testified that "it is not so much the initial decision to eat the candy bar, but once the compromise is in place, that's when it gets worse. It's the second candy bar." (Dkt. # 142 at 201:6-9). In other words, Dr. Jones testified that, in Petitioner's case, the results of an initial poor decision can be multiplied by the compromised frontal lobe injury. While the Magistrate Judge may have misstated that Petitioner would have more difficulty with impulse control in making an initial decision, the misstatement does not impact the conclusion that trial counsel provided ineffective assistance in failing to present the expert testimony.

In challenge five, Respondent alleges that the Magistrate Judge "incorrectly concluded" that ASPD could be the result of Petitioner's alcohol dependence and brain injury.  (Dkt. # 163 at 33).  Respondent's challenge is misplaced.  The Magistrate Judge wrote that "Dr. Jones testified that anti-social personality disorder could be a result of petitioner's Axis I problems -- alcohol dependence and cognitive disorder."  (Dkt. # 159 at 28).  That statement accurately reflects the following testimony of Dr. Jones:  "Q:  Can the personality disorders come from -- can the personality disorder in Axis II be as a result of the problems identified in Axis I? A:  Yes."  (Dkt. # 142 at 209:11-14).  In objecting to the statement as erroneous, Respondent cites to and quotes much of the same testimony relied on by the Magistrate Judge in his Report.  Respondent's characterization of the statement as an incorrect conclusion fails to acknowledge the Magistrate Judge's complete summary of the testimony of Dr. Jones.  (Dkt. # 159 at 28-32).  After reviewing all of Dr. Jones' testimony, the court agrees with the Magistrate Judge's findings of fact contained in the Report.

In challenge nine, Respondent claims that the Magistrate Judge incorrectly found that "Dr. Jones would have attributed [P]etitioner's actions to his personality disorder only if no other factors were at issue."  (Dkt. # 163 at 36 (quoting Dkt. # 159 at 68)).  Respondent has taken the challenged statement out of context.  In the Report, the Magistrate Judge concluded that,

> Mr. Lyman's concerns about the testimony regarding petitioner's diagnosis of anti-social personality disorder simply cannot outweigh the benefits of utilizing Dr. Jones's testimony. This fact is particularly true because Dr. Jones specifically stated that if petitioner was intoxicated or otherwise compromised at the time of the murder, he would have opined that petitioner was impaired by the gunshot wound. Dr. Jones would have attributed petitioner's actions to his personality disorder only if no other factors were at issue.

(Dkt. # 159 at 68).  The Magistrate Judge's statements are supported by the following testimony of Dr. Jones at the evidentiary hearing:

76

| The Court: | . . . Dr. Jones, in terms of the discussion we had about events that create a multiplying effect, given your evaluation of Mr. Fitzgerald and assuming there was no intoxication and no acute diabetic event, would the decision to pick up a gun and go rob a convenience store be one of those multiplying events, or would that just be something that would still fit within sort of his normal behavior? |
|---|---|
| Witness: | Were he not intoxicated, were there not to be any disruption from the diabetes, then I would conceptualize this as a product of his antisocial personality disorder and the brain injury would be a nonfactor. |

(Dkt. #142 at 293:13–294:1).  Respondent claims that Dr. Jones' testimony was that "he would attribute Petitioner's behavior *solely* to ASPD if Petitioner's frontal lobe damage was not exacerbated by alcohol or diabetes."  (Dkt. # 163 at 36 (emphasis in original)).  The distinction urged by Respondent is without substantive effect.  While the Magistrate Judge did not specifically mention the brain injury in the sentence challenged by Respondent, it is clear that throughout the Report the Magistrate Judge fully appreciated the potential effect of the compromising factors of alcohol and diabetes on Petitioner's frontal lobe damage.  This court concludes that the purported factual mischaracterizations regarding Dr. Jones' testimony, as discussed above, are without merit.

In challenges six and seven, Respondent focuses on several of the Magistrate Judge's characterizations of testimony regarding Petitioner's diabetes.  Respondent claims that, in the "Findings of Fact" section of the Report, the Magistrate Judge incorrectly stated that "although Dr. Jones did not have enough information to render an opinion regarding the potential effects of Petitioner's diabetes on his behavior on the night of the murder, 'he did not question Dr. Bratcher's ability to do so.'"  (Dkt. # 163 at 33 (quoting Dkt. # 159 at 30)).  According to Respondent, the Magistrate Judge "unreasonably implied that Dr. Bratcher would have been able to render a credible opinion."  (Dkt. # 163 at 34).  This Court disagrees with Respondent's interpretation of the Report.

77

Later, in the "Conclusions of Law" section of the Report, the Magistrate Judge specifically stated that Dr. Jones "advised either Mr. Lyman or Dr. LaFortune that an endocrinologist, such as Dr. Bratcher, would be better able to opine on the impact of alcohol and diabetes on Petitioner's metabolism, and that he could rely on her report to supplement his conclusions." (Dkt. # 159 at 62). The Magistrate Judge did not ignore the extent of Dr. Bratcher's information or the lack of evidence regarding Petitioner's blood sugar level in reaching any of his conclusions.  This objection is without merit.

Respondent also challenges the Magistrate Judge's statement that "it is likely that some evidence of the impact of Mr. Fitzgerald's diabetes on his brain function that evening could be presented were Dr. Jones and Dr. Bratcher able to consult with one another and review all of the evidence."  (Dkt. # 163 at 34 (quoting Dkt. # 159 at 68 n.27)).  Respondent misinterprets the meaning of the footnote.  Based on review of the testimony at the evidentiary hearing, the court finds that had either Dr. Bratcher or Dr. Jones, in reliance on Dr. Bratcher's report, testified at the resentencing trial, evidence of Petitioner's diabetes and its potential impact on Petitioner's behavior on the night of the robberies and murder would have been presented to the jury.  That finding is reflected in the footnote cited by Respondent.  This objection is without merit.

In challenge eight, Respondent argues that the Magistrate Judge improperly credited Dr. LaFortune's testimony regarding the experts.  (Dkt. # 163 at 35).  Respondent questions Dr. LaFortune's belief that Dr. Bratcher and Dr. Jones could have put Petitioner's antisocial behaviors "in context."  (Id.).  Respondent argues that Dr. Bratcher was nonessential, insofar as her testimony would merely have indicated "Petitioner had unspecified behaviors which indicated a rebellion against diabetes."  (Id.)  After reviewing the transcripts from the evidentiary hearing, the

court finds this objection falls short.  As the record indicates, Dr. Bratcher was prepared to provide

an analysis of Petitioner's medical history, how his diabetes affected his development as a person,

and how his diabetes and gunshot wound affected his judgment the night of the murder.  (Dkt. # 25

at 98-100; Dkt. # 141 at 65:5-66:16).  This objection is without merit.

In summary, the court conducted a de novo review of the nine challenges raised in

Respondent's objection to the Magistrate Judge's findings of fact.  Based on the foregoing, the court

finds that Respondent's objections fail to raise any new issue of law or fact that alter the validity of

the Report's conclusions.

### 5.  Prejudice resulting from Mr. Lyman's deficient performance

As the last objection to the Report, Respondent contends that Petitioner has failed to show

a reasonable probability that the outcome of his resentencing trial would have been different if

Mr. Lyman had presented the testimony of Ms. Stockfleth, Ms. Ashley, Dr. Bratcher, and Dr. Jones.

(Dkt. # 163 at 36-37).  Respondent argues that the "mitigating" evidence omitted by Mr. Lyman

would have strengthened the State's case in aggravation and weakened Petitioner's case in

mitigation and that, as a result, Petitioner cannot satisfy the prejudice prong of the Strickland

standard.

The evidence supporting the aggravating circumstances found by the resentencing jury (i.e.,

that Petitioner was previously convicted of a felony involving the use or threat of violence to the

person, and that there was a probability Petitioner would commit criminal acts of violence that

would constitute a continuing threat to society) was strong.  However, because Mr. Lyman decided

not to present expert testimony to explain why Petitioner committed the acts resulting in the murder,

the jury was left to conclude that Petitioner was simply a calculating, violent man.

Because a death sentence requires a unanimous vote from the jury, if "there is a reasonable probability that one juror" would have chosen a life sentence, Petitioner has established prejudice. Wiggins, 539 U.S. at 537; Wilson v. Sirmons, 536 F.3d 1064, 1095 (10th Cir. 2008).   As the Magistrate Judge observed, Petitioner's resentencing jury "had no understanding of the interplay of petitioner's diabetes diagnosis, his lack of family support from a young age, his frontal lobe damage, and the impact his intoxication had on his brain function." (Dkt. # 159 at 69).   Had the jury heard evidence demonstrating that Petitioner's conduct was the result of mental and physical injuries and was beyond his control, there is a reasonable probability that one juror would have voted for life imprisonment rather than the death penalty.   Respondent's objection based on the prejudice prong of Strickland is without merit.

Having determined that the parties' objections to the Report lack merit, the Court shall accept the Report. Petitioner received ineffective assistance of counsel at his resentencing trial. Furthermore, because the omitted issue of ineffective assistance of trial counsel is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission directly establishes deficient performance by appellate counsel.   Furthermore, the court is convinced that the result of Petitioner's appeal would have been different had  the claim of ineffective assistance of trial counsel been developed and presented on appeal.   Therefore, Petitioner is entitled to a new sentencing trial.   Habeas corpus relief shall be conditionally granted on Ground 7.

## VIII.   Trial court's admission of prejudicial and inflammatory evidence during resentencing trial (Ground 8)

Petitioner claims he was denied a fundamentally fair resentencing trial because the trial court admitted the first stage evidence from his May 1996 trial in violation of his Eighth and Fourteenth

Amendment rights.  Specifically, Petitioner argues that the following evidence was improperly admitted:  (1) the surveillance and crime scene videotapes and photographs; (2) ballistics and firearms testimony and evidence; (3) autopsy and crime scene photographs, diagrams, and protocol; and (4) the medical examiner's testimony.[15]  Petitioner contends the disputed evidence was irrelevant to resentencing issues and that it was more prejudicial than probative under Okla. Stat. tit. 12, § 2403 (1991).  Respondent contends the admission of the challenged evidence did not render Petitioner's trial so fundamentally unfair as to deprive him of due process of law.

In Petitioner's second direct appeal, the OCCA denied this claim of error.  Fitzgerald II, 61 P.3d at 905.  The state appellate court ruled that the evidence of which Petitioner complains was properly admitted under Okla. Stat. tit. 21, § 701.10a, governing the admissibility of evidence when a capital case is remanded for a new sentencing trial.  Id. at 905 and n.18.  Section 701.10a(4) provides in pertinent part:  "All exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing proceeding[.]" As explained by the OCCA, "[t]his statute requires that all properly admitted evidence from the original trial be admitted at the resentencing trial, but preserves a defendant's ability to challenge that underlying (and therefore ongoing) admissibility."   Fitzgerald II,  61 P.3d at 905 (citing Humphreys v. State, 947 P.2d 565, 573 (Okla. Crim. App. 1997)).  The OCCA rejected Petitioner's

---

[15]     In his petition, Petitioner mentions that he objected to the introduction of the following evidence at trial: a letter written by Petitioner regarding the assault rifle; a receipt from the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF); transcripts of Petitioner's statements to law enforcement; judgments and sentences for the robbery convictions; testimony about how Petitioner got the assault rifle; testimony about the night of the murder and Petitioner's arrest. (Dkt. # 24 at 176).  However, the petition contains no argument as to how introduction of this evidence rendered his trial fundamentally unfair.  Consequently, to the extent Petitioner seeks relief with respect to the introduction of this evidence, it is denied.

argument that the admission of evidence at resentencing is limited to evidence bearing directly on punishment and denied Petitioner's claim of error because he did not argue how the challenged evidence was improperly admitted in his original trial.[16] Id.

Habeas review is not available to correct state law evidentiary errors. Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999) (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (habeas review is limited to violations of constitutional rights)).  This court is concerned only with the possible infringement of federal constitutional rights.  Accordingly, the court will review the trial court's evidentiary rulings only insofar as Petitioner's federal constitutional rights may have been impacted.  Considerable deference must be given to state court evidentiary rulings, and the court may not provide habeas relief unless those rulings "rendered the trial so fundamentally unfair that a denial of constitutional rights results."  Duckett v. Mullin, 306 F.3d 982, 999 (10th Cir. 2002) (quoting Mayes v. Gibson, 210 F.3d 1284, 1293 (10th Cir. 2000)).  The fundamental fairness analysis is approached "with 'considerable self-restraint.'"  Smallwood, 191 F.3d at 1275 (quoting Jackson v. Shanks, 143 F.3d 1313, 1322 (10th Cir. 1998)).   The fundamental fairness inquiry requires the court to look at the effect of the disputed evidence within the context of the entire second stage and consider its relevance, the strength of the aggravating evidence as compared to the mitigating evidence, and decide where the disputed evidence's admission could have given the prosecution an unfair advantage.  Spears v. Mullin, 343 F.3d 1215, 1226 (10th Cir. 2003).

---

[16]     Petitioner relied on Howell v. State, 967 P.2d 1221 (Okla. Crim. App. 1998) to support this proposition on direct appeal and relies upon it again in these proceedings. The OCCA rejected this holding from Howell and noted that "Howell is not binding precedent as the opinion only received a majority of votes for the result from this Court.  Moreover, we find Howell's language — limiting the admission of evidence in a capital resentencing trial to issues relating to punishment — to be inconsistent with 21 O.S.2001, § 701.10a and its interpretation in Humphreys v. State."  Fitzgerald II, 61 P.3d at 905.

As explained above, the OCCA held that the challenged evidence was properly admitted under Oklahoma law.  Moreover, the challenged evidence was probative of the aggravating circumstances alleged.   At Petitioner's resentencing trial, the State alleged the following aggravators:  (1) Fitzgerald had been previously convicted of a felony involving the threat or use of violence to the person; (2) the existence of a probability he would commit criminal acts of violence that would constitute a continuing threat to society; and (3) the defendant committed the murder to avoid lawful arrest or prosecution.  See Fitzgerald II, 61 P.3d at 903 n.3.

In order to establish the continuing threat aggravator, the State was required to establish the following:

First, that the defendant's behavior has demonstrated a threat to society; and

Second, a probability that this threat will continue to exist in the future.

OUJI CR 2d 4-74.  This aggravator focuses on the defendant's propensity towards violence.  See James v. Gibson, 211 F.3d 543, 559 (10th Cir. 2000).  Under Oklahoma law, proof of the continuing threat aggravating factor is based on "the circumstances surrounding the murder for which the defendant has just been convicted and his prior criminal conduct."  Moore v. Reynolds,  153 F.3d 1086, 1111 (10th Cir. 1998) (quoting Douglas v. State, 951 P.2d 651, 675 (Okla. Crim. App. 1997)); see also James, 211 F.3d at 559 ("The most compelling evidence supporting continuing threat can come from the facts surrounding the murder itself.").  In Jurek v. Texas, 428 U.S. 262, 271 (1976), the Supreme Court upheld an aggravating circumstance nearly identical to Oklahoma's continuing threat aggravating circumstance.  The Court quoted with approval the Texas Court of Criminal Appeals, as follows:

In determining the likelihood that the defendant would be a continuing threat to society, the jury could consider whether the defendant had a significant criminal

record. It could consider the range and severity of his prior criminal conduct. It could further look to the age of the defendant and whether or not at the time of the commission of the offense he was acting under duress or under the domination of another.

Jurek, 428 U.S. at 272-73.

In this case, the probative value of the surveillance tapes and crime scene videotape outweighed any prejudicial effect. Obviously, the surveillance tape of the attempted robbery and murder of William Russell (State Tr. Ex. 52) is probative of the continuing threat aggravating circumstance in that it shows the exact circumstances and nature of the murder at issue. Moreover, this tape was relevant to the alleged aggravating circumstance of "murder to avoid arrest." The video tapes of the two armed robberies committed by Petitioner on the same night as the murder (State Tr. Exs. 1 and 76) are probative of the continuing threat aggravating circumstance as the tapes show other criminal conduct of Petitioner. Likewise the crime scene videotape prepared and narrated by Tulsa Police Detective Roy Heim (State Tr. Ex. 53) was probative of the continuing threat aggravating circumstance. The videotape was prepared shortly after the police arrived on the scene and before any evidence was collected. With the narration by Detective Heim, the videotape demonstrated how the murder occurred and showed the direct path of the fatal bullet. At several points, the videotape shows the victim laying in a pool of blood on the floor of the store. This tape, though prejudicial, was probative insofar as it served to educate the jury as to the circumstances of the murder.

Petitioner claims that the music playing in the background during this tape was prejudicial. He characterizes the music as "loud punk music" and argues that the two songs playing in the background contain lyrics concerning the commission of acts of violence. The background music is barely audible and as noted by the trial court, the lyrics are nearly indiscernible. See Tr. II Vol.

IV at 725.  The music obviously came from the store's radio.  There is little likelihood that the background music would prejudice the jury.

Similarly, the testimony of the medical examiner, the autopsy and crime scene photographs, the autopsy diagrams, and  protocol were probative of the continuing threat aggravator as they explain and show the circumstances of Mr. Russell's murder.  The photographs, diagrams, and protocol corroborate the medical examiners' testimony.

The ballistics and firearm evidence, of which Petitioner complains, was relevant to establish Petitioner's propensity for violence in support of the continuing threat aggravator.  This evidence came in the form of firearms, ammunition, and spent shell casings utilized during testimony.  Petitioner did not kill Mr. Russell with a hunting rifle.  Rather, Petitioner purchased and used an SKS assault rifle.  See State Tr. Ex. EE at 674-76, 678; Ex. GG at 850-51.

Petitioner argues that Spears v. Mullin, 343 F.3d 1215 (10th Cir. 2003), supports his position that the admission of the challenged evidence rendered his resentencing proceedings fundamentally unfair.  However, the challenged evidence admitted in the present case is easily distinguished from the challenged evidence admitted in Spears.  In Spears, the Tenth Circuit held that the admission of graphic crime scene photographs depicting the victim's post-mortem stab wounds and otherwise mutilated body rendered Spear's second stage trial fundamentally unfair.   Id. at 1226-28.  Specifically, the court determined that the photographs at issue were not relevant to the alleged aggravating circumstances and potentially misled the jury.  Id. at 1227-28.  In addition, the Spears court stated,

> Even if the photographs were minimally relevant to the heinous, atrocious, or cruel aggravator, the photographs' prejudicial effect outweighed their probative value. Important to this conclusion is the fact that the State waited until the second stage to introduce the photographs. By contrast, the State introduced comparatively

85

> innocuous photographs at the first stage, seeming to deliberately await the second stage to present the more gruesome photographs solely for their shock value.

Id. at 1228.  The court found that the evidence supporting the aggravating circumstances was not particularly strong when compared to the mitigating evidence and ultimately held, "[t]his highly inflammatory evidence fatally infected the trial and deprived Spears and Powell of their constitutional rights to a fundamentally fair sentencing proceeding."  Id. at 1229.  In contrast, here, the disputed evidence is relevant to alleged aggravators, as explained above.  The disputed evidence is not of a particularly inflammatory or gruesome nature.  Moreover, the evidence supporting the alleged aggravators in this instance is particularly strong.

This Court does not find the OCCA ruling contrary to or an unreasonable application of Supreme Court precedent.[17]  Given the probative nature of the challenged evidence and the wealth of additional evidence supporting the aggravating circumstances found by the jury, the admission of the challenged evidence was not so unduly prejudicial as to render the proceedings against Petitioner fundamentally unfair.  See Duckett, 306 F.3d at 999.  Consequently, Petitioner is not entitled to relief on this ground.

## IX.  Denial of right to present mitigating evidence rebutting the "continuing threat" aggravating circumstance (Ground 9)

Petitioner claims he was denied the right to present mitigating evidence and evidence that would have rebutted the "continuing threat" aggravating circumstance.  Petitioner specifically claims that the trial court erred by not permitting (1) the jury to see him in his wheelchair, and (2) Dr. Mark

---

[17]   Petitioner argues that because the OCCA did not make a specific finding regarding whether any of the challenged evidence denied Petitioner a fair trial, this Court's review should be de novo.  To the contrary, a state appellate court does not have to cite or even be aware of the applicable federal law, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8 (2002).

Cunningham to testify regarding his risk assessment of prison society.  Respondent argues that the

OCCA's rejection of this claim was not an unreasonable application of Supreme Court precedent.

Petitioner raised this issue in his second direct appeal.  The OCCA rejected Petitioner's claim

of error and found that the trial court properly excluded the above evidence.  Fitzgerald II,  61 P.3d

at 903-05.

The Supreme Court has determined that a jury may not be precluded from considering any

"constitutionally relevant mitigating evidence."  Buchanan v. Angelone, 522 U.S. 269, 276 (1998)

(citing, inter alia, Penry v. Lynaugh, 492 U.S. 302, 317-18 (1989)).  The Supreme Court has

described such evidence as "any aspect of a defendant's character or record and any of the

circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

Eddings v. Oklahoma, 455 U.S. 104, 110 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604

(1978)).  "Consideration of mitigating factors allows a jury to make an individualized sentencing

determination based upon the defendant's specific life experiences and characteristics."  Hawkins

v. Mullin, 291 F.3d 658, 680 (10th Cir. 2002).  "However, the state may shape and structure the

jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any

relevant mitigating evidence."  Buchanan, 522 U.S. at 276 (citing Johnson v. Texas, 509 U.S. 350,

362 (1993); Penry, 492 U.S. at 326; Franklin v. Lynaugh, 487 U.S. 164, 181 (1988)).

With respect to Petitioner's claim that he was denied the opportunity to present evidence

rebutting the "continuing threat" aggravator, "a defendant must have a meaningful opportunity to

deny or explain the State's evidence used to procure a death sentence."  Duvall v. Reynolds,  139

F.3d 768, 797 (10th Cir. 1998) (citing Gardner v. Florida, 430 U.S. 349, 362 (1977)).  However, as

discussed above, habeas review is not available to correct state law evidentiary errors.  Smallwood

v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999) (citing Estelle v. McGuire, 502 U.S. 62, 67-68

(1991) (habeas review is limited to violations of constitutional rights)).  Accordingly, the court will

review the trial court's evidentiary rulings only insofar as Petitioner's federal constitutional rights

may have been impacted, and the court may not provide habeas relief unless those rulings "rendered

the trial so fundamentally unfair that a denial of constitutional rights results."  Duckett, 306 F.3d at

999.

### A.  The wheelchair

The OCCA rejected Fitzgerald's claim that the jury should have been permitted to see him

in his wheelchair and found as follows:

> After his original trial but before resentencing, Fitzgerald's leg was severely
> broken in an incident with Tulsa County Deputies. Fitzgerald was left with limited
> mobility and must now use a wheelchair or other device to ambulate. He is, however,
> able to sit in a chair and walk short distances without aid. Based upon this evidence,
> the trial court ordered that Fitzgerald be seated in a normal chair during trial, and
> prohibited him from sitting in his wheelchair, because it was "not medically
> necessary." Fitzgerald argues that this was error because it prohibited him from
> introducing evidence regarding his limited mobility, which was relevant in
> mitigation and to rebut the "continuing threat" aggravating circumstance. However,
> the trial court's ruling did not prohibit the jury from hearing evidence offered by
> Fitzgerald regarding his medical condition and diminished ability to move about.

> The jury viewed the videotape of the leg fracture, received evidence that
> Fitzgerald could not bear weight on it and needed an assistive device for ambulation,
> was instructed that Fitzgerald had limited mobility as a result of his broken leg, and
> was well informed of those limitations. The trial court did not prohibit any evidence
> regarding any of his medical conditions from being presented to the jury. Thus, we
> cannot say that the trial court's order prohibiting Fitzgerald from sitting in the
> wheelchair in the courtroom was error. This argument is denied.

Fitzgerald II,  61 P.3d at 903-04.

It was not unreasonable for the OCCA to determine that the trial court's order prohibiting

Petitioner from sitting in the wheelchair in the courtroom was not error.  The trial court's order did

not prohibit Petitioner from introducing evidence that he was required to utilize a wheelchair, nor as indicated by the OCCA, did the trial court prohibit Petitioner from introducing evidence of his leg break or his resulting mobility problems.   The trial court's order simply did not prohibit Petitioner from introducing any constitutionally relevant mitigating evidence or any evidence which might rebut the "continuing threat" aggravator, and as a result, did not render Petitioner's resentencing trial fundamentally unfair.

### B.  Dr. Mark Cunningham

Likewise, the OCCA rejected Fitzgerald's claim of error with regard to Dr. Cunningham's proposed testimony and found as follows:

> At the State's request, the trial court prohibited Fitzgerald from calling Dr. Cunningham to testify. Fitzgerald had filed an Offer of Proof of the Proposed Testimony of Dr. Mark Cunningham, stating that Cunningham would testify regarding "violence risk assessment." The Offer of Proof laboriously detailed why Cunningham was an expert, what violence risk assessment was, how it is performed, and why it is the best way to determine an inmate's level of risk. As the Offer of Proof did not discuss Fitzgerald or his level of risk, the trial court ordered Fitzgerald to produce that additional information. Fitzgerald then filed a Response to the State's Motion in Limine Regarding Testimony of Dr. Mark Cunningham which reiterated the highlights of the Offer of Proof and argued that Dr. Cunningham's testimony was admissible, but failed to offer any additional information over his particularized risk assessment. The trial court then granted the State's motion to prohibit Dr. Cunningham from testifying.

> This Court had originally reversed and remanded Fitzgerald's sentence for resentencing-in part, because he was prohibited from presenting expert testimony to rebut the "continuing threat" aggravating circumstance and discuss his future dangerousness.  In that opinion, this Court discussed the necessity and importance of hiring such an expert. In response, Fitzgerald "contacted," possibly hired Dr. Cunningham to conduct a risk assessment for him, and perhaps even retained Dr. Cunningham to serve as a witness for the defense. However, nothing in either the Offer of Proof or Response indicates that Cunningham performed risk assessment on Fitzgerald or how he would testify regarding such an assessment. Thus, the trial court correctly prohibited Dr. Cunningham from testifying and this Proposition is denied.

Fitzgerald II, 61 P.3d at 904-05 (footnotes omitted) (citing Hooker v. State, 887 P.2d 1351, 1367 (Okla. Crim. App. 1994)).

Petitioner argues that the OCCA's reliance on Hooker was in error. Petitioner claims that Hooker stands for the proposition that a defendant is not entitled to an instruction that "society" was limited to prison society. (Dkt. #24 at 189). This Court cannot second-guess the state court's ruling on state law issues. See Smallwood, 191 F.3d at 1275. However, it should be noted that, contrary to Petitioner's argument, the state appellate court in Hooker upheld a trial court's decision to prevent a defense expert from testifying where the expert's opinions were not based on individual assessment of the subjects of her opinion. See Hooker, 887 P.2d at 1367 ("The witness' theoretical conclusions are not relevant to Hooker's character or the circumstances of this particular crime."). Similarly, here, the OCCA found that while Petitioner sought to use an expert to present risk assessment evidence, "nothing in either the Offer of Proof or Response indicates that Cunningham performed risk assessment on Fitzgerald or how he would testify regarding such an assessment. Thus, the trial court correctly prohibited Dr. Cunningham from testifying." Fitzgerald II, 61 P.3d at 905.

Petitioner's reliance upon Skipper v. South Carolina, 476 U.S. 1 (1986) is misplaced. In Skipper, the trial court excluded testimony of jailers and a regular visitor regarding the defendant's good behavior during the time he spent in jail awaiting trial. Upon review, the Court held that the exclusion of the evidence deprived the petitioner of his right to present all relevant mitigating evidence. Id. at 4-5. The Court found that "the jury could have drawn favorable inferences from this testimony regarding petitioner's character and his probable future conduct if sentenced to life in prison" and that "such inferences would be 'mitigating' in the sense that they might serve 'as a

basis for a sentence less than death.'" (Id. (quoting Lockett, 438 U.S. at 604)).  Unlike the excluded

testimony in Skipper, which was relevant individualized evidence of the known prior behavior and

history of the defendant, the proffered testimony of Dr. Cunningham in the present case consisted

of theoretical, generalized conclusions on "how he employed group statistical data in conducting an

assessment of an inmate's adjustment to prison, such as Petitioner."  (Dkt. # 24 at 189).

Petitioner does not challenge the fact that Dr. Cunningham's risk assessment testimony was

not individualized to Petitioner.  (Dkt. # 24 at 189-90).  Tellingly, Petitioner has not pointed to a

single decision where any court has permitted such generalized testimony in mitigation or to rebut

evidence of future dangerousness.  In fact, courts have rejected theoretical, generalized testimony

offered in mitigation or to rebut evidence of future dangerousness. See, e.g., United States v. Edelin,

180 F. Supp. 2d 73, 74-76 (D.D.C. 2001) ("The proffered testimony . . . has no relation to the

specific charges against [the defendant], his character, or any other proper mitigation factor, would

provide no basis for the jury to impose a sentence less than death, and is therefore inadmissible as

mitigation evidence."); United States v. Johnson, 223 F.3d 665, 675 (7th Cir. 2000) (finding that

evidence that maximum security federal prisons with control units would be sufficient to control

defendant's dangerous propensities was not an appropriate mitigating factor; mitigating factors are

limited to factors specific to the defendant, not those against the death penalty in general); United

States v. Thomas,  2006 WL 140558, at *24 (D. Md. 2006) (unpublished)[18] (holding that to be

reliable, a risk assessment methodology must incorporate an individualized and complete assessment

of the defendant).  In Edelin, the defendant intended to call (the same) Dr. Mark Cunningham to

---

[18]     This and other unpublished opinions are cited herein for persuasive value.  See 10th Cir. R.
         32.1(A).

provide testimony about generalized risk assessment by the Bureau of Prisons, statistical incidence of violent acts within the Bureau of Prisons' system, and confinement classifications and security levels in the Bureau of Prisons.   Edelin, 180 F. Supp. 2d at 74.   The trial court granted the government's motion to preclude the defendant from introducing any expert testimony about the Bureau of Prisons' ability to prevent defendant Edelin from committing any future criminal acts. Id. at 75.   The trial court reasoned that in contrast to Skipper, the proffered testimony "has no relation to the specific charges against [the defendant], his character, or any other proper mitigation factor, would provide no basis for the jury to impose a sentence less than death, and is therefore inadmissible as mitigation evidence."   Edelin, 180 F. Supp. 2d at 76.

It was not unreasonable for the OCCA to determine that the trial court did not err in prohibiting Dr. Cunningham from testifying.   The generalized theoretical opinion of Dr. Cunningham regarding the defendant's probable favorable adjustment to prison if his life was spared is not relevant to "any aspect of [Fitzgerald's] character or record" nor evidence of "the circumstances of the offense."   See Lockett, 438 U.S. at 604.   Nor was it relevant to rebut evidence that Petitioner individually posed a continuing threat to society.   The trial court's order did not render Petitioner's resentencing trial fundamentally unfair.   Habeas corpus relief on Ground 9 is denied.

## X.     Victim impact evidence (Ground 10)

Petitioner argues that the introduction of victim impact evidence at his resentencing trial rendered his death sentence unconstitutional in violation of the Sixth, Eighth, and Fourteenth Amendments.   Petitioner argues that victim impact evidence serves as an unconstitutional "superaggravator" and that the victim's father, mother, and sister were permitted to inject improper

and prejudicially irrelevant victim impact testimony into the proceedings.  Respondent contends that the OCCA's determination that the victim impact testimony was proper is not contrary to or an unreasonable application of Supreme Court precedent.

Petitioner argues that the victim's father, mother, and sister were permitted to inject improper and prejudicially irrelevant victim impact testimony into the proceedings.  Glen Russell, the victim's father, testified that in order to escape the reality of his son's death, he accrued large credit card bills which eventually led to bankruptcy.  Tr. II Vol. VII at 978.  He also testified that he lost his job due to his deep depression, was place on Prozac, and suffered sleeplessness and ulcers.  Id. at 979.  Janet Russell, the victim's sister, stated that her brother's murder caused her to become very withdrawn which in turn affected her work performance.  Id. at 984-85.  The victim's mother, Grace Russell, testified that her son was a pleasant, loving young man who was engaged to be married, and planned to move to Brazil.  Id. at 987-88.  As a result of his murder, Mrs. Russell withdrew from her family and developed physical illnesses, such as heart and stomach pains, whenever she would see a Git-N-Go Store.  Id. at 989.  Petitioner also complains that the prosecution asked Mrs. Russell an open-ended question as to whether there was anything else she would like to tell the jury as to how her son's murder has affected her, to which she responded, "Well, probably a lot of things but I don't think I'm able to say them here in court."  Id. at 990.

The OCCA denied relief on this claim noting that the "superaggravator" argument has been rejected and that "the victim impact evidence in this case was properly limited to the financial, emotional, psychological and physical effects of the victim's murder on his mother, father and sister."  Fitzgerald II,  61 P.3d at 905.

In 1992, Oklahoma enacted legislation permitting victim impact evidence.  See Okla. Stat. tit. 21, § 701.10(c) (1992),[19] and Okla. Stat tit. 22, §§ 984, 984.1 (1992).[20]  If a state chooses to allow the admission of victim impact evidence, the Eighth Amendment erects no per se bar.  The established Supreme Court precedent involving victim impact statements is set forth in Payne v. Tennessee, 501 U.S. 808 (1991).  Hain v. Gibson, 287 F.3d 1224, 1238 (10th Cir. 2002).  The Supreme Court in Payne held that "the only constitutional limitation on such evidence is if it 'is so unduly prejudicial that it renders the trial fundamentally unfair.'  In such an event, the Court indicated, 'the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.'" Id. (quoting Payne, 501 U.S. at 825).  The prohibition against the victim's family giving their "characterizations and opinions about the crime, the defendant, and the appropriate sentence" remains in place.  Id. at 1238-39 (quoting Booth v. Maryland, 482 U.S. 496, 502 (1987), overruled in part by Payne, 501 U.S. at 825); see also Dodd v. Trammell, --- F.3d ---, 2013 WL 5124331, *20 (10th Cir. 2013).  The Supreme Court in Payne specifically outlined why victim impact evidence was relevant to a capital jury's sentencing decision:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the

---

[19]    Section 701.10 (c) of Title 21 provides, "[i]n the sentencing proceeding, . . . the state may introduce evidence about the victim and about the impact of the murder on the family of the victim."

[20]    Section 984 of Title 22, in effect at the time of Fitzgerald's crime and trial, defines "victim impact statements" as "information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence." Per section 984.1, copies of the victim impact statements are to be made available to the parties.

> defendant. The State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.

Hain, 287 F.3d at 1238 n.10 (quoting Payne, 501 U.S. at 825) (citations omitted) (internal quotation marks omitted).

The victim impact evidence introduced at Fitzgerald's trial was not "'so unduly prejudicial that it render[ed] the trial fundamentally unfair.'"  See Hain, 287 F.3d at 1238 (quoting Payne, 501 U.S. at 825).  The victim's family described the victim as an individual and each family member told of the specific harm and unique loss they suffered emotionally, physically, or financially as a result of the murder.  See id. at n.10.  The victim's family's statements were not lengthy or overly emotional – the testimony was limited to descriptions of the victim and the impact of the murder on the victim's family.  See Payne, 501 U.S. at 827.  The OCCA's determination was not an unreasonable application of Payne.  Habeas relief on Ground 10 is denied.

## XI.    Constitutionality of "continuing threat" aggravator (Ground 11)

Petitioner asserts that the continuing threat aggravator is unconstitutionally vague and overbroad.  The OCCA denied relief on this claim in Petitioner's second direct appeal.  The OCCA noted that it has previously upheld the constitutionality of the "continuing threat" aggravator and declined to revisit the issue.  Fitzgerald II, 61 P.3d at 905-06 (citing Walker v. State, 887 P.2d 301, 320 (Okla. Crim. App. 1994)).

Similarly, Tenth Circuit precedent forecloses Petitioner's facial challenge to Oklahoma's continuing threat aggravator as unconstitutional.  Sallahdin v. Gibson, 275 F.3d 1211, 1232 (10th Cir. 2002); see also Medlock v. Ward, 200 F.3d 1314, 1319 (10th Cir. 2000) (noting that the Tenth

Circuit has repeatedly upheld the facial constitutionality of the continuing threat aggravator as narrowed by the State of Oklahoma); Nguyen v. Reynolds, 131 F.3d 1340, 1353-54 (10th Cir. 1997) (citing Tuilaepa v. California, 512 U.S. 967, 972 (1994)) ("Because the continuing threat factor is neither unconstitutionally vague nor applicable to every defendant convicted of murder in the first degree, it is properly used during both the eligibility decision and the selection decision."). Petitioner does not make any argument which compels or permits this Court to disregard the binding precedent.  Accordingly, habeas relief must be denied on this issue.

Petitioner also states in the title to his Ground 11 claim that the "continuing threat" aggravating circumstance was unconstitutional as applied at his resentencing trial.  He provides no argument in his brief to allow the Court to analyze the claim.  The Court therefore denies his "as applied" claim on the merits.

## XII.   "Prior violent felony" and "continuing threat" aggravators (Ground 12)

Petitioner contends his constitutional rights were violated because the same past criminal conduct (his prior convictions for armed robbery and burglary)  was used by the State to support both the "continuing threat" aggravator and the "prior conviction of violent felonies" aggravator. Petitioner claims that the "continuing threat" aggravator and the "prior conviction of violent felonies" aggravator are duplicative and skewed the weighing process, resulting in an arbitrary sentence of death in violation of the Eighth and Fourteenth Amendments.   In disposing of Petitioner's second direct appeal, the OCCA rejected this argument:

> In Proposition VI, Fitzgerald claims that his constitutional rights were violated because the State was allowed to use his former violent felony convictions to support both the "prior violent felony" and "continuing threat" aggravating circumstances. This claim has previously been addressed and rejected by this Court because the evidence of prior convictions to support these two aggravating circumstances does

96

not "show the same aspect of appellant or his crime." The same is true here and this Proposition is denied.

Fitzgerald II,  61 P.3d at 906 (footnote omitted).

Notably, Petitioner acknowledges that the Supreme Court has not addressed this issue. Instead, he relies primarily on a case from the Tenth Circuit, United States v. McCullah, 76 F.3d 1087 (10th Cir. 1996).  In McCullah, the court held that "double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally."  Id. at 1111. Such precedent does not, however, stand for the proposition that any time evidence supports more than one aggravating circumstance, the weighing process is unconstitutionally skewed.

The Tenth Circuit has repeatedly held that McCullah does not prohibit the use of the same evidence in support of more than one aggravator.  See Medlock v. Ward, 200 F.3d 1314, 1319 (10th Cir. 2000); Trice v. Ward, 196 F.3d 1151, 1173-74 (10th Cir. 1999); Cooks v. Ward, 165 F.3d 1283, 1289 (10th Cir. 1998).  "The test we apply is not whether certain evidence is relevant to both aggravators, but rather, whether one aggravating circumstance 'necessarily subsumes' the other." Cooks, 165 F.3d at 1289 (quoting McCullah, 76 F.3d at 1111).

As previously stated, the AEDPA requires the application of Supreme Court precedent in determining whether the state court proceeding violated clearly established federal law.  See 28 U.S.C. § 2254(d)(1).  Because there is no Supreme Court precedent regarding duplicative aggravating circumstances, this Court denies habeas relief on this basis.  However, even assuming arguendo that the AEDPA standards allow Petitioner to rely on McCullah as a basis for federal habeas relief, it is apparent the jury in Petitioner's case did not "double count" aggravating factors and that neither aggravating factor at issue here "necessarily subsume[d]" the other. See Cooks, 165

F.3d at 1289.  The aggravating factors at issue focused on different aspects of Petitioner's conduct. The "prior conviction of a violent felony" aggravator focused solely on Petitioner's past criminally violent behavior.  See id.  In contrast, the "continuing threat" aggravator focused on future conduct and whether Petitioner was likely to engage in violent criminal behavior in the future and whether he would be a threat to society as a result.  See id.  Although this factor was undoubtedly based in part on Petitioner's previous crimes, it arguably focused on different aspects of those crimes than did the "prior violent felony" factor (e.g., whether any aspects of Petitioner's prior crimes suggested that he was likely to engage in future violent behavior).  Moreover, the continuing threat aggravator was based on other facts as well, including the circumstances of the murder, evidence of Petitioner's planned escape from prison, State Tr. Ex. II,  JJ, and evidence that Petitioner planned at some point to rob an armored car in Pennsylvania, Tr. II. Vol. VI at 838.

Because the OCCA's rejection of this issue was not an unreasonable application of clearly established federal law, Petitioner is not entitled to habeas corpus relief on this claim.

**XIII.**   **Failure to instruct jury that aggravating circumstances must outweigh the mitigating circumstances beyond a reasonable doubt (Ground 13)**

Petitioner alleges that Oklahoma's sentencing scheme for death penalty cases violates the Sixth, Eighth, and Fourteenth Amendments.  Petitioner's particular complaint is that the jury in his case was not required to find beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances.  In support of his claim, Petitioner cites Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002).

Respondent contends that Ground 13 is procedurally barred, claiming that the OCCA in Petitioner's second post-conviction proceeding declined to address the substance of this claim due to Petitioner's failure to present the claim on direct appeal.  However, rather than consider the

procedural posture of this claim, the court finds the claim can be more easily and succinctly denied on the merits.  Romero v. Furlong, 215 F.3d 1107, 1111 (10th Cir. 2000).  In Matthews v. Workman, 577 F.3d 1175 (10th Cir. 2009), an Oklahoma capital habeas petitioner, relying on both Apprendi and Ring, argued that his jury should have been instructed to find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.  Without this determination, Matthews argued his death sentence was invalid.  Relying on its decision in United States v. Barrett, 496 F.3d 1079, 1107 (10th Cir. 2007), the Tenth Circuit found no merit to the claim.  In particular, the court found that the jury's weighing of the factors in aggravation and mitigation "is not a finding of fact subject to Apprendi but a 'highly subjective, largely moral judgment regarding the punishment that a particular person deserves.'"  Matthews, 577 F.3d at 1195 (quoting Barrett, 496 F.3d at 1107).  In accordance with Matthews, Fitzgerald's Ground 13 claim is denied.

## XIV.   Cumulative errors in both stages (Ground 14)

In Ground 14, Petitioner claims that he is entitled to relief based on cumulative error.  The court has determined in Ground 6 above, that Petitioner is not entitled to relief on the ground of cumulative error as to the guilt or innocence stage of trial.  Because the court has determined that Petitioner is entitled to a new sentencing trial based on his Ground 7 claim of ineffective assistance of trial and appellate counsel, the court need not analyze Petitioner's claim of cumulative error during his resentencing trial.

## CERTIFICATE OF APPEALABILITY

Rule 11, Rules Governing Section 2254 Cases in the United States District Courts, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  The Court recognizes that "[r]eview of a death sentence is among the

most serious examinations any court of law ever undertakes." Brecheen v. Reynolds. 41 F.3d 1343, 1370 (10th Cir. 1994).  To be granted a certificate of appealability, however, Petitioner must demonstrate a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists of reason or that the questions deserve further proceedings.  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). "Obviously the petitioner need not show that he should prevail on the merits. He has already failed in that endeavor." Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983) (citations omitted).

The court has determined that Petitioner received ineffective assistance of counsel at his resentencing trial.  For that reason, the Petition for Writ of Habeas Corpus is conditionally granted as to Ground 7.  However, the court has denied relief as to the grounds of error affecting the guilt or innocence stage of Petitioner's trial (Grounds 1-6).  The court recognizes that some of Petitioner's stated issues relate to the alleged deprivation of one of his constitutional rights, which, if substantiated, could entitle him to habeas relief.  In order to ensure that these issues receive the type of review on appeal which should be accorded such serious matters, the court has carefully considered each issue and finds that the following issue could be debated among jurists or could be resolved differently by another court:

> Ground 2:   Petitioner was denied the basic tools to present a defense to malice aforethought murder by the denial of expert assistance guaranteed by Ake v. Oklahoma and his conviction violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Additionally, this court finds that this issue is adequate to deserve encouragement to proceed further. See Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citing Barefoot, 463 U.S. at 893).

**ACCORDINGLY IT IS HEREBY ORDERED** that:

1.     The Report and Recommendation (Dkt. # 159) is **accepted** and the court overrules the objections (Dkt. ## 163, 164) thereto.

2.     The petition for writ of habeas corpus (Dkt. # 24) is **conditionally granted** in part and **denied** in part, as follows:

   a.     The petition is **conditionally granted** as to Ground 7.  The writ of habeas corpus shall issue unless the State of Oklahoma commences resentencing proceedings in Tulsa County District Court, Case No CF-1994-3451, within 180 days of the entry of this Opinion and Order.

   b.     The remaining grounds for relief raised in the petition for writ of habeas corpus are **denied**.

3.     A certificate of appealability is granted as to the claim enumerated herein.

4.     A separate judgment shall be entered in this matter.

   **DATED** this 7th day of October, 2013.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

101